IN THE

# United States Court of Appeals
# for the Federal Circuit

---

BYD (H.K.) Co., Ltd.,

*Plaintiff-Appellant*,

v.

UNITED STATES,

*Defendant-Appellee*.

---

Appeal from the United States Court of International Trade in
Case No. 1:23-CV-00221, Judge M. Miller Baker

---

**NONCONFIDENTIAL OPENING BRIEF FOR
PLAINTIFF-APPELLANT BYD (H.K.) Co., Ltd.**

---

Craig A. Lewis
Nicholas W. Laneville

HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Tel.: (202) 637-6634
Fax: (202) 637-5910

*Counsel to Plaintiff-Appellant BYD
(H.K.) Co., Ltd.*

October 15, 2025

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 25-1937 |
| **Short Case Caption** | BYD (H.K.) Co., Ltd. v. US |
| **Filing Party/Entity** | BYD (H.K.) Co., Ltd. |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/15/2025

Signature: /s/ Craig A. Lewis

Name: Craig A. Lewis

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| BYD (H.K.) Co., Ltd. | | BYD Company Limited |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐  None/Not Applicable           ☐  Additional pages attached

| | | |
|---|---|---|
| Gregory M.A. Hawkins (Hogan Lovells US LLP) | | |
| | | |
| | | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐  Yes (file separate notice; see below)    ☑  No    ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑  None/Not Applicable           ☐  Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

I, Nicholas W. Laneville, have entered an appearance as counsel to BYD (H.K.) Co., Ltd. in this proceeding and certify that I have authority to file this document.

/s/ Nicholas W. Laneville
Nicholas W. Laneville
October 15, 2025

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS.............................................................................i

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF RELATED CASES ....................................................x

JURISDICTIONAL STATEMENT .........................................................1

STATEMENT OF THE ISSUES..............................................................2

STATEMENT OF THE CASE...................................................................3

STATEMENT OF THE FACTS ...............................................................4

SUMMARY OF THE ARGUMENT .....................................................13

ARGUMENT ........................................................................................16

    I.      STANDARD OF REVIEW ............................................16

    II.    THE CIT COMMITTED REVERSIBLE ERROR BY FAILING TO REMAND COMMERCE'S DETERMINATION AFTER PROPERLY FINDING THAT THE AGENCY UNLAWFULLY IGNORED THE CAMBODIAN TOLLERS' OPERATIONS ......................................19

        A.    Commerce Committed Legal Error in Excluding the Toll Processors' Data from Its Analysis...........................................19

        B.    Commerce's Failure to Properly Consider the Toll Processors' Cambodian Activities Warranted a Remand ...........................22

    III.   Commerce's Interpretation of "Minor or Insignificant" under § 1677j(b)(1)(C) Was Not In Accordance with Law .............................27

        A.    Processing That Represents Over 30 Percent of Total Cost and Involves the Most Complex and Significant Steps in the Entire Processing Chain is Not Minor or Insignificant ......................29

B.      The Legislative History and Broader Statutory Construction Conflict with Commerce's Interpretation of "Minor or Insignificant"...........................................................................31

IV.     Commerce's Analysis and Balancing of the "Minor or Insignificant" Factors Was Not in Accordance with Law and was unsupported By Substantial Evidence ..........................................................................35

A.      Commerce Impermissibly Placed "Preeminent" Weight on Research and Development (§ 1677j(b)(2)(B))........................38

B.      Commerce Ignored Congress' Instruction and the Statute's Plain Meaning in Evaluating the Value Added Through the Cambodian Processing (§ 1677j(b)(2)(E)) ...............................44

1.      Commerce's Value-Added Analysis was Faulty.....................44

2.      Commerce's Value-Added Finding is Inconsistent with the Plain Meaning of the Statute ..............................................................47

C.      Commerce's Analysis of the "Investment" Prong was Unlawful (§ 1677j(b)(2)(A))......................................................................49

V.      COMMERCE'S USE OF SURROGATE VALUES IN ANALYZING THE PROPORTIONAL VALUE OF CHINESE INPUTS WAS NOT IN ACCORDANCE WITH LAW AND WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE...........................................................53

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ..............................60

## CONFIDENTIAL MATERIAL

The confidential material included in pages 8, 44, 48, 54, and 58 consists of business proprietary information submitted to, or released by, the U.S. Department of Commerce under administrative protective order, **Appx1-4,** the disclosure of which is protected by statute, 19 U.S.C. § 1677f.

# TABLE OF AUTHORITIES

## Cases

*Al Ghurair Iron & Steel LLC v. United States*,
65 F.4th 1351 (Fed. Cir. 2023) ............................................................. 23, 25, 57

*Allegheny Ludlum Corp. v. United States*,
24 C.I.T. 452,
112 F.Supp.2d 1141 (Ct. Int'l Trade 2000) ......................................................19

*Allied Tube and Conduit Corp. v. United States*,
31 C.I.T. 1090 (Ct. Int'l Trade, 2007) ......................................................... 51, 53

*Atl. Sugar, Ltd. v. United States*,
744 F.2d 1556 (Fed. Cir. 1984) ......................................................................20

*Best Power Tech. Sales Corp. v. Austin*,
984 F.2d 1172 (Fed. Cir. 1993) ......................................................................30

*Burlington Truck Lines, Inc. v. United States*,
371 U.S. 156 (1962) ......................................................................................19

*BYD (H.K.) Co., Ltd. v. United States*,
Ct. No. 23-00221, slip op. 25-60 (Ct. Int'l Trade May 16, 2025) ............... passim

*Ceramark Technology v. United States*,
11 F.Supp.3d 1317 (Ct. Int'l Trade 2014) ......................................................19

*Chevron, U.S.A., Inc. v. NRDC, Inc.*,
467 U.S. 837 (1984) .................................................................................. 17, 28

*Consol. Edison Co. v. N.L.R.B.*,
305 U.S. 197 (1938) ......................................................................................19

*Daewoo Elecs. Co. v. Int'l Union of Electronic Elec., Technical, Salaried & Mach. Workers, AFL-CIO*,
6 F.3d 1511 (Fed. Cir. 1993) ..........................................................................19

*Diamond Sawblades Mfrs. Coalition v. United States*,
612 F.3d 1348 (Fed. Cir. 2010) ......................................................................23

*Downhole Pipe & Equip., L.P. v. United States*,
776 F.3d 1369 (Fed. Cir. 2015) ......................................................................17

*Dunn v. Commodity Futures Trading Com'n,*
   519 U.S. 465 (1997)...................................................................18

*Florida Power & Light Co. v. Lorion,*
   470 U.S. 729 (1985)...................................................................24

*Gallant Ocean (Thailand) Co. v. United States,*
   602 F.3d 1319 (Fed. Cir. 2010) ...............................................19

*Huaiyin Foreign Trade Corp. v. United States,*
   322 F.3d 1369 (Fed. Cir. 2003) ...............................................19

*Intercargo Ins. Co. v. United States,*
   83 F.3d 391 (Fed. Cir. 1996)....................................................23

*Int'l Bus. Machs. Corp. v. United States,*
   201 F.3d 1367 (Fed. Cir. 2000) ...............................................30

*Loper Bright Enterprises et al. v. Raimondo,*
   603 U.S. 369 (2024)........................................................... passim

*MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.,*
   512 U.S. 218 (1994)...................................................................48

*Mittal Steel Point Lisas Ltd. v. United States,*
   548 F.3d 1375 (Fed. Cir. 2008) ...............................................17

*NLRB v. Columbian Enameling & Stamping Co.,*
   306 U.S. 292 (1939)...................................................................19

*Nucor Corporation v. United States,*
   461 F. Supp. 3d 1374 (Ct. Int'l Trade 2020) .........................20

*Pesquera Mares Australes v. United States,*
   266 F.3d 1372 (Fed. Cir. 2001) ...............................18, 30, 48

*Stein Industries Inc. v. United States,*
   365 F. Supp. 3d 1364 (Ct. Int'l Trade 2019) .........................20

*Taniguchi v. Kan Pac. Saipan, Ltd.,*
   566 U.S. 560 (2012)...................................................................48

*Timex V.I., Inc. v. United States,*
  157 F.3d 879 (Fed. Cir. 1998) ............................................18

*United States v. Bricker, et al.,*
  135 F.4th 427 (6th Cir. 2025) ............................................58

*Universal Camera Corp. v. N.L.R.B.,*
  340 U.S. 474 (1951) .........................................................19

**Statutes**

19 U.S.C. § 1516a(2)(B)(vi) .......................................1, 4

19 U.S.C. § 1516a(b)(1)(B)(i) ......................................17

19 U.S.C. § 1671a(c)(4) ................................................34

19 U.S.C. § 1671e .......................................................34

19 U.S.C. § 1673a(c)(4) ................................................34

19 U.S.C. § 1673e .......................................................34

19 U.S.C. § 1677b(f)(1) ..........................................55, 56

19 U.S.C. § 1677f(i)(3)(A) ............................................20

19 U.S.C. § 1677j(b)(3) ...............................................28

19 U.S.C. § 1677j(b)(1) ...............................................28

19 U.S.C. § 1677j(b)(1)(C) ..................................... passim

19 U.S.C. § 1677j(b)(1)(D) ...........................................12

19 U.S.C. § 1677j(b)(2) ....................................... passim

19 U.S.C. § 1677j(b)(2)(A) ................................. 14, 27, 40

19 U.S.C. § 1677j(b)(2)(B) ...........................................39

19 U.S.C. § 1677j(b)(2)(D) ................................. 14, 27, 40

19 U.S.C. § 1677j(b)(2)(E) ............................................................... 44, 47

28 U.S.C. § 1295(a)(5) ............................................................................2

28 U.S.C. § 1581(c) .................................................................................1

**Administrative Materials**

*Anti-Circumvention Inquiry of the Antidumping and Countervailing Duty Order on Certain Pasta from Italy: Affirmative Preliminary Determinations of Circumvention of Antidumping and Countervailing Duty Orders*,
68 Fed. Reg. 46571 (Dep't Commerce Aug. 6, 2003) ........................................46

*Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Scope Determination and Final Affirmative Determinations of Circumvention with Respect to Cambodia, Malaysia, Thailand, and Vietnam*,
88 Fed. Reg. 57419 (Dep't Commerce Aug. 23, 2023) ............................... passim

*Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Affirmative Determinations of Circumvention With Respect to Cambodia, Malaysia, Thailand, and Vietnam*,
87 Fed. Reg. 75221 (Dep't Commerce Dec. 8, 2022) ........................................11

*Certain Aluminum Foil from the People's Republic of China: Preliminary Affirmative Determinations of Circumvention with Respect to the Republic of Korea and the Kingdom of Thailand*,
88 Fed. Reg. 17177 (Dep't Commerce Mar. 22, 2023) ......................................42

*Certain Welded Carbon Steel Standard Pipes and Tubes from India: Preliminary Negative Determinations of Circumvention of the Antidumping Order*,
87 Fed. Reg. 52507 (Dep't Commerce Aug. 26, 2022) ......................................42

*Crystalline Silicon Photovoltaic Cells and Modules from China, Inv. Nos. 701-TA-481 and 731-TA-1190* (Final),
USITC Pub. No. 4360 (Nov. 2012) ......................................................9

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at*

*Less Than Fair Value, and Antidumping Duty Order*,
77 Fed. Reg. 73018 (Dep't Commerce Dec. 7, 2012) ................................. 3, 4, 5

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order,*
77 Fed. Reg. 73017 (Dep't Commerce Dec. 7, 2012) ................................. 3, 4, 5

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Initiation of Circumvention Inquiry on the Antidumping Duty and Countervailing Duty Orders*,
87 Fed. Reg. 19071 (Dep't Commerce Apr. 1, 2022) ...........................................6

*Light-Walled Welded Rectangular Carbon Steel Tubing from Taiwan*,
88 Fed. Reg. 21980 (Dep't Commerce Apr. 12, 2023) ......................................42

Memorandum from James Maeder to Lisa W. Wang, *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Preliminary Decision Memorandum for the Circumvention Inquiry With Respect to the Kingdom of Cambodia,*
Case No. A-570-979 (Circumvention Inquiry, Cambodia–2022) (Dec. 1, 2022)
.................................................................................................................. passim

Memorandum from Jose Rivera to the File, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic from China – Circumvention Inquiry with Respect to Cambodia: Preliminary Analysis Memorandum for BYD (H.K.) Co., Ltd.,*
Case No. A-570-979 (Circumvention Inquiry – Cambodia 2022) (Dec. 1, 2022)
.................................................................................................................. passim

Memorandum from Jose Rivera to the File, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China – Circumvention Inquiry with Respect to Cambodia: Final Analysis Memorandum for BYD (H.K.) Co., Ltd.,*
Case No. A-570-979 (Circumvention Inquiry–Cambodia 2022) (Aug. 17, 2023)
.................................................................................................................. passim

Memorandum from Jose Rivera to The File, *Verification of the Questionnaire Responses of BYD (H.K.) Co., Ltd. in the Circumvention Inquiry of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the*

*People's Republic of China - with Respect to Cambodia*,
Case No. A-570-979 (Circumvention Inquiry – Cambodia–2022) (Mar. 15,
2023) ..................................................................................................................10

*Notice of Scope Rulings*,
86 Fed. Reg. 47476 (Dep't Commerce Aug. 25, 2021)....................................4, 35

*Preliminary Negative Determination of Circumvention of the Antidumping Order
on Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab
Emirates*,
80 Fed. Reg. 26,229 (Dep't Commerce May 7, 2015) ........................................45

**Other Authorities**

*Adjudicating International Trade Cases at the U.S. Commerce Department:
Endless Remand or Balanced Resolve?*,
39 J. Marshall L. Rev. 59, 63-65 (2005)..............................................................24

*Insignificant*, CAMBRIDGE DICTIONARY,
https://dictionary.cambridge.org/us/dictionary/english/insignificant (last visited
October 7, 2025) .................................................................................................31

*Insignificant*, OXFORD ENGLISH DICTIONARY,
https://www.oed.com/dictionary/insignificant_adj?tab=
meaning_and_use#351290 (last visited October 7, 2025)...................................31

*Minor*, CAMBRIDGE DICTIONARY,
https://dictionary.cambridge.org/us/dictionary/english/minor (last visited
October 7, 2025) .................................................................................................31

*Minor*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-
webster.com/dictionary/minor (last visited October 7, 2025) ............................31

Panel Report, *Australia – Anti-Dumping and Countervailing Duty Measures on
Certain Products from China*,
WTO Doc. WT/DS603/R (adopted Apr. 26, 2024)............................................56

*Process*, CAMBRIDGE DICTIONARY,
https://dictionary.cambridge.org/us/dictionary/english/process (last visited
October 7, 2025) .................................................................................................30

*Process*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/process (last visited October 7, 2025)...........................30

*Small*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/small (last visited Oct. 10, 2025) ..................................48

*Small*, The American Heritage Dictionary of the English Language, https://ahdictionary.com/word/search.html?q=small (last accessed Oct. 10, 2025) ....................................................................................................................48

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316 (1994).................................................................... passim

## STATEMENT OF RELATED CASES

No appeal in or from the same proceeding in the lower court was previously before this Court or any other appellate court. No case known to counsel will directly affect or be directly affected by this Court's decision in the pending appeal.

This action challenges the U.S. Department of Commerce's solar products from China circumvention determination with respect to Cambodia.  A separate action before the U.S. Court of Appeals for the Federal Circuit, Ct. Nos. 25-1940, 25-1941 (*Trina Solar Science & Technology (Thailand) Ltd., Canadian Solar International Limited, Canadian Solar Manufacturing (Thailand) Co., Ltd. v. United States*), challenges the U.S. Department of Commerce's solar products from China circumvention determination with respect to Thailand.  While that action arises from a separate factual record with distinct interested parties, that appeal and this appeal do have certain issues in common.  That action could, therefore, indirectly impact this appeal.

# JURISDICTIONAL STATEMENT

Appellant BYD (H.K.) Co, Ltd. ("BYD HK") timely brought this action pursuant to 19 U.S.C. § 1516a(2)(B)(vi) and 28 U.S.C. § 1581(c) challenging the final affirmative circumvention determination of the U.S. Department of Commerce, International Trade Administration ("Commerce" or "the agency"), notice of which was published on August 23, 2023, as *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Scope Determination and Final Affirmative Determinations of Circumvention with Respect to Cambodia, Malaysia, Thailand, and Vietnam*, 88 Fed. Reg. 57419 (Dep't Commerce Aug. 23, 2023), Appx452–466 ("*Final Determination*") and accompanying Memorandum from James Maeder to Lisa Wang, *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Issues and Decision Memorandum for the Circumvention Inquiry With Respect to the Kingdom of Cambodia*, Case Nos. A-570-979/C-570-980 (Circumvention Inquiry, Cambodia 2022) (Aug. 17, 2023), Appx284–451 ("*Final IDM*"); Memorandum from Jose Rivera to the File, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China – Circumvention Inquiry with Respect to Cambodia: Final Analysis Memorandum*

*for BYD (H.K.) Co., Ltd.*, Case No. A-570-979 (Circumvention Inquiry–Cambodia 2022) (Aug. 17, 2023), Appx280–283 ("*BYD HK Final Analysis Mem.*"). The U.S. Court of International Trade ("CIT") affirmed Commerce's determination in *BYD (H.K.) Co., Ltd. v. United States*, Ct. No. 23-00221, slip op. 25-60 (Ct. Int'l Trade May 16, 2025), Appx5–45. BYD HK appealed the CIT's decision to this court on July 16, 2025.

This Court has jurisdiction over BYD's appeal of the CIT's decision under 28 U.S.C. § 1295(a)(5), which grants plaintiffs the right to appeal from the final judgment of the CIT.

## STATEMENT OF THE ISSUES

*Whether* Commerce's refusal to consider the investments and activities of BYD HK's Cambodian toll processors in evaluating the Cambodian processing at issue resulted in a harmless error.

*Whether* Commerce acted in a manner contrary to law by failing to give effect to the governing statute's plain meaning, as set forth at 19 U.S.C. §§ 1677j(b)(1)(C), 1677j(b)(2), when evaluating whether the processes taking place in Cambodia was "minor or insignificant."

*Whether* Commerce's balancing of the § 1677j(b)(2) factors—and the agency's assigning "preeminent" weight to research and development ("R&D"), using a skewed investment comparison, and treating value-added of greater than

one-third as "small,"—was contrary to law and otherwise not supported by substantial evidence.

*Whether* Commerce's use of "surrogate values" as derived under Commerce's non-market economy ("NME") authority for all Chinese inputs (rather than using this actual cost information on the record from BYD HK's cost accounting records) to compute the proportion of the value of the goods exported to the United States that was represented by those Chinese inputs was not supported by substantial evidence and contrary to law.

## STATEMENT OF THE CASE

This case involves an appeal of Commerce's final affirmative circumvention determination in the 2022 circumvention inquiry of *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 77 Fed. Reg. 73018 (Dep't Commerce Dec. 7, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order*, 77 Fed. Reg. 73017 (Dep't Commerce Dec. 7, 2012) (collectively, the "*Solar I Orders*"). *See Final Determination* and accompanying *Final IDM*; *BYD HK Final Analysis Mem.* BYD HK appeals only Commerce's company-specific determination related to BYD HK.

BYD HK sought judicial review by the CIT of the *Final Determination* pursuant to 19 U.S.C. § 1516a(2)(B)(vi). This appeal comes to this Court after the CIT affirmed Commerce's *Final Determination* on May 16, 2025. *BYD (H.K.) Co., Ltd. v. United States*, Ct. No. 23-00221, slip op. 25-60 (Ct. Int'l Trade May 15, 2025), Appx5.

## STATEMENT OF THE FACTS

On December 7, 2012, following affirmative injury determinations issued by the U.S. International Trade Commission ("ITC"), Commerce imposed antidumping duty ("AD") and countervailing duty ("CVD") orders on imports of solar cells and modules from China. *Solar I Orders*. The scope of these orders on Chinese solar cells and modules has been clarified on multiple occasions as excluding any solar cells (or modules containing such cells) where the positive-negative ("p/n") junction was formed outside of China. *See*, *e.g.*, *Notice of Scope Rulings*, 86 Fed. Reg. 47476 (Dep't Commerce Aug. 25, 2021); *Letter from Akin Gump Strauss Hauer & Feld LLP to the Department, Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: NextEra Comments on Auxin's Circumvention Ruling Request*, Case No. A-570-979 (Anti-circumvention Inquiries, Cambodia–2022, Malaysia–2022, Thailand–2022, Vietnam–2022) (May 2, 2022) ("NextEra Comments") at Att. 20, Commerce Memorandum, *Final Scope Ruling on the Antidumping and*

*Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells from the People's Republic of China: ET Solar Inc.* (A-570-979 & C-570-980) (June 15, 2021) at 9, 11-12, Appx3050, 3052-3053. Commerce also indicated in its original *Solar I* investigation that converting Chinese-origin wafers into crystalline silicon photovoltaic ("CSPV") cells in a third country would not warrant a circumvention inquiry, indicating instead that "Petitioner has the option of bringing additional petitions to address any dumping concerns it has regarding solar modules/panels assembled from solar cells produced in a third country." NextEra Comments at Att. 13, Memorandum from Jeff Pedersen to Gary Taverman, *Scope Clarification: Antidumping and Countervailing Duty Investigations of Crystalline Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China*, Case Nos. A-570-979/C-570-980 (Investigations) (Mar. 19, 2012) at 9, Appx2989–2990.

On April 1, 2022, Commerce initiated country-wide circumvention inquiries to determine whether imports of CSPV solar cells and modules completed in Cambodia, Malaysia, Thailand, or Vietnam using parts and components from China were circumventing the *Solar I Orders*. *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Initiation of Circumvention Inquiry on the Antidumping Duty and Countervailing Duty Orders*, 87 Fed. Reg. 19071 (Dep't Commerce Apr. 1, 2022).

Commerce initiated the inquiry following a February 8, 2022, request by Auxin Solar Inc. ("Auxin"), a small domestic CSPV module assembler.

Commerce initiated and conducted this circumvention inquiry notwithstanding strong objections from respondents (maintained throughout the proceeding) that the inquiry contradicted long-established rulings by both Commerce and other agencies concerning the processing of solar cells. In particular, respondents objected that Commerce (and other U.S. government agencies) have consistently found that the formation of a p/n junction on a polysilicon wafer is the critical process that establishes the essential character of a solar cell and module, and the location where the p/n junction is formed therefore establishes the country of origin of the cell and module for various trade and trade remedy purposes. Respondents argued that it would be inherently contradictory and legally impermissible for Commerce to find that the same "critical" processes are also "minor or insignificant" for purposes of the circumvention statute.

On April 22, 2022, BYD HK reported its use of toll manufacturers in Cambodia to produce solar cells and modules and submitted quantity and value data from these unrelated producers for Commerce's assessment in respondent selection. Letter from Hogan Lovells US LLP to the U.S. Department of Commerce, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Response to Quantity and Value*

*Questionnaire*, Case No. A-570-979 (Anti-Circumvention Inquiry, Cambodia – 2022) (Apr. 22, 2022), Appx2670–2683.

On May 12, 2022, Commerce selected BYD HK and New East Solar (Cambodia) Co., Ltd. as "mandatory respondents" subject to individual examination in Commerce's circumvention inquiry. *See* Memorandum from James Maeder to Lisa W. Wang*, Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Preliminary Decision Memorandum for the Circumvention Inquiry With Respect to the Kingdom of Cambodia*, Case No. A-570-979 (Circumvention Inquiry, Cambodia–2022) (Dec. 1, 2022), Appx129–154 ("*Prelim. IDM*") at 2, Appx131. Commerce issued circumvention questionnaires to both selected companies. *Id.*

BYD HK is a trading agent registered in Hong Kong and is fully owned by BYD Company Limited, a manufacturing conglomerate. Memorandum from Jose Rivera to the File, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic from China – Circumvention Inquiry with Respect to Cambodia: Preliminary Analysis Memorandum for BYD (H.K.) Co., Ltd.*, Case No. A-570-979 (Circumvention Inquiry – Cambodia 2022) (Dec. 1, 2022) ("*BYD HK Prelim. Analysis Mem.*") at 3, Appx114–121. During

2019, BYD HK contracted with three unaffiliated toll processors in Cambodia to manufacture solar products. *Id.* at 2, Appx115.

These unaffiliated Cambodian processors made significant investments and operated substantial facilities and manufacturing lines in Cambodia, with a combined capacity of approximately of **[ amount ]**. *Id.* at 4, Appx117. Pursuant to an arrangement with BYD HK, the toll processors would take raw materials, including wafers supplied by BYD HK's affiliated wafer supplier BYD (Shangluo) Industrial Co., Ltd. ("Shangluo BYD"), and transform them first into functioning solar cells, and then into solar modules. *Prelim. IDM* at 14, Appx142. The startup costs for the Cambodian tollers were in excess of $**[ value ]** U.S. Dollars ("USD"). *BYD HK Prelim. Analysis Mem.* at 3, Appx116. Substantial machinery, equipment, and manufacturing facilities were deployed to this end. *Final IDM* at 34–35, Appx317–18.

This Cambodian processing included transforming inert polysilicon wafers into functioning solar cells by creating p/n junctions on the cells—a complex, multi-step process that involved considerable capital investments in specialized plants, using advanced equipment, and skilled labor. *Id.* at 34–36, Appx317–319. These Cambodian solar cells were then further processed into functioning finished solar modules through a further multi-step process that utilized additional machinery, equipment, and inputs. *Id.* Commerce described this processing,

contrasting it with the upstream processing required in earlier stages that was

performed outside of Cambodia to make polysilicon ingots and wafers:

> {R}elative to ingot and wafer production, solar cell and
> module production involves a greater number of stages,
> each requiring a high level of technological sophistication.
> Specifically, the process for turning wafers into solar cells
> requires an expensive, multi-stage assembly line requiring
> high-technological machinery and workers with strong
> technological knowledge.

*Prelim. IDM* at 17, Appx145. The ITC likewise previously found solar cell

production to be the "most capital intensive part of the manufacturing process,"

and "a highly automated, capital intensive, and technologically sophisticated

process, requiring skilled technicians and employees with advanced degrees." *Id.*

(citing *Crystalline Silicon Photovoltaic Cells and Modules from China, Inv. Nos.

701-TA-481 and 731-TA-1190* (Final), USITC Pub. No. 4360 (Nov. 2012), at I-18).

Commerce acknowledged that "{t}he essence of the solar module is realized in

solar cell production." *Final IDM* at 36, Appx319.

BYD HK fully cooperated as a mandatory respondent throughout the course

of the circumvention proceeding. BYD HK timely and completely responded to

Commerce's numerous questionnaires and requests for information issued between

March 2022 and January 2023. BYD supplied Commerce with extensive data and

documentation from the unaffiliated Cambodian toll-processors demonstrating that

they had substantial investments in plants and equipment, conducted complex and

sophisticated processing in Cambodia, and added substantial value to the exported products (accounting for more than a third of the value of the solar modules that BYD exported from Cambodia). *BYD HK Prelim. Analysis Mem.* at 2-3, Appx116-117; *BYD HK Final Analysis Mem.* at 2, Appx281. *See also Final IDM* at 3 – 4, Appx334–335.

Commerce thereafter conducted on-site verification of BYD HK's submissions from February 6 through February 9, 2023. Commerce found no significant discrepancies between BYD HK's reported information and the information presented at verification. Memorandum from Jose Rivera to The File, *Verification of the Questionnaire Responses of BYD (H.K.) Co., Ltd. in the Circumvention Inquiry of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China - with Respect to Cambodia*, Case No. A-570-979 (Circumvention Inquiry – Cambodia–2022) (Mar. 15, 2023), Appx251–379.

Commerce reached preliminary affirmative determinations of circumvention on December 1, 2022, on a country-wide basis and with respect to BYD HK. *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Affirmative Determinations of Circumvention With Respect to Cambodia, Malaysia, Thailand, and Vietnam*, 87 Fed. Reg. 75221 (Dep't

Commerce Dec. 8, 2022) ("*Preliminary Determination*"), Appx240–250. In the

*Preliminary Determination*, Commerce first found broadly that "the production

performed by the respondents in the third country is not minor or insignificant" and

that this "does not weigh in favor of finding circumvention." *Prelim. IDM* at 18,

Appx146. Commerce also found that the value-added contributed by the

production processes in Cambodia accounted for more than a third of the total

value of the finished products. *See BYD HK Prelim. Analysis Mem.* at 4, Appx117.

Commerce nevertheless found that this relatively large value-added figure

"weigh{ed} in favor of finding circumvention." *Id.*

 With respect to all other aspects of the manufacturing activities that were

performed in Cambodia to produce the solar cells and modules, Commerce chose

to disregard the operations of the Cambodian toll-processors and instead

considered only the limited activities undertaken in Cambodia directly by BYD

HK, the Hong Kong-based trading company. Commerce accordingly found (i) that

because BYD HK had made "no investment in Cambodia related to solar cells and

modules" the level of investment in Cambodia weighed in favor of finding

circumvention; (ii) that the amount of R&D by BYD HK in Cambodia was minor

or insignificant; and (iii) that the extent of BYD HK's production facilities in

Cambodia was minor. In each case, Commerce considered only the activities

undertaken by BYD HK in Cambodia and disregarded entirely the substantial

production, investments, and other activities by the tollers actually undertaken in Cambodia to produce the merchandise subject to the inquiry. *See Prelim. IDM* at 13–19, Appx141–47; *see also BYD HK Prelim. Analysis Mem.* at 3–4, Appx116–17. On the basis of these findings, Commerce preliminarily determined that the operations taking place in Cambodia were "minor and insignificant," and that BYD HK was circumventing the *Solar I Orders* by manufacturing solar cells and modules in Cambodia.

Commerce analyzed the relative amount of investment in China and Cambodia. In conducting its analysis, Commerce compared the level of investment in Cambodia and the level of investment of BYD HK's Chinese affiliates on an absolute rather than on a per-megawatt basis. *Final IDM* at 18–19, Appx301–302.

To determine under 19 U.S.C. § 1677j(b)(1)(D) whether the value of the merchandise produced in China was a "small proportion" of the value of the merchandise that was exported to the United States, Commerce chose to apply a NME methodology to value Chinese-produced inputs that were used to produce solar cells and modules in Cambodia. Specifically, Commerce based its calculations on inflated "surrogate values" derived from a third country, rather than the actual lower amounts paid for the inputs. *BYD HK Prelim. Analysis Mem.* at 4, Appx117; *Final IDM* at 44–45, Appx327–328. BYD HK objected that this methodology was inappropriate for an inquiry involving production in a market

economy country and distorted and overstated the significance of the Chinese inputs. *Final IDM* at 44–45, Appx327–328 (citing Brief from Hogan Lovells US LLP to the U.S. Department of Commerce, *2022 Circumvention Inquiry of Antidumping Duty Order on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Second Tranche Case Brief*, Case No. A-570-979 (Anti-circumvention Inquiry. Cambodia–2022) (Mar. 24, 2023), at 17, Appx7537.

On August 23, 2023, Commerce published its Final Determination. Commerce affirmed each of its preliminary findings with respect to the 19 U.S.C. § 1677j(b) factors and continued to find that "BYD HK's process of assembly or completion in Cambodia of the solar modules shipped to the United States {was} minor or insignificant." *Final IDM* at 61, 67, Appx344, 350. Commerce thus found that BYD HK had circumvented the *Solar I Orders* and issued affirmative country-wide and company-specific findings of circumvention with respect to Cambodia and BYD HK.

## SUMMARY OF THE ARGUMENT

BYD HK seeks a reversal of the CIT's Slip Op. 25-60 and a remand to Commerce with respect to the following issues:

1. **Whether the CIT Erred in Failing to Remand Commerce's Determination for Reconsideration After Finding that Commerce**

**Unlawfully Disregarded the Tollers' Activities in Evaluating the Level of Investment and the Extent of Production Facilities.**

Yes. The CIT correctly ruled that Commerce unlawfully disregarded the toll processor's facilities and activities in evaluating the level of investment and extent of production facilities (§§ 1677j(b)(2)(A) and (D)). Rather than remanding the determination for reconsideration by the agency, the court instead improperly speculated that the agency would have reached the same result had it properly considered the toll processors' activities and that Commerce's failure to do so amounted to "harmless error." The CIT's finding that Commerce's error was harmless amounts to an improper re-weighing of the evidence by the Court. The CIT also erred in finding that Commerce's error was harmless. Commerce's failure to consider these entities' operations in its analysis of the § 1677j(b)(2) factors resulted in a harmful error to BYD's detriment.

**2. Whether Commerce Correctly Applied the "Minor or Insignificant" Statutory Standard.**

No. To find circumvention, the statute requires that Commerce find the process of assembly or completion in Cambodia to be "minor or insignificant." Commerce misinterpreted this phrase and elevated the required level of third-country investment, processing, and value-added far beyond what is required by the plain meaning of the statute. Such an interpretation cannot withstand scrutiny

considering the plain meaning of the text, the associated legislative history, and the broader statutory structure.

### 3. Whether Commerce's Analysis and Balancing of the "Minor and Insignificant" Factors Was Supported by Substantial Evidence and Otherwise in Accordance with Law.

No. Commerce made several critical errors in analyzing the factors set forth at § 1677j(b)(2). Commerce impermissibly placed determinative weight on the R&D prong of the statute, disregarded significant value-added in Cambodia, and relied on skewed investment data to make an affirmative circumvention finding. Commerce's analysis was thus both not in accordance with the statute and unsupported by substantial evidence.

### 4. Whether Commerce's Use of Surrogate Values in a Market Economy Case Was Permissible Under the Statute.

No. Commerce has no statutory or factual basis for its departure from BYD HK's actual books and records, which are inherently more accurate than the use of surrogate values. BYD HK reported complete cost information for Chinese inputs that were consumed through the Cambodian manufacturing operations that reflected the actual purchase value of raw materials into the Cambodian market. Commerce's unsupported assertions that the actual purchase values in those books do not "reasonably reflect the costs associated with the production and sale of the merchandise" are factually unsubstantiated and are insufficient to meets Commerce's burden to support its findings with substantial evidence.

**ARGUMENT**

## I.    STANDARD OF REVIEW

The Federal Circuit reviews decisions of the CIT de novo, applying the same standard used by the CIT. *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1373 (Fed. Cir. 2015) (citing *Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1380 (Fed. Cir. 2008)). In appeals of final antidumping duty and countervailing duty determinations, the Court shall hold unlawful and remand any administrative determination by Commerce that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

Commerce's determinations must in all cases be consistent with the governing statute. Following the Supreme Court's decision in *Loper Bright Enterprises et al. v. Raimondo*, 603 U.S. 369 (2024), in which the Court overruled *Chevron, U.S.A., Inc. v. NRDC, Inc*, 467 U.S. 837 (1984), Commerce's interpretations of statutory provisions are not entitled to deference by this Court. Instead, "{c}ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright*, 603 U.S. at 412. In other words, this Court must determine not whether an agency's "reading {is} 'permissible' in such a case," *id.* at 73, as *Chevron* directed, *Chevron*, 467 U.S. at 843, but rather whether the agency's interpretation reflects

16

"the best reading of the statute. . . ." *Loper Bright*, 603 U.S. at 373. In so doing,

"{c}ourts must exercise their independent judgment in deciding whether an agency

has acted within its statutory authority, as the APA requires . . . {and} need not and

under the APA may not defer to an agency interpretation of the law simply because

a statute is ambiguous." *Id.* at 413.

Even before the Supreme Court's decision in *Loper*, no deference was owed

to Commerce when the intent of Congress was judicially ascertainable. *Timex V.I.,*

*Inc. v. United States*, 157 F.3d 879, 881–82 (Fed. Cir. 1998). This requires the

Court to "first carefully investigate the matter to {discern} Congress's purpose and

intent on the question at issue." *Id*. at 881. In determining the plain meaning of

statutory language, the Court is required to employ the traditional tools of statutory

construction (*e.g.*, dictionary definitions, grammatical structure). *See*, *e.g.*,

*Pesquera Mares Australes v. United States*, 266 F.3d 1372, 1382–83 (Fed. Cir.

2001) (relying on the dictionary definition of a key phrase in a statute). If

appropriate, the Court must also consider the legislative history to determine

congressional intent. *Timex*, 157 F.3d at 882 (citing *Dunn v. Commodity Futures*

*Trading Com'n*, 519 U.S. 465 (1997)).

Separately, Commerce's determinations must likewise be supported by

substantial evidence. Substantial evidence is "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Universal*

*Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). It must be "more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established." *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

In making its judgment, the Court "reviews the record as a whole, including any evidence that fairly detracts from the substantiality of the evidence," *Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319, 1323 (Fed. Cir. 2010) (internal quotation marks and citation omitted), and determines "whether the evidence and reasonable inferences from the record support {the agency's} finding." *Daewoo Elecs. Co. v. Int'l Union of Electronic Elec., Technical, Salaried & Mach. Workers*, *AFL-CIO*, 6 F.3d 1511, 1520 (Fed. Cir. 1993) (internal quotation marks and citation omitted). Commerce must provide a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). Commerce's "total failure to consider or discuss record evidence which, on its face, provides significant support for an alternative conclusion renders {a determination} unsupported by substantial evidence." *Ceramark Technology v. United States*, 11 F.Supp.3d 1317, 1323 (Ct. Int'l Trade 2014) (citing *Allegheny Ludlum Corp. v. United States*, 24 C.I.T. 452, 479, 112 F.Supp.2d 1141, 1165 (Ct. Int'l Trade 2000)); *see also Huaiyin Foreign Trade Corp. v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (citing *Atl.*

*Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984))("we determine the existence of substantial evidence by considering the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'").

Commerce is also required by law to include in its final determination "an explanation of the basis for its determination that addresses relevant arguments{ } made by interested parties who are parties to the investigation or review." 19 U.S.C. § 1677f(i)(3)(A). The Court will not sustain Commerce's determination when Commerce failed to address a party's relevant argument." *See Nucor Corporation v. United States*, 461 F. Supp. 3d 1374, 1380 (Ct. Int'l Trade 2020) (*citing Stein Industries Inc. v. United States*, 365 F. Supp. 3d 1364, 1371 (Ct. Int'l Trade 2019)).

## II.    THE CIT COMMITTED REVERSIBLE ERROR BY FAILING TO REMAND COMMERCE'S DETERMINATION AFTER PROPERLY FINDING THAT THE AGENCY UNLAWFULLY IGNORED THE CAMBODIAN TOLLERS' OPERATIONS

### A.    Commerce Committed Legal Error in Excluding the Toll Processors' Data from Its Analysis

The statute directs Commerce to consider whether "the process of assembly or completion in the third country" is "minor or insignificant." *See* 19 U.S.C. § 1677j(b)(1)(C). To evaluate that question, the statute further directs Commerce to consider a variety of activities undertaken "in the foreign country" at issue

including levels of investment, the nature of the production process, the extent of production facilities, and research and development. 19 U.S.C. § 1677j(b)(2).

During the circumvention investigation, BYD provided Commerce with extensive information about the unaffiliated tollers' large investments, infrastructure, workforce, and production capabilities in Cambodia. *Final IDM* at cmt. 11, Appx332–335. Yet, in both the *Preliminary* and *Final Determinations*, for purposes of determining whether the process of assembly or completion in the foreign country is "minor or insignificant" under § 1677j(b)(1)(C), Commerce completely disregarded all of the operations of the Cambodian toll-processors and instead considered only the limited activities undertaken in Cambodia directly by BYD HK, the Hong Kong-based trading company. *See Prelim. IDM* at 13–19, Appx141–147; *see also BYD HK Prelim. Analysis Mem.* at 3–4, Appx116-117; *Final IDM.* at 51, Appx334. Commerce reasoned that it would be "unreasonable to use the investments/production facilities of BYD HK's unaffiliated tollers as the basis for comparison in Cambodia when BYD HK contributed nothing to such investments/production facilities." *See Final IDM.* at 51, Appx334. BYD objected to Commerce, and again on appeal before the CIT, that the issue under the statute is the significance of the processing that is conducted in the third country, not *who* conducted the processing and that Commerce's failure to consider the toll

processor data in its "minor or insignificant" analysis was therefore contrary to law.

The CIT agreed with BYD:

> The court agrees with BYD that under the statute, "what *goes on* in the inquiry country . . . is at issue, not *who* does it." ECF 36, at 42 (emphasis added); *see* 19 U.S.C. § 1677j(b)(1)(C) (requiring the Department to determine whether "the process of assembly or completion" in the third country "is minor or insignificant") (emphasis added). As to each § 1677j(b)(2) factor, Commerce must evaluate the relevant aspect of "the process of assembly or completion" without gerrymandering its findings—as it did here—based on the identity of the actor(s) undertaking it.

Slip Op. 25-60 at 19-20.

Even though the CIT found that Commerce's failure to consider the toll processor data in its "minor or insignificant" analysis was a legal error, the CIT did not remand this issue to Commerce for reconsideration. Instead, the CIT found that this legal error was, in the court's opinion, "harmless," asserting that "{e}ven if the Department had considered the tollers' activities and flipped its findings about the investment and production facilities factors, the result would have been the same" and "{a} remand would be wasteful." *Id.* at 21-22.

We respectfully disagree with the CIT. As explained below, the CIT's failure to remand Commerce's determination to allow the agency to address this issue in the first instance is reversible error. Moreover, the Court's counterfactual findings with respect to how Commerce's consideration of the

processor data would have impacted the agency's determination – in other words, whether Commerce's error was "harmless" – is not supported by the evidence.

### B. Commerce's Failure to Properly Consider the Toll Processors' Cambodian Activities Warranted a Remand

The appropriate remedy for Commerce's established legal error is a remand to the agency to reconsider its affirmative circumvention determination accounting for the tollers' data. 1/ For substantive errors by the agency, including failure to address contradictory evidence or conclusions unsupported by substantial evidence, the court typically requires remand rather than harmless error treatment. *See Diamond Sawblades Mfrs. Coalition v. United States*, 612 F.3d 1348, 1352–53 (Fed. Cir. 2010) (upholding CIT's decision to remand agency determination that was not supported by substantial evidence); *but see Al Ghurair Iron & Steel LLC v. United States*, 65 F.4th 1351, 1363 (Fed. Cir. 2023) (not remanding to the agency for a substantive error in its affirmative circumvention determination). 2/

1/   We note that no party appealed the CIT's determination that Commerce committed legal error in failing to consider the toll processor data. Accordingly, that aspect of the CIT's opinion is not subject to challenge here.

2/   The Court typically applies a two-part harmless error test for procedural errors. *See*, *e.g.*, *Intercargo Ins. Co. v. United States*, 83 F.3d 391, 394–396 (Fed. Cir. 1996). BYD submits that the error contested here is substantive rather than procedural.

The CIT's failure to grant a remand to address Commerce's substantive legal error must be reversed for at least two reasons. First, refusing to grant a remand improperly usurps the agency's role in the administrative process as the factfinder. As the Supreme Court has stated, "{i}f the record before the agency does not support the agency action. . . , the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). Thus, the court "is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry." *Id*. Rather, it must return jurisdiction to the agency. 3/ However, by speculating that Commerce would have reached the same result in this case if it had addressed its error and weighed the excluded evidence, that is exactly what the CIT did.

Second, even if it were appropriate or permissible in these circumstances for the Court to engage in its own fact-finding, the CIT's decision was also erroneous because it rests on the faulty presumption that Commerce's affirmative determination was otherwise sound. The CIT approved Commerce's "minor or

---

3/      For further elaboration of the principles concerning the appropriateness of remand and relevant precedent, *see Adjudicating International Trade Cases at the U.S. Commerce Department: Endless Remand or Balanced Resolve*?, 39 J. Marshall L. Rev. 59, 63-65 (2005)(noting that "Given the highly technical and fact-intensive nature of trade remedy cases, the requirement that the court remand a determination that it finds to be unsupported by substantial evidence is of special importance.").

insignificant" analysis, despite that analysis assigning R&D "singular importance," Slip Op. 25-60 at n.9, Appx26, and thus the court reasoned that the agency's failure to properly consider the other § 1677j(b)(2) factors—*including the tollers' data as part of that consideration*—was of little practical consequence. But Commerce's determination is built on sand. Commerce incorrectly and unlawfully raised the R&D factor above all others (addressed below in Section IV.A), then ignored important record evidence relating to these other factors. If this Court decides (as it should) that the agency's privileging of R&D—which directly contradicts the legislative history and Commerce's past practice—was flawed, then the agency's failure to consider the relevant Cambodian investments and production operations was certainly not harmless.

In support of its decision not to remand to Commerce on this issue, the CIT cited to *Al Ghurair*, 65 F.4th at 1363, where the Court found that errors in Commerce's value-added analysis were harmless because "Commerce's finding of circumvention involved a multi-factor test and was supported by many findings other than its calculation of { } value added." *Id*. But, unlike in that case, the agency's errors here are more significant than an erroneous value-added calculation, given that these errors impact several of the independent § 1677j(b)(2) factors. And, in further contrast to *Al Ghurair*, BYD HK has appealed the other factors in Commerce's multi-factor analysis. *See id*. ("AGIS does not appeal

Commerce's determination that global data indicated a value added of 10% to 31% and that this data accurately described the value added by UAE production. Thus, we conclude that Commerce's overall determination does not require reversal or correction on remand.") (internal citations omitted). Therefore, the impact of Commerce's error in failing to consider record evidence in its minor or insignificant analysis remains consequential.

Furthermore, the CIT reasoned that a remand would be "wasteful" in light of Commerce's final circumvention determination in a companion circumvention investigation of processing in Thailand with an entirely different record. *See* Slip Op. 25-60 at 22, Appx26 ("{e}ven if the Department had considered the tollers' activities and flipped its findings about the investment and production facilities factors…the result would have been the same. A remand would be wasteful."). 4/ Even if Commerce's affirmative determination in a different circumvention inquiry rested on R&D alone, that would not prevent the agency from drawing a different conclusion in the proceeding at issue, which stands on different facts. *See* Slip Op.

_____

4/      In the Thailand segment, "the Department concluded that the process of assembly or completion was minor or insignificant based on the singular importance of R&D, even though the rest of the § 1677j(b)(2) factors pointed in the other direction." Slip Op. 25-60 at n.9, Appx26. We understand that this determination is also being contested in *Trina Solar Science & Technology (Thailand) Ltd., Canadian Solar International Limited, Canadian Solar Manufacturing (Thailand) Co., Ltd. v. United States*, Nos. 25-1940, 25-1941 (Fed. Cir. 2025).

25-60 at 22, Appx26. Commerce's analysis of whether the process of assembly or completion was minor or insignificant "depend{s} on the particular circumvention scenario," Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316 (1994) ("SAA") at 4,216, and the statute requires consideration of all five factors. 19 U.S.C. § 1677j(b)(2). Commerce does not undertake a rote tallying of those factors supporting a "minor and insignificant" finding and those that do not; the agency instead reaches an overall determination of whether the process of assembly or completion was minor or insignificant, as informed by the § 1677j(b)(2) factors. *See infra* Sec. IV. Accordingly, were Commerce to remedy its error and properly consider the tollers' data, then Commerce would not necessarily—and indeed should not—reach the same result.

The CIT committed reversable error in not remanding this issue to Commerce to reconsider its determination in light of the evidence that was unlawfully excluded from its original determination. This element of the Court's opinion should be reversed and the matter remanded to Commerce with instructions that the agency reassess its affirmative circumvention determination by properly considering the tollers' data in Commerce's analysis of the § 1677j(b)(2) factors, §§ 1677j(b)(2)(A), and (D) in particular.

**III. COMMERCE'S INTERPRETATION OF "MINOR OR INSIGNIFICANT" UNDER § 1677J(B)(1)(C) WAS NOT IN ACCORDANCE WITH LAW**

In the *Final Determination*, Commerce misinterpreted and misapplied the controlling standard under which the § 1677j(b)(1)(C) analysis must be conducted. As explained below, Commerce was obligated to act consistent with "the best reading of the statute. . . ." *Loper Bright*, 603 U.S. at 373 (explaining that the "best reading" is "'the reading the court would have reached' if no agency were involved.") (*quoting Chevron*, 467 U.S. at 843). The statute requires a finding that the processing performed in the third country is "minor or insignificant" a measurement that is unambiguously at the low end of the scale. Yet Commerce has effectively taken the position that the operations in Cambodia must be considered "minor or insignificant" unless it can be shown that those operations account for a *large* portion of the investment, value-added, and processing operations required to manufacture the finished goods. That interpretation simply cannot be squared with the plain meaning of the statutory text and is thus unlawful.

The statute governing circumvention inquiries sets out five statutory criteria that Commerce had to consider in determining whether a solar module assembled

in Cambodia could be included within an AD/CVD orders on solar products from

China: <u>5/</u>

> (A)  Whether the merchandise imported into the United States from Cambodia is the same class or kind as merchandise that is subject to the *Solar I Orders*;

> (B)  Whether before importation into the United States, such merchandise is completed or assembled in Cambodia from merchandise that is subject to the *Solar I Orders* or produced with inputs from the country under the *Solar I Orders*;

> (C)  Whether the process of assembly or completion in Cambodia is minor or insignificant;

> (D)  Whether the value of the merchandise produced in the country subject to the *Solar I Orders* is a significant portion of the total value of the merchandise exported to the United States; and,

> (E)  Whether the action is appropriate to prevent evasion of the *Solar I Orders*. <u>6/</u>

Commerce's interpretations of statutory provisions are not entitled to

deference from this Court. *Loper Bright*, 603 U.S. at 412. Instead, this "Court{}

must exercise {its} independent judgment in deciding whether an agency has acted

within its statutory authority, as the APA requires." *Id.* at 400 ("In an agency case

---

<u>5/</u>    19 U.S.C. § 1677j(b)(1). Moreover, in determining whether to include merchandise assembled or completed in a foreign country within the scope of an order, Commerce takes into account such factors as the pattern of trade, including sourcing patterns, affiliations, and whether imports into the foreign country of the merchandise have increased after initiation of the investigation that results in the order. 19 U.S.C. § 1677j(b)(3).

<u>6/</u>    19 U.S.C. § 1677j(b)(1)(E).

as in any other, though, even if some judges might (or might not) consider the statute ambiguous, there is a best reading all the same—'the reading the court would have reached' if no agency were involved.").

As explained below, Commerce's interpretation of the statute conflicts with the plain meaning of the statute, its legislative history, and the broader statutory construct. Commerce's misinterpretation of the statute permeates through Commerce's entire affirmative circumvention finding.

### A. Processing That Represents Over 30 Percent of Total Cost and Involves the Most Complex and Significant Steps in the Entire Processing Chain is Not Minor or Insignificant

The Court must use "all relevant interpretive tools" in interpreting the statute, *Loper Bright*, 603 U.S. at 373, starting with the provision's plain meaning. "In order to ascertain the 'established meaning,' {of a statutory term} it is {generally} appropriate to consult dictionaries." *See Pesquera*, 266 F.3d at 1382–83 (*citing Int'l Bus. Machs. Corp. v. United States*, 201 F.3d 1367, 1372 (Fed. Cir. 2000); *Best Power Tech. Sales Corp. v. Austin*, 984 F.2d 1172, 1177 (Fed. Cir. 1993).

First, the scope of the provision is related to the "*process* of assembly or completion." 19 U.S.C. § 1677j(b)(2) (emphasis added). "Process" means "a series of actions or operations conducing to an end," and especially "a continuous operation or treatment especially in manufacture." *Process*, MERRIAM-WEBSTER

DICTIONARY, https://www.merriam-webster.com/dictionary/process (last visited October 7, 2025); *see also Process*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/process (last visited October 7, 2025) ("a series of actions that you take in order to achieve a result"). The statute therefore limits and directs Commerce's inquiry to *the actions of assembling or completing the merchandise.*

Second, with respect to the standard to be applied by Commerce, "minor" is defined as "inferior in importance, size, or degree." *Minor*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/minor (last visited October 7, 2025). In another source, the term is described as something "having *little importance, influence or effect.*" *Minor*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/minor (last visited October 7, 2025) (emphasis added). "Insignificant" means "{d}evoid of significance, weight, or force; {o}f no importance or moment; *immaterial; trivial, trifling*; mean, contemptible." *Insignificant*, OXFORD ENGLISH DICTIONARY, https://www.oed.com/dictionary/insignificant_adj?tab= meaning_and_use#351290 (last visited October 7, 2025) (emphasis added); *see also Insignificant*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/insignificant (last visited October 7, 2025) ("small or not noticeable, and therefore not considered

important"). Together, the phrase "minor or insignificant" clearly evinces Congress's intent 7/ to expand the application of AD/CVD orders outside their existing scope *only* where third-country processing is *truly immaterial—i.e.*, involving "immaterial, trivial, trifling" activities performed outside of the country subject to an AD/CVD order prior to importation to the United States. Under the governing standard of review, it stands to reason that this Court should not defer to an application of this standard by Commerce that results in processing that is "significant" being treated as "minor or insignificant" *See Loper Bright*, 603 U.S. at 400, 412. While it may be true that there are no "bright line" measures for "minor or insignificant," it is also true that a process must exceed this threshold when it both (i) adds one third of the value of the imported article and (ii) is acknowledged to involve the most qualitatively significant steps in the entire processing chain.

### B. The Legislative History and Broader Statutory Construction Conflict with Commerce's Interpretation of "Minor or Insignificant"

The plain reading of the phrase "minor or insignificant" as concerning "immaterial, trivial, trifling" activities is confirmed by legislative history and Congressional intent.

---

7/     The legislative history and broader statutory schema likewise support this interpretation, as discussed in Section III.B below.

In amending the relevant statutory circumvention provisions in 1994, Congress explained that the logic of circumvention proceedings rests on the idea that producers in a country subject to an existing AD/CVD order could set up a "screwdriver" assembly in a third country to change the country of origin of subject goods and circumvent the order. SAA at 4216–17. Congress did not intend to vest Commerce with authority to enforce the circumvention remedy whenever the level of processing in the third country is less than the level of processing in the country under order, as Commerce appears to now believe. Congress intended instead for Commerce to assess the third-country production process at issue and find circumvention only in cases where the operations were truly "minor or insignificant"—*i.e.*, "immaterial, trivial, trifling." In fact, Congress addressed the limitations to the circumvention provisions for this exact reason. The SAA states that the circumvention provisions are intended to be "fair to all parties" and that "{b}ecause Commerce will find circumvention only where assembly or completion operations in the United States or in third countries are minor, the proposed amendments will not deter legitimate investment." SAA at 4217. These statements illustrate that Congress understood that the circumvention provisions would be used only when the assembly process was akin to a "screwdriver operation."

Commerce's capacious interpretation of this standard, however, throws this balance out the window. The agency's interpretation cannot be squared with the

statute's unambiguous requirement that the operations in the third country must be "minor or insignificant" for third country-produced goods to be eligible for inclusion in the scope of an existing order on another country.

Furthermore, viewed in the context of the broader trade remedy statutory schema, this proper, more restrictive view of the circumvention standard makes perfect sense. The circumvention statute is an *extraordinary* exception to the general statutory scheme for application of trade remedy measures. Where applied, the circumvention authority enables Commerce to expand the scope of existing AD/CVD orders without following the more rigorous and involved procedures associated with new AD/CVD investigations. In particular, a party seeking circumvention relief (1) is not required to make the otherwise required showing of industry support (*i.e.*, standing) for the trade relief sought, 19 U.S.C. §§ 1671a(c)(4), 1673a(c)(4), and (2) is not required to make a showing of material injury to the satisfaction of the ITC. 19 U.S.C. §§ 1671e, 1673e. The circumvention statute enables Commerce to bypass these otherwise mandatory hurdles, however, only where the processing in a third country is so "minor or insignificant" that the merchandise being exported from that third country can reasonably be considered as having been manufactured in the country on which the AD/CVD orders have already been imposed (in this case, China). Conversely, using this statute to expand orders to cover goods substantially made in third

countries where the processes undertaken to make those goods are "sophisticated," "complex," and "transformative" upends Congress' carefully designed statutory framework and allows the circumvention statute to encroach on the role of the AD/CVD investigation statute.

Commerce's affirmative circumvention determination has massively expanded the scope of the *Solar I Orders* to include solar cells and modules manufactured in Cambodia that were previously unquestionably outside the scope of the orders. This scope expansion was made in the absence of any analysis of whether the domestic industry would support such expansion and any investigation by the ITC as to whether Cambodian imports materially injured the domestic industry. And Commerce expanded the scope notwithstanding its own repeated prior determinations that any solar cells on which the p/n junction was formed outside of China were excluded from the scope of the *Solar I Orders*. *See*, *e.g.*, *Notice of Scope Rulings*, 86 Fed. Reg. 47476 (Dep't Commerce Aug. 25, 2021); NextEra Comments at Att. 20, Commerce Memorandum, *Final Scope Ruling on the Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells from the People's Republic of China: ET Solar Inc.* (A-570-979 & C-570-980) (June 15, 2021) at 9, 11-12, Appx3050, 3052-3053.

The CIT largely dismissed these concerns, primarily focusing on the balancing of § 1677j(b)(2) factors rather than the overarching consideration of

whether the processing is "minor or insignificant." The court did not examine the legislative or other interpretive guidance in understanding what "minor or insignificant" processing properly entails. This was a clear legal error.

Commerce's misinterpretation of the "minor or insignificant" standard permeates through Commerce's analysis under the statute and renders that product of that analysis—Commerce's affirmative circumvention finding—unlawful.

## IV. COMMERCE'S ANALYSIS AND BALANCING OF THE "MINOR OR INSIGNIFICANT" FACTORS WAS NOT IN ACCORDANCE WITH LAW AND WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE

Commerce made several critical errors in analyzing the factors set forth at § 1677j(b)(2). As explained below, Commerce impermissibly placed determinative weight on R&D, ignored significant value-added in Cambodia, and relied on skewed investment data to make an affirmative circumvention finding. The Court should thus remand to Commerce with instructions that the agency reassess its affirmative circumvention determination to include proper analysis of the § 1677j(b)(2) factors.

As a threshold matter, the statutory text and the SAA make clear that Commerce is to balance the § 1677j(b)(2) factors, appropriately giving weight to those factors more closely related to the actual processing at issue. The statute governing circumvention inquiries sets out five statutory criteria that Commerce must consider in determining whether a product completed or assembled in

Cambodia may be included within an AD or CVD order on products from China, including—under § 1677j(b)(1)(C)—"{w}hether the process of assembly or completion {in Cambodia} is minor or insignificant." In a subsequent section of the statute, § 1677j(b)(2), Congress directs Commerce to consider the following factors in determining whether the process of assembly or completion in Cambodia is "minor or insignificant":

(A)    the level of investment in the foreign country;

(B)    the level of R&D in the foreign country;

(C)    the nature of the production process in the foreign country;

(D)    the extent of production facilities in the foreign country; and,

(E)    whether the value of the processing performed in the foreign country represents a small proportion of the value of the merchandise imported into the United States.

The broader structure of § 1677j(b) establishes a clear hierarchical relationship between the general legal standard and the specific enumerated factors. Subsection (b)(1)(C) sets forth the overarching legal test that the administering authority must apply—determining whether a process of assembly or completion is minor or insignificant. Subsection (b)(2) provides mandatory analytical guidance—instructing Commerce to assess and weigh certain specific evidence in determining whether the process of assembly or completion is minor or insignificant under paragraph (1)(C). This statutory structure demonstrates Congress's intent that the heart of Commerce's analysis should drive towards

determining whether the process at issue is minor or insignificant, and that analysis is to be informed by certain enumerated factors. None of these subsidiary informative factors should be privileged above the core analysis, which is centered on the processing at issue.

This interpretation is further supported by the legislative history. The SAA explains that "{t}he overall thrust of section 230 of the bill"—including analysis of all five subparts under § 1677j(b)(2)—"*is to focus the anticircumvention inquiry on the question of whether minor or insignificant assembly or completion is taking place*." SAA at 4217 (emphasis added). The analyses of each subfactor in the § 1677j(b)(2) must be conducted in the context of Commerce's broader analysis of whether the process at issue was "minor and insignificant," and different weighting in Commerce's analysis should be applied to those factors that are more relevant to consideration of processing.

Finally, while Commerce will evaluate all five subfactors in the statute and "{n}o single factor will be controlling," *Final IDM* at 24-25, Appx307–308 (quoting SAA at 4216), this does not mean all factors are given equal weight. As explained above, § 1677j(b)(2) limits Commerce's analysis to the "process of assembly or completion." Inherent in that limitation is that certain factors— specifically, the nature of the production process and the value of processing factors—are more directly connected to Commerce's analysis under

§ 1677j(b)(1)(C) of "whether the process {at issue} is minor or insignificant" because these factors relate more acutely to that processing than the other factors. This is consistent with several prior Commerce determinations. *See infra* at Section IV.A (quoting several such determinations). In fact, Commerce does not appear to have ever previously found that the process of assembly or completion was minor or insignificant when the "nature of the production process" weighed against that conclusion. 8/ This is because the overarching analysis in § 1677j(b)(1)(C), which the factors in § 1677j(b)(2) inform, relates to the "process of assembly or completion"—the production of the imported articles. Accordingly, Commerce must be faithful to the instructions of Congress in balancing the § 1677j(b)(2) factors, giving appropriate weight to those factors that relate to the process at issue.

### A. Commerce Impermissibly Placed "Preeminent" Weight on Research and Development (§ 1677j(b)(2)(B))

As noted above, one of the factors Commerce is directed to consider in evaluating whether the processing is minor or insignificant is "the level of research and development in the foreign country." *See* 19 U.S.C. § 1677j(b)(2)(B). In this case, Commerce found R&D to be of "preeminent importance" given that "R&D has been key for technological breakthroughs" in CSPV technology. *Final IDM* at

---

8/      In the *Final Determination* here, Commerce found that the nature of the production process weighed against a finding of circumvention for BYD, and in fact for all respondents. *Final IDM* at 32, Appx315.)

62, Appx345; *see also Prelim. IDM* at 22, Appx150 (giving "particular importance" to the levels of R&D "given the uniquely complex nature of solar cell and module production."). Commerce found that BYD HK is a trading company that did not conduct R&D in Cambodia. Commerce then placed decisive weight on this factor in determining that the processing in Cambodia was minor and insignificant. *See Final IDM* at 62, Appx345. The CIT incorrectly agreed with Commerce's placement of "singular importance" on R&D. *See* Slip Op. 25-60 at 22, n. 9, Appx26. The CIT went as far as stating "{e}ven if the Department had considered the tollers' activities and flipped its findings about the investment and production facilities factors, *see* § 1677j(b)(2)(A) and (D), the result would have been the same." *Id.* This ruling contradicts the Court's separate recitation of Commerce's obligation under the Statute to "evaluate each of the{ } factors . . . , depending on the particular circumvention scenario," keeping in mind that "{n}o single one will be controlling." Slip Op. 25-60 at 5, Appx9 (citing SAA at 4216). For the reasons set out below Commerce's analysis impermissibly overweighted the R&D factor and distorted the statutory analysis.

First, the plain meaning of the statute upends Commerce's approach. As explained above, the statute instructs Commerce to evaluate whether a particular "process of assembly or completion is minor or insignificant," taking into account five factors. 19 U.S.C. § 1677j(b)(2). While R&D is among these five factors, it is

perhaps the least instructive in evaluating the actual "process of assembly or completion" at issue—it goes instead to whether money has been spent in-country to develop that process. It does not whatsoever go to the process itself. In fact, Commerce's own finding in this investigation that "the nature of {R&D} is such that, once carried out, it is easily transmissible across national borders" supports this exact point. *Final IDM* at 27–28, Appx310–311. And this is precisely what Commerce found to have taken place—while Commerce found that BYD did not carry out R&D in Cambodia, it nevertheless determined that the Cambodian processing at issue was "sophisticated," "complex," and "technologically advanced." *See Final IDM* at 27–28, 34-36, Appx310–311, 317–318. Commerce's own findings in this investigation thus demonstrate that the location of R&D activities is a poor indicator of whether the process of assembly in any particular location is minor or insignificant.

Taking Commerce's approach to its logical conclusion demonstrates how incongruent that approach is with the statute. Commerce's elevation of the R&D prong above all others creates a scenario where companies could be penalized for conducting R&D in a country subject to an AD/CVD order and manufacturing their products elsewhere. That is, failure to move R&D from the original country alone would expose companies to circumvention risk—this is plainly not how the statute is meant to operate. *See*, *e.g.*, SAA at 4216–4217 ("Section 230 of the bill

amends existing sections 781(a) and 781(b) of the Act which address the circumvention of antidumping or countervailing duty orders through the establishment of screwdriver assembly operations in { } a third country{,}" and "the overall thrust of {the circumvention statute} is to focus the anticircumvention inquiry on the question of whether minor or insignificant assembly or completion is taking place.").

Second, and as noted briefly above, Commerce's placement of "preeminent importance" on R&D in this investigation is also at odds with its prior determinations where Commerce appears to have recognized that R&D is a less consequential factor. For instance, Commerce has explained that:

- "A lack of {R&D} expenses does not necessarily mean that circumvention exists," *Certain Welded Carbon Steel Standard Pipes and Tubes from India: Preliminary Negative Determinations of Circumvention of the Antidumping Order,* 87 Fed. Reg. 52507 (Dep't Commerce Aug. 26, 2022) and accompanying Issues and Decision Memorandum at 16 (unchanged in final).

- "A lack of {R&D} expenses . . . provides no information as an informative factor in *determining* whether the Order is being circumvented{.}" *Id.*

- A "lack of significant R&D expenses . . . is not informative in determining whether processing in {the third country} is minor or insignificant." *Light-Walled Welded Rectangular Carbon Steel Tubing from Taiwan: Preliminary Affirmative Determination of Circumvention of the Antidumping Duty Order*, 88 Fed. Reg. 21980 (Dep't Commerce Apr. 12, 2023) and accompanying Issues and Decision Memorandum at 14.

- The factors involving the level of investment, *the level of R&D*, and the extent of the production facilities in {the third country} *weigh less heavily in our determination* than the factors involving the nature of the production process and the value added in {the third country} because the former relate more broadly to the companies and their facilities, whereas the latter relate more to the production of the inquiry merchandise itself. *Certain Aluminum Foil from the People's Republic of China: Preliminary Affirmative Determinations of Circumvention with Respect to the Republic of Korea and the Kingdom of Thailand*, 88 Fed. Reg. 17177 (Dep't Commerce Mar. 22, 2023) and accompanying Issues and Decision Memorandum (Korea) at 15 (emphasis added).

Commerce has thus previously appropriately recognized that R&D was a less consequential factor, yet it decided in this investigation to place its importance above all others. In addition to being at odds with the thrust of the statute, this approach likewise contradicts agency precedent.

Finally, Commerce's elevation of R&D to the lead factor in its analysis displaces and inherently underweights the "nature of the production process" factor. Commerce analyzed the processing in Cambodia and concluded that "record evidence shows that the nature of the production process in Cambodia for solar cells and modules is significant. *Prelim. IDM* at 22, Appx 150; *Final IDM* at 36, Appx319. Commerce highlighted that:

> . . . *the production of solar cells and solar modules in the inquiry countries has greater labor demands, more steps, and requires more inputs than ingot and wafer production in China*. Moreover, the *multi-step solar cell and solar module production process requires sophisticated, precise, and technologically advanced equipment, and a skilled workforce*. Production of solar

cells and wafers involves more than attaching Chinese components together. *Solar cell and solar modules production involve exacting processes* (e.g., molecular-level impregnation of phosphorus into the wafer at a high heat, printing solar cells (metals, such as silver paste, are printed onto the solar cell to collect electricity)) and treatments to, and preparation of, inputs used in production (such as lamination and curing of EVA, solar cells, and the backsheet).

Importantly, *the essential nature of the final product is imparted and realized through production in the inquiry country when the p/n junction is formed in the wafer*. The p/n junction "… results in the creation of solar cells— albeit unfished solar cells—capable of converting sunlight into electricity via the photovoltaic effect." Moreover, other components in the solar cell and solar module are important to its ability to function because they channel the electricity out of the cell so that the product can be used as intended.

*Final IDM* at 36, Appx319 (emphases added, footnotes omitted). Commerce's placement of preeminent importance on R&D in the face of the above findings plainly contorts the statutory analysis—in determining "whether the process of assembly {was} minor or insignificant," Commerce emphasized where R&D dollars were spent over the significant and complex "nature of the production processing" at issue. This is plainly incorrect.

Commerce's prizing of the R&D factor above all others is inconsistent with the statute, the SAA, and Commerce's precedent. This issue should therefore be remanded to Commerce for reconsideration.

### B. Commerce Ignored Congress' Instruction and the Statute's Plain Meaning in Evaluating the Value Added Through the Cambodian Processing (§ 1677j(b)(2)(E))

The statute directs Commerce to take into account, as part of its assessment of whether the process undertaken in Cambodia is "minor or insignificant," "whether the value of the processing performed in {Cambodia} represents a small proportion of the value of the merchandise imported into the United States." 19 U.S.C. § 1677j(b)(2)(E). In the *Final Determination*, Commerce found that the value added from processing performed in Cambodia represented **[ amount ]** percent of the value of the finished solar modules imported into the United States. *BYD HK Final Analysis Mem.* at 2, Appx281. Commerce determined that this value-added amount "weighed in favor of finding circumvention." *Final IDM* at 63–64, Appx346–347. The CIT upheld this determination. *See* Slip Op. 25-60, Appx5–45. We demonstrate in the sections that follow that Commerce's analysis was legally flawed and at odds with the governing statute.

### 1. Commerce's Value-Added Analysis was Faulty

As an initial matter, Commerce has recognized that in evaluating the value-added factor, "Congress has directed {the Department} to focus more on the nature of the production process and less on the difference in value between the subject merchandise and the parts and components imported into the processing country." *Preliminary Negative Determination of Circumvention of the Antidumping Order*

*on Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab Emirates*, 80 Fed. Reg. 26,229 (Dep't Commerce May 7, 2015), and accompanying Issues and Decision Memorandum at 7 (stating "Congress has also redirected the Department's focus 'from a rigid numerical calculation of value-added toward a more qualitative focus on the nature of the production process.'") (footnotes omitted). The Department has historically found that it must not conduct only a comparison between the value of the subject merchandise and the value of the relevant inputs in analyzing the value-added prong. *See, e.g.*, *Anti-Circumvention Inquiry of the Antidumping and Countervailing Duty Order on Certain Pasta from Italy: Affirmative Preliminary Determinations of Circumvention of Antidumping and Countervailing Duty Orders*, 68 Fed. Reg. 46571, 46575 (Dep't Commerce Aug. 6, 2003) (unchanged in *Anti-Circumvention Inquiry of the Antidumping and Countervailing Duty Orders on Certain Pasta from Italy: Affirmative Final Determinations of Circumvention of Antidumping and Countervailing Duty Orders*, 68 Fed. Reg. 54888 (Dep't Commerce Sep. 19, 2003). This is consistent with the SAA's criticism of a "mechanical, quantitative approach" and instruction that the value-added prong of the statute does "not establish rigid numerical standards for determining the significance of the assembly (or completion) activities . . . ." SAA at 4216–4217.

Yet, as the CIT summarized:

> To determine the value added by Cambodian processing (§ 1677j(b)(2)(E)), the Department summed BYD's tollers costs and divided the result by the per-unit weighted average value of the company's U.S. sales. Appx0001003. That "exceeded a third," ECF 36, at 39, which the agency found to be a small proportion and thus to indicate circumvention. Appx 0001003."

Slip Op. 25-60 at 9, Appx13.

Commerce failed to evaluate the value added on a qualitative basis as Congress instructed. And, had Commerce properly considered the significant qualitative value that was added in Cambodia, Commerce would have been compelled to conclude that the processing in Cambodia added more than a "small proportion of the value of the merchandise imported into the United States." Indeed, Commerce's own findings elsewhere in this investigation prove this point. Commerce summarized the significance of the operations taking place in Cambodia (*i.e.*, cell and module manufacturing) as follows:

> Importantly, *the essential nature of the final product is imparted and realized through production in the inquiry country {(i.e., Cambodia)} when the p/n junction is formed in the wafer*. The p/n junction "… results in the creation of solar cells—albeit unfished solar cells—capable of converting sunlight into electricity via the photovoltaic effect." Moreover, *other components in the solar cell and solar module are important to its ability to function because they channel the electricity out of the cell so that the product can be used as intended.*

*Final IDM* at 36, Appx319 (emphases added, footnotes omitted). Commerce failed entirely to incorporate this qualitative assessment of the value added in Cambodia

into Commerce's analysis under § 1677j(b)(2)(E). This failure renders Commerce's value-added finding faulty.

### 2. Commerce's Value-Added Finding is Inconsistent with the Plain Meaning of the Statute

The statute instructs Commerce to evaluate "whether the value of the processing performed in {Cambodia} represents a small proportion of the value of the merchandise imported into the United States." 19 U.S.C. § 1677j(b)(2)(E). The record before Commerce cannot be squared with Commerce's finding that the value added in Cambodia was "small."

In the absence of a statutory definition of what constitutes a "small" proportion, the tools of statutory interpretation direct us to the plain meaning of the statute. *See*, *e.g.*, *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218 (1994); *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560 (2012); *see also Pesquera Mares Australes v. U.S.*, 266 F.3d 1372, 1382–83 (Fed. Cir. 2001) (relying on the dictionary definition of a key phrase in a statute). The term "small" is defined in Merriam-Webster's dictionary as "minor in influence, power, or rank," "little or close to zero in an objectively measurable aspect (such as quantity)," and "of little consequence; trivial." *Small*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/small (last visited Oct. 10, 2025). The American Heritage Collegiate Dictionary likewise defines small as "Limited in importance or significance; trivial: a small matter," "having limited

position, influence, or status; minor." *Small*, The American Heritage Dictionary of the English Language, https://ahdictionary.com/word/search.html?q=small (last accessed Oct. 10, 2025). These definitions are consistent with "the overall thrust of {the circumvention statute} which is to focus the anticircumvention inquiry on the question of whether minor or insignificant assembly or completion is taking place" and fetter out "screwdriver{-type} operations." SAA 4216–4217.

Even taking Commerce's quantitative approach, Commerce's conclusion that the Cambodian value-add was "small" cannot stand. By Commerce' own calculation, the value added in Cambodia accounted for [ amount ] percent of the value of the finished solar modules imported into the United States. *BYD HK Final Analysis Mem.* at 2, Appx281. [ amount ] percent is not "little or close to zero," it is not "minor in influence," and it is neither "of little consequence" nor "trivial." It is in excess of one-third of the value of the imported good.

Further, when the qualitative value of the Cambodian processing is taken into account, this value add only grows. That is, according to Commerce, "the essential nature of the final product is imparted and realized through production in" Cambodia." *Final IDM* at 36, Appx319. It is the Cambodian conversion of raw materials into functioning solar cells and then solar modules that enables these raw materials to generate and forward electricity. *Id.* This "multi-step solar cell and solar module production process {which} requires sophisticated, precise, and

technologically advanced equipment, and a skilled workforce," *id.,* which converts

raw materials into photovoltaic power generation devices likewise cannot

accurately be described as "limited in importance or significance; trivial."

Notwithstanding Commerce's misconstruction of the term "small," the CIT

upheld Commerce's analysis, and BYD respectfully disagrees with that court's

determination in this regard. The CIT reasoned that "{i}t suffices here that the

Department observed that in prior cases it '*found similar ratios to be minor*.'" Slip

Op. 25-60 at 23, Appx27 (emphasis in original). But these decisions predate the

altered standard of review of agency interpretations of statutes articulated in *Loper*

*Bright*. The standard articulated in those past findings might have been

"reasonable," as required under *Chevron*, but they are not the best interpretation of

the statute as required under *Loper Bright*. Adding a third of a product's value

through a process which has been considered to confer the "essential character" of

a good cannot be considered of "small" value. This issue must therefore be

remanded back to Commerce for further consideration in a manner consistent with

the statute.

### C. Commerce's Analysis of the "Investment" Prong was Unlawful (§ 1677j(b)(2)(A))

Commerce committed two independent errors in analyzing the "level of

investment in {Cambodia}." First, as discussed in Section II above, Commerce

ignored the tollers' investments. As addressed above, the failure to consider the tollers' data in this regard constitutes a legal error subject to remand.

Second, Commerce compared the level of investment in Cambodia and the level of investment of BYD's Chinese affiliates on an absolute basis (*i.e.*, total value of investments made) rather than on a per-megawatt basis (*i.e.*, value of the investments relative to production). This approach distorted and understated the level of investment in Cambodia and caused Commerce's analysis to be inconsistent with the statute. *See, e.g., Allied Tube and Conduit Corp. v. United States*, 31 C.I.T. 1090, 1097 (Ct. Int'l Trade, 2007) (remanding a decision to Commerce as being unsupported by substantial evidence because Commerce used a distortive methodology). This section is dedicated to addressing this second error.

The investment analysis as articulated in the statute considers the "level of investment" undertaken in the processing country that was required to carry out the operations being done in that country. This analysis is to be done "consistent with the overall thrust of {the statute} which is to focus the anticircumvention inquiry on the question of whether minor or insignificant assembly or completion is taking place." SAA at 4217.

In adopting its absolute-basis approach, Commerce noted that the "statute does not instruct {the agency} to employ a particular analysis," and argued that analyzing investment "using the 'per unit' methodology . . . would 'overlook{} the

relative requirements of establishing ingot and wafer production facilities in China, as compared with the cell and module production facilities in Cambodia." Slip Op. 25-60 at 26, Appx30. "Commerce explained that…a per-unit analysis would be distortive because China's dominance in ingot and wafer manufacturing means that economies of scale result in lower per-unit investment costs." Slip Op. 25-60 at 26, Appx30. The CIT upheld Commerce's analysis similarly because "{n}othing in the statute requires the agency to calculate the level of investment in the manner BYD and FPL prefer" and because the CIT considered that Commerce had discretion in choosing its methodology for analyzing the level of investment in Cambodia. Slip Op. 25-60 at 27, Appx31. The deference afforded to Commerce in this regard was misplaced.

Commerce's methodology was distortive and utterly failed to evaluate the "level of investment in {Cambodia}" per the statute's instruction. The key issue with Commerce's approach is that it failed to take into account the vastly smaller market served by the Cambodian operations as compared to BYD's Chinese affiliates, who serve the very large Chinese and global markets. The Government has previously contended that "a per-unit basis does not account for the threshold investments necessary to achieve production" and "fails to account for the economies of scale realized in the Chinese market." *BYD (H.K.) Co. v. United States*, No. 23-00221 (Ct. Int'l Trade 2024), Def.'s Opp'n to Pl.'s & Pl.-

Intervenor's Mots. for J. on the Admin. R., ECF No. 39. But calculating on a per-unit basis (*i.e.*, total investments divided by total production) does not in any way "ignore" investment amounts—it fully and reasonably accounts for these amounts and spreads them proportionally over economic output (*i.e.*, production) in order to obtain a reasonable point of comparison. It heeds the call of the statute by providing an actual perspective of the "level of investment" in Cambodia, measured in dollars per watt of production, rather than a crude dollar figure. By ignoring the size of the markets served and crudely comparing investment levels on an absolute basis, Commerce created a severely lopsided comparison that does not serve the statute's purpose—it does not enable Commerce to get a sense of the "level of investment" in Cambodia that is relative to the processing taking place there. *See* SAA at 4217 ("the overall thrust of {the circumvention statute} is to focus the anticircumvention inquiry on the question of whether minor or insignificant assembly or completion is taking place"). Comparing investment dollars spent per watt of production provides instead actual useful insight into the relative amounts of investment sunk into the process in Cambodia as compared to the dollars sunk into the upstream production process in China.

Commerce's analysis of the investment prong did not faithfully carry out the intent of the statute and was therefore unlawful. *See, e.g., Allied Tube and Conduit Corp. v. United States*, 31 C.I.T. 1090, 1097 (Ct. Int'l Trade, 2007) (remanding a

decision to Commerce as being unsupported by substantial evidence because Commerce used a distortive methodology). This issue should accordingly be remanded to Commerce for further consideration.

**V.      COMMERCE'S USE OF SURROGATE VALUES IN ANALYZING THE PROPORTIONAL VALUE OF CHINESE INPUTS WAS NOT IN ACCORDANCE WITH LAW AND WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE**

As part of Commerce's broader circumvention analysis, 19 U.S.C. § 1677j(b)(1)(D) required Commerce to determine whether the value of Chinese inputs consumed through the Cambodian processing at issue represented a "significant portion" of the total value of the merchandise exported to the United States. Commerce collected cost data for inputs consumed in the Cambodian production at issue. BYD HK reported complete cost data that reflected the actual purchase value of raw materials in the Cambodian market. *See* Letter from Hogan Lovells US LLP to the U.S. Department of Commerce, *2022 Circumvention Inquiry of Antidumping Duty Order on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Response to Third Supplemental Questionnaire*, Case No. A-570-979 (Anti-circumvention Inquiry – Cambodia–2022) (Oct. 12, 2022) at Exhs. S3-3-A and S3-3-B, Appx73167–7504.

Commerce did not dispute the accuracy of these data. Nevertheless, rather than using this actual cost information that BYD reported, Commerce elected to

instead use "surrogate values" for all Chinese inputs (*i.e.*, values for the same or similar types of inputs imported by other parties into third country markets) as derived under Commerce's NME authority. *Final IDM* at 45, Appx328. The CIT affirmed this approach. Slip Op. 25-60 at 27-31. BYD respectfully submits that Commerce's methodology was not in accordance with the statute and was unsupported by substantial evidence.

As an initial point, it is undisputed that Cambodia is a market economy. There is therefore no evident factual or statutory basis for Commerce to have used an NME surrogate value methodology in this case. Moreover, by adopting this NME methodology, Commerce unlawfully overstated the value of Chinese inputs by utilizing inflated "surrogate values" to account for the value of Chinese inputs, rather than the lower actual cost of the inputs. 9/ Indeed, the results of Commerce's analysis speaks for itself—Commerce found the cost of the Chinese inputs as a percent of the value of the merchandise sold in the United States was, remarkably, [ amount ] percent. *BYD HK Prelim. Analysis Mem.* at 4, Appx117.

In defense of this methodology, Commerce argued that neither the statute nor Commerce's regulations describe how to determine "value" for this purpose. The CIT likewise emphasized the absence of a statutory definition for this term.

---

9/     *See BYD HK Prelim. Analysis Mem.* at 4, Appx117 under heading "Whether the value of the processing performed in Cambodia represents a small proportion of the value of the merchandise imported into the United States."

Slip Op. 25-60 at 29–30. Commerce claims that it chose to value the inputs based on their "cost" and therefore looked for "instruction" in the statutory provisions for determining cost of production and constructed value under 19 U.S.C. § 1677b(f)(1). Those provisions require Commerce "normally" to use the costs as recorded in the books and records of the respondent if such costs are kept in accordance with generally accepted accounting principles of the exporting country and "reasonably reflect costs associated with the production and sale of the merchandise." *Final IDM* at 45, Appx328, (citing 19 U.S.C. § 1677b(f)(1)).

According to Commerce:

> Under the Act, the prices of goods produced in NME countries cannot generally be relied upon. The presence of government controls on various aspects of NMEs renders calculation of costs based on actual prices paid for NME inputs invalid under Commerce's normal methodologies. Because the respondent assembled solar modules in the inquiry country using inputs that were produced in China, and China is an NME country, we believe the prices paid by the respondent could be distorted by controls in the NME country. Given these facts, we find it would be inappropriate to use the respondent's records to determine the cost of the Chinese-produced inputs.

*Id*. 10/ Based on these assertions, Commerce chose surrogate values as an alternative basis to determine the value of inputs. Commerce further asserted that

---

10/     A World Trade Organization Dispute Settlement Panel recently considered and rejected a very similar approach in Panel Report, *Australia – Anti-Dumping and Countervailing Duty Measures on Certain Products from China*, WTO Doc. WT/DS603/R (adopted Apr. 26, 2024) at 91.  There, Australia's investigatory

this methodology is consistent with International Trade Administration Policy Bulletin 94.1, which sets out Commerce's presumption that prices of NME-produced goods sold to third country resellers are likely distorted by state controls. *Id*. Commerce also claims that this approach was sustained by the CIT in *Al Ghurair Iron & Steel LLC v. United States*, 536 F. Supp. 3d 1357 (Ct. Int'l Trade 2021).

Commerce's application of the NME methodology in the context of this case cannot be squared with the statute or the facts. To begin with, Policy Bulletin 94.1 is not at all analogous. The issue addressed in Policy Bulletin 94.1 was the determination of normal value ("NV") based on sales of the merchandise under consideration (*i.e.*, finished goods completed in an NME country) by third country resellers, not input costs. By contrast, the values at issue here are values of *inputs* used to manufacture subject merchandise, not values for the merchandise under

---

agency rejected costs recorded in the books and records of Chinese respondents and relied instead on external costs as a basis for computing normal value. Australia argued that the Chinese costs were inherently distorted and therefore could not be relied upon. The investigatory agency identified certain specific programs and systemic support for Chinese steel inputs that it argued demonstrated this distortion. (This is far beyond what Commerce did in the instant investigation, where Commerce asserted a distortion with no record factual support whatsoever). The Panel considered the Australian investigatory agency's methodology to be in violation of Article 2.2.1.1. of the Anti-Dumping Agreement (*i.e.*, the Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade 1994), which is the international agreement that establishes certain basic rules for World Trade Organization Members seeking to impose AD measures.

consideration. These inputs include globally traded goods such as polysilicon wafers and aluminum. Similarly, while the CIT has upheld the use of surrogate values in the circumvention context the issue has, to our knowledge, never been addressed by this Court. Those opinions also predate the Supreme Court's decision in *Loper Bright*. Review of Commerce's methodology under *Loper Bright* would require a reviewing court to find that Commerce's interpretation of the statute is the "best" one, and not merely "permissible"—a much different analysis. *Loper Bright*, 603 U.S. at 369.

The CIT interpreted the relevant statutory language in light of *Loper Bright* and nevertheless upheld Commerce's approach. Slip Op. 25-60 at 29–30. That court determined that by not defining the term "value" in the statute, Congress afforded Commerce an "open-ended grant{} of authority," and that in such circumstances the court's role is to "ensure that the {agency's} 'action is both reasonable and reasonably explained." Slip Op. 25-60 at 30 (citing *Loper Bright*). This interpretation of *Loper* seems to side-step the court's duty to determine "the best reading of the statute" as instructed by the Supreme Court. *Loper Bright*, 603 U.S. at 373; *see also, e.g.*, *United States v. Bricker, et al.*, 135 F.4th 427 (6th Cir. 2025) ("even when the statute expressly delegates authority to an agency, creating some degree of deference, we must still 'ensure that the agency's action is both

reasonable and reasonably explained' and '{t}hrough it all, we must decide for ourselves whether the law means what the agency says.'").

Furthermore, while Commerce may have explained its reasoning, that reasoning was not reasonable. Absent any basis on the record, Commerce elected to throw out the cost reporting that BYD HK submitted to Commerce and elected instead to use unrelated cost data external to those books and records. This approach considerably inflated the value of Chinese inputs in Commerce's analysis, resulting in a remarkable finding that [ amount ] percent of the value of the goods exported from Cambodia was associated with Chinese inputs. Even if the CIT were correct that Commerce was due some measure of deference in Commerce's interpretation of the statute (which we contest), its approach to implementing that statute was patently unreasonable.

Beyond Commerce's faulty interpretation of the statute, Commerce's analysis was likewise unlawful because Commerce failed to substantiate the factual premise for departing from BYD HK's actual books and records. That premise is that the actual purchase values in those books do not "reasonably reflect the costs associated with the production and sale of the merchandise." *Final IDM* at 45, Appx328. In the place of substantial evidence to support this distortion theory, Commerce offers only generalized conjecture that the prices for Chinese inputs sold in the Cambodian market economy must be distorted by "state control"

and "the absence of market directed decisions on price and output." *Id.* at 44-45, Appx327–328. However, the Chinese Government exercises no state control over Cambodia's market economy and Commerce has identified no evidence to the contrary. Moreover, if any presumptions should apply in this case, the presumption must be that prices for sales to the Cambodian market (a market economy) are determined by market factors, not the Chinese Government. Certainly, the substantial evidence standard requires, at a minimum, that Commerce identify particularized evidence to support a contrary conclusion, and Commerce's references to an inapposite Policy Bulletin and court decisions that have not been reviewed by this Court cannot stand in the place of such evidence.

Commerce's analysis was unlawful because it flouted the statute, relying on an NME methodology where such methodology was not permitted and it was unsupported by substantial evidence because Commerce's decision to throw out BYD's cost reporting was not supported on the record. This matter should accordingly be remanded to Commerce with instructions to use the actual purchase values reported by BYD HK.

**CONCLUSION AND STATEMENT OF RELIEF SOUGHT**

For the foregoing reasons, the CIT's judgment below should be reversed and

remanded to Commerce for further consideration.

Respectfully submitted,

/s/ Craig A. Lewis
Craig A. Lewis
Nicholas W. Laneville

HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
Phone: +1.202.637.5600
Fax: +1.202.637.5910
E-mail: craig.lewis@hoganlovells.com

*Counsel to BYD (HK) Co., Ltd.*

Dated: October 15, 2025

# ADDENDUM

**Slip Op. 25-60**

**UNITED STATES
COURT OF INTERNATIONAL TRADE**

───────────────

**Court No. 23-00221**

───────────────

BYD (H.K.) CO., LTD.,

*Plaintiff,*

and

FLORIDA POWER & LIGHT COMPANY,

*Plaintiff-Intervenor,*

v.

UNITED STATES,

*Defendant,*

and

AUXIN SOLAR INC.,

*Defendant-Intervenor.*

───────────────

Before: M. Miller Baker, Judge

**OPINION**

[Sustaining the Department of Commerce's circumvention determination.]

Dated: May 16, 2025

*Craig A. Lewis*, *Nicholas W. Laneville*, and *Gregory M.A. Hawkins*, Hogan Lovells US LLP, Washington, DC, on the briefs for Plaintiff.

*Matthew R. Nicely*, *Daniel M. Witkowski*, and *Julia K. Eppard*, Akin Gump Strauss Hauer & Feld LLP, Washington, DC, on the briefs for Plaintiff-Intervenor.

*Brian M. Boynton*, Principal Deputy Assistant Attorney General; *Patricia M. McCarthy*, Director; *Reginald T. Blades, Jr.*, Assistant Director; and *Stephen C. Tosini*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, on the brief for Defendant. Of counsel on the brief was *Spencer C. Neff*, Attorney, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, Washington, DC.

*Baker*, Judge: Plaintiff BYD (H.K.) Co. challenges the Department of Commerce's finding that solar cell imports from Cambodia circumvent antidumping and countervailing duty orders on such equipment made in China. As explained below, the court sustains the agency's determination.

## I

The Tariff Act of 1930, as amended, allows Commerce to impose antidumping or countervailing duties on a "class or kind" of imported merchandise if it "finds that the merchandise reflects unfair pricing or unfair subsidization and the [International Trade] Commission finds material injury to the domestic industry." *Canadian Solar, Inc. v. United States*, 918 F.3d 909, 917 (Fed. Cir. 2019) (citing 19 U.S.C. §§ 1671(a)(1), 1673(1)). In imposing such duties, the Department

must "include 'a description of the subject merchandise, in such detail as [it] deems necessary.'" *Id.* (emphasis removed) (quoting 19 U.S.C. §§ 1671e(a)(2), 1673e(a)(2)). The statute "defines 'subject merchandise' as 'the class or kind of merchandise that is within the scope of an investigation [or] an order under this subtitle.'" *Id.* (quoting 19 U.S.C. § 1677(25)). In practice, Commerce describes the product "within the scope of the order[ ]" by reference to its "technical characteristics" and "country of origin" (sometimes referred to in this opinion as the "source country"). *Id.* at 913.

The Department "typically determines country of origin based on the country where the merchandise is processed or manufactured." *Id.* But in trade, as in war, the antagonist gets a vote. To avoid duties, a producer may "finish[ ] or assemble[ ]" its products "in a different country" using components manufactured in the source country. *Bell Supply Co. v. United States*, 888 F.3d 1222, 1228 (Fed. Cir. 2018). Whether the final product as exported from the third country is deemed to originate from the source country depends on whether it was "substantial[ly] transform[ed]" in the former. *Id.*

"A substantial transformation occurs where, as a result of manufacturing or processing steps, the product loses its identity and is transformed into a new product having a new name, character and use." *Id.* (cleaned up) (quoting *Bestfoods v. United States*,

165 F.3d 1371, 1373 (Fed. Cir. 1999)). If such a trans-
formation occurs, the third country becomes the coun-
try of origin, and the product is out-of-scope. *Id.* at
1230. Otherwise, such goods are deemed to originate
from the source country, meaning they're in-scope. *Id.*

Even if substantially transformed in a third coun-
try, the products finished or assembled there from
source-country components are not necessarily home
free, as it were. As relevant here, the statute's anticir-
cumvention provision, 19 U.S.C. § 1677j, authorizes—
but does not require—Commerce to extend antidump-
ing and countervailing duty orders to such articles
when certain other conditions are satisfied. *See id.*
§ 1677j(b)(1); *see also Bell Supply*, 888 F.3d at 1230
(explaining that if the Department "applies the sub-
stantial transformation test and concludes that the
imported article has a country of origin different from
the country identified in an AD or CVD order, then [it]
can include such merchandise within the scope of
[such an] order only if it finds circumvention under
§ 1677j").

For there to be circumvention, imports "completed
or assembled" in a third country from source-country
components must be "of the same class or kind" as
goods subject to the duty order. 19 U.S.C.
§ 1677j(b)(1)(A), (B). The "process of assembly or com-
pletion" has to be "minor or insignificant." *Id.*
§ 1677j(b)(1)(C). The value of the parts made in the
source country must also be "a significant portion of

the total value" of the product as finally exported to this nation. *Id.* § 1677j(b)(1)(D). Finally, "action [must be] appropriate . . . to prevent" avoidance of duty orders. *Id.* § 1677j(b)(1)(E).

If Commerce finds those conditions satisfied, it must then determine whether to extend the orders to the third-country goods. In doing so, it must "take into account" certain considerations. *Id.* § 1677j(b)(3). As relevant here, they include any "affiliat[ion]" between the company doing the "assembl[y] or complet[ion]" and the manufacturer or exporter of source-country parts or components. *Id.* § 1677j(b)(3)(B).

In many anticircumvention cases, including this one, the crux of the controversy is the "minor or insignificant" condition under § 1677j(b)(1)(C). As to that question, Commerce must "take into account" certain factors regarding operations in the third country. They are "(A) the level of investment"; "(B) the level of research and development"; "(C) the nature of the production process"; "(D) the extent of production facilities"; and "(E) whether the value of the processing performed" there "represents a small proportion of the value of the merchandise imported into the United States." *Id.* § 1677j(b)(2). "Commerce will evaluate each of these factors . . . , depending on the particular circumvention scenario. No single [one] will be controlling." *Statement of Administrative Action Accompanying the Uruguay Round Agreements Act* (SAA), H.R.

Doc. 103–316, vol. 1, at 893, 1994 U.S.C.C.A.N. 4040, 4216.[1]

## II

In 2012, Commerce issued orders imposing anti-dumping and countervailing duties on solar cells made in China.[2] *See* 77 Fed. Reg. 73,018; 77 Fed. Reg. 73,017. A decade later, domestic producer Auxin Solar Inc. asked the Department to investigate whether

---

[1] The SAA is an "authoritative expression" of the statute's meaning. 19 U.S.C. § 3512(d).

[2] In technical jargon, the orders cover "crystalline silicon photovoltaic cells, . . . whether or not partially or fully assembled into other products, including, but not limited to, modules, laminates, panels and building integrated materials." Appx0001019. According to the Energy Department, a solar cell "is a nonmechanical device that converts sunlight directly into electricity." https://www.eia.gov/energyexplained/solar/photovoltaics-and-electricity.php. "Individual cells can vary from 0.5 inches to about 4.0 inches across." *Id.* One such cell "can only produce 1 or 2 Watts, which is only enough electricity for small uses, such as powering calculators or wristwatches." *Id.* Cells can be "electrically connected in a packaged, weather-tight . . . *panel* (sometimes called a *module*)." *Id.* (emphasis in original). In plain English, a solar panel is an assembly of linked solar cells.

A solar cell, in turn, is created by "the addition of a p/n junction" to a solar wafer. Appx0001205 (Commerce so noting); ECF 36, at 9 (BYD, citing prior agency decisions). For purposes of the orders, that is the key manufacturing step that determines the country of origin. Appx0001205.

such merchandise imported from Thailand, Cambodia, Vietnam, and Malaysia circumvented those orders. *See* 87 Fed. Reg. 19,071. The agency did so and selected BYD as a mandatory respondent for the Cambodian segment. Appx0003958.

### A

Commerce preliminarily determined that all conditions in 19 U.S.C. § 1677j(b)(1) were satisfied and that—with certain exceptions not applicable here—extending the duty orders to solar cell exports from Cambodia was appropriate. *See generally* Appx0001015–0001037.

One of those conditions disputed here is whether the process of assembly or completion in Cambodia was minor or insignificant. *See* 19 U.S.C. § 1677j(b)(1)(C). Of the five statutory factors bearing on this condition*, see id.* § 1677j(b)(2)(A)–(E), the Department found that all but one (the "nature of the production process," *see id.* § 1677j(b)(2)(C)) indicated circumvention. *See generally* Appx0001027–0001033.

Explaining those findings, the Department observed that BYD does not directly engage in production of solar cells and modules in Cambodia. Instead, it provides inputs to unaffiliated "tollers," who do the

work.[3] Appx0001025. The tollers, in turn, own their own manufacturing equipment and facilities.[4] Appx0001176. The company provided Commerce with information about the scale of the tollers' investments, infrastructure, workforce, and production capabilities. Appx0001028, Appx0001032.

The Department nevertheless declined to use that information for purposes of determining the "level of investment" (§ 1677j(b)(2)(A)) and "extent of production facilities" (§ 1677j(b)(2)(D)) in Cambodia. Limiting its consideration instead to BYD's non-existent activities, it found that those factors indicated circumvention. Appx0001028; Appx0001032.

---

[3] "[T]oll processing"—also known as "toll manufacturing"—"is '[a]n arrangement under which a customer provides the materials for a manufacturing process and receives the finished goods from the manufacturer. . . . The same party owns both the input and the output of the manufacturing process. This is a specialized form of contract manufacturing.'" *Wind Tower Trade Coal. v. United States*, 569 F. Supp. 3d 1221, 1226 n.3 (CIT 2022) (quoting *Toll Manufacturing*, Black's Law Dictionary (11th ed. 2019)).

[4] The record is inconsistent regarding the degree to which the tollers owned versus leased their facilities. *Compare* Appx0001176 (Commerce stating that the Cambodian manufacturing "facilities/equipment were purchased/owned by the . . . tollers") *with id.* (stating that "the tollers leased their facilities"). As the parties appear to assume the former, so does the court.

As to R&D (§ 1677j(b)(2)(B)), Commerce observed that BYD reported that neither it nor its tollers undertook any. Appx0001029. Thus, the Department found that this factor also indicated circumvention. *Id.*

To determine the value added by Cambodian processing (§ 1677j(b)(2)(E)), the Department summed BYD's toller costs and divided the result by the per-unit weighted average value of the company's U.S. sales. Appx0001003. That "exceeded a third," ECF 36, at 39, which the agency found to be a small proportion and thus to indicate circumvention. Appx0001003.

On the other hand, Commerce determined that the final relevant factor, the nature of the Cambodian processing (§ 1677j(b)(2)(C)), cut in the other direction. Appx0001032. That's because, compared to the production of precursor components in China, "solar cell and module production involves a greater number of stages, each requiring a high level of technological sophistication." Appx0001031. In marked contrast to its disregard of the tollers' activities in connection with investment and production facilities (§§ 1677j(b)(2)(A) and (D)), in this context the Department treated them as proxies for BYD: "[W]e find that the nature of the production *performed by the respondents* in the third country is not minor or insignificant compared to" the production of precursor components in China. Appx0001032 (emphasis added).

In balancing the § 1677j(b)(2) considerations, Commerce acknowledged that "record evidence shows that

the nature of the production process in Cambodia for solar cells and modules is significant." Appx0001036. Nevertheless, for the reasons discussed above the level of investment and extent of production facilities pointed in the opposite direction. *Id.* The company's "insignificant amount" of R&D was of "particular importance" in view of "the uniquely complex nature of solar cell and module production." *Id.* Under the "totality of the factors," the agency found "the process of assembly or completion in Cambodia" to be "minor and insignificant." *Id.*; *see also* 19 U.S.C. § 1677j(b)(1)(C).

The second disputed statutory condition here involves the Department's finding that the Chinese components of BYD's solar cell exports from Cambodia to this nation were "a significant portion of the total value" of the finished products. *See* Appx0001033 (discussing 19 U.S.C. § 1677j(b)(1)(D)). Noting that China is a nonmarket-economy country, the agency used surrogate data from market-economy countries, rather than the prices BYD paid, to value the Chinese-produced inputs. *Id.*

The third and final disputed statutory condition is Commerce's finding—without any supporting reasoning—that "action is warranted to prevent evasion of the Orders." Appx0001037 (citing 19 U.S.C. § 1677j(b)(1)(E)).

B

After receiving comments from interested parties, the Department reaffirmed its findings with some minor modifications and, as relevant here, additional explanation. *See* Appx0001196–0001363.

As to its conclusion that BYD's process of assembly or completion in Cambodia was "minor or insignificant" under 19 U.S.C. § 1677j(b)(1)(C), the agency discussed the relevant § 1677j(b)(2) factors. For R&D, it observed that the company "agree[d] with" its finding that there was no such activity in Cambodia, and only contested its relative significance. Appx0001257. In response, Commerce emphasized that the China-based R&D is of "preeminent importance in the solar industry," as it "has been key for technological breakthroughs." *Id.* In these "particular circumstances," the agency attached great weight to this factor. *Id.*

The Department also responded to BYD's objections as to its findings about the "level of investment" and "extent of production facilities" factors. Defending its decision to disregard the tollers' activities because those entities were "unaffiliated" with the company, Appx0001246, the agency asserted that it had the discretion to base its findings on the "particular circumvention scenario." Appx0001245–0001246 (quoting SAA at 893, 1994 U.S.C.C.A.N. at 4216).

In a similar vein, Commerce justified its decision to evaluate investment "on an absolute basis as opposed

to a per-unit basis." Appx0001213. It noted that the "statute does not instruct [the agency] to employ a particular analysis." *Id*. Using a per-unit comparison would underweight the magnitude of the investment for establishing the precursor "ingot and wafer production facilities in China." *Id*. It would also distort the results because Chinese economies of scale allowed for "lower-per unit investment costs." Appx0001213–0001214.

The Department also responded to BYD's critique of its finding that the "value of processing" in Cambodia was a "small proportion of the value of the merchandise imported into the United States." Appx0001259 (quoting 19 U.S.C. § 1677j(b)(2)(E)). The agency rejected the company's argument that "value" encompasses monetary *and* qualitative considerations. Appx0001259–0001261. It also explained that its calculation here—greater than one-third—was comparable to ratios it had previously "found . . . to be minor." Appx0001261.

Commerce then answered BYD's challenge to its conclusion that the "value" of the Chinese components was a "significant portion" of the "total value" of the solar cells exported to this country. Appx0001239; 19 U.S.C. § 1677j(b)(1)(D). In response to the contention that it should have used the prices the company paid for Chinese parts rather than surrogate data from market-economy countries, the agency explained that neither the statute nor agency regulations "describe

how . . . to determine 'value.'" Appx0001239. Because the inputs were produced in a nonmarket-economy country, their prices "could be distorted" by government controls. Appx0001240.

Finally, the Department addressed whether action was "appropriate . . . to prevent evasion" of the orders. Appx0001271 (quoting 19 U.S.C. § 1677j(b)(1)(E)). It explained that extending them to Cambodian solar cells was necessary because the other statutory conditions "were met, and the factors under [§ 1677j(b)(3)] further evinced the existence of circumventing behavior, and because [nothing] suggested that circumvention would cease absent" such action. *Id.*

### III

Invoking jurisdiction conferred by 28 U.S.C. § 1581(c), BYD brought this suit under 19 U.S.C. §§ 1516a(a)(2)(A)(ii) and (a)(2)(B)(vi) challenging the Department's final determination. Florida Power & Light (FPL), an importer of Cambodian solar cells, intervened as a plaintiff, while Auxin did likewise as a defendant. The parties have fully briefed BYD's and FPL's motions for judgment on the agency record, which are ripe for disposition.

In § 1516a(a)(2) actions such as this, "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). The question

is not whether the court would have reached the same decision on the same record. Rather, it is whether the administrative record as a whole permits Commerce's conclusion.

> Substantial evidence has been defined as more than a mere scintilla, as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. To determine if substantial evidence exists, we review the record as a whole, including evidence that supports as well as evidence that fairly detracts from the substantiality of the evidence.

*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (cleaned up); *see also SSIH Equip. S.A. v. U.S. Int'l Trade Comm'n*, 718 F.2d 365, 382 (Fed. Cir. 1983) (if Commerce makes a choice between "two fairly conflicting views," the court may not substitute its judgment even if its view would have been different "had the matter been before it *de novo*") (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

## IV

### A

In concluding that "the process of assembly or completion" in Cambodia is "minor or insignificant," 19 U.S.C. § 1677j(b)(1)(C), as explained above Commerce made affirmative findings on four of the five

§ 1677j(b)(2) considerations—all but the "nature of the production process" in that country. BYD and FPL attack the Department's balancing of these factors as well as its conclusions as to three of them.

1

BYD first contends that Commerce erred as a matter of law in finding the "process of assembly or completion" in Cambodia "minor or insignificant." ECF 36, at 30–39. The company asserts that the agency's "inquiry should have ended as soon as it found that the value-added in Cambodia exceeded a third and the nature of the Cambodian processing—the processing at the heart of [the] inquiry—was neither minor nor insignificant. But it did not." *Id.* at 39.

The problem for BYD is that § 1677j(b)(2) requires the Department to consider and balance *all five* factors, not just the company's preferred ones. That's what the agency did here: It weighed them based on the record before it. To contend that it erred as a matter of law because it refused to limit its analysis to a subset of the mandatory considerations flies in the face of the statute.

Taking a different tack, FPL argues that Commerce erroneously balanced the § 1677j(b)(2) factors. *See* ECF 38, at 12–17. As the company sees it, the Department's "nature of the production process" findings show that solar cell manufacturing operations in Cambodia "are significant, extensive, and complex." *Id.* at

14. They also demonstrate "the addition of substantial value." *Id*. at 15.

Although the record might have permitted the Department to reach such a conclusion, it did not *compel* such a result. "Where two different, inconsistent conclusions may reasonably be drawn from the evidence in [the] record, an agency's decision to favor one conclusion over the other is the epitome of a decision that must be sustained upon review for substantial evidence." *In re Morsa*, 713 F.3d 104, 109 (Fed. Cir. 2013) (brackets omitted) (quoting *In re Jolley*, 308 F.3d 1317, 1329 (Fed. Cir. 2002)). As the agency reasonably explained the basis for its weighing of the § 1677j(b)(2) factors, including its finding that R&D in the solar industry context was of "preeminent importance," Appx0001257, FPL's argument that it should have reached a different result is unavailing.

2

BYD complains that "Commerce improperly placed decisive weight on the importance of R&D" because "[n]othing in the text of the statute indicates that [it] should be afforded 'particular importance.'" ECF 36, at 57. The company also argues that as the SAA teaches that "no single [§ 1677j(b)(2)] factor will be controlling," *id*. (quoting SAA at 893, 1994 U.S.C.C.A.N. at 4216), the Department may not "afford R&D determinative status," *id*. at 57–58.

The company misreads both the statute and the SAA. Commerce must consider the five § 1677j(b)(2) factors "depending on the particular circumvention scenario." SAA at 893, 1994 U.S.C.C.A.N. at 4216. No single one is controlling *as a matter of law*, but the statute permits the Department to balance them based on the record evidence in any given case. Here, the agency did that and reasonably explained why it assigned preponderant weight to R&D. *See* Appx0001257 (explaining that the China-based R&D is of "preeminent importance in the solar industry," as it "has been key for technological breakthroughs"). The record supports that weighting, even if a different finder of fact might have reached a different conclusion. *Cf. Morsa*, 713 F.3d at 109.

BYD also contends that Commerce's weighting of R&D contradicts agency precedent. ECF 36, at 58–59. In the cited decisions, however, the agency simply assigned less weight to R&D based on the facts before it. That it assigned greater weight here is not a contradiction but instead merely reflects the differing record evidence in this case. It should go without saying—but apparently it needs restating—that each case turns on its own facts.[5]

---

[5] In passing, BYD also appears to challenge the Department's R&D *finding* on the ground that the agency did not consider the tollers' activities. *See id.* at 57. This half-hearted contention fails for two reasons.

3

BYD challenges the failure to include the tollers' operations in evaluating the "level of investment" and "extent of production facilities" factors (§§ 1677j(b)(2)(A) and (D)). ECF 36, at 39–40. It insists it was unlawful for the Department not to consider their activities. *Id.* at 40. According to the company, the agency must examine, "without qualification," the process of assembly or completion in the third country and decide whether it is minor or insignificant. *Id.* at 41. "Quite simply, for purposes of the circumvention analysis, it is what *goes on* in the inquiry country that is at issue, not *who* does it." *Id.* at 42 (emphasis added). It argues that the statute neither "state[s nor] implie[s] that Commerce may choose to disregard pro-

---

To begin with, arguments only made in passing are waived. *See ArcelorMittal France v. AK Steel Corp.*, 700 F.3d 1314, 1325 n.6 (Fed. Cir. 2012). Moreover, before Commerce, the company "*agree[d] with*" the agency's preliminary determination that there was no relevant R&D activity in Cambodia, and only contested the relative significance of the finding. Appx0001257 (emphasis added). Having so failed to contest the Department's finding that Cambodian R&D was minor, it's too late to do so now. *See* 28 U.S.C. § 2637(d) (requiring exhaustion of administrative remedies); 19 C.F.R. § 351.309(c)(2) (requiring parties to submit case briefs that "present all arguments that continue in the submitter's view to be relevant to the [agency's] final determination or final results"). At this stage, the court will only entertain the argument that BYD made below—that the agency assigned undue *weight* to its R&D finding.

cessing activities performed in the third country because they are not carried out by the respondent itself." ECF 43, at 11.

FPL, in turn, argues that "[b]y focusing its analysis solely on a company *not involved in production operations* (BYD), while ignoring the data for the Cambodian companies engaged in the actual process of completion or assembly of the imported merchandise (BYD's tollers)," Commerce conducted an incomplete investigation. ECF 38, at 21 (emphasis in original). FPL also contends that the Department's "inability" to verify the tollers' data was a problem of its own making because it knew BYD relied on tollers and could have selected them as additional respondents. *Id.* at 24 (citing Appx0003710–0003723).

The government responds that the statute gives Commerce discretion to consider any affiliation between "the producer in a third country" and the input supplier based in the source country. ECF 41, at 21 (citing 19 U.S.C. § 1677j(b)(3)(B)). It also contends that the Department reasonably exercised that discretion in not including the tollers' activities in assessing the level of investment and the extent of production facilities. *Id.* at 18–22.

The court agrees with BYD that under the statute, "what *goes on* in the inquiry country . . . is at issue, not *who* does it." ECF 36, at 42 (emphasis added); *see* 19 U.S.C. § 1677j(b)(1)(C) (requiring the Department to determine whether "the process of assembly or

completion" in the third country "is minor or insignificant") (emphasis added). As to each § 1677j(b)(2) factor, Commerce must evaluate the relevant aspect of "the process of assembly or completion" without gerrymandering its findings—as it did here—based on the identity of the actor(s) undertaking it.[6]

Contrary to the government's argument, § 1677j(b)(3)(B) does not license Commerce to consider affiliations at the § 1677j(b)(1)(C) stage. As explained today in the court's concurrent opinion in *Canadian Solar International Ltd. v. United States*, Ct. Nos. 23-00222 and 23-00227, Slip Op. 25-59, at 16 (CIT May 16, 2025), the statute requires the Department to undertake an "if/then" analysis. "Only *if* it finds the conditions in § 1677j(b)(1)(A)–(E) satisfied does it *then* consider whether to expand an order to cover a third country. In doing so, it must then consider the § 1677j(b)(3) factors," including affiliation. *Id.* (emphasis in original); *see also* 19 U.S.C. § 1677j(b)(3)(B) ("*In determining whether to include*" products assembled in

---

[6] The court also observes that the Department's erroneous reading of the statute does not even have the benefit of internal consistency. If the tollers' activities are irrelevant, then why did the agency consider them in finding that the "nature of the production process" (§ 1677j(b)(2)(C)) is significant? *See* Appx0001031 ("[T]he process for turning wafers into solar cells requires an expensive, multi-stage assembly line requiring high-technological machinery and workers with strong technological knowledge."). The tollers provided the hi-tech equipment and services of skilled technicians.

a third country in a duty order, Commerce "shall take into account such factors as . . ." any affiliation between the manufacturer or exporter of source-country parts and "the person who uses" those parts "to assemble or complete" the products) (emphasis added). The agency cannot allow § 1677j(b)(3) considerations to "bleed over into its weighing of the § 1677j(b)(2) factors that bear on § 1677j(b)(1)(C)." *Canadian Solar*, Slip Op. 25-59, at 16.[7]

That all said, as in the companion case from Thailand, this legal error was harmless. As BYD acknowledges, the weight Commerce attached to China-based

---

[7] The court observes that even if the § 1677j(b)(3) considerations applied at the stage of determining whether the § 1677j(b)(1) conditions are satisfied, the tollers *were* affiliated with BYD for the statute's purposes if the company could control them under the relevant contracts. *See* 19 U.S.C. § 1677(33)(G) (defining "affiliated" to include "[a]ny person who controls any other person and such other person" and providing that "control" exists when one person "is legally or operationally in a position to exercise restraint or direction over" another); *cf. DeFiore v. SOC LLC*, 85 F.4th 546, 555 (9th Cir. 2023) (noting the "crucial distinction between independent contractors that are agents and independent contractors that are instead non-agent service providers"); *see also Restatement (Second) of Agency* § 14N (1958) ("One who contracts to act on behalf of another and subject to the other's control except with respect to his physical conduct *is an agent and also an independent contractor*.") (emphasis added). On this record, it's unclear whether the tollers were agents or non-agent service providers.

R&D was "determinative" here in balancing the § 1677j(b)(2) factors. ECF 36, at 59.[8] Even if the Department had considered the tollers' activities and flipped its findings about the investment and production facilities factors, *see* § 1677j(b)(2)(A) and (D), the result would have been the same.[9] A remand would be wasteful. *Cf. Al Ghurair Iron & Steel LLC v. United States*, 65 F.4th 1351, 1363 (Fed. Cir. 2023) ("Commerce's finding . . . was supported by many findings other than its [erroneous] calculation of [the plaintiff's] value added.").

4

BYD attacks the agency's finding that "the value of the processing performed in" Cambodia was "a small proportion of the value of the merchandise imported into the United States." ECF 36, at 47–56 (addressing 19 U.S.C. § 1677j(b)(2)(E)). The company first argues that on an absolute basis, the figure calculated here—greater than one-third—cannot be "small." *Id.* at 48–51. It argues that "[i]t is simply unreasonable for

---

[8] FPL endorses BYD's arguments as to R&D. *See* ECF 38, at 17–18.

[9] In Commerce's finding of circumvention in Thailand that the court sustains today, as to one respondent the Department concluded that the process of assembly or completion was minor or insignificant based on the singular importance of R&D, even though the rest of the § 1677j(b)(2) factors pointed in the other direction. *Canadian Solar*, Slip Op. 25-59, at 7–8.

Commerce to have considered this level of processing to be minor or insignificant." *Id.* at 48.

In effect, the company asks the court to legislate a ceiling for determining what is a "small proportion." But there are no "rigid numerical standards for determining the significance of the [§ 1677j(b)(2)] activities." SAA at 894, 1994 U.S.C.C.A.N. at 4217; *cf. Al Ghurair*, 65 F.4th at 1361 n.4 (noting with approval the concession that "Commerce should not be held to a numerical or 'bright-line' test in considering the value added in third-country processing").

It suffices here that the Department observed that in prior cases it "*found similar ratios to be minor*," Appx0001261–0001262 (emphasis added) (citing 85 Fed. Reg. 8823)—a point BYD does not dispute. The court thus rejects the company's contention that Commerce unreasonably found the value added in Cambodian processing to be small. *Cf. Al Ghurair*, 65 F.4th at 1361 n.4 (sustaining the agency's finding that "the value added" in the third country "was insignificant *in view of prior [agency] cases making similar findings*") (emphasis added).[10]

---

[10] BYD also complains that Commerce's value-added finding here contradicts three agency decisions. *See* ECF 36, at 49–50. The Department, however, reasonably explained why it found them unpersuasive. In one, the agency "ranged" the values "by plus or minus 10 percent" and found the § 1677j(b)(2)(E) factor "inconclusive."

Shifting gears, BYD argues that the Department erroneously "failed to evaluate the value added on a qualitative basis as directed by Congress." ECF 36, at 51. To support that proposition, the company purports to quote from the SAA. *See id.* at 53. The cited language, however, does not appear in that document. In any event, the statute forecloses the company's argument. The "nature of the production process" in § 1677j(b)(2)(C) necessarily encompasses qualitative considerations. As the government argues, to evaluate such matters under both § 1677j(b)(2)(C) and § 1677j(b)(2)(E) "would double-count the nature of the production process within the totality of the factors." ECF 41, at 26.

The company also contends that Commerce's refusal to include qualitative considerations in its value-added determination departs from previous practice.

---

Appx0001261 (discussing 73 Fed. Reg. 21,580, 21,585). In a second, it "did not provide an explicit determination as to whether the value of processing was small." *Id.* (citing 64 Fed. Reg. 40,336, 40,341–43). And in a third, the Department "stressed" that its "not small" finding "was an anomaly" because the percentage fell within a range (12–26 percent) it had found to be "small" in previous cases. Appx0001261–0001262 (citing 77 Fed. Reg. 6537, 6539). That anomaly resulted from the agency basing its "not small" finding on "the extensive and substantial processing that occurred." Appx0001262. In this case, Commerce explained that such qualitative considerations should have no bearing on "the percentage calculated under" § 1677j(b)(2)(E). *Id.*

*See* ECF 36, at 52. But the previous agency decisions BYD cites are of limited value. To begin with, they antedate the applicable regulation for circumvention inquiries, which requires assessing the "value of processing" based on "the *cost* of producing the part or component." Appx0001259 (emphasis added and quoting 19 C.F.R. § 351.226(i)). Commerce observed that "[c]osts are measured numerically, as is the value of merchandise." *Id.* It discussed its prior decisions and explained that they referred to "the overall decision of whether processing is minor or insignificant or the overall determination of whether circumvention is occurring," rather than the specific § 1677j(b)(2)(E) factor. Appx0001260. Even if the Department changed course, it sufficiently explained its rationale for doing so. *See Al Ghurair*, 65 F.4th at 1360 (stating an agency is not bound by its prior determinations if it explains its reasons for departing from past practice).

5

BYD complains that for purposes of § 1677j(b)(2)(A), Commerce compared the company's level of investment in Cambodia to the level made by its Chinese affiliates "on an absolute basis (*i.e.*, total value of investments made) rather than on a per-megawatt basis (*i.e.*, value of the investments relative to production)." ECF 36, at 60.[11] It says this was "unreasonable and highly distortive" because the Cambodian

_____

[11] FPL joins this argument. ECF 38, at 27–28.

operations serve a "vastly smaller market" than the Chinese affiliates who serve "the very large Chinese and global markets." ECF 36, at 60–61. It also asserts that the agency's approach is wrong because it "ignores the very different scales of production in the two countries. The Chinese industry has invested in a large upstream industry that supplies virtually all of the world's demand for polysilicon wafers, whereas the Cambodian industry is manufacturing cells and modules for the U.S. and (relatively small amounts) for certain other markets." *Id.* at 61.

As the government argues, *see* ECF 41, at 32, the Department observed that the statute does not speak to how the level of investment should be calculated. Appx0001213. Doing so here using the "per-unit" methodology proffered by BYD and FPL would "overlook[ ] the relative requirements of establishing ingot and wafer production facilities in China, as compared with the cell and module production facilities in Cambodia." *Id*. It thus "would dilute the large necessary initial investments required by the production volume of the facilities." *Id.* Commerce explained that it must account for the "threshold level of investment in the Chinese facilities" and that a per-unit analysis would be distortive because China's dominance in ingot and wafer manufacturing means that economies of scale result in lower per-unit investment costs. Appx0001213–0001214.

The court agrees with the government. Nothing in the statute requires the agency to calculate the level of investment in the manner BYD and FPL prefer. The administrative record, in turn, shows that the Department considered their arguments and reasonably explained why the calculation should be made on an absolute basis. Given its discretion regarding questions of methodology, that suffices.

*    *    *

The court sustains Commerce's balancing of the § 1677j(b)(2) factors and thus its conclusion that "the process of assembly or completion" of solar cells in Cambodia is "minor or insignificant" under § 1677j(b)(1)(C).

### B

BYD next attacks Commerce's § 1677j(b)(1)(D) finding that the value of Chinese components in solar cells exported to this country from Cambodia is a "significant portion of the total value" of those goods. The company zeroes in on the Department's use of surrogate data from market-economy countries, rather than the prices BYD paid, to value the Chinese inputs. *See* ECF 36, at 63–69; Appx0001239–0001240.

Commerce observed that the Tariff Act generally presumes that prices of goods from nonmarket-economy countries are unreliable because of government controls, and it found that such controls could have

distorted BYD's prices. Appx0001240. It therefore deemed it inappropriate to use the company's records to value the Chinese inputs. *Id.*

BYD objects that the agency did not contest its data's accuracy. ECF 36, at 64. "It is undisputed that Cambodia is a market economy. There is therefore no evident factual or statutory basis for Commerce to have used [a nonmarket-economy] surrogate value methodology in this case." *Id.* It adds that the agency "unlawfully overstated" the inputs' value because the surrogate values were higher than the actual prices. *Id.* at 64–65.

The government responds that it is irrelevant whether Cambodia has a market economy—the Department must value merchandise produced in the country subject to the duty orders, which in this case has a nonmarket economy. ECF 41, at 34–35. "To use Chinese input prices based on *nonmarket principles* to determine what proportion of the United States *market price* was derived from Chinese production would be irrational." *Id.* at 34.

The only significant case law the parties discuss is *Al Ghurair Iron & Steel LLC v. United States*, 536 F. Supp. 3d 1357, 1376–78 (CIT 2021), *aff'd*, 65 F.4th 1351 (Fed. Cir. 2023), which the Department also cited, *see* Appx0001239–0001240. The plaintiff there argued, as BYD does here, that the statute does not allow Commerce to use surrogate values to calculate the cost of source-country components when the third

country has a market economy. 536 F. Supp. 3d
at 1376. The government responded that the agency's
standard practice is to presume that nonmarket-econ-
omy costs and pricing are inherently unreliable even
when the inputs are used in a market-economy coun-
try. *Id.* at 1377. The court agreed with the government
and held that Congress had left a gap for the Depart-
ment to fill: "Given the lack of definition of 'value' and
silence as to the method to use to assess 'value,' Com-
merce acted reasonably." *Id.* at 1378.

BYD argues that *Al Ghurair* is no longer persuasive
authority in the wake of *Loper Bright Enterprises v.
Raimondo*. ECF 36, at 66–67 (citing 603 U.S. 369, 404
(2024)). Under that decision, "[a] statutory ambiguity
'is not a delegation to anybody.'" *Pickens v. Hamilton-
Ryker IT Sols., LLC*, 133 F.4th 575, 587 (6th Cir. 2025)
(Sutton, C.J.) (quoting *Loper Bright*, 603 U.S. at 400).
When faced with "an unclear statute," judges must
"arrive at their own 'independent judgment' about
what [it] means." *Id.* (quoting *Loper Bright*, 603 U.S.
at 412).

In *Loper Bright*, however, the Court did not throw
out the administrative discretion baby with the *Chev-
ron* deference bathwater. *See id.* (citing Gary Lawson,
*"Then What?": A Framework for Life Without* Chevron,
60 Wake Forest L. Rev. 57, 93–94 (2025)). "[I]t will
sometimes be the case that 'the best reading of a stat-
ute is that it delegates discretionary authority to an
agency.'" *Id.* (quoting *Loper Bright*, 603 U.S. at 395).

"'[B]road and open-ended' grants of authority . . . are incapable of precise definition not because they are ambiguous, but because they unambiguously convey discretion." *Id.* (quoting *Kisor v. Wilkie*, 588 U.S. 558, 632 (2019) (Kavanaugh, J., concurring in the judgment), and citing Donald L.R. Goodson, *Discretion Is Not (*Chevron*) Deference*, 62 Harv. J. on Legis. 12, 16–17 (2024)). In those circumstances, and assuming the statute provides constitutionally delegable authority and that the agency has stayed within its lane, *see id.*, the court's role is to ensure that the former's "action is both 'reasonable and reasonably explained,'" *id.* at 588 (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)).

Here, the statute delegates authority to Commerce to define the general term "value" in 19 U.S.C. § 1677j(b)(1)(D). The court agrees with *Al Ghurair* and holds that the Department reasonably exercised that discretion using surrogate values rather than Chinese prices.

Consider the relevant background principles. Commerce observed that the Tariff Act generally presumes the prices of goods produced in nonmarket-economy countries are unreliable because of government controls. Appx0001240. China is such a country. *See* 46 Fed. Reg. 24,614, 24,614. The orders here impose antidumping and countervailing duties on solar cells from that nation.

That, in turn, raises a fundamental point: Countervailing duties respond to a foreign government's subsidizing of the manufacture, production, or export of merchandise, *see* 19 U.S.C. § 1671(a)(1), so it is reasonable to assume that the price of such goods, or of the inputs used to make them, reflects the subsidy. The subsidy is baked into the price. So, while BYD complains that the surrogate values were higher than the actual prices, ECF 36, at 64–65, that is exactly the point—the agency reasonably presumed that the actual prices of Chinese-made components *are* artificially low.

The Tariff Act presumes that nonmarket-economy pricing is unreliable, and there is no reason to believe that otherwise-suspect prices of goods from such countries are valid for sales just because they're made in a third country rather than the United States. Thus, the court holds that Commerce's discretionary use of surrogate data to value the cost of Chinese-made inputs was reasonable.

## C

Finally, BYD contends that the statute requires the Department "to weigh the evidence and provide reasoning as to why an affirmative determination is 'appropriate.'" ECF 36, at 71 (citing 19 U.S.C. § 1677j(b)(1)(E)). It asserts that "[n]either the statute nor the SAA provides a specific definition of 'appropriate' to be applied in the circumvention context," *id.*, and that under *Michigan v. EPA*, the agency was

required to consider "all the relevant factors" and pay "at least some attention to cost." *Id.* (quoting 576 U.S. 743, 752 (2015)). According to the company, action was not appropriate in view of Presidential Proclamation 10414[12] and the Department's own precedents. ECF 36, at 72–75.

The court agrees with BYD, and the government does not dispute, that § 1677j(b)(1)(E) is an independent condition that the agency must find satisfied before it may include exports from a third country within the scope of orders applying to source-country exports. That said, the court concurs with the government that the company's "appeals to matters of cost and public policy lack merit." ECF 41, at 37.

To begin with, BYD failed to argue before the Department that the latter should consider costs in making its § 1677j(b)(1)(E) finding. Exhaustion doctrine precludes the company from now raising that contention. *See* 28 U.S.C. § 2637(d).

In any event, BYD misreads the statute, under which the *only* relevant inquiry is whether "action is appropriate under [§ 1677j(b)(1)] *to prevent evasion.*"

---

[12] In this order, the President declared an emergency with respect to the availability of reliable electricity and directed Commerce to suspend the application of antidumping and countervailing duties on solar cells and modules from Cambodia, Malaysia, Thailand, and Vietnam for two years. *See* 87 Fed. Reg. 35,067.

19 U.S.C. § 1677j(b)(1)(E) (emphasis added). It simply does not require the broad inquiry suggested by the company.

Commerce explained that the § 1677j(b)(1)(A)–(D) conditions for finding circumvention were met and that no information on the record suggested that circumvention "would cease" unless the orders were extended to cover exports from Cambodia, Appx0001271—a finding that BYD does not dispute. Therefore, the Department reasonably found "that action is appropriate under" § 1677j(b)(1)(E) to prevent evasion. *Id.* That is all the statute required at this stage.[13]

But even if the statute required the broader inquiry pressed by BYD, the agency reasonably explained why action was appropriate given the objections raised by the company. As to Proclamation 10414, nothing in it precluded the Department from finding circumvention—it just meant that the agency could not implement its affirmative finding until the proclamation expired. Appx0001272. The court further observes that, in any event, the statute gives the responsibility of

---

[13] If the Department finds all the § 1677j(b)(1) conditions satisfied, that does not automatically require it to extend duty orders to exports from third countries. It has discretion to do so based on its evaluation of the § 1677j(b)(3) factors, other considerations that it deems relevant, and input from the International Trade Commission. *See* 19 U.S.C. §§ 1677j(b)(1), (b)(3).

assessing potential circumvention to Commerce, *not* to
the President, whose order was irrelevant under the
§ 1677j criteria.

As to the Department's prior decisions, nowhere in
its original investigation did it *disclaim* future circum-
vention inquiries—as BYD asserts—concerning the
conversion of "Chinese-origin wafers into [solar] cells
in a third country." ECF 36, at 73. Instead, the agency
observed that domestic producers have "*the option* of
bringing additional [antidumping and countervailing
duty] petitions to address any . . . concerns . . . regard-
ing solar modules/panels assembled from solar cells
produced in a third country." Appx0013244 (emphasis
added). It "did not preclude circumvention inquiries"
as an option when solar cells are made in third coun-
tries using Chinese components. Appx0001271.

BYD also asserts that the Department "previously
confirmed that it is inappropriate to conduct a circum-
vention inquiry where merchandise was 'expressly and
intentionally excluded from the scope of the Orders,'
as was the case here." ECF 38, at 73 (citing *Walk-Be-
hind Lawn Mowers from China*, 88 Fed. Reg. 13,434,
13,435, and quoting accompanying Memorandum of
Intent to Rescind Circumvention Inquiry at 4). The
company conflates the apples (the technical character-
istics of products covered by an order) and oranges (the
country of origin) that are the elements of scope. *See
Canadian Solar*, 918 F.3d at 913. In *Walk-Behind
Lawn Mowers*, the Department found a § 1677j(a)

circumvention inquiry[14] unwarranted because the original scope language expressly excluded by *technical description* the components that would be subject to the circumvention duties. *See* Memo of Intent to Rescind at 6–8. Extending the order to such components "would introduce an internal inconsistency into the scope by both excluding and including the same merchandise and would expand the scope contrary to the terms of the Orders." *Id.* at 7. Here, Commerce's circumvention determination extends the duties to the products sharing the same technical characteristics described in the original orders. Thus, no internal inconsistency as to such characteristics is created.

Insofar as the company contends that extending the orders to the same products that are the result of substantial transformation in the third country creates an internal inconsistency, the Federal Circuit's decision in *Bell Supply* forecloses that theory. *See* 888 F.3d at 1230 (explaining that when Commerce finds substantial transformation, it "can include such merchandise within the scope of an [antidumping or countervailing duty] order . . . *if it finds circumvention* under § 1677j") (emphasis added).

---

[14] In such an inquiry, the exports in question are source-country components that are shipped to the United States and then completed or assembled into products "of the same class or kind" of merchandise from the former nation that is subject to duty orders. *See* 19 U.S.C. §1677j(a)(1).

**Ct. No. 23-00221**                                    **Page 36**

BYD's arguments challenging the Department's finding that action was "appropriate . . . to prevent evasion," 19 U.S.C. § 1677j(b)(1)(E), are unavailing. The court therefore upholds it.

\*   \*   \*

The court denies the motions for judgment on the agency record filed by BYD (ECF 36) and FPL (ECF 38) and sustains Commerce's determination. Judgment will enter. *See* USCIT R. 58(a).

Dated:  May 16, 2025           /s/ *M. Miller Baker*
        New York, NY            Judge

# Web page cited in the opinion

 **U.S. Energy Information Administration**

# Solar explained
# *Photovoltaics and electricity*



**BASICS**

## Photovoltaic cells convert sunlight into electricity

A photovoltaic (PV) cell, commonly called a solar cell, is a nonmechanical device that converts sunlight directly into electricity. Some PV cells can convert artificial light into electricity.

Sunlight is composed of *photons*, or particles of solar energy. These photons contain varying amounts of energy that correspond to the different wavelengths of the solar spectrum.

A PV cell is made of semiconductor material. When photons strike a PV cell, they will reflect off the cell, pass through the cell, or be absorbed by the semiconductor material. Only the photons that are absorbed provide energy to generate electricity. When the semiconductor material absorbs enough sunlight (solar energy), electrons are dislodged from the material's atoms. Special treatment of the PV cell's surface during manufacturing makes the front surface of the cell more receptive to the dislodged, or *free*, electrons so that the electrons naturally migrate to the surface of the cell.

## The flow of electricity in a solar cell

The movement of electrons, which all carry a negative charge, toward the front surface of the PV cell creates an imbalance of electrical charge between the cell's front and back surfaces. This imbalance, in turn, creates a voltage potential similar to the negative and positive terminals of a battery. Electrical conductors on the PV cell absorb the electrons. When the conductors are connected in an electrical circuit to an external load, such as a battery, electricity flows through the circuit.



**Inside a photovoltaic cell**

Source: U.S. Energy Information Administration

# PV cells, panels, and arrays

The PV cell is the basic building block of a PV system. Individual cells can vary from 0.5 inches to about 4.0 inches across. However, one PV cell can only produce 1 or 2 Watts, which is only enough electricity for small uses, such as powering calculators or wristwatches.

PV cells are electrically connected in a packaged, weather-tight PV *panel* (sometimes called a *module*). PV panels vary in size and in the amount of electricity they can produce. Electricity-generating capacity for PV panels increases with the number of cells in the panel or in the surface area of the panel. PV panels can be connected in groups to form a PV *array*. A PV array can be composed of as few as two PV panels to hundreds of PV panels. The number of PV panels connected in a PV array determines the amount of electricity the array can generate.

PV cells generate direct current (DC) electricity. DC electricity can be used to charge batteries that power devices that use DC electricity. Nearly all electricity is supplied as alternating current (AC) in electricity transmission and distribution systems. Devices called *inverters* are used on PV panels or in PV arrays to convert the DC electricity to AC electricity.

PV cells and panels produce the most electricity when they are directly facing the sun. PV panels and arrays can use tracking systems to keep the panels facing the sun, but these systems are expensive. Most PV systems have panels in a fixed position that are usually facing directly south in the northern hemisphere—or directly north in the southern hemisphere—at an angle that optimizes the physical and economic performance of the system.



did you **know**?

Solar photovoltaic cells are grouped in panels, and panels can be grouped into arrays of different sizes to power water pumps, power individual homes, or provide utility-scale electricity generation.



Source: National Renewable Energy Laboratory (copyrighted)

## PV system efficiency

The efficiency that PV cells convert sunlight to electricity varies by the type of semiconductor material and PV cell technology. The efficiency of commercially available PV panels averaged less than 10% in the mid-1980s, increased to around 15% by 2015, and is now approaching 25% for state-of-the art modules. Experimental PV cells and PV cells for niche markets, such as space satellites, have achieved nearly 50% efficiency.

## PV system applications

When the sun is shining, PV systems can generate electricity to directly power devices such as water pumps or supply electric power grids. PV systems can also charge a battery to provide electricity when the sun is not shining for individual devices, single homes, or electric power grids.

Some advantages of PV systems are:

- PV systems can supply electricity in locations where electricity distribution systems (power lines) do not exist, and they can also supply electricity to electric power grids.
- PV arrays can be installed quickly.
- The environmental effects of PV systems located on buildings are minimal.



Source: National Renewable Energy Laboratory (copyrighted)



Source: National Renewable Energy Laboratory (copyrighted)

# History of PV systems

The first practical PV cell was developed in 1954 by Bell Telephone researchers. Beginning in the late 1950s, PV cells were used to power U.S. space satellites. By the late 1970s, PV panels were providing electricity in remote, or *off-grid*, locations that did not have electric power lines. Since 2004, most PV systems in the United States are *grid-connected*—they are connected to an electric power grid. These PV systems are installed on or near homes and buildings and at *utility-scale* power plants that have at least 1 megawatt of electric-generation capacity. Technological advances, lower costs for PV systems, and various financial incentives and government policies, especially tax credits and net metering, have helped to greatly expand PV use since the mid-1990s. Millions of grid-connected PV systems are now installed in the United States.

Electricity generation at utility-scale PV power plants increased from 6 million kilowatthours (kWh) (or 6,000 megawatthours [MWh]) in 2004 to about 162 billion kWh (or 161,651,000 MWh) in 2023. About 74 billion kWh (or 73,619,000 MWh) were generated by *small-scale*, grid-connected PV systems in 2023, up from 11 billion kWh (or 11,233,000 MWh) in 2014. *Small-scale PV systems* have less than 1,000 kilowatts of electricity-generation capacity. Most small-scale PV systems are located on buildings and are sometimes called *rooftop PV* systems.

*Last updated: May 24, 2024, with preliminary data for 2023 from the Electric Power Monthly, February 2024.*

### UNITED STATES COURT OF INTERNATIONAL TRADE

| |
|---|
| BYD (H.K.) CO., LTD., |
| *Plaintiff,* |
| and |
| FLORIDA POWER & LIGHT COMPANY, |
| *Plaintiff-Intervenor,* |
| v. |
| UNITED STATES, |
| *Defendant,* |
| and |
| AUXIN SOLAR INC., |
| *Defendant-Intervenor.* |

Ct. No. 23-00221-MMB

### JUDGMENT

For the reasons stated in Slip Opinion 25-60 (ECF 49), the court sustains

the Department of Commerce's final determination of circumvention.

Dated:     May 16, 2025              /s/ *M. Miller Baker*
           New York, New York        M. Miller Baker, Judge

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-979/C-570-980
Circumvention Inquiry
Cambodia 2022
**Public Document**
E&C/OVII: TP/JR

August 17, 2023

| | |
|---|---|
| **MEMORANDUM TO:** | Lisa W. Wang<br>Assistant Secretary<br>  for Enforcement and Compliance |
| **FROM:** | James Maeder<br>Deputy Assistant Secretary<br>  for Antidumping and Countervailing Duty Operations |
| **SUBJECT:** | Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Issues and Decision Memorandum for the Circumvention Inquiry With Respect to the Kingdom of Cambodia |

---

## I.    SUMMARY

We have analyzed the case and rebuttal briefs of the interested parties in the circumvention inquiries of the *Orders*.[1]  As a result of our analysis, we continue to find, consistent with the *Preliminary Determination*, that solar cells and modules completed in Cambodia from parts and components manufactured in China, are circumventing the *Orders*.  We find that BYD HK and NE Solar are circumventing the *Orders* and that a country-wide determination is most appropriate to prevent further circumvention of the *Orders* by non-examined producers of inquiry merchandise in Cambodia.  We recommend that you approve the positions described in the "Discussion of the Issues" section of this memorandum.  Based on our analysis of the comments received, we made certain changes to the language in the certification.

Further, in December 2022, Sonali filed a scope ruling request[2] seeking that Commerce determine that the solar modules it imports into the United States, which were manufactured in Cambodia using solar cells manufactured in Cambodia from silicon wafers produced in China, are not covered by the scope of the *Orders*.  On the basis of our analysis of Sonali's request and the sources described in 19 CFR 351.225(k)(1), we determine that Sonali's solar cells and modules are not included in the scope of the *Orders*.[3]

---

[1] Appendices I, II, and III attached to this memorandum identify, respectively, the acronyms and abbreviations, court and case citations, and proceeding documents.
[2] *See Sonali Scope Application*.
[3] *See Orders*.



Below is the complete list of issues for which we received comments and rebuttal comments from interested parties:

## A. Methodological Issues

Comment 1.  Whether Solar Cells With a p/n Junction Formed Outside of China Should Be Subject to the Circumvention Inquiries

Comment 2.  Whether a Wafer Should Be Considered a Chinese Input Where Either the Wafer or the Polysilicon in the Wafer was Produced Outside of China

Comment 3.  Whether Commerce Should Analyze Investment Data on a Per-Unit Basis

Comment 4.  Whether to Depart from the Section 781(b)(2) "Minor or Insignificant" Methodology Applied in the *Preliminary Determinations*

Comment 5.  Whether the Nature of Third-Country Processing Indicates the Processing is Minor or Insignificant Under Section 781(b)(2)(C) of the Act

Comment 6.  How to Value U.S. Imports of Solar Cells and Modules for Purposes of Section 781(b)(2)(E) of the Act

Comment 7.  Whether Material Costs Should be Included in the Value of Third-Country Processing

Comment 8.  Whether Commerce Should Rely on Surrogates to Value Chinese Inputs Consumed in the Inquiry Country

## B. Country-Specific Issues

Comment 9.  Whether Commerce Should apply AFA to NE Solar

Comment 10.  Whether NE Solar's Production Process Data Support a Negative Final Determination

Comment 11.  Whether to Include BYD HK's Tollers in Determining Whether the Process of Assembly or Completion is Minor or Insignificant

Comment 12.  Whether BYD HK's Process of Assembly in Cambodia is Minor or Insignificant Under Section 781(b)(1)(C) of the Act

## C. Overall Determinations

Comment 13.  Whether the Factors Under 781(b)(3) of the Act Justify an Affirmative Final Determination

Comment 14.  Whether Commerce's Country-wide Affirmative Circumvention Determination was Appropriate

Comment 15.  Affirmative Circumvention Determinations Would not be Appropriate Under Section 781(b)(1)(E) of the Act

## D. Certification Issues

Comment 16.  Whether Commerce Should Allow AFA Companies to Certify

Comment 17.  Certification Requirements and Corrections

Comment 18.  Whether Commerce Can Require Certifications for U.S. Entries of Merchandise Not Covered by the *Orders*

2

Comment 19.  Whether Exporters and Importers Should be Permitted to Submit Multiple
        Certifications, as Applicable
Comment 20.  Whether or Not Companies Found Not to Be Circumventing Should Be Required
        to Certify and to Identify Their Wafer Suppliers
Comment 21.  Whether Commerce Should Reconsider Certification Eligibility in Changed
        Circumstances Reviews
Comment 22.  Whether Cadmium Telluride Thin Film Solar Products are Covered by
        Affirmative Final Determinations or Related Certification Requirements
Comment 23.  Clarification and Enforcement of the Utilization Requirement
Comment 24.  Whether the "Wafer-Plus-Three" Requirement is Appropriate

**E.    Other Issues**

Comment 25.  Whether Commerce Properly Placed *Ex Parte* Memoranda on the Record That
        Concerned the Circumvention Inquiries
Comment 26.  Whether Commerce's Determination to Apply *Presidential Proclamation 10414*
        Retroactively is Contrary to Law
Comment 27.  Whether Third-Country Exporters Without an AD Rate Should Receive the
        Separate Rate

## II.    BACKGROUND

On December 8, 2022, Commerce published the *Preliminary Determination*.  Between February
6 and 9, 2023, we conducted verification of BYD HK.[4]  On January 29, 2023, NE Solar informed
Commerce officials that it was canceling verification.[5]  Pursuant to section 781(e) of the Act, on
May 30, 2023, we notified the ITC of our affirmative preliminary determination of
circumvention and informed the ITC of its ability to request consultations with Commerce
regarding the possible inclusion of the products in question within the *Orders* pursuant to section
781(e)(2) of the Act.[6]  The ITC did not request consultations with Commerce.

In accordance with 19 CFR 351.309, we invited parties to comment on the *Preliminary
Determination* and our verification findings.[7]  Between March 6 and April 3, 2023, parties

---

[4] *See* BYD HK's Verification Report.
[5] *See* NE Solar January 29, 2023 *Ex Parte* Memorandum.
[6] *See* ITC Notification Letter.
[7] *See* First Tranche Briefing Schedule; and Second Tranche Briefing Schedule – Cambodia.

3

submitted case and rebuttal briefs.[8]  Additionally, numerous parties requested a hearing.[9]  On July 18, 2023, Commerce held a public hearing.[10]

Pursuant to 19 CFR 351.225(d)(2), Commerce, on January 20, 2023, informed interested parties via a memorandum of its intent to address Sonali's scope ruling application in this circumvention inquiry.[11]  Accordingly, on January 25, 2023, Sonali's full scope ruling application was filed on the record of this inquiry.[12]  In the scope ruling application, Sonali requested that Commerce determine that the solar modules that it imports into the United States, which were manufactured in Cambodia using solar cells manufactured in Cambodia from silicon wafers produced in China, are outside the scope of our *Orders*.[13]  On the basis of our analysis of Sonali's request and the sources described in 19 CFR 351.225(k)(1), we determine that Sonali's solar cells and modules manufactured in Cambodia are not included in the scope of the *Orders*.

## III. MERCHANDISE SUBJECT TO THE SCOPE INQUIRY

The products at issue are Sonali's solar modules manufactured and assembled in Cambodia by Enalex Energy (KH) Co. Ltd (Enalex).  Such panels could be considered within the *Orders* if produced/assembled from solar cells originating in China.  Sonali states that the Chinese input at issue consists of the silicon wafers that are imported into Cambodia from China and are then manufactured into solar cells in Cambodia by Comalex PV (KH) Technology Co., Ltd. (Comalex) and then into solar modules, also in Cambodia, by Enalex.[14]  The solar cells embedded in the solar modules at issue are produced using Chinese-origin silicon wafers purchased and manufactured by C&B International Holdings Co., Ltd (C&B International), a Chinese wafer manufacturer.[15]  Sonali cites entry declaration forms, as well as solar cell and solar module processing procedures conducted by Comalex and Enalex within Cambodia as examples of the processing that takes place in Cambodia.[16]  Sonali states that Comalex

---

[8] *See* Auxin's March 6, 2023 Case Brief; BYD HK's March 6, 2023 Case Brief; CSIL's March 6, 2023 Case Brief; First Solar Malaysia's March 6, 2023 Case Brief; First Solar Vietnam's March 6, 2023 Case Brief; Hanwha's March 6, 2023 Case Brief; Jinko's March 6, 2023 Case Brief; Maxeon's March 6, 2023 Case Brief; NE Solar's March 6, 2023 Case Brief; NextEra's March 6, 2023 Case Brief; Risen's March 6, 2023 Case Brief; Silfab's March 6, 2023 Case Brief; TTL's March 6, 2023 Case Brief; VINA's March 6, 2023 Case Brief's March 6, 2023 Case Brief; VSUN's March 6, 2023 Case Brief's March 6, 2023 Case Brief; Auxin's March 17, 2023 Rebuttal Brief; Boviet's March 17, 2023 Rebuttal Brief; BYD HK's March 17, 2023 Rebuttal Case Brief; CSIL's March 17, 2023 Rebuttal Brief; First Solar Malaysia's March 17, 2023 Rebuttal Brief; First Solar Vietnam's March 17, 2023 Rebuttal Brief; JA Solar, LONGi, VINA and VSUN's March 17, 2023 Rebuttal Brief; Hanwha's March 17, 2023 Rebuttal Brief; Jinko's March 17, 2023 Rebuttal Brief; Maxeon's March 17, 2023 Rebuttal Brief; NextEra's March 17, 2023 Rebuttal Brief; Risen's March 17, 2023 Rebuttal Brief; Silfab's March 17, 2023 Rebuttal Brief; TTL's March 17, 2023 Rebuttal Brief; BYD HK's March 24, 2023 Case Brief; Silfab's March 24, 2023 Case Brief; Auxin's March 24, 2023 Case Brief; NextEra's March 24, 2023 Case Brief; Auxin's April 3, 2023 Rebuttal Brief; BYD HK's April 3, 2023 Rebuttal Brief; NextEra's April 3, 2023 Rebuttal Brief.
[9] *See* Auxin's Hearing Request; BYD HK's Hearing Request; NextEra's Hearing Request; NE Solar's Hearing Request; Silfab's Hearing Request.
[10] *See* Hearing Transcript
[11] *See Sonali Scope Inquiry*.
[12] *See Sonali Scope Application.*
[13] *Id.* at Attachment 1.
[14] *Id.* at 8.
[15] *Id.*
[16] *Id.* at Exhibits C, E, F, G, H, and J.

4

manufactures solar cells from the imported silicon wafers in Cambodia by performing a series of high-tech production processes in order to transform them into energy-collecting solar cells, including the formation of the p/n junctions necessary to convert solar energy into electrical currents, before they are further processed and assembled into solar modules that are exported to the United States.[17]

## IV.    SCOPE OF THE *ORDERS*

The merchandise covered by the *Orders* is crystalline silicon photovoltaic cells, and modules, laminates, and panels, consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including, but not limited to, modules, laminates, panels and building integrated materials.

The *Orders* cover crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Merchandise under consideration may be described at the time of importation as parts for final finished products that are assembled after importation, including, but not limited to, modules, laminates, panels, building-integrated modules, building-integrated panels, or other finished goods kits.  Such parts that otherwise meet the definition of merchandise under consideration are included in the scope of the *Orders*.

Excluded from the scope of the *Orders* are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of the *Orders* are crystalline silicon photovoltaic cells, not exceeding 10,000mm$^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell.  Where more than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.

Additionally, excluded from the scope of the *Orders* are panels with surface area from 3,450 mm$^2$ to 33,782 mm$^2$ with one black wire and one red wire (each of type 22 AWG or 24 AWG not more than 206 mm in length when measured from panel extrusion), and not exceeding 2.9 volts, 1.1 amps, and 3.19 watts.  For the purposes of this exclusion, no panel shall contain an internal battery or external computer peripheral ports.

Also excluded from the scope of the *Orders* are:

1)      Off grid crystalline silicon photovoltaic cells (CSPV) panels in rigid form with a glass cover, with the following characteristics:

---

[17] *Id.* at 14-15.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

(A) A total power output of 100 watts or less per panel;
(B) a maximum surface area of 8,000 cm2 per panel;
(C) do not include a built-in inverter;
(D) must include a permanently connected wire that terminates in either an 8mm male barrel connector, or a two-port rectangular connector with two pins in square housings of different colors;
(E) must include visible parallel grid collector metallic wire lines every 1–4 millimeters across each solar cell; and
(F) must be in individual retail packaging (for purposes of this provision, retail packaging typically includes graphics, the product name, its description and/or features, and foam for transport); and

2) Off grid CSPV panels without a glass cover, with the following characteristics:

(A) A total power output of 100 watts or less per panel;
(B) a maximum surface area of 8,000 cm2 per panel;
(C) do not include a built-in inverter;
(D) must include visible parallel grid collector metallic wire lines every 1–4 millimeters across each solar cell; and
(E) each panel is
   1. permanently integrated into a consumer good;
   2. encased in a laminated material without stitching, or
   3. has all of the following characteristics:  (i) the panel is encased in sewn fabric with visible stitching, (ii) includes a mesh zippered storage pocket, and (iii) includes a permanently attached wire that terminates in a female USB–A connector.

In addition, the following CSPV panels are excluded from the scope of the *Orders*:

1) Off-grid CSPV panels in rigid form with a glass cover, with each of the following physical characteristics, whether or not assembled into a fully completed off-grid hydropanel whose function is conversion of water vapor into liquid water:
(A) A total power output of no more than 80 watts per panel;
(B) A surface area of less than 5,000 square centimeters (cm2) per panel;
(C) Do not include a built-in inverter;
(D) Do not have a frame around the edges of the panel;
(E) Include a clear glass back panel; and
(F) Must include a permanently connected wire that terminates in a two-port rectangular connector.

Additionally excluded from the scope of the Orders are off-grid small portable crystalline silicon photovoltaic panels, with or without a glass cover, with the following characteristics: (1) a total power output of 200 watts or less per panel; (2) a maximum surface area of 16,000 cm2 per panel; (3) no built-in inverter; (4) an integrated handle or a handle attached to the package for ease of carry; (5) one or more integrated kickstands for easy installation or angle adjustment; and (6) a wire of not less than 3 meters either permanently connected or attached to the package that terminates in an 8mm diameter male barrel connector.

6

Modules, laminates, and panels produced in a third country from cells produced in China are covered by the *Orders*; however, modules, laminates, and panels produced in China from cells produced in a third country are not covered by the *Orders*.

Merchandise covered by the *Orders* is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.71.0000, 8501.72.1000, 8501.72.2000, 8501.72.3000, 8501.72.9000, 8501.80.1000, 8501.80.2000, 8501.80.3000, 8501.80.9000, 8507.20.8010, 8507.20.8031, 8507.20.8041, 8507.20.8061, 8507.20.8091, 8541.42.0010, and 8541.43.0010.  These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of the *Orders* is dispositive.[18]

## V.     REGULATORY FRAMEWORK FOR SCOPE INQUIRY

When a scope application is filed, Commerce examines the scope language of the order(s) at issue and the description of the product contained in the scope ruling application.[19]  Pursuant to Commerce's regulations, in determining whether a product is covered by the scope of an order, Commerce may make its determination on the basis of the scope language alone where such language is dispositive.[20]

Commerce may also take into account primary interpretive sources in determining a scope ruling, including the descriptions of the merchandise contained in the petition and investigation; previous or concurrent determinations by Commerce, including prior scope rulings, memoranda, or clarifications pertaining to the order at issue or other orders with same or similar language; and determinations of the ITC pertaining to the order at issue.[21]  Additionally, Commerce may consider secondary interpretive sources, such as any other determinations of Commerce or the ITC, CBP rulings or determinations, industry usage, dictionaries, and any other relevant record evidence, in determining a scope ruling.  However, to the extent that these secondary interpretive sources conflict with primarily interpretive sources under 19 CFR 351.225(k)(1)(i), the primary interpretive sources will normally control.[22]  If Commerce determines that these sources are determinative of the matter, it will issue a final scope ruling as to whether the merchandise is covered by the order(s).[23]

Where the descriptions of the merchandise in the sources described in 19 CFR 351.225(k)(1) are not dispositive, Commerce will consider the five additional factors set forth at 19 CFR 351.225(k)(2)(i).  These factors are:  (A) the physical characteristics of the merchandise; (B) the expectations of the ultimate purchasers; (C) the ultimate use of the product; (D) the channels of trade in which the product is sold; and (E) the manner in which the product is advertised and displayed.  In the event of a conflict between these factors, the physical characteristics of the merchandise will normally be allotted greater weight than other factors.[24]

---

[18] *See Orders*; *see also Solar CCR Excluding Certain Off-Grid Solar Products*.
[19] *See Walgreen Co.*, 620 F.3d 1350, 1357 (Fed. Cir. 2010).
[20] *See* 19 CFR 351.225(k)(1).
[21] *See* 19 CFR 351.225(k)(1)(i).
[22] *See* 19 CFR 351.225(k)(1)(ii).
[23] *See* 19 CFR 351.225(h).
[24] *See* 19 CFR 351.225(k)(2)(ii).

Commerce's scope rulings are made on a case-by-case basis, and may be applied on a producer-specific, exporter-specific, or importer-specific basis, or some combination thereof, or to all products from the same country with the same relevant physical characteristics as the product at issue, on a country-wide basis, regardless of the producer, exporter, or importer of the products.[25]

## VI.    INTERESTED PARTY SCOPE COMMENTS

Sonali states that the solar modules it imported into the United States from Cambodia using solar cells produced from Chinese-origin silicon wafers fall outside of the scope of the *Orders* because the silicon wafer lacks the physical characteristics required to be considered a solar cell. Specifically, the p/n junction, which is the characteristic that plays a key role in converting solar energy into electrical current, is added to the wafer in Cambodia.  As stated in the SunSpark Scope Ruling, "wafers are not cells."[26]  Accordingly, the silicon wafer does not determine the country of origin of the solar cell.  Rather, Sonali states that the Chinese-origin wafers "underwent substantial transformation in Cambodia, where diffusion occurred creating the completed p/n junction and enabling activation resulting in a new product, having a new name, character and use."[27]  As such, Sonali contends, based on the evidence provided within its scope request, the solar modules at issue do not fall within the scope of the *Orders* because the solar cells used are not Chinese.

No additional comments were filed by interested parties, including the domestic industry.

## VII.   SCOPE DETERMINATION

Based on Sonali's scope ruling application and its description of the processing taking place in Cambodia, the solar cells assembled into solar modules in Cambodia from Chinese-origin silicon wafers, do not fall within the scope of the *Orders* because the formation of the p/n junction occurred in Cambodia.  As the Chinese-origin silicon wafers did not undergo the activation of the p/n junction until reaching Cambodia, the raw material is not a solar cell from China within the meaning of the scope of the *Orders*.  We view the facts of the SunSpark Scope Ruling to be analogous with the facts of this scope request.  As stated in the SunSpark Scope Ruling, "wafers are not cells."[28]  Therefore, based on the record evidence and descriptions submitted by Sonali and the language of the scope of the *Orders*, the merchandise at issue in this scope inquiry is not within the scope of the *Orders*.

## VIII.  SCOPE OF THE CIRCUMVENTION INQUIRY

This circumvention inquiry covers:  (A) crystalline silicon photovoltaic cells that meet the physical description of crystalline silicon photovoltaic cells in the scope of the *Orders*, subject to the exclusions therein, whether or not partially or fully assembled into other products, that were produced in Cambodia from wafers produced in China; and (B) modules, laminates, and panels

---

[25] *See* 19 CFR 351.225(m)(1).
[26] *See SunSpark Technology Final Scope Ruling.*
[27] *See Sonali Scope Application* at 11-13.
[28] *See SunSpark Technology Final Scope Ruling* at 5.

consisting of crystalline silicon photovoltaic cells, subject to the exclusions for certain panels in the scope of the *Orders*, whether or not partially or fully assembled into other products, that were produced in Cambodia from wafers produced in China and where more than two of the following components in the module/laminate/panel were produced in China:  (1) silver paste; (2) aluminum frames (3) glass; (4) backsheets; (5) ethylene vinyl acetate sheets; and (6) junction boxes.  If modules, laminates, and panels consisting of crystalline silicon photovoltaic cells do not meet both of the conditions in item (B) above, then this circumvention inquiry does not cover the modules, laminates, and panels, or the crystalline silicon photovoltaic cells within the modules, laminates, and panels, even if those crystalline silicon photovoltaic cells were produced in Cambodia from wafers produced in China.  Wafers produced outside of China with polysilicon sourced from China are not considered to be wafers produced in China for purposes of this circumvention inquiry.

## IX.     PERIOD OF THE CIRCUMVENTION INQUIRY

The period of the inquiry is January 1, 2008, through December 31, 2021.

## X.     CHANGES SINCE THE *PRELIMINARY DETERMINATION*

As detailed below, we made a change to the *Preliminary Determination* by making an affirmative determination of circumvention with respect to NE Solar due to its cancelation of verification (*see* Comment 9).  For a complete description of our analysis, *see* the *Preliminary Determination* and for a complete description of the change to this analysis, *see* the Final Analysis Memorandum.[29]

## XI.     DISCUSSION OF THE ISSUES

**Methodological Issues**

**Comment 1.   Whether Solar Cells With a p/n Junction Formed Outside of China Should
                Be Subject to the Circumvention Inquiries**

*CSIL*[30]
- Because Commerce has long held that solar cells and modules with a p/n junction formed outside of China are not subject to the *Orders*,[31] solar cells and modules with p/n junctions formed in the four inquiry countries should not be subject to these circumvention inquiries.

*Auxin*[32]
- Commerce's practice with respect to the p/n junction does not prevent it from issuing an affirmative circumvention finding that solar cells and modules with a country of origin

---

[29] *See* Memorandum, BYD HK Final Analysis Memorandum.
[30] *See* CSIL's March 6, 2023 Case Brief at 2-3.
[31] *Id.* at 2 (citing the *Orders*).
[32] *Id.* at 9-13; *see also* Auxin's March 17, 2023 Rebuttal Brief at 30-31.

9

other than China are covered by the scope of the *Orders*.[33] Thus, solar cells and modules with a p/n junction formed outside of China should be subject to the circumvention inquiries.

**Commerce's Position:** We disagree with CSIL. Commerce previously determined that it is the addition of a p/n junction that transforms a silicon wafer into a solar cell.[34] Thus, the country where the p/n junction is formed is the country-of-origin of the solar cell. While products with a country-of-origin other than the country subject to the order are not normally covered by the order, the Act expressly provides an exception to this rule under the circumvention provisions in section 781 of the Act. Circumvention inquiries under section 781(b) of the Act can bring within the discipline of an order merchandise that would not be subject to the order under a country-of-origin analysis.[35]

The circumvention provisions in section 781(b)(1)(A) of the Act, only require that the merchandise imported into the United States be of the same class or kind as the merchandise produced in the country that is the subject of the order. It does not require the merchandise to have the same country-of-origin as the merchandise that is the subject of the order.

In fact, "{c}ircumvention can only occur if the articles are from a country not covered by the relevant AD or CVD orders."[36] To read section 781(b) of the Act as applying to a class or kind of merchandise that is covered by an AD and/or CVD order only when the country of origin of the merchandise is the order country would render section 781(b) of the Act moot. Hence, there is no basis for not examining the solar cells and solar modules at issue (*i.e.*, solar cells and solar modules where the country-of-origin is Cambodia, Malaysia, Thailand, or Vietnam) in these circumvention inquiries.

**Comment 2.   Whether a Wafer Should Be Considered a Chinese Input Where Either the Wafer or the Polysilicon in the Wafer was Produced Outside of China**

*Whether Wafers Sliced from Chinese Polysilicon Outside of China Should Be Considered a Chinese Input*

Commerce preliminarily defined inquiry merchandise as solar cells produced in Cambodia, Malaysia, Thailand, or Vietnam, from wafers produced in China, and solar modules produced in Cambodia, Malaysia, Thailand, or Vietnam that contain such solar cells where three or more of the following components in the module/laminate/panel were produced in China:  (1) silver paste; (2) aluminum frames (3) glass; (4) backsheets; (5) ethylene vinyl acetate sheets; and (6) junction boxes. Commerce also preliminarily determined that wafers produced outside of China using polysilicon sourced from China are not Chinese wafers for purposes of the circumvention inquiries.

---

[33] *See* Auxin's March 17, 2023 Rebuttal Brief at 30-31 (citing *Bell Supply CAFC*, 888 F.3d at 1229-31).
[34] *See* Solaria Scope Ruling.
[35] *See 2021 Regulations Final Rule*, 86 FR at 52342.
[36] *See Bell Supply CAFC*, 888 F.3d at 1229.

10

*Auxin*[37]

- Commerce should determine that wafers sliced from Chinese-origin polysilicon ingots outside of China are Chinese wafers for purposes of defining inquiry merchandise.
- Commerce's decision to the contrary is arbitrary, inconsistent with record evidence, and undermines its affirmative findings of circumvention.
- Slicing Chinese-origin polysilicon ingots into wafers outside of China does not constitute substantial transformation of the ingot; thus, the wafers remain of Chinese-origin. Significant processing is required to produce polysilicon ingots used to make wafers (*i.e.,* several stages of melting and doping polysilicon, crystal growth, use of 70 percent of the total energy consumed in producing a wafer); whereas slicing the ingots into wafers is minor (*i.e.*, cutting the ingot, submerging it in a chemical bath, cleaning, and inspecting).[38]
- Commerce's decision allows parties to continue to exclusively rely on Chinese-origin materials to produce solar cells and modules and evade AD and CVDs by simply slicing polysilicon ingots into wafers outside of China. Commerce should not permit this.
- The CAFC held that Commerce has discretion to fashion a remedy in its proceedings that will prevent simple avoidance of AD/CVDs and that it should do so.[39]

*BYD HK,*[40] *CSIL,*[41] *Jinko,*[42] *NextEra,*[43] *TTL,*[44] *Silfab*[45]

- Granting Auxin's request would inappropriately expand the coverage of the circumvention inquiries which were initiated to examine cell and module assembly outside of China only where "all of the manufacturing process up through the production of wafers takes place in China."[46] Commerce should reject Auxin's *post hoc* attempts to expand the circumvention inquiries.
- Auxin's argument that the country of origin of the wafer should be based on the location of the polysilicon ingot production because of the significance of that production is undermined by its separate argument that Commerce should determine that any wafer produced from Chinese-origin polysilicon—regardless of where the ingot is produced, is a Chinese wafer for purposes of the circumvention inquiries.[47]
- Auxin's arguments about the polysilicon and wafer-making processes and substantial transformation are irrelevant because polysilicon and wafers are not subject merchandise.[48]
- Commerce should not examine whether a product is circumventing an AD/CVD order simply because an input into an input in that product comes from the order country. To

---

[37] *See* Auxin's March 6, 2023 Case Brief at 4-9; *see also* Auxin's March 17, 2023 Rebuttal Brief at 5-13.

[38] *See* Auxin's March 6, 2023 Case Brief at 4-6 (citing Circumvention Request at 18-19; and the *NREL Report* in Exhibit 97).

[39] *Id.* at 7 (citing *Canadian Solar CAFC*, 918 F.3d at 919.

[40] *See* BYD HK's March 17, 2023 Rebuttal Brief at 3-7.

[41] *See* CSIL's March 6, 2023 Rebuttal Brief at 6-10.

[42] *See* Jinko's March 17, 2023 Rebuttal Brief at 1-5.

[43] *See* NextEra's March 17, 2023 Rebuttal Brief at 3-6.

[44] *See* TTL's March 17, 2023 Rebuttal Brief at 3-6.

[45] *See* Silfab's March 17, 2023 Rebuttal Brief at 7-8.

[46] *See* NextEra's March 6, 2023 Case Brief at 5 (citing Circumvention Request at 67).

[47] *See* NextEra's March 17, 2023 Rebuttal Brief at 5 (citing Auxin's March 6, 2023 Case Brief at 5-6).

[48] *See* Jinko's March 17, 2023 Rebuttal Brief at 3.

11

do so here essentially means that solar cells produced anywhere in the world from Chinese polysilicon would be subject to the *Orders,* which would render the original scope of the *Orders*, *i.e.*, solar cells from China, meaningless.[49]

- Auxin failed to demonstrate how domestic producers of solar cells and modules are harmed by Commerce's decision that wafers produced outside of China using polysilicon sourced from China are not Chinese wafers for purposes of the circumvention inquiries.[50]

- Commerce should exercise its "substantial discretion in interpreting" the circumvention provisions in the Act and continue to find that solar cells made from wafers produced outside of China are not inquiry merchandise.[51]

*Whether Wafers Sliced from Non-Chinese Polysilicon Inside China Should Be Considered a Chinese Input*

*TTL,[52] NextEra,[53] Maxeon,[54] Risen,[55] Jinko[56]*

- Inquiry merchandise should not include solar cells and modules assembled in an inquiry country using Chinese wafers made from non-Chinese polysilicon because Auxin did not request circumvention inquiries with respect to such merchandise. Rather, Auxin requested circumvention inquiries with respect to solar cells and modules produced in an inquiry country where, "all of the manufacturing process up through the production of wafers takes place in China."[57]

- Auxin explained that the examples of circumvention described in its request for circumvention inquiries "involve exporters {in Cambodia, Malaysia, Thailand, and Vietnam} that do not produce polysilicon ingots or wafers — the key upstream inputs in CSPV cells and modules — in those countries, but instead sourced these and other necessary materials and inputs *from China*" (emphasis added).[58] Thus, it is clear that Chinese-origin polysilicon is a key factor in the circumvention inquiries. As such, wafers produced from non-Chinese origin polysilicon should be excluded from the circumvention inquiries.[59]

- Commerce incongruently considers solar cells/modules made in the inquiry countries from non-Chinese wafers containing Chinese polysilicon to be outside the scope of these inquiries, while it considers solar cells/modules made in the inquiry countries from Chinese wafers containing non-Chinese polysilicon to be inquiry merchandise even though those cells and module contain much less Chinese content than the former solar cells/modules. Commerce should correct this inconsistency and find solar cells/modules

---

[49] *Id.* at 2.
[50] *Id.* at 4.
[51] *Id.* at 3.
[52] *See* TTL's March 6, 2023 Case Brief at 3-7; *see also* TTL's March 17, 2023 Rebuttal Brief at 5-6.
[53] *See* NextEra's March 6, 2023 Case Brief at 2-4.
[54] *See* Maxeon's March 6, 2023 Case Brief at 2-3; *see also* Maxeon's March 17, 2023 Rebuttal Brief at 2-3.
[55] *See* Risen's March 6, 2023 Case Brief at 1-5; *see also* Risen's March 17, 2023 Rebuttal Brief at 1-2.
[56] *See* Jinko's March 17, 2023 Rebuttal Brief at 1-5.
[57] *See, e.g.*, NextEra's March 6, 2023 Case Brief at 3 (citing Circumvention Request at 67).
[58] *See* Risen's March 6, 2023 Case Brief at 3.
[59] *Id.*

12

made in the inquiry countries from Chinese wafers containing non-Chinese polysilicon are not inquiry merchandise.[60]

- It neither makes sense, nor comports with the law, to find solar cells that are assembled in the inquiry countries from non-Chinese polysilicon to be circumventing the *Orders* when the value added in China for such solar cells may be less than 33 percent of the total value of the solar cell.[61]  A circumvention determination that is not properly targeted to provide relief only for cell assembly in a third country that is truly circumventing the *Orders* will exacerbate the solar cell shortages faced by module assemblers in the United States.[62]

- Moreover, because the value of the polysilicon in solar cells/modules is a significant portion of the total value of the solar cells/modules, if the wafers in those products were made from non-Chinese polysilicon it is less likely that the solar cells and modules would meet the criterion for finding circumvention under section 781(b)(1)(D) of the Act (*i.e.,* the value of the merchandise produced in the order country is a significant portion of the total value of the merchandise exported to the United States). [63]

- Under certain existing measures, CBP already requires U.S. importers to identify the origin of the polysilicon in imported solar modules.[64]  Thus, administration of a decision that solar cells/modules with wafers containing non-Chinese polysilicon are not inquiry merchandise would not be burdensome.

*Auxin*[65]

- Auxin's request for circumvention inquiries was not limited to solar cells and modules that contain Chinese-origin polysilicon; rather, Auxin requested that Commerce initiate circumvention inquiries with respect to solar cells and modules assembled in the inquiry countries where "the vast majority of the materials and equipment … {were} sourced from China."[66]

- Auxin's description of inquiry merchandise as solar cells and modules produced in an inquiry country where, "all of the manufacturing process up through the production of wafers takes place in China," was simply a factual description of the nature of the circumvention that was occurring.[67]

- In order to find circumvention, the Act requires, among other things, that the merchandise imported into the United States be assembled in a foreign country from merchandise produced in the order country and that the value of the merchandise produced in the order country be a significant portion of the total value of the imported merchandise.  The Act

---

[60] *See* TTL's March 6, 2023 Case Brief at 6-7 (citing TTL's May 19, 2022, and JA Solar's May 2, 2022 Comments at Exhibit 2).
[61] *See* Maxeon's March 6, 2023 Case Brief at 2-3 (citing *NREL Report* included in NextEra May 2, 2022 Comments at Attachment 24; and *Malaysia* PDM at 19-20).
[62] *Id.* at 3.
[63] *See* NextEra's March 6, 2023 Case Brief at 3 (citing the *NREL Report* in NextEra's May 2, 2022 Comments at Attachment 24).
[64] *See* Risen's March 6, 2023 Case Brief at 3; *see also* TTL's March 6, 2023 Case Brief at 7 (citing *DHS Order Re: Forced Labor in Xinjiang*; *see also* the Uyghur Forced Labor Prevention Act).
[65] *See* Auxin's March 17, 2023 Rebuttal Brief at 6-13.
[66] *Id.* at 11.
[67] *Id.* at 9.

13

does not require that every component assembled in the foreign country be sourced from the order country.

- Polysilicon accounts for less than 10 percent of the cost of a solar module.[68]  It makes no sense to exclude solar modules made with non-Chinese polysilicon from inquiry merchandise when all the other module components, representing over 90 percent of the value of the module, may have been sourced from China.

**Commerce's Position:**  For purposes of this inquiry, we have continued to find that a wafer is produced in China if the ingot was sliced to form the wafer in China.  The circumvention provisions under section 781(b) of the Act involve merchandise imported into the United States that was completed or assembled in a foreign country from merchandise that was produced in the order country.  The phrase "produced in" is not further explained or defined in the Act.  We find the Senate Report concerning the Omnibus and Trade Competitiveness Act of 1988, and other sections of the circumvention provisions in the Act provide insights into how to properly apply the phrase "produced in" to the present facts.

When Congress passed the Omnibus and Trade Competitiveness Act in 1988, it explained that section 781 of the Act "addresses situations where 'parts and components … are *sent* from the country subject to the order to the third country for assembly and completion"[69] (emphasis added).  Additionally, section 781(b)(1)(c) of the Act provides that when determining whether an AD or CVD order should cover merchandise assembled or completed in a third-country, Commerce should examine whether third-country imports of the merchandise that was produced in the order country and assembled or completed in that third country increased after initiation of the investigation that led to the order.  These provisions, which indicate that the focus is on the part or component exported (sent) from the order country in the form ultimately used in the finished product in the third country, taken together with the "produced in" requirement, lead us to conclude that the "production" that must occur in the order country involves those production steps that transform the raw materials into the part or component that is sent to the third country for assembly into the finished product.  In other words, we have considered merchandise to be "produced in" the order country for purposes of section 781(b)(1)(B)(ii) of the Act if the final manufacturing step occurs there.

Auxin identified three stages of wafer production:  (1) refining polysilicon; (2) forming the refined polysilicon into an ingot; and (3) processing the ingot into wafers.[70]  Only the last stage of production results in the merchandise that was shipped from China to the inquiry countries for assembly and completion into solar cells and solar modules.  Neither of the intermediate products produced in this process (refined polysilicon and polysilicon ingots) is the merchandise that was shipped/exported to the third country for assembly into the final product.  Hence, wafers processed outside of China from ingots made of Chinese polysilicon do not satisfy the "produced in" the order country requirement of section 781(b)(1)(B)(ii) of the Act (the production step that resulted in the part or component that is used in completion or assembly in the third country (the wafer) did not occur in China).  Similarly, wafers processed in China from ingots made of non-Chinese polysilicon do satisfy the "produced in" the order country requirement of section

---

[68] *Id.* at 12 (citing the *NREL Report* in NextEra's May 2, 2022 Comments at PDF page 496).
[69] *See Senate Report 100-71* at 101.
[70] *See, e.g.*, Circumvention Request at 15.

781(b)(1)(B)(ii) of the Act (the production step that resulted in the part or component (the wafer) that is used in completion or assembly in the third country occurred in China).

Auxin contends that Commerce should conduct a substantial transformation analysis and find that wafers processed outside of China from ingots made of Chinese polysilicon are "produced in" China for purposes of section 781(b)(1)(B)(ii) of the Act because minimal processing is required to process an ingot into wafers.  However, we do not find that a substantial transformation analysis is the appropriate analysis here.

Commerce typically conducts a substantial transformation analysis to determine whether the country of origin of a product that is within the class or kind of merchandise covered by an AD/CVD order, is the country covered that order.  First, wafers are not in a class or kind of merchandise covered by any AD/CVD order.  Second, the only requirement in section 781(b)(1)(B)(ii) of the Act is that the merchandise be "produced in the foreign country with respect to which such order or finding applies" not that its country of origin is the country to which such order or finding applies.  Thus, we need only identify the country where the raw materials were transformed into the part or component that was used in assembly in the inquiry country.  There is no need to consider the substantial transformation criteria (*e.g.*, the class or kind of the upstream and downstream products, where the essential component of the product is substantially transformed, and the extent and value of the processing) to identify the country where the ingots are sliced into wafers, thus, forming the product that was used as an input.  Consequently, we have not used a substantial transformation analysis to determine whether wafers were "produced in" China for purposes of section 781(b)(1)(B)(ii) of the Act where the relevant production steps occurred in multiple countries.

While Auxin contends that Commerce's focus on the country where the ingot was sliced into wafers allows parties to evade AD and CVDs by simply slicing Chinese polysilicon ingots into wafers outside of China, Auxin did not point to anything in the Act or Commerce's practice in circumvention cases that compels Commerce to determine that a component was "produced in" the order country for purposes of section 781(b)(1)(B)(ii) of the Act based on where an input into that component was produced.  There is no mention in section 781(b)(1)(B)(ii) of the Act of inputs into components.  Rather, section 781(b)(1)(B)(ii) of the Act requires that the component that was assembled in the third country be produced in the order country.  Moreover, in prior circumvention inquiries involving merchandise completed or assembled in third countries, Commerce focused its analysis on where the component that was assembled into the finished product in the third country was produced, not where the materials that were used to produce the component were produced.  For example, in *CORE from China (UAE)*[71] which typically involved processing hot-rolled steel made in China into CORE in the UAE, Commerce did not consider where the iron ore or billets that were used to make the hot-rolled steel were sourced, but rather it considered where the hot-rolled steel was produced.

We find that the country in which the ingot is sliced to form the wafer is, pursuant to the language in section 781(b)(1)(B)(ii) of the Act, the most reasonable interpretation of where the wafer is produced.  To the extent that this raises evasion concerns, we do not find that such concerns are sufficient to warrant a deviation from our interpretation of the statute.  Indeed,

---

[71] *See CORE from China (UAE) Final*, 85 FR at 41957.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

Auxin's proposed alternative would potentially require Commerce to find circumvention based on wafers that, in our interpretation, are not "produced" in China.  While this alternative may address evasion concerns, it is contrary to the statute, and therefore, impermissible.

We also disagree with interested parties' arguments that Auxin's request for these circumvention inquiries established that inquiry merchandise must contain wafers made from Chinese-origin polysilicon.  Although Auxin noted in its request that all the manufacturing processes for the merchandise subject to the inquiries, up through the production of wafers, takes place in China, Auxin appears to have been describing the existing situation that it viewed as constituting circumvention.  In fact, Auxin explained in its request that "{r}easonably available evidence establishes that certain companies may complete the production process through polysilicon refinement, ingot formation, and the production of the wafers in China, after which the wafers are converted to CSPV cells in the third country using additional and substantial Chinese-origin components."[72]  However, the circumvention inquiries that Auxin specifically requested, and on which Commerce initiated, cover solar cells and modules assembled and completed in Cambodia, Malaysia, Thailand, or Vietnam using Chinese-produced inputs, not necessarily Chinese-produced inputs where all the materials that were used to produce the inputs in China were also produced in China.

Interested parties that oppose finding circumvention also argued that it makes no sense to find solar cells and solar modules containing wafers made from non-Chinese polysilicon to be circumventing the *Orders*, because the wafers in those solar cells and modules have very little Chinese content.  However, those parties did not provide a basis in the Act, Commerce's regulations, or its practice, for interpreting the "produced in" the order country requirement in section 781(b)(1)(B)(ii) of the Act as a content percentage requirement.  Rather, the plain meaning of "produced" is to make from components or raw materials.  Thus, "produced in" the order country means the production steps that transformed the raw materials into the part or component that is sent to the third country for assembly into the finished product occurred in the order country.

Therefore, based on the foregoing, we consider wafers to be a product of China if the ingot was sliced to form the wafer in China.  As a result, we have not defined inquiry merchandise as solar cells and solar modules assembled in an inquiry country from wafers produced outside of China using Chinese polysilicon (as advocated by Auxin), and we have not excluded from our definition of inquiry merchandise solar cells and solar modules assembled in an inquiry country from wafers produced inside China using polysilicon produced outside of China (as advocated by parties opposed to finding circumvention).

Lastly, certain interested parties argued that determining whether wafers were produced in China based on the country-of-origin of the polysilicon in the wafer would not be administratively burdensome because under certain existing measures, CBP already requires U.S. importers to identify the origin of the polysilicon in imported solar modules.  Because we deem the country of origin of polysilicon to be irrelevant to the question of whether a wafer is produced in China, this argument is moot.  In any case, it is not clear that it is administratively feasible to uniformly apply "percentage-of-Chinese-content" or "source-of-component-inputs" definitions of the

---

[72] *See* Circumvention Request at 27.

phrase "produced in" in section 781(b)(1)(B)(ii) of the Act to all the components that could be exported from China to the inquiry countries for assembly into solar cells and solar modules (such as aluminum frames, junction boxes, *etc.*). Such a rule appears to be complicated and administratively burdensome given that there could be as many as 100 different inputs used to produce a solar module.

**Comment 3.   Whether Commerce Should Analyze Investment Data on a Per-Unit Basis**

*NextEra*[73]
- Commerce must consider the large upstream industry in China that supplies virtually all of the world's demand for wafers. Failing to do so results in an overly simplistic and distortive comparison that does not properly account for differences in scale and market structure.
- Consistent with legislative history, Commerce's past practice, and congressional intent, an alternative approach is warranted in this case. Commerce has also acknowledged that there is no one-size-fits-all approach and that it may determine an appropriate analysis. Thus, Commerce should analyze investment on a per-unit basis for this final determination.
- Commerce has the data needed to calculate the investment of mandatory respondents on a per-megawatt basis, which allows Commerce to account for differences in scale, market size, and demand, and thus more accurately compare the size of investments in the two countries.

*Auxin*[74]
- NextEra argues that a per-MW analysis is more appropriate because it accounts for differences in scale, market size, and demand, and thus, more accurately compares the size of investments in the two countries.[75]
- However, it has been Commerce's practice under section 781(b)(2) of the Act to evaluate the absolute level of investment, as opposed to the per-unit level of investment, because it is a proper and relevant analysis for identifying the level of investment in the third country.[76]
- Commerce's practice is grounded in the recognition that per-unit levels of investment can be distortive, fail to reflect initial threshold levels of investment, and thus fail to capture circumventing activity.
- CSPV production facilities in China require significant threshold levels of investment to capitalize on economies of scale. Commerce should therefore follow its practice and compare the absolute level of investment rather than the per-unit level of investment.
- In *CORE from China (Vietnam)*, Commerce rejected per-unit comparisons because comparing per-unit investment overlooks the relative requirements for establishing integrated production facilities in China, as compared with processing facilities in the

---

[73] *See* NextEra's March 24, 2023 Case Brief at 20-22.
[74] *See* Auxin's April 3, 2023 Rebuttal Brief at 36-41.
[75] *Id.* (citing NextEra's March 24, 2023 Case Brief at 20-22).
[76] *Id.* (citing *CORE from China (Vietnam), CORE from China (UAE)* and *CRS from China (Vietnam)*).

third country, as they dilute the large necessary initial investments required by the volume of the facilities.[77]

- If Commerce were to utilize a per-unit comparison, it would delay closing the circumvention loophole because only when the circumventing company achieved scale would it achieve a per-unit investment figure that approaches the per-unit investment figure of a fully scaled production facility in the original country.
- Benefiting from economies of scale is crucial to realize lower per-megawatt investment costs for polysilicon, ingot and wafer manufacturing.
- NextEra fails to recognize that Chinese over-investment in its CSPV production process has decimated the industry in the United States and allowed Chinese producers to realize lower per-unit costs.
- Commerce should continue to evaluate the level of investment on an absolute basis because such an analysis is consistent with Commerce's practice and ensures that China's industrial policy, heavy subsidies to its PV industry, and other non-market practices do not distort Commerce's overall analysis by failing to capture initial threshold levels of investment in China.

**Commerce's Position:** We agree with Auxin that Commerce should evaluate investment on an absolute basis as opposed to a per-unit basis. For these final determinations, we continue to find that the absolute level of investment is a proper and relevant analysis for evaluating the level of investment in Cambodia under section 781(b)(2)(A) of the Act.

The statute does not instruct Commerce to employ a particular analysis when evaluating the level of investment in the foreign country for purposes of section 781(b)(2)(A) of the Act. Given the statute's silence on the issue, Commerce may determine an appropriate analysis to apply. We find that a comparison between the level of investment in the third country and the level of investment of respondents' Chinese affiliates, on an absolute as opposed to a per-megawatt basis, is a proper and relevant analysis for identifying "the level of investment in the third country" under the Act. We disagree with NextEra's argument that we should compare the levels of investment on a per-unit basis because we find the proposed alternative of adjusting for per-unit production capacity to be inappropriate in this case. Comparing per-unit investment overlooks the relative requirements of establishing ingot and wafer production facilities in China, as compared with the cell and module production facilities in Cambodia, as this would dilute the large necessary initial investments required by the production volume of the facilities.

Accounting for the threshold level of investment in the Chinese facilities, therefore, captures the investment in the production process that would otherwise be ignored if we were to compare per-unit investment or that would otherwise not be representative if we adjusted for capacity. Thus, the absolute level of investment of the finishing process relative to the production process of the respondents' affiliates is the appropriate comparison.

In addition to the high levels of investments and large manufacturing facilities required for ingot and wafer manufacturing, the size of China's solar industry can also have a direct impact on the economies of scale that can be realized, allowing ingot and wafer manufacturers to realize lower

---

[77] *Id.* (citing *CORE from China (Vietnam)*).

18

per-unit investment costs, and thus distorting our analysis.  China's dominance in the global ingot and wafer manufacturing capacity means Chinese ingot and wafer producers are able to benefit from economies of scale in order to achieve lower per-unit investment costs.  China currently accounts for 97 percent of global wafer manufacturing capacity, a feat achieved thanks to economies of scale, supply chain integration, and government support.[78]  China has a lower global manufacturing capacity for cells and modules, accounting for 80 percent and 70 percent of the world's production capacity, respectively.[79]  China's ingot and wafer manufacturing industries have therefore been able to benefit heavily from economies of scale, they have been able to achieve steep drops in manufacturing costs at every step of the production process, thus diluting investment amounts in a per-unit figures analysis.[80]

As explained above, the much larger threshold levels of investment required to establish ingot and wafer manufacturing facilities and the resulting economies of scale distort the investment figures for a per-unit analysis.  Therefore, with respect to section 781(b)(2)(A) of the Act, we have continued to compare the investments of the cell and module production process in Cambodia to investments of the ingot and wafer production process in China on an absolute basis.

**Comment 4.   Whether to Depart from the Section 781(b)(2) "Minor or Insignificant"  Methodology Applied in the *Preliminary Determination*s**

*Auxin*[81]

*Commerce Arbitrarily Broke with its Longstanding Practice Without Explanation*
- Commerce departed from its longstanding merchandise-centric comparative methodology when conducting its "minor or insignificant" analysis under section 781(b)(1)(C) of the Act in favor of a new affiliate-centric approach without explanation.  Commerce is required to explain the reasons for a departure from its practice.  Its failure to do so here is arbitrary and unlawful.[82]
- Since 2012, Commerce has applied a consistent merchandise-centric comparative methodology, which follows the flow of goods, when conducting its "minor or insignificant" analysis under sections 781(b)(1)(C) and (b)(2) of the Act.  This approach has been applied by Commerce in circumvention cases involving a broad range of merchandise and industries.[83]

---

[78] *See* Auxin's July 29, 2022 Comments at Exhibit 1 (citing IEA Report at 24).
[79] *Id.* (citing IEA Report at 24-27).
[80] *Id.* (citing IEA Report at 17); *see also* Auxin's April 3, 2023 Rebuttal Brief at 39-41.
[81] *See* Auxin's March 24, 2023 Case Brief at 7-17 and 19-25; and Auxin's April 3, 2023 Rebuttal Brief at 4-9 and 29-34.
[82] *See* Auxin's March 24, 2023 Case Brief (citing *Save Domestic Oil*, 357 F.3d at 1283; and *Encino Motorcars*, 579 U.S. at 212).
[83] In all of the following cases cited in Auxin's March 24, 2023 Case Brief, Commerce compares operations, R&D and investment in the third country to the order country with identifying affiliation as a consideration:  In *SDGE from China (UK)*, Commerce explained that "the purpose of the analysis set out in sections 781(b)(1)(C) and (b)(2)(E) of the Act is to evaluate whether a process is minor or insignificant within the context of the totality of the production of subject merchandise.  That is, {Commerce's} analysis addresses the relative size and significance of the processing provided by {the respondent} in comparison to the processing necessary to produce the overall

19

- Commerce's approach has been affirmed by the CIT as a reasonable interpretation of the circumvention statue and consistent with its past practice in 781(b) cases.  Specifically, the CIT explained that "a determination of the third country's portion of the total sum of investment is useful to gauge the level of investment in a third country.  Comparative analysis helps also to ensure that larger companies with much smaller operations in a third country – operations that may appear significant in absolute terms given the size of the firm, but that comprise a small share of total operations – will not be able to elude an AD/CVD order simply on account of the firm's large overall size.  Accordingly, a comparative analysis was reasonable."[84]

- The CIT affirmed Commerce's analysis, in part, because it was consistent with Commerce's longstanding practice.  The CIT noted that Commerce had a longstanding practice of "us{ing} a similar type of comparative analysis and arrived at similar conclusions" and therefore Commerce's merchandise-centric comparative methodology "aligns with its past practice."[85]

- In recent cases Commerce has continued to apply its merchandise-centric comparative framework comparing the production steps taken by the mandatory respondents in those cases to the entire production process in the order country.[86]

- In *SDGE from China (UK), CORE from China (Vietnam), CRS from China (Vietnam),* and *HFC from China (India)*, Commerce found the process of completion in the third country to be minor or insignificant even when the respondents were not affiliated with producers or exporters in the country subject to the order.[87]

- Commerce's affiliate-centric methodology is inconsistent with the language and purpose of the statute as it raises affiliation to a mandatory criterion for finding circumvention.

- Sections 781(b)(1)(C) and 781(b)(2) of the Act do not instruct Commerce to consider affiliation when determining whether the process of assembly or completion is minor or insignificant.  Under section 781(b) of the Act, only sub-paragraph (3) specifies affiliation as a consideration.

- Commerce's affiliate-centric methodology allows unaffiliated entities to circumvent AD/CVD orders with impunity, such that, many of Commerce's previous affirmative

---

finished product."  *See SDGE from China (UK)*, 77 FR at 47599.  In *PET Film from the UAE (Bahrain)*, Commerce repeated that under its 781(b) analysis, "{i}t is appropriate to compare the cost of the process and completion in the third-country facilities with the cost of the process and completion of the facilities needed to produce the subject merchandise in the home country."  *See PET Film from the UAE (Bahrain)* IDM at Issue 2.  In *CORE from China (Vietnam)* at Comment 5, Commerce again reiterated that its practice has been to "compare the total investment required (as well as, separately, the R&D, production process, and facilities) from the beginning of the production process in the country subject to an antidumping or countervailing duty order to the investment required (as well as, separately, the R&D, production process, and facilities) to finish the final product in a third country, rather than to compare the investments (as well as, separately, the R&D production process, and facilities) required to perform the same finishing steps in each country."  *See CRS from China (Vietnam)* IDM at Comment 5; *CORE from Taiwan (Malaysia)* IDM at Comment 1; *OCTG from China* (*Brunei and the Philippines)* IDM at Comment 1; and *HFCs from China (India)* IDM at Comment 3.

[84] *See* Auxin's March 24, 2023 Case Brief (citing *Al Ghurair CIT 2021*, 536 F. Supp. 3d at 1368).

[85] *Id.*

[86] *Id.* (citing *SSSS from China (Vietnam) Preliminary* PDM at 20; *see also Pipe and Tube from India (UAE and Oman)* IDM at Comment 6).

[87] *Id.* (citing *SDGE from China (UK)*, 77 FR at 47600; *CORE from China (Vietnam)* IDM at Comment 12; *CRS from China (Vietnam)* at Comment 12; *HFC from China (India) Preliminary* PDM at 22, unchanged in *HFC from China (India) Final*.

findings of circumvention since 2012 would now require a negative finding of circumvention under this framework.  Not only is this requirement unnecessary, but it contradicts frequent Commerce determinations that affiliation is not a necessary condition for circumvention.[88]

- Commerce's condition that it will only consider affiliated operations in the order country as a basis for comparison would allow a party to easily evade detection of circumvention by selling inputs through an unaffiliated trading company in the order country.

- Commerce's merchandise-centric framework dates back as early as 1993, where in *Granular PTFE Resin from Italy*, Commerce "evaluated the level of respondent's investments in the United States within the context of the level of investment required for an integrated facility for the production of granular PTFE resin" in Italy.[89]

- It is rare that Commerce has not conducted a minor or insignificant comparative analysis, and only when the record of a proceeding lacked sufficient data for such an analysis or when the third country operations being evaluated pre-dated the issuance of the relevant order.

- In departing from its established practice in the *Preliminary Determinations*, Commerce did not conclude that the record lacked sufficient data or that the respondents' operations pre-dated the issuance of the order.

- In *Hot-Rolled Lead and Bismuth*, Commerce acknowledged that it was departing from comparing to a fully integrated producer explaining that "rolling mills which subsequently roll lead billets into hot-rolled lead bar predate the order and have always been considered a distinct part of the industry."[90]

- In *Ferrovanadium from Russia*, Commerce rejected petitioner's "argument that {Commerce} should compare the U.S. vanadium pentoxide process to the overall ferrovanadium process" finding that such an analysis was "misplaced in this case."[91] Commerce acknowledged the standard practice and explained that "{w}here the company completing the processing is unaffiliated to foreign producers/exporters and the processing activity … existed prior to the antidumping order, {Commerce} finds the analysis which it employed for the Preliminary Results of U.S. processing activity without comparison to overall production activities is the appropriate analysis."[92]

- For BYD HK, there is no record evidence demonstrating that the company was established before the imposition of the *Order*.

---

[88] *See* Auxin's March 24, 2023 Case Brief (citing *Butt-Weld Pipe Fittings from China (Thailand)* IDM at Comment 3, where Commerce explained that "a relationship between the Chinese manufacturer and Thai converter/exporter is not a necessary condition for finding circumvention" and "{i}t is possible for circumvention to occur between unrelated companies."; In *Brass Sheet and Strip from Canada* IDM at Comment 5 Commerce mentioned "{w}hile we have noted that it is 'more likely' for related parties to engage in circumvention activity, a relationship between the exporter and importer is not a necessary condition for finding circumvention.  While circumvention may be more likely to occur between related parties, it is also possible for circumvention to occur between unrelated companies;"; In *CORE from China (Vietnam)* IDM at Comment 12; and *CRS from China (Vietnam)* at Comment 12 Commerce once again reiterated recently that the "lack of affiliation does not constitute evidence that circumvention is not occurring.").

[89] Auxin's April 3, 2023 Rebuttal Brief (citing *Granular PTFE Resin from Italy* at Comment 12).

[90] *Id.* (citing *Hot-Rolled Lead and Bismuth* at Comment 5).

[91] *Id.* (citing *Ferrovanadium from Russia Final Determination* IDM at Comment 1; *see also Ferrovanadium from Russia Preliminary Determination*, 77 FR 6537.

[92] *Id.* (citing *Ferrovanadium from Russia Final Determination* IDM at Comment 1).

*Commerce's Approach Results in It Ignoring the Most Important Stage of Production*

- Commerce's affiliate-centric approach results in its analysis ignoring the first stage of the production process:  the mining and refining of solar-grade polysilicon.[93]  As noted by the ITC, polysilicon is the "main underlying raw material input" for solar cells.[94] Commerce has previously recognized that "{b}y any reasonable measurement, polysilicon is the most important input used in solar modules."[95]
- Producing and achieving the requisite level of purity for solar-grade polysilicon "requires large capital investments to build a plant, large corporate investment to learn and refine the production process, highly skilled labor to operate the plant, and low electricity costs due to the large amount of energy needed to produce polysilicon."[96]
- Auxin's circumvention request explicitly identified production of solar-grade polysilicon in China as the first stage of solar cell/module production.[97]
- Auxin uploaded information on the record showing that the average investment required to produce subject merchandise in China is $4.7 billion.  Should Commerce change its analysis for the final to a "merchandise-centric approach" it should compare third country operations to the $4.7 billion.[98]
- IEA and DOE reports placed on the record by Auxin note that polysilicon, ingots, and wafers require a higher level of investment compared to solar cell and module production.[99]

*NextEra*[100] and *BYD HK*[101]

*The Act Does Not Mandate a Specific Methodology Under Section 781(b)(2)*

- Commerce's analysis must "vary from case to case depending on the particular circumstances unique to each circumvention inquiry."[102]
- While section 781(b)(2) of the Act does not instruct Commerce to consider affiliation when determining whether the process of assembly or completion in a third country is minor or insignificant, the statute does not preclude Commerce from considering affiliation.  Commerce has stated that it has the discretion under the circumvention statute to determine the appropriate minor or insignificant analysis under section 781(b)(2) "depending on the totality of the circumstances of the particular anti-circumvention inquiry."[103]  Thus, Auxin reads a limitation into the statute where one does not exist.

---

[93] *See* Auxin's March 24, 2023 Case Brief (citing *Cambodia* PDM at 15).

[94] *Id.* (citing *ITC Solar Monitoring* at I-60 and VI-1).

[95] *Id.* (citing *Solar Cells from China 2017-2018 AR* IDM at Comment 4).

[96] *Id.* (citing Auxin's May 16, 2022 Comments at Exhibit 5).

[97] *Id.* (citing Circumvention Request at 27).

[98] *See* Auxin's April 3, 2023 Rebuttal Brief (citing Auxin's July 29, 2022 Investment and R&D Information at Excel Attachment).

[99] *Id.* (citing Auxin's May 16, 2022 Comments at Exhibit 5; and Auxin's July 29, 2022 Investment and R&D submission at Exhibit 1).

[100] *See* NextEra's April 3, 2023 Rebuttal Brief at 4-15.

[101] *See* BYD HK's April 3, 2023 Rebuttal Brief at 4-8.

[102] *See* NextEra's April 3, 2023 Rebuttal Brief (citing *PET Film from the UAE (Bahrain) Preliminary Determination* IDM at 5).

[103] *Id.* (citing *CORE from China (Vietnam)* IDM at 7).

22

- In the CIT *Al Ghurair* determination, the CIT prefaced its decision by stating that "the statute does not outline a specific methodology for Commerce to follow to determine the level of investment."[104]  The CIT further explained that when there is an absence of a designated methodology, Commerce has the discretion on its own method of analysis.[105]
- Commerce reasonably exercised this discretion and determined to make an affiliation comparison for its analysis for certain factors.
- The SAA explains that "Commerce will evaluate each of {the statutory} factors as they exist either in the United States or a third country, depending on the particular circumvention scenario."[106]  This guidance has been adopted in various circumvention cases cited by Auxin, including *PET Film from the UAE (Bahrain)*, *CORE from Taiwan (Malaysia)*, *HFCs from China (India)*, *OCTG from China (Philippines and Brunei)*.[107]
- Commerce has repeatedly stated that its analysis must be tailored to the particular facts of the case,[108] based on the "factors as they exist in the third country, depending on the totality of the circumstances of the particular anti-circumvention inquiry."[109]
- As such, Auxin is incorrect that its "merchandise-centric" analysis is appropriate because it is product and industry neutral.  Instead, Commerce's analysis must be tailored to the specific facts of the circumvention inquiries.

*Commerce's Reliance on Affiliation Accurately Represents Auxin's Request*

- Commerce's affiliate-centric approach is consistent with Auxin's original request for circumvention and record evidence.  Auxin's circumvention request defined the alleged circumventing activity as "assemblers of CSPV cells and modules … that use affiliated Chinese input suppliers and a fully integrated Chinese supply chain to circumvent the existing Orders."[110]  Moreover, Auxin clarified that its allegations "rely heavily upon the relationships between certain Chinese input suppliers and their affiliates in the targeted third countries," and claimed that the affiliation relationships " narrow{} the alleged circumvention activity in this petition to major Chinese companies that use other countries as export platforms."[111]

*Chinese Solar Producers are not Integrated with Polysilicon Producers*

- There is no record evidence of fully integrated production in China (from polysilicon to module production) during the period of inquiry.  Neither of the two mandatory respondents are fully integrated.[112]

---

[104] *Id.* (citing *Al Ghurair CIT 2021*, 536 F. Supp. 3d at 1368*)*

[105] *Id.* (citing *Al Ghurair CIT 2021*, 536 F. Supp. 3d at 1368 (*Timken Co.*, 968 F. Supp. 2d at 1286 n.7, *aff'd* 589 F. App'x 995 (Fed. Cir. 2015))).

[106] *Id.* (citing *SAA* at 893)

[107] *Id.* (citing *PET Film from the UAE (Bahrain) Preliminary* PDM at 5; *CRS from China (Vietnam)* IDM at Comment 5; *CORE from Taiwan (Malaysia)* IDM at 19-20; *HFCs from China (India) Preliminary* PDM at 17; *OCTG from China (Philippines and Brunei) Preliminary* PDM at 9).

[108] *Id.* (citing *Pet Film from the UAE (Bahrain) Preliminary* PDM at 5; *CORE from China (Vietnam)* IDM at 7).

[109] *Id.* (citing *CORE from China (Vietnam)* IDM at 7; *CRS from China (Vietnam)* IDM at Comment 5; *HFCs from China (India) Preliminary* PDM at 11-12, 17; *CORE from Taiwan (Malaysia)* IDM at 8; *OCTG from China (Philippines and Brunei) Preliminary* PDM at 6; *SSSS from China (Vietnam)* IDM at 15; *Pipe and Tube from India (UAE and Oman)* IDM at 8, 12).

[110] *Id.* (citing Circumvention Request at 1-2).

[111] *Id.* (citing Circumvention Request at 87).

[112] *Id.* (citing BYD HK Initial QR Part I at 15; and NE Solar IQR Part I at 11).

23

- Auxin identified only one company in China with investments in progress for production of polysilicon, ingot, wafers, cells, and modules; and most companies Auxin identified produce at only one or two of these production stages.[113]
- This demonstrates that solar cell and module production is not fully integrated in China back to the polysilicon refinement stage of production.
- In steel cases Commerce used the facts on the record to compare final processing steps in the third country to the operations of integrated steel mills in the country subject to the order.[114]  However, there is no such facts regarding integration in the solar industry.
- Thus, including the polysilicon stage as part of Commerce's consideration of the Chinese solar industry would ignore the reality of the industry subject to the inquiry as the refinement of polysilicon is separate from the other stages of the solar cell and module production process.

*Auxin's Suggested Remedies are Unreasonable*
- Auxin's proposal would require Commerce to calculate an absolute investment figure by averaging the investments of various producers at different stages of the supply chain and summing them to create an estimate of the cost of a hypothetical fully integrated facility. For the solar industry, doing so would not represent the actual structure of the industry and, thus, would be an inappropriate basis for Commerce's comparison.

*Commerce has Considered Affiliation in Performing Its Analysis under 782(b)(2)*
- Contrary to Auxin's claims, Commerce has focused on comparisons with affiliates in prior circumvention inquiries.  In *PET from the UAE (Bahrain),* Commerce collected data from a third-country manufacturer in Bahrain and its affiliate in the UAE to conduct its comparative analysis, making the same comparison between affiliates' investments and operation that Auxin asserts is not appropriate here.[115]  In *CRS from Korea (Vietnam)* and *Diamond Sawblades (Thailand)*, Commerce had data on the record from affiliated parties and opted to make a direct comparison between the respondents' investments and the operations of its affiliate in the country subject to the order.[116]
- Auxin ignores the significant portion of Commerce's analysis that did not consider affiliation at all.  When analyzing the factors under section 781(b)(2) of the Act, Commerce did not consider affiliation when evaluating section 781(b)(2)(C) and 781(b)(2)(E) of the Act.

**Commerce's Position:**  We disagree with Auxin that Commerce should revise its application of the "minor or insignificant" factors, as enumerated in section 781(b)(2) of the Act.[117]  The statute and the SAA grant Commerce discretion in evaluating the five minor or insignificant factors.

---

[113] *Id.* (citing Auxin's Investment and R&D Information at Excel Attachment).
[114] *Id.* (citing *CORE from China (Vietnam)*; *CRS from China (Vietnam);* and *SSSS from China (Vietnam)*).
[115] *Id.* (citing *PET Film from the UAE (Bahrain) Cambodia* PDM at 5-6, unchanged in *PET Film from the UAE (Bahrain)*).
[116] *Id.* (citing *CRS from Korea (Vietnam) Preliminary* PDM at 14-17 (unchanged in *CRS from Korea (Vietnam)*); and *Diamond Sawblades (Thailand) Preliminary* PDM at 12, unchanged in *Diamond Sawblades (Thailand)*).
[117] The five factors listed under section 781(b)(2) of the Act:  (A) level of investment in the foreign country; (B) level of research and development in the foreign country; (C) nature of the production process in the foreign country; (D) extent of production facilities in the foreign country; and (E) value of processing performed in the foreign country.

24

The statute only provides that Commerce "shall take into account" the five factors, without further instruction.  According to the SAA, Commerce will evaluate the five factors under section 781(b)(2) of the Act "as they exist either in the United States or a third country, depending on the *particular circumvention scenario*," and that "{n}o single factor will be controlling."[118]  Thus, Commerce must tailor its analysis to the facts on the record.  Here, we place particular emphasis on affiliation, aided by the circumvention request itself, because the 'circumvention scenario' alleged by Auxin is unique and distinguishable from most of those examined in our previous circumvention inquiries.

In this circumvention inquiry, the particular circumvention scenario, per Auxin's request, is centered around third country companies using "affiliated Chinese input suppliers and a fully integrated supply chain to circumvent the existing *Orders*."[119]  Auxin notes that "{t}he circumvention allegations contained herein rely heavily upon the relationships between certain Chinese input suppliers and their affiliates in the targeted third countries, a factor that Commerce must consider."[120]  Again, Auxin describes that the "fact pattern significantly narrows the alleged circumventing activity in this petition to major Chinese companies that use other countries as export platforms to continue selling cheap CSPV cells and modules to the United States."[121]  In accordance with the SAA's language instructing Commerce to "evaluate the factors … depending on the particular circumvention scenario," we applied our minor and insignificant analysis, with respect to the respondents' level of investment, level of research and development, and extent of production facilities, using a comparative approach that accounts for the production activities of the upstream affiliates of the third country producers, mirroring Auxin's request.

Auxin's circumvention request is why we also disagree with Auxin's arguments that we should adopt a "merchandise-centric" comparative approach for the final determination and include solar-grade polysilicon in our 781(b)(2) analysis.  Auxin focuses on the language in *SDGE from China (UK)* stating that the purpose of the analysis under section 781(b)(1)(C) of the Act is to "evaluate whether a process is minor or insignificant within the context of the totality of the production of subject merchandise" such that Commerce's analysis addresses "the relative size and significance of the processing provided by {the respondent} in comparison to the processing necessary to produce the overall finished product."[122]  Again, Congress and our past practice require us to consider the unique facts and circumstances of each specific case.  In *Al Ghurair CAFC 2023*, the CAFC noted that Commerce "is not bound by its prior determinations" and should there be a reason to deviate from its past practice, Commerce may explain why it is appropriate to do so.[123]  In the underlying CIT decision, the CIT noted that Commerce has the discretion to decide its own analysis to determine the level of investment as section 781(b)(2) of the Act does not outline a specific methodology."[124]  In accordance with *Timken Co.,* the CIT provided Commerce the discretion "to adapt to different factual circumstances to address

---

[118] *See* SAA at 893 (emphasis added).
[119] *See* Circumvention Request at 1-2.
[120] *Id.* at 87.
[121] *Id.*
[122] *See SDGE from China (UK)*, 77 FR at 47599.
[123] *See Al Ghurair CAFC 2023,* 65 F.4th at 1360 (citing *Hyundai Electricity CAFC*, 15 F.4th at 1089).
[124] *See Al Ghurair CIT 2021,* 536 F. Supp. 3d at 1368 (citing *Timken Co.*, 968 F. Supp. 2d at 1286 n.7, aff'd, 589 F. App'x 995 (Fed. Cir. 2015)).

25

circumvention."[125]  In *CRS from China (Vietnam)*, Commerce applied a similar logic where it stated that the statute does not instruct Commerce to apply a particular analysis, and therefore, "Commerce may determine an appropriate analysis to apply."[126]  Again, Congress and our past practice require us to consider the unique facts and circumstances of each specific case.  In accordance with the recognized discretion granted to Commerce in circumvention inquiries, for this inquiry, Commerce utilized an approach which is specific to the upstream affiliates of each respondent.  Because none of the respondents to this inquiry were affiliated with upstream producers of polysilicon, we did not consider Chinese polysilicon production as part of our comparative analysis of the 'minor or insignificant' factors.

Auxin's circumvention request alleges a circumvention fact pattern that involves integrated Chinese solar producers spinning off the last steps of production (*i.e.*, solar cell and solar module production) to the inquiry countries to undermine the existing *Orders* and avoid AD/CVD duties. With that fact pattern in mind, after selecting the largest producers/exporters of solar cells and/or solar modules in the third countries, we requested a litany of information related to the corporate structure and operations of the respondents, examining any affiliation links to producers involved in the production of solar cells and modules in China.  After examining the information placed on the record by the respondents, the facts indicated that:  (1) none of our respondents' affiliates in China had fully integrated production back to the mining and refining of solar-grade polysilicon during the period of inquiry; and (2) there is no substantial record evidence of fully integrated production in China during the period of inquiry.[127]  BYD HK provided information showcasing that its upstream affiliates in China started at the ingot stage of production, thus we decided it was appropriate to directly compare BYD HK's Cambodian facilities to that of its upstream affiliates in China, starting from the ingot stage of production when examining sections 781(b)(2)(A), (B), and (D) of the Act.[128]  Such facts, on the respondent-specific level, were subsequently authenticated by us when conducting the verification of BYD HK.

Based on the facts above, we disagree with Auxin's insistence that Commerce include in its comparison to the order country the first stage of production of solar cells and modules, *i.e.*, the mining and refining of solar-grade polysilicon.  The pre-URAA cases Auxin relies on in support of starting the comparative analysis at the first stage of the production process, *Granular PTFE Resin from Italy* and *Brass Sheet and Strip from Canada,* are cases where Commerce compared third country operations to fully integrated producers in the country subject to the order.[129] Moreover, other post-URAA cases cited by Auxin, *CORE from China (Vietnam)*, *CRS from China (Vietnam)*, and *SSSS from China (Vietnam)*, are cases where Commerce used the facts on the record to compare fully integrated steel producers in China to the operations conducted in the third country.  These cases are not comparable to the present circumvention inquiry as our record demonstrates that fully integrated production (*i.e.*, production facilities that manufacture polysilicon, wafers, ingots, solar cells, and solar modules) is not typical of the solar industry in

---

[125] *Id.*
[126] *See CRS from China (Vietnam) Final* IDM at Comment 5; *CORE from China (Vietnam) Final* IDM at 34; *OCTG from China (Brunei and the Philippines) Final* IDM at 7.
[127] *See Cambodia* PDM at 14.
[128] *Id*.
[129] *See Granular PTFE Resin from Italy* IDM at 12-13, n.16 (citing *Brass Sheet and Strip from Canada*, 58 FR at 33613 ("compar{ing} {respondents' rerolling} activities to that of *vertically integrated producers*, such as brass mills, which cast, roll, and finish the product") (emphasis added)).

26

China.  Auxin's argument that Commerce should compare the level of production in the third country to a fully integrated producer in China, as it did in prior circumvention inquiries, is therefore inapposite.  Even if Commerce were to determine that such an approach was appropriate to evaluate the circumvention scenario alleged by Auxin, the record lacks evidence of a 'fully integrated' solar cell and module producer comparable to the fully integrated steel mills which has been used as a basis for comparison in other cases.

The solar industry is distinguishable from the industries involved in the cases cited by Auxin, and therefore warrants a different methodological approach, when considering the 'minor or insignificant' factors, to that applied in past cases.  In the steel industry, producers in the order country typically are fully integrated starting at the first stage of production.[130]  We do not have a similar fact pattern on this record.  Prior to the *Preliminary Determination,* we provided all parties, including Auxin, an opportunity to place investment and R&D information on the record of the proceeding.  However, no party provided substantial record evidence of fully integrated production in China during the period of inquiry.  Regarding the Chinese solar industry as a whole, Auxin, in its July 29, 2022 Investment and R&D submission, identified only one company in China with in-progress investments in all stages of production, *i.e.*, solar-grade polysilicon, ingot, wafers, solar cells, and solar modules.[131]  An interested party, NextEra, placed information on the record indicating that the solar industry is not composed of fully integrated producers starting with mining or refining solar-grade polysilicon.[132]  In fact, a report Auxin itself placed on the record, and cited in its March 24, 2023 Case Brief, confirms that integration in the Chinese solar industry does not begin at the mining and refining of solar-grade polysilicon stage of production, and instead involves the later stages of the solar cell and module production process (*i.e.*, wafer through module production).[133]  Auxin argues that we should use its July 29, 2022 Investment and R&D submission to extrapolate an estimate of the investment and R&D needed for one fully integrated solar cell and module producer in China from a number of different companies that operate in different stages of the production process and use those estimates as the basis for our comparison to the order country.  Given the fragmented nature of the solar industry in China, we find a comparison to a fully integrated producer in China, in accordance with Auxin's proposed "merchandise-centric" approach to be inappropriate.

The solar industry is also unique in other respects.  First, solar cell production is more technically complex and dependent on skilled labor to a greater degree than most other products that Commerce has examined in prior circumvention inquiries.[134]  For this reason, we placed particular emphasis on the "level of research and development" factor when evaluating whether the production in the third country was minor or insignificant.  *See* Comment 12.  However, the

---

[130] *See CORE from China (Vietnam) Preliminary* PDM at 18, n.82.
[131] *See* Auxin's Investment and R&D Information at Excel Attachment.  Auxin did not provide information establishing that this company had actually commenced production of solar cells and modules.
[132] *See* NextEra's May 2, 2022 Comments at Att. 2 and at 9 ("Of the leading global polysilicon producers by capacity in 2021, only two, the Chinese companies GCL and Tongwei, participate in supply chain stages other than polysilicon. Of these two companies, GCL is a significant wafer producer, and Tongwei is a leading CSPV cell producer. All other polysilicon producers … operate exclusively in the polysilicon stage of the CSPV manufacturing supply chain.").
[133] *See* Auxin's May 16, 2022 Comments at Exhibit 5.
[134] *See ITC Solar Final* at I-15 (solar cell production is "a highly automated, capital intensive, and technologically sophisticated process, requiring skilled technicians and employees with advanced degrees.").

27

nature of research and development is such that, once carried out, it is easily transmissible across national borders.  Further, solar cells and modules are unique products insofar as one country, here China, accounts for almost one hundred percent of the global production of a primary upstream input, *i.e.*, solar wafers.[135]  These factors, when taken into consideration together, contribute to a circumvention scenario in which large solar conglomerates are incentivized to 'spin off' production of solar cells into third countries, and in which third country producers are left with little choice but to source solar wafers from China.  Our comparative analysis of the 'minor or insignificant' factors, in which we compare respondents' level of investment, level of research and development, and extent of production facilities to those of their affiliated Chinese input suppliers, is the most appropriate manner in which to account for *these particular facts*, which again are unique to the solar industry.

Further, contrary to the language Auxin cites from *SDGE from China (UK)*, there is precedent for Commerce to not examine whether the process of assembly in the third country is minor or insignificant in comparison to the entirety of the production process in the order country.  This was the case in *PET Film from the UAE Preliminary Determination,* where Commerce found it appropriate to compare PET film facilities in the third country, Bahrain, to PET film facilities in the order country, and did not include all production stages in the comparative analysis.[136]  This was also the case in *SSSS from China (Vietnam), Pipe and Tube from India (UAE and Oman)*, *CORE from China (UAE)*, and *OCTG from China (Brunei and the Philippines)* where similar to this circumvention inquiry, for the factors under section 781(b)(2) of the Act, Commerce compared upstream production in the order country to downstream production in the third country.[137]

Citing *Ferrovanadium from Russia Final Determination* and *Hot-Rolled Lead and Bismuth*, cases where Commerce decided against conducting a comparative analysis under section 781(a)(2) of the Act, Auxin argues that the absence of a comparative analysis under 781(a)(2) is only appropriate where there is "no affiliation between the relevant parties **and** third country (or U.S.) operations pre-existed the relevant order"[138]  Although these two cases were circumvention inquiries conducted under section 781(a) of the Act, similar statutory language applies to sections 781(a)(2) and 781(b)(2).  While we agree with Auxin that these are two important aspects to consider, in this specific case, we also consider Auxin's circumvention request, which focused heavily on upstream solar input producers working in tandem with affiliated third country solar cell and solar module producers to circumvent the existing *Orders,* an important distinction that must be considered.  Auxin's proposed standard, which aims to compare third country producers to the entire solar cell and module production process in the order country, fails to account for the rapid growth of the solar cell industry in the years following the issuance of the *Orders*, and may inappropriately target certain third country producers with no upstream affiliates in the order

---

[135] *See* Circumvention Request at 28-30 (citing Bloomberg NEF Report at 1, 9).

[136] *See PET Film from the UAE Preliminary Determination* PDM at 5.

[137] *See CORE from China (UAE)* at Comment 1; *SSSS from China (Vietnam)* IDM at 18-19 "where Commerce compared the R&D activities of the upstream hot-rolling of stainless steel in China to the R&D activities of the further processor in the third country;" *Pipe and Tube from India (UAE and Oman)* IDM at Comment 6; and *OCTG from China (Brunei and the Philippines) Preliminary* PDM at 10, unchanged in *OCTG from China (Brunei and the Philippines)* IDM at Comment 1.

[138] *See* Auxin's April 3, 2023 Rebuttal Brief at 6-8.

28

country.[139]  Therefore, for third country solar cell and module producers with no upstream input affiliates in the order country, we find a comparative analysis in the manner requested by Auxin for sections 781(b)(2)(A), (B), and (D) of the Act to be inappropriate.

Auxin also argues that we have gone against our practice by elevating affiliation to a mandatory criterion under section 781(b)(2) of the Act, therefore, making affiliation a prerequisite for finding circumvention.  However, this point by Auxin is a misrepresentation of our minor or insignificant analysis applied in the *Preliminary Determination.*  Although Auxin is correct that, in this specific case, for our evaluation of the level of investment, the level of research and development, and the extent of the production process, we centered our analysis around upstream input affiliates, Auxin incorrectly conflates our analysis with respect to sections 781(b)(2)(A), (B), and (D) to the entire determination made under section 781(b)(1)(C) of the Act and our circumvention finding writ-large.  In evaluating whether the process of assembly in the third country was minor, for the criterion under section 781(b)(2)(C) of the Act, nature of production process, we compared third country operations to the production of a silicon wafer in China, starting from the solar-grade polysilicon stage of production, regardless of affiliation.  Specifically, in the *Preliminary Determination*, we found that the nature of the production process, as examined under section 781(b)(2)(C) of the Act, is "not minor or insignificant compared to either *processing polysilicon into wafers*, or ingots into wafers, in China, which does not weigh in favor of finding circumvention."[140]  Similarly, when examining the criteria under section 781(b)(2)(E) of the Act, value of processing, in the *Preliminary Determination* we again did not factor in affiliation and note that the silicon wafer is naturally inclusive of the polysilicon that went into it.[141]  As such, Auxin's reliance on *Butt-Weld Pipe Fittings from China (Thailand)* and *CORE from China (Vietnam)*, cases where Commerce noted that affiliation does not have to be present for circumvention to occur, is misplaced as we did not, in this case, elevate affiliation to a mandatory criterion under section 781(b)(2) of the Act or consider affiliation a prerequisite to finding circumvention.  For similar reasons, Auxin's dependence on *SDGE from China (UK),* affirmed in *U.K. Carbon & Graphite, CORE from Vietnam (China), Retail Carrier Bags from Taiwan Final Determination, CRS from China (Vietnam), Tissue Paper from China (India), SDGE from China (UK),* and *HFC from China (India), i.e.*, prior circumvention cases where the process of assembly was found minor even for respondents that did not have affiliates in the order country, adds no value within the context of this proceeding as the methodology applied in the *Preliminary Determination* does not preclude a company with no affiliates in the order country from being found to be circumventing an order.

We note that Commerce, in the cases cited by Auxin, has opted to conduct a direct comparison under section 781(b)(2) of the Act between a respondent's third country operations and the operations of its affiliate in the country subject to an AD/CVD order.  For example, *PET Film from the UAE (Bahrain), CORE from Taiwan (Malaysia)*, *CRS from Korea (Vietnam)*, and *Diamond Saw Blades from China (Thailand)* are examples of prior circumvention cases where Commerce conducted a direct comparison between the respondents and their affiliates in the

---

[139] *See* Circumvention Request at 57-58, n. 231.
[140] *See Cambodia* PDM at 18.  Our approach with respect to 781(b)(2)(C), nature of the production process in the foreign country, remains unchanged in this final determination.
[141] *Id.* at 19.  Our approach with respect to 781(b)(2)(E), value of processing in the foreign country, remains unchanged in this final determination.

country subject to the order when examining the criteria under 781(b)(2)(A), level of investment, 781(b)(2)(B), R&D, 781(b)(2)(C), nature of production process, and 781(b)(2)(D), extent of production facilities.[142]  In line with *PET Film from the UAE (Bahrain)*, *CORE from Taiwan (Malaysia)*, *CRS from Korea (Vietnam)*, and *Diamond Saw Blades from China (Thailand)*, when examining 781(b)(2)(A), level of investment, 781(b)(2)(B), R&D, and 781(b)(2)(D), extent of production facilities, we reasonably opted to make a direct comparison between a respondent's operations in the third country and its upstream affiliates in the country subject to an AD/CVD order.

Therefore, the assumption by Auxin that unaffiliated suppliers will get a free path to circumvent the existing *Orders* is false.  Rather, in accordance with the SAA, our finding as to whether the extent of processing was minor or insignificant was supported by our evaluation of all five factors listed in section 781(b)(2) of the Act, including the nature of the production process and the value added in the third country, which Commerce evaluated without comparison to respondents' upstream affiliates.

Therefore, our minor or insignificant determination, under section 781(b)(1)(C) of the Act, was a "multi-factor"[143] analysis and did not rely merely on affiliation or the exclusion of a stage of production as the linchpins of our circumvention findings.  For these reasons, for the final determination, we will not depart from the minor or insignificant analysis applied in the *Preliminary Determination*.

**Comment 5.   Whether the Nature of Third-Country Processing Indicates the Processing is Minor or Insignificant Under Section 781(b)(2)(C) of the Act**

*Auxin*[144]

- Commerce incorrectly determined, based on the nature of third-country processing, that the processing is not minor or insignificant[145]  In making that decision, Commerce failed to properly weigh:  (1) capital requirements; (2) costs associated with building; (3) the time required to build, the manufacturing facility; (4) technical hurdles associated with starting up operations; (5) energy to require to produce the product; (6) labor demands; (7) number of stages of production; and (8) number of inputs used to produce the product.[146]  Each of these items are addressed below.
- Commerce based its finding that solar cell production is the most capital intensive part of the manufacturing process on outdated data from 2009 to 2012.[147]  Recent data from IEA's 2021 report, show that "polysilicon and ingots/wafers together account for almost 70% of all investment in solar PV manufacturing due to their high capital

---

[142] *See PET Film from the UAE (Bahrain) Preliminary* PDM at 5-6, unchanged in *PET Film from the UAE (Bahrain)*; *CORE from Taiwan Preliminary Determination* PDM at 14-17, unchanged in *CORE from Taiwan Final*; and *Diamond Sawblades (Thailand) Preliminary* PDM at 12, unchanged in *Diamond Sawblades (Thailand)*.
[143] *See Al Ghurair CAFC 2023*, 65 F.4th at 1363.
[144] *See* Auxin's March 24, 2023 Case Brief at 19-20, 23-32.
[145] *Id.* (citing *Cambodia* PDM at 14).
[146] *Id.* (citing *Cambodia* PDM at 15-18).
[147] *Id.* (citing *Cambodia* PDM at 17).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

requirements"[148] and "polysilicon plants and ingot and wafer factories are significantly more CAPEX-heavy than cell- and module-manufacturing facilities."[149]

- The IEA reported that "… polysilicon and ingots/wafers together account for almost 70% of all investment in solar PV manufacturing ..." while cells and modules have low minimum investment requirements.[150]

- The BloombergNEF Report indicated that polysilicon and wafer facilities "take the longest to construct"[151] (12-40 months for polysilicon plants but only 3-12 months for cell and module facilities according to IEA; 3-4 years for polysilicon plants but only 1-3 years for ingot, wafer, solar cell and module facilities according to DOE).[152]

- The BloombergNEF Report concluded that "{t}echnical hurdles are highest for plants that make polysilicon and wafers";[153] thus, "{g}iven low technical and financial barriers, it is also easier for module companies to open shop in other countries in response to tariffs or other policy developments."[154]  The DOE noted that "the module production process … does not require the same level of technical skill …"[155]

- According to the IEA, "{p}olysilicon production accounts for 40% of all energy consumed to manufacture solar PV modules, the largest {energy consumption} of all supply chain segments" followed by ingot and wafer production."[156]  Less than one third of energy consumption is for the production of solar cells and solar modules.

- The DOE found ingot and wafer production to be the most labor-intensive stages of solar cell production.  Although there are lower labor requirements for polysilicon production, it "requires highly skilled labor to operate a plant."[157]

- Based on information from the ITC and the DOE, there are 21-24 discrete steps to produce polysilicon, ingots, and wafers (seven steps to produce polysilicon and 14 to 17 steps to produce wafers depending on the type of wafer produced) but only 17-19 steps to produce solar cells and modules.

- Although more inputs are used to produce solar cells and modules than polysilicon, ingots, and wafers, the greater time and costs to start up, the significant energy required to run, and the higher technical hurdles associated with, polysilicon, ingot, and wafer facilities compared to solar cells and module facilities, and the fact that most inputs used to the produce solar cells and modules in the inquiry country are sourced from China, support finding solar cell and module production in the inquiry country to be minor or insignificant.

---

[148] *Id.* (citing Auxin's July 29, 2022 Comments at Exhibit 1 (citing *IEA Report* at 47)).

[149] *Id.* (citing Auxin's July 29, 2022 Comments at Exhibit 1 (citing IEA Report at 85)).

[150] *Id.* (citing Auxin's July 29, 2022 Comments at Exhibit 1 (citing *IEA Report* at 47 and 86)).

[151] *Id.* (citing Circumvention Request at Exhibit 4 (citing *Bloomberg Report* at 1)).

[152] *Id.* (citing Auxin's July 29, 2022 Comments at Exhibit 1 (citing *IEA Report* at 65); Auxin's May 16, 2022 Comments at Exhibit 5 (citing *DOE Solar Deep Dive* at 12)).

[153] *Id.* (citing Circumvention Request at Exhibit 4 (citing *Bloomberg Report* at 1)).

[154] *Id.* (citing Circumvention Request at Exhibit 4 (citing *Bloomberg Report* at 3.4)).

[155] *Id.* (citing Auxin's May 16, 2022 Comments at Exhibit 5 (citing *DOE Solar Deep Dive* at 45)).

[156] *Id.* (citing Auxin's July 29, 2022 Comments at Exhibit 1 (citing *IEA Report* at 36-37)).

[157] *Id.* (citing Auxin's May 16, 2022 Comments at Exhibit 5 (citing *DOE Solar Deep Dive* at 25)).

*BYD HK*[158]
- Commerce correctly concluded that the nature of solar cell and module production in the inquiry country is not minor or insignificant.
- As Commerce previously noted, "cell production is where the essence of a solar module is realized" because "{t}he essential component of solar modules/panels is the solar cell …"[159]

*NextEra*[160]
- Processing in the inquiry country is significant because it creates the p/n junction which forms the solar cell and it is "where the essence of a solar module is realized."[161]
- Solar cell and solar module production in the inquiry country requires substantial initial and ongoing investments, extensive production facilities, sophisticated and highly technical equipment, and skilled laborers with specialized training.[162]
- Auxin failed to address record information about the transformative nature of production in the inquiry country, ignored information regarding the production equipment used, and relied on irrelevant facts regarding energy consumption and lead times in its analysis.
- Commerce's finding that the nature of production in the inquiry country is not minor or insignificant supports a negative circumvention determination.

**Commerce's Position:** We continue to find that the nature of the production process in the inquiry country is not minor or insignificant.

As an initial matter, it is useful to repeat here our description of the production process from the *Preliminary Determination,* which is not specific to any one respondent but encompasses the essence of the manufacturing performed by all the respondents. As described in the *Preliminary Determination*:

> According to the ITC, to produce ingots, polysilicon rocks are placed into a quartz crucible along with a small amount of boron, which is used to provide a positive electric orientation. The crucible is then heated in a furnace to approximately 2,500 degrees Fahrenheit to produce monocrystalline silicon, currently the most common form of polysilicon used in producing solar cells. Once the polysilicon is melted, a seed crystal is lowered into the material and rotated, with the crucible rotated in the opposite direction. The melt starts to solidify on the seed and the seed is slowly raised out of the melt—creating a single long crystal. The crystal is then cooled before it is moved onto the next step. The process of growing the crystal takes approximately 2.5 days.[163]

> To produce wafers, the top and tail of the ingot are cut off and the remaining portion is cut into equal length pieces and then squared. A wire saw is used to

---

[158] *See* BYD HK's April 3, 2023 Rebuttal Brief at 8-11.
[159] *Id.* (citing *Cambodia* PDM 18).
[160] *See* NextEra's April 3, 2023 Rebuttal Brief at 15-17.
[161] *Id.* (citing *Cambodia* PDM at 18).
[162] *See* NextEra's April 3, 2023 Rebuttal Brief (citing NextEra' May 2, 2022 Submission at 3-40).
[163] *See Cambodia*  PDM at 16 (citing *ITC Solar Monitoring* at I-62).

32

slice the ingots into wafers.  Typically, diamond wire saws are used for monocrystalline wafer slicing.  The wafers are then cleaned, dried, and inspected.[164]

Solar cell production typically involves phosphorus being diffused into a thin layer on the wafer surface at high heat, which gives the surface of the wafer its negative potential electrical orientation.  The combination of that layer, and a boron-doped layer below, creates the positive-negative (p/n), junction.  A thin layer of silicon is removed from the edge of the solar cell to separate the positive and negative layers.  A silicon nitride antireflective coating is then added to the solar cell to increase the absorption of sunlight and metals are printed on the solar cell to collect electricity.  Aluminum and silver layers are applied, and then the solar cell is placed in a furnace, where the high temperature causes the silver paste to become imbedded in the surface of the silicon layer, forming a reliable electrical contact.  The final step in the process is testing and sorting the solar cells based on their characteristics and efficiency.[165]

To assemble solar cells into solar modules, a piece of glass is placed on the production line, and EVA or another encapsulant is placed on top of the glass.  Then a group of solar cells is placed in a line and soldered together, creating a string.  The strings are then placed on top of the encapsulant, and the string interconnections are soldered together.  After this, another layer of EVA and a backsheet are added, and the product is laminated and cured.  Usually a frame is added, and a junction box is attached to the back of the module.[166]

As explained in Comment 4, we did not consider the production of polysilicon in our analysis because none of the respondents' affiliates in China produced polysilicon, and there is no substantial evidence on the record to support finding that the Chinese solar industry is vertically integrated from the production of polysilicon to the production of solar modules.

We examined the nature of the production process by comparing the production of solar cells and solar modules in the inquiry country to the production of ingots and/or wafers in China, depending on whether the respondents' affiliates in China produced ingots and/or wafers.

Because Auxin claims that Commerce failed to properly weigh certain factors in its analysis of the nature of third-country processing (*i.e.*, capital requirements, building costs and time, technical hurdles, energy consumed in production, labor demands, number of production stages, and number of inputs used) we have addressed each of Auxin's factors below.  While we have addressed each of the factors relied upon by Auxin, it is important to note that Commerce has not established these factors as criteria for analyzing the nature of the production process in the foreign country, but examines the nature of that production process on a case-by-case basis.

---

[164] *Id.* (citing *ITC Solar Monitoring* at I-64).
[165] *Id.* (citing *ITC Solar Monitoring* at I-65 to I-66).
[166] *Id.* (citing *ITC Solar Monitoring* at I-67).

For the final determination, we have not considered capital expenditures/requirements or the cost associated with building production facilities in our analysis of the nature of production because we analyzed the level of investment in the production facilities under section 781(b)(2)(A) of the Act.  Thus, Auxin's comments regarding capital requirements and the cost to build manufacturing facilities are moot.

With respect to the time required to construct each type of production facility, according to the *DOE Solar Deep Dive*, ingot and wafer facilities, solar cell facilities, and solar module facilities require one to three years to build.[167]  Thus, this factor does not indicate that the nature of solar cell and solar module production in the inquiry country differs from the production of ingots and wafers in China.

With respect to technical hurdles, the *Bloomberg Report notes that* wafer factories "bear many technical hurdles, which makes it difficult for new factories to be built outside of China,"[168] whereas "{c}ell manufacturing … compared to wafers and polysilicon … has lower technical hurdles"[169] and "{b}uilding a new module factory has low technical hurdles compared with wafer and polysilicon."[170]  Nonetheless, record evidence indicates that there are significant technical requirements that must be met for, and changing technologies with respect to, producing solar cells.

According to the *FTI report*, "the equipment and technology, as well as the number of processing steps required to produce a {solar} cell are far more technically sophisticated than those of the polysilicon or wafer manufacturing operations. … Cell manufacturing alone requires a fully integrated, multi-step manufacturing line with equipment to perform {multiple} processes … . Each of these processes requires one or more uniquely designed and calibrated machines to advance the wafer from a commodity product to a finished cell …"[171]

Moreover, while the technology required to produce ingots has not significantly changed since it was created,[172] the same is not true for solar cells.  "Technology improvements in the wafer-to-cell process are responsible for most of the performance improvements of solar panels."[173]  Because of technological improvements to solar cells, module makers must regularly upgrade their production lines to avoid becoming obsolete.[174]  Hence, there are also meaningful technological requirements that must be met before producing solar cells.

Regarding energy, according to the *IEA Report* ingot and wafer production consumes higher amounts of energy when compared to the solar cell and solar module production, which "require less heat and lower temperatures for drying and cooling, and most of the electricity is used for automated mechanical work."[175]  However, it is not clear that energy consumption is necessarily

---

[167] *See DOE Solar Deep Dive* at 12.
[168] *See Bloomberg Report* at 3.2.
[169] *Id.* at 3.3.
[170] *Id.* at 3.4.
[171] *See FTI Report at 11.*
[172] *See Denis De Ceuster Report* at 9.
[173] *Id.* at 1.
[174] *See Bloomberg Report* at 3.4.
[175] *See IEA Report* at 37.

informative when examining whether the nature of the production process is minor or insignificant. Energy consumption may have more to do with the type of processing required than the scale or extent of the processing. Therefore, the record does not support a finding that the lower energy consumption required to produce solar cells and modules contributes in a meaningful way to our evaluation of the nature of the production process.

With respect to labor, according to the *DOE Solar Report* 0.40 - 0.80 direct employees are required per MW of ingot and wafer production, while 0.15-0.45 and 0.50-0.70 direct employees are required per MW of solar cell and solar module production, respectively.[176] This means that a one GW ingot and wafer production facility requires 400-800 direct manufacturing workers, while one GW solar cell and solar module production facilities require 150-450 direct manufacturing workers and 500-700 direct manufacturing workers, respectively.[177] Based on this information, the labor requirements for a solar cell and solar module facility are greater than the labor requirements for an ingot and wafer production facility.

With respect to the skill level, the ITC reported that processing wafers into solar cells involves sophisticated machinery, which requires "skilled technicians and employees with advanced degrees."[178] There is no information on the record that indicates that the production of ingots and wafers require skilled workers.

According to the *DOE Solar Deep Dive,* producing ingots and wafers requires 14 or 17 steps (depending on the type of wafer produced, *i.e.*, monocrystalline or multicrystalline), producing solar cells requires seven or 11 steps (depending on whether a full-area AI-BSF cell or full-area PERC cell is being produced), and producing solar modules requires nine steps.[179] Thus, it requires fewer steps to produce ingots and wafers in China, than to produce solar cells and solar modules in the inquiry country.

More significant, however, is the nature of the production performed in each production step. The *IEA Report* specifies that while each segment of the manufacturing processes require various types of special equipment, solar cell production requires sophisticated, precise and advanced automation equipment, and solar module production requires "highly automated machinery and accurate quality-testing equipment at multiple stages."[180] Meanwhile, the IEA Report indicates that ingot production uses "simpler, more conventional equipment …"[181] Therefore, producing solar cells and solar modules in the inquiry country involves a multi-step production process that requires more precise and sophisticated equipment at multiple stages compared to producing ingots and wafers in China.

Regarding inputs, solar cell and solar module production requires approximately 100 different inputs, whereas converting polysilicon into wafers only involves a handful of inputs.[182]

---

[176] *See DOE Solar Report* at 11.
[177] *Id.* at 11.
[178] *See ITC Solar Final* at I-18; *see also ITC Solar Safeguard Proceeding 2017* at I-22 – I-23.
[179] *See DOE Solar Deep Dive* at 30-31, 35-36, and 44.
[180] *See IEA Report* at 35.
[181] *Id.* at 3.
[182] *See Cambodia* PDM at 17.

35

More importantly, producing wafers from polysilicon in China is less extensive of a transformation of the input than producing solar cells and solar modules from wafers in the inquiry country.  The essence of the solar module is realized in solar cell production.  In the *Preliminary Determination,* we noted that:

> once a wafer is doped and an opposite electrical orientation is imparted on the surface, it results in the creation of a p/n junction.  When sunlight strikes the cell, the positive and negative charge carriers are released, causing electrical current to flow.  It is at this point that the cell is capable of generating electricity from sunlight.[183]

> Therefore, Commerce has determined that it is only when the p/n junction is created that a wafer is no longer just a wafer, but is a solar cell that is subject to *the Orders*.[184]

In sum, the production of solar cells and solar modules in the inquiry countries has greater labor demands, more steps, and requires more inputs than ingot and wafer production in China. Moreover, the multi-step solar cell and solar module production process requires sophisticated, precise, and technologically advanced equipment, and a skilled workforce.  Production of solar cells and wafers involves more than attaching Chinese components together.  Solar cell and solar modules production involve exacting processes (*e.g.*, molecular-level impregnation of phosphorus into the wafer at a high heat,[185] printing solar cells (metals, such as silver paste, are printed onto the solar cell to collect electricity[186])) and treatments to, and preparation of, inputs used in production (such as lamination and curing of EVA, solar cells, and the backsheet).[187]

Importantly, the essential nature of the final product is imparted and realized through production in the inquiry country when the p/n junction is formed in the wafer.  The p/n junction "… results in the creation of solar cells—albeit unfished solar cells—capable of converting sunlight into electricity via the photovoltaic effect."[188]  Moreover, other components in the solar cell and solar module are important to its ability to function because they channel the electricity out of the cell so that the product can be used as intended.  We do not believe that the technical hurdles associated with ingot and wafer production outweigh the above facts when comparing the nature of producing ingots and wafers to the nature of producing solar cells and solar modules.

Based on the foregoing, we continue to find that the nature of the production process in the inquiry country performed by the mandatory respondent(s) does not support finding the process of assembly or completion in the inquiry country to be minor or insignificant.

---

[183] *Id.* at 18 (citing Solaria Scope Ruling at 10-11).
[184] *Id.* at 18 (citing SunSpark Scope Ruling at 6).
[185] *See* Circumvention Request at 20.
[186] *Id.* at 20.
[187] *Id.* at 21.
[188] *See* ET Solar Scope Ruling at 7.

36

## Comment 6. How to Value U.S. Imports of Solar Cells and Modules for Purposes of Section 781(b)(2)(E) of the Act

*Auxin*[189]

- Section 781(b)(2)(E) of the Act requires Commerce to determine "whether the value of the processing performed in the foreign country represents a small proportion of the value of the merchandise imported into the United States."
- Commerce should base the value of the merchandise that is imported into the United States on the COM of that merchandise rather than U.S. sales price because U.S. sales prices could be transfer prices, prices that reflect dumping or subsidization, or prices below costs.
- Commerce has acknowledged that section 781 of the Act does not define "value," and it explained that in determining value under that section of the Act it considers the items that are being valued and the "availability and reliability of reported prices and costs."[190]
- In *Plywood from China (Vietnam) Preliminary*, Commerce valued the merchandise imported into the United States using COM where it noted that " … the U.S. price is insufficient to cover even the Chinese veneer content of the finished hardwood plywood."[191]
- This same logic should be applied in these circumvention inquiries where Commerce finds a similar fact pattern when comparing the cost of Chinese inputs used in the inquiry merchandise (based on surrogate values) to the sales value of the merchandise imported into the United States.

*NextEra*[192]

- Using COM to value the merchandise that was imported into the United States for purposes of section 781(b)(2)(E) of the Act directly conflicts with Commerce's statutory mandate and is inconsistent with its practice.
- In *Glycine from China (India)*, Commerce explained that "although the statute does not specify a method for determining value {under section 781(b)(2)(E) of the Act}, it does clearly specify that this is a *value-based test,* and *not a cost-based test*."[193]
- In *PET Film from the UAE (Bahrain),* Commerce confirmed that it must use "the value of the merchandise exported to the United States", not costs, in its calculations under section 781(b)(2)(E) of the Act, "consistent with use of the phrase 'value of processing performed'" in that section of the Act.[194]
- In *Plywood from China (Vietnam)*, Commerce was forced to base its calculations under section 781(b)(2)(E) of the Act on whatever facts were available since there were no usable data from respondents on the record (Commerce applied total AFA. The unique methodology used in that case is not relevant here.[195]

---

[189] *See* Auxin's March 24, 2023 Case Brief at 37-39.
[190] *Id.* (citing *SDGE from China (UK)* IDM at Comment 3).
[191] *Id.* (citing *Plywood from China (Vietnam) Preliminary*).
[192] *See* NextEra's April 3, 2023 Rebuttal Brief at 19-21.
[193] *Id.* (citing *Glycine from China (India)* IDM at 18).
[194] *Id.* (citing *PET Film from the UAE (Bahrain)* IDM at 5).
[195] *Id.* (citing *Plywood from China (Vietnam) Preliminary* PDM at 15, 24).

*BYD HK*[196]

- Section 781(b)(2)(E) of the Act, directs Commerce to determine "the value of merchandise imported into the United States,"[197] and Commerce has noted that "although the statute does not specify a method for determining value, it does clearly specify that this is a *value-based test* and *not a cost-based test*."[198]

**Commerce's Position:**  We disagree with Auxin's position that Commerce should use COM to value the merchandise that was imported into the United States for purposes of section 781(b)(2)(E) of the Act.  Although the word "value" is not defined in section 781(b)(2)(E) of the Act, Congress described this section of the Act as determining "whether the value of the processing performed in … the third country represents a small portion of the value of the merchandise sold in, or imported into, the United States."[199]  The phrase "value of the merchandise sold" indicates a sales value that generally reflects all costs incurred, not just the cost of materials, labor, and factory overhead (COM), as well as a profit.

Commerce has taken this position in other cases.  In *Glycine from China (India)* Commerce explained that "although the statute does not specify a method for determining value {in section 781(b)(2)(E) of the Act,} it does clearly specify that this is a value-based test, and not a cost-based test."[200]  This plain reading of the statute is also consistent with Commerce's calculations in other circumvention inquiries.[201]

Neither *SDGE from China (UK)* nor *Plywood from China (Vietnam)* supports Auxin's position.  The issue in *SDGE from China (UK)* involved how to value third-country processing (the numerator in the ratio of third-country processing divided by the value of the merchandise imported into the United States), not how to value the merchandise that was imported into the United States for purposes of section 781(b)(2)(E) of the Act.[202]

In *Plywood from China (Vietnam)*, Commerce did not have any usable data from Vietnamese producers or exporters of hardwood plywood to determine the relative value of the processing performed in Vietnam.  Consequently, Commerce used data that were provided by the requester of the circumvention inquiry and submitted in the Vietnam Finewood Scope Inquiry.  The requester in *Plywood from China (Vietnam)* argued that most of the production costs for hardwood plywood were incurred in China and thus Vietnamese processing is relatively minor.  In the absence of data from Vietnamese producers or exporters of hardwood plywood, Commerce attempted to confirm the requester's allegation by examining the percentage of COM represented by core veneers from China and Vietnamese processing (*i.e.*, Commerce sought to

---

[196] *See* BYD's April 3, 2023 Rebuttal Brief at 14 and 15.
[197] *Id.* (citing section 781(b)(2)(E) of the Act).
[198] *Id.* (citing *Glycine from China (India)* IDM at 18).
[199] *See* S. Rep. No. 103-412 (1994), at 82.
[200] *See Glycine from China (India)* IDM at 18.
[201] *See, e.g.*, *CORE from China (UAE) Preliminary* PDM at 21, unchanged in *CORE from China (UAE)*; *Pipe and Tube from India (Oman and UAE)* IDM at 37; *OCTG from China (Brunei and Philippines) Preliminary* PDM at 13, unchanged in *OCTG from China (Brunei and Philippines)*.
[202] *See SDGE from China (UK)* IDM at Comment 3 ("… UKCG requests that the Department reconsider the methodology used to determine the numerator of the quantitative portion of the analysis of further processing … As discussed below, the Department has indeed reconsidered its calculation of the value included in the numerator").

38

confirm whether most costs were incurred in China). Although Commerce applied AFA in its determination, it noted that it based its analysis on "the value associated with completing hardwood plywood using Chinese-origin core veneers (and potentially Chinese face and back veneers) in Vietnam is relatively insignificant in comparison to the primary stages of production that are completed in China."[203] Thus, Commerce's cost-based approach in *Plywood from China (Vietnam)*, was unique to the facts of that case and should not necessarily stand as precedent for all circumvention inquiries. In fact, in the final determination in *Plywood from China (Vietnam)*, Commerce explained that:

> Although the U.S. Importers and {Vietnamese} Exporters assert that the methodology relied on in other circumvention inquiries to calculate the value added in a third country differs from the methodology Commerce used in the Preliminary Determination, we continue to find that our determination relied on the best available information on our record. … Given the limited information available on the record, we have continued to apply our quantitative analysis from the Preliminary Determination.[204]

Lastly, we do not find Auxin's arguments that the reported U.S. prices are distorted to be persuasive. Auxin based its arguments on a comparison of the total value, based on surrogate values, of Chinese inputs in a solar module, to the U.S. sales value of the module. However, Commerce calculated the total value of Chinese inputs in a solar cell or solar module that Auxin used in its comparison for purposes of section 781(b)(1)(D) of the Act, not section 781(b)(2)(E) of the Act. Auxin never explains why it would be distortive to compare the cost of processing solar cells and modules in, for example, Cambodia, Malaysia, or Thailand, to the U.S. sales value of those solar cells and modules when presumably, the sales value would reflect the processing costs incurred in those countries. Moreover, it is not appropriate to find that inquiry merchandise is being dumped or unfairly subsidized in the context of a circumvention inquiry.

For the foregoing reasons, we have continued to use U.S. sales prices to value the merchandise that was imported into the United States for purposes of section 781(b)(2)(E) of the Act.

## Comment 7.   Whether Material Costs Should be Included in the Value of Third-Country Processing

*Auxin*[205]

- When applying section 781(b)(2)(E) of the Act (*i.e.*, determining whether the value of the processing performed in the third country represents a small proportion of the value of the merchandise imported into the United States), Commerce must exclude the value of material inputs in the value of the processing. By using the phrase "processing performed," the Act focused on the processing operations in the third country, not the value of the material inputs used in those processing operations.
- This interpretation is consistent with *HFCs from China (India)* where Commerce determined that "when the Act is referring to the value of the processing, it is referring to

---

[203] *See Plywood from China (Vietnam) Preliminary* PDM at 10, 23 and 24.
[204] *See Plywood from China (Vietnam) Final* IDM at Comment 2.
[205] *See* Auxin's March 24, 2023 Case Brief at 33-39.

the process of completion or assembly of the parts or components, not the process to manufacture the parts or components."[206]

- In *HFCs from China (India)*, Commerce noted that "Congress acknowledged in {certain} passages of the SAA that, under the previous statutory criteria, the inclusion of the parts or components from a third country proved to be problematic. Therefore, Congress enacted the revisions to section 781(b) of the Act, which allowed Commerce to focus on whether the process of assembly or completion is minor or insignificant pursuant to section 781(b)(2) of the Act." [207]

- Rather, material inputs used in third-country processing should be considered when determining the total value of the exported merchandise under section 781(b)(1)(D) of the Act (where Commerce must determine whether the portion of the product produced in the order country is a significant portion of the total value of the product exported to the United States) and sections 781(b)(2)(A) (level of investment in the third country), (C) (nature of the production process in the third country), and (D) (extent of the production facilities in the third country) of the Act.[208]

*BYD HK*[209] *NextEra*[210]

- Ignoring third-country direct materials in the value-added calculation, as proposed by Auxin, would force Commerce to disregard a component of the subject processing, thereby distorting the analysis.

- Commerce has a longstanding practice of including the value of material inputs used in third-country processing in the value of that processing under section 781(b)(2)(E) of the Act and should not depart from that practice here.[211]

- Auxin did not explain why here Commerce should depart from its overwhelming prior practice based on a single instance (*HFCs from China (India)*), where it excluded the value of material inputs used in third-country processing from the value of that processing.[212]

- The statutory language contains no limitation that supports Auxin's proposal to arbitrarily exclude non-Chinese materials as a part of the value of foreign processing and Commerce's interpretation of the statute is clearly reasonable and permissible.

- The fact that section 781(b)(1)(D) of the Act requires Commerce to consider the value of the Chinese inputs relative to the "total value of the exported merchandise" does not qualify or limit the statutorily distinct analysis required under section 781(b)(2)(E) as to whether the "value of the processing performed in the foreign country represents a small proportion of the value of the merchandise imported into the United States."

---

[206] *Id.* (citing *HFCs from China (India)* IDM at 17).
[207] *Id.*
[208] *Id.*
[209] *See* BYD HK's April 3, 2023 Rebuttal Brief at 11-14.
[210] *See* NextEra's April 3, 2023 Rebuttal Brief at 18-20.
[211] *See, e.g., CORE from China (UAE)* IDM at 20; *CRS from Korea (Vietnam) Preliminary* PDM at 17 (unchanged in *CRS from Korea (Vietnam)*); *Diamond Sawblades (Thailand) Preliminary* PDM at 12, unchanged in *Diamond Sawblades (Thailand).*
[212] *See* NextEra's April 28, 2023 Vietnam Rebuttal Brief at 36-37.

**Commerce's Position:**  We disagree with Auxin's position that in this circumvention inquiry, Commerce should exclude material costs from the value of processing for purposes of section 781(b)(2)(E) of the Act.

Section 781(b)(2)(E) of the Act directs Commerce to determine "whether the value of the processing performed in the foreign country represents a small proportion of the value of the merchandise imported into the United States."  Although Auxin claims that the phrase "the value of the processing performed" means the value of the processing operations performed in the third country, not the value of the material inputs used in those processing operations, the phrase "processing operations" is not further defined in the Act, and the individual items to be included in, or excluded from, the value of processing are not identified in the Act.  Moreover, Auxin did not cite any accounting authority or other authority showing that a manufacturer's processing costs do not include material costs.

Processing generally entails subjecting something to a series of actions in order to achieve a particular result or the act of taking something through a set of prescribed procedures.  For example, the Executive Summary and portions of the narrative in the *Bloomberg Report*, which is a report that Auxin relied on in its Circumvention Request, indicate that processing refers to the entire manufacturing activity[213] and processing costs refer to the total cost of a certain stage of production.[214]  In contrast, a graph in the *Bloomberg Report* indicates that processing costs include depreciation and fixed overhead costs.[215]  Therefore, it appears that the word "processing" is not consistently used to refer to the same types of costs.  Thus, the plain meaning of "processing," as used in section 781(b)(2)(E) of the Act, does not answer the question of whether the value of processing includes material costs.

Auxin primarily rests its argument on Commerce's decision in *HFCs from China (India)* and Commerce's discussion of the SAA in that case.  When Commerce calculated the value of processing for purposes of section 781(b)(2)(E) of the Act in *HFCs from China (India)*, it did not include the processing and material costs that the respondent incurred in the third country to produce the HFC component (R-125) that the respondent blended with the Chinese HFC component (R-32) to form the hydrofluorocarbon blend (R-410A) sold in the United States.  Commerce explained that "when the Act is referring to the value of the processing, it is referring to the process of completion or assembly of the parts or components, *not the process to manufacture the parts or components*.  This interpretation of the language in the Act is consistent with Congress' intent towards this portion of the statute" (emphasis added).[216]

Thus, the issue in *HFCs from China (India)* involved the material costs that the respondent incurred to self-produce a product that it used to "complete" the Chinese product, and not the question of whether the cost of materials and supplies used when assembling and completing the Chinese product in the third-country should be included in the value of processing for purposes of section 781(b)(2)(E) of the Act.  In fact, in *HFCs from China (India)*, the respondent did not

---

[213] *See Bloomberg Report* at the Executive Summary at PDF page 5, item 5.
[214] *Id.* at PDF page 15.
[215] *Id.* at Figure 9.
[216] *See HFCs from China (India)* PDM at Comment 3.

use any materials in its "completion" of the Chinese R-32, it merely blended the self-produced R-125 with the Chinese R-32 to form the hydrofluorocarbon blend (R-410A) sold in the United States.[217]  Hence, we do not find Commerce's decision in *HFCs from China (India)*, to be directly applicable in this case.

Moreover, the decision in *HFCs from China (India)*, which Commerce described as "consistent with Congress' intent towards this portion of the statute,"[218] was to focus on the process of completing the Chinese components in the third country, as opposed to the process of manufacturing parts that were used to finish the Chinese components in the third country. Commerce's decision in *HFCs from China (India)* was to not focus on the processing that had nothing to do with the assembly or completion of the merchandise imported from the order country (China).  Thus, this decision was entirely consistent with Congress' revisions to Section 781(b) which directed "Commerce to focus on whether the process of assembly or completion {in the third-country} is minor or insignificant pursuant to section 781(b)(2) of the Act."[219] Additionally, Commerce's decision in *HFCs from China (India)* was fact specific and did not necessarily establish a broader practice regarding which costs should be included in the value of processing being performed in the foreign country for purposes of section 781(b)(2)(E) of the Act.

Auxin's argument is based, in part, on Commerce's citation in *HFCs from China (India)* to the SAA's discussion of a "third-country parts" problem that existed in the pre-URAA version of the Act, which required that the difference between the value of the order country product that was processed in the third country and the final product imported into the United States be small to find circumvention.  Congress found this provision was ineffective in identifying circumvention because in some cases only minor assembly was performed in the third country, yet the difference in value was not small (*e.g.*, a "screwdriver" operation in the third country where high value third-country electronic components were simply connected together with electronic components from the order country into a finished product).  Therefore, Congress revised the Act by removing the "difference in value" provision and adding, among other things, section 781(b)(2)(E) of the Act (whether the value of the processing performed in the foreign country represents a small proportion of the value of the merchandise imported into the United States).[220]

However, after discussing the third-country parts problem, the SAA simply explains that new section 781(b)(2)(E) of the Act requires that Commerce determine whether the value of the third-country processing is small and notes that this requirement is consistent with the overall focus of revisions to the Act, which is to determine whether the process of assembly or completion in the third country is minor or insignificant.  The SAA never indicated that the cost of all the materials used in third-country processing should be excluded from the value of that processing for purposes of section 781(b)(2)(E) of the Act, and Commerce has not taken that position in numerous prior circumvention cases.[221]

---

[217] *Id*. ("… we valued only the respondents' direct labor, manufacturing overhead, SG&A expenses, and net interest expenses in valuing the production process as these are the *only* expenses incurred by GFL … in performing the processing on the components to make HFC blends" (emphasis added).
[218] *Id*.
[219] *Id*.
[220] *See* SAA at 892-94.
[221] *Id*.

42

A discussion of this matter is in Commerce's summary of the comments that it received on its revisions to the regulations that it proposed pursuant to the URAA. Specifically, one party "argued that because the emphasis in anticircumvention inquiries concerning completion or assembly in … a third country is now on whether that process is minor or insignificant, any parts or components sourced from third countries should not be included in making that judgement."[222] Commerce replied to that comment by stating that "we have not adopted this suggestion."[223] While Commerce went on to explain that third-country parts and components must still be considered under section 781(b)(1)(D) of the Act, the issue raised by the commenter was clearly focused on the issue at hand here, namely how third-country parts should be treated in determining whether completion or assembly in a third country was minor.[224] Yet, Commerce did not indicate, at that time, that its policy would be to exclude the cost of materials from the value of the processing in all circumvention inquiries, as suggested by Auxin.

Moreover, Commerce's regulations under 19 CFR 351.226(i) specify that "{i}n determining the value of … processing performed … under section 781(b)(2)(E) of the Act, the Secretary may determine the value of the part or component on the basis of the cost of producing the part or component under section 773(e) of the Act—or, in the case of nonmarket economies, on the basis of section 773(c) of the Act." Thus, Commerce's regulations discuss valuing parts or components when determining the value of processing under section 781(b)(2)(E) of the Act.

Similarly, we do not find it appropriate to exclude the cost of processing materials from the value of third-country processing in this circumvention inquiry. Here, we are not facing the situation described in the SAA, where a few high value third-country components are being connected together with components from the order country into a finished product. Auxin itself claimed that "{t}he total cost components from China represent a significant portion of the total value of the merchandise ultimately exported to the United States."[225] Moreover, the process of completing certain of the Chinese components in the third country involves more than simply attaching Chinese and third-country components together. Some third-country materials are applied to, or infused into, the Chinese components to modify their properties (*e.g.*, phosphorus is diffused into wafers to effect a molecular-level impregnation that changes the electrical properties of the wafer).[226] As a result, the processing involves more than just the activities performed on the components; it includes third-county materials interacting with the Chinese components to change the properties of the component. It is not clear, in this case, that all third-country materials should be excluded from the value of third-country processing, even the materials that form the nature of the processing.

Moreover, we do not find it reasonable to apply Auxin's interpretation of the SAA in this case, given the cost structure of solar cells and solar modules. Record evidence indicates that non-material costs account for significantly less than half the price for solar modules. The ITC noted that "{r}aw material costs for the production of solar modules (much of which are the cost of the

---

[222] *See Antidumping Duties; Countervailing Duties*, 62 FR at 27329.
[223] *Id*.
[224] *Id*.
[225] *See* Circumvention Request at 78.
[226] *Id.* at 20.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

cells) accounted for 81.5 percent of U.S. producers' total cost of goods sold."[227]  The *Bloomberg Report* (2021), indicates that material inputs account for 67 percent of the cost of converting a solar cell into a solar module while other processing costs account for 13 percent and labor and electricity costs accounted for 20 percent of total costs.[228]  Given that the total non-material costs incurred to produce solar cells and solar modules, even in China, are limited, we do not find that Auxin's proposal to only consider non-material costs when calculating the value of third-country processing would provide a meaningful measure of the significance of the assembly or completion in the third-country.  Therefore, in order to calculate a meaningful measure of third-country processing of solar cells and solar modules under section 781(b)(2)(E) of the Act, and for the other reasons explained above, we have continued to include material costs in the value of processing performed in the foreign country for purposes of 781(b)(2)(E) of the Act.

**Comment 8.   Whether Commerce Should Rely on Surrogates to Value Chinese Inputs Consumed in the Inquiry Country**

*BYD HK*[229]
- Commerce should value the Chinese inputs that were used to assemble modules in Cambodia based on their purchase prices, not surrogate values, because Cambodia is a market-economy country, Commerce is not calculating a normal value, and the Act directs the use of surrogate values only to determine normal value in NME countries.[230]
- There is no methodological reason to disregard actual costs in favor of surrogate values and doing so overstated the value of Chinese inputs.[231]

*Auxin*[232]
- Commerce should value the Chinese inputs that were used to assemble modules in Cambodia based on surrogate values because assembly in a market-economy country does not undermine Commerce's authority to use surrogates to value inputs that were produced in an NME country (in this case China)[233] and the *Orders* under consideration are on an NME country.[234]

**Commerce's Position:**  We continue to find that it is appropriate to value Chinese-produced inputs that were used to produce solar cells and modules in the inquiry country based on surrogate values.  When determining whether circumvention occurred, section 781(b)(1)(D) of the Act instructs Commerce to determine whether "the value of the merchandise produced in the foreign country to which the antidumping duty order applies is a significant portion of the value of the merchandise that was exported to the United States."  Neither the Act nor Commerce's regulations describe how it is to determine "value."  In this case we have interpreted "value" to mean the cost of the input.  While we are not determining the cost of production or constructed

---

[227] *See USITC Solar Investigation Final* at V-1.
[228] *See Bloomberg Report* at PDF page 18 and Figure 12 and PDF page 22 and Figure 18.
[229] *See* BYD HK's March 24, 2023 Case Brief at 17.
[230] *Id.* (citing section 773(c)(1) of the Act).
[231] *Id.* (citing BYD HK's Preliminary Analysis Memorandum at 4).
[232] *See* Auxin's April 3, 2023 Rebuttal Brief at 70-71.
[233] *Id.* (citing *U.K. Carbon and Graphite*, 931 F. Supp. 2d at 1322; *see also Al Ghurair CIT 2021*, 536 F. Supp. 3d at 1377-78).
[234] *Id.* (citing *Al Ghurair CIT 2021*, 536 F. Supp. 3d at 1376, 1377).

value here, we find section 773(f)(1) of the Act instructive in considering the issue before us. When calculating cost of production and constructed value, section 773(f)(1) notes that:

> {c}osts shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise.

Use of the word "normally" indicates that there may be circumstances where it is inappropriate to use the respondent's records to determine costs. In such cases, Commerce has the discretion to determine costs by some other reasonable means.

Under the Act, the prices of goods produced in NME countries cannot generally be relied upon. The presence of government controls on various aspects of NMEs renders calculation of costs based on actual prices paid for NME inputs invalid under Commerce's normal methodologies. Because the respondent assembled solar modules in the inquiry country using inputs that were produced in China, and China is an NME country, we believe the prices paid by the respondent could be distorted by controls in the NME country. Given these facts, we find it would be inappropriate to use the respondent's records to determine the cost of the Chinese-produced inputs.

In such situations, Commerce must determine costs by some other reasonable means. Commerce's longstanding practice is to use surrogates to value inputs in an NME country. While the inquiry country is not an NME country, this inquiry concerns the *Orders* on an NME country, China, and the inputs in question were produced in China. Thus, for the reasons noted above, and consistent with Commerce's practice of using surrogate values in circumvention inquiries involving NME countries,[235] we find it appropriate to use surrogates, rather than the respondent's purchase prices, to value Chinese-produced inputs that were used to produce solar cells and modules in the inquiry country.

We disagree with the respondent's position that purchase prices should be used to value the Chinese produced inputs because the inquiry country is a market economy country. We find the current situation similar to the one described in Policy Bulletin 94.1, where Commerce noted that "{i}n view of the economic distortion created by state control in NMEs, and the absence of market directed decisions on price and output, it is unrealistic to expect the prices of NME produced goods sold to third {country} resellers to be unaffected by that distortion."[236] Moreover, the CIT "has sustained Commerce's use of surrogate values in previous circumvention inquiries involving merchandise assembled in an ME country, because the decision to do so reflects Commerce's reasonable construction of the statute.[237]

---

[235] *See, e.g.*, *SDGE from China (UK)* IDM at Comment 2; *see also CORE from China (UAE)* IDM at Comment 2; *CORE from China (Vietnam)*; and *Hangers from China (Vietnam)*.
[236] *See* Policy Bulletin 94.1.
[237] *See Al Ghurair CIT 2021*, 536 F. Supp. 3d at 1378 (citing *U.K. Carbon and Graphite*, 931 F. Supp. 2d at 1336).

**Country-Specific Issues**

**Comment 9.   Whether Commerce Should apply AFA to NE Solar**

*Auxin*[238]

- Notwithstanding Commerce's preliminary finding that NE Solar was not circumventing *the AD and CVD Orders*, NE Solar's cancellation of verification renders all of its submitted information unreliable and unusable, and thus warrants the application of AFA pursuant to sections 776(a) and (b) of the Act.
- Commerce's preliminary finding that NE Solar was not circumventing the *Orders* was premised on NE Solar's questionnaire responses being accurate, complete, and verifiable.
- Commerce applying total AFA to NE Solar for the final determination would be consistent with Congress' intent in the SAA that a respondent not benefit from its own lack of cooperation.[239]
- Furthermore, in accordance with *Nippon Steel* and other court cases, Commerce may use an adverse inference when selecting from among the facts available when a party has not fully cooperated to the best of its ability to provide reliable or usable information.[240]
- In *Fish Fillets from Vietnam (Cambodia)*, Commerce applied total AFA to the respondent, Lian Heng, because it submitted questionnaire responses but then terminated the verification.[241]
- Thus, Commerce may rely on AFA pursuant to sections 776(a)(2)(D) and 776(b) of the Act with respect to NE Solar for the final determination since Commerce was not able to verify NE Solar's questionnaire responses.
- Accordingly, Commerce should find, as AFA, that NE Solar is circumventing the *Orders* and should preclude NE Solar from participating in any certification regime.

*NextEra*[242]

- Commerce should reject Auxin's arguments regarding applying total AFA to NE Solar due to the cancellation of its verification because there's no record evidence regarding the circumstances surrounding the cancelation.[243]
- NE Solar cancelling verification does not negate Commerce's preliminary findings that "the nature of the production performed by the respondents in the third country is not

---

[238] *See* Auxin's March 24, 2023 Case Brief at 39-42; and Auxin's April 3, 2023 Rebuttal Brief at 71-72.
[239] *Id.*
[240] *See* Auxin's March 24, 2023 Case Brief; and Auxin's April 3, 2023 Rebuttal Brief (citing *Antidumping Duties; Countervailing Duties; Final Rule*, 62 FR 27296, 27340; *Nippon Steel*, 337 F.3d 1373, 1382; *Building Sys. De Mex.*, 567 F. Supp. 3d 1306, 1316; *Mukund CIT*, 37 CIT 443, 452; and *Mukund Fed. Cir.*, 767 F.3d 1300, 1308 ("In general, use of partial facts available is not appropriate when the missing information is core to the antidumping analysis and leaves little room for the substitution of partial facts without undue difficulty.").
[241] *See* Auxin's March 24, 2023 Case Brief and Auxin's April 3, 2023 Rebuttal Brief (citing *Fish Fillets from Vietnam (Cambodia)* IDM at Comment 2).
[242] *See* NextEra's April 3, 2023 Rebuttal Brief at 21-22.
[243] *Id.* (citing NE Solar January 29, 2023 *Ex Parte* Memorandum).

minor or insignificant compared to either processing polysilicon into wafers, or ingots into wafers, in China, which does not weigh in favor of finding circumvention."[244]

- Commerce applied its finding regarding the production process universally to all mandatory respondents in the inquiry countries based on substantial publicly available information, and not mandatory respondents' questionnaire responses[245]
- Commerce's finding regarding the significant nature of the production process alone warrants a negative circumvention determination for the final.

**Commerce's Position:**  For this final determination, Commerce is applying AFA to NE Solar and will not rely on its questionnaire responses.  According to section 776(a) of the Act, Commerce shall use facts otherwise available in reaching a determination if:  (1) necessary information is not available on the record; or (2) an interested party or any other person:  (A) withholds information that has been requested by the administering authority or the Commission under this title; (B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to subsection (c)(1) and (e) of section 782; (C) significantly impedes a proceeding under this title; or (D) provides such information that cannot be verified as provided in section 782(i).  Section 776(b) of the Act permits the application of an adverse factual inference where a party fails to act to the best of its ability in complying with a request for information from Commerce.  In the instant circumvention inquiry, Commerce finds that NE Solar has impeded this proceeding by not allowing Commerce to verify all of the information it submitted.[246]  By canceling verification, NE Solar also provided information that could not be verified.  Therefore, NE Solar's failure to cooperate with Commerce by cancelling verification is grounds for us to apply a factual inference in accordance with section 776(a)(2)(D) of the Act.  Further, NE Solar's cancellation of verification was uncooperative with our requests for information, and therefore constitutes a failure to act to the best of its ability, warranting the application of AFA pursuant to section 776(b) of the Act.

We disagree with NextEra's comment that NE Solar's failure to participate in verification warrants no change to Commerce's preliminary finding of no circumvention.  As noted by Auxin, the cancellation of verification precluded Commerce from verifying NE Solar's reported information.  NextEra's argument that the preliminary finding regarding the nature of the production process is enough for a negative finding for NE Solar overall is misplaced because Commerce was not able to verify NE Solar's production process.  Importantly, Commerce was unable to verify any of the information NE Solar reported.  Because NE Solar refused to permit verification of its submitted information, Commerce finds NE Solar's reported information to be unreliable for purposes of the final determination.  Further, even if Commerce were to find that the nature of the production process for NE Solar supported a finding that the production process in Cambodia was minor or insignificant, Next Era's argument would not prevail because Commerce would lack data relevant to the four remaining minor or insignificant factors. Because NE Solar's lack of cooperation precluded Commerce from conducting a holistic evaluation of the factors contained in section 781(b)(2) of the Act, Commerce's application of

---

[244] *See* NextEra's April 3, 2023 Rebuttal Brief (citing *Cambodia* PDM at 18 ("{T}he nature of the production performed by the respondents in the third country is not minor or insignificant compared to either processing polysilicon into wafers, or ingots into wafers, in China, which does not weigh in favor of finding circumvention.").
[245] *Id.* (citing *Cambodia* PDM at 15).
[246] *See* NE Solar January 29, 2023 *Ex Parte* Memorandum.

47

AFA to find that NE Solar's production process in Cambodia was minor or insignificant is warranted.

We also disagree with NextEra's argument that Commerce can rely on NE Solar's questionnaire responses for our final determination even though Commerce was not able to verify the submitted questionnaires. As noted by Auxin, in *Fish Fillets from Vietnam (Cambodia)* Commerce applied AFA to a non-cooperative respondent, in accordance its practice, that cancelled verification despite the respondent's questionnaire responses being timely.[247] As noted by NextEra, Commerce stated in the *Cambodia* PDM that we would apply our finding regarding the production process universally to all mandatory respondents in the inquiry countries based on substantial publicly available information, and not mandatory respondents' questionnaire responses; however, the matter at hand here is the fact that NE Solar cancelled verification and thus did not cooperate to the best of its ability during the proceeding. We also stated in the *Cambodia* PDM that we intended to verify the information relied upon in making our preliminary determination.[248] The fact that NE Solar cancelled verification made it impossible for Commerce to confirm and verify the information we used to make our preliminary determination that NE Solar did not circumvent the *Orders*. In addition to Commerce precedent, the courts have affirmed Commerce's ability to apply AFA to non-cooperative companies as noted in *Nippon Steel*, *Building Sys. De Mex.*, *Mukund CIT*, and *Mukund Fed. Cir.*[249] Thus, in accordance with section 776(a)(D) of the Act, Commerce has applied AFA to NE Solar for the final determination.

**Comment 10. Whether NE Solar's Production Process Data Support a Negative Final Determination**

*NextEra*[250]

- Commerce preliminarily determined that cell and module production by NE Solar in Cambodia was not circumventing the Orders and concluded that NE Solar's level of investment, level of R&D, and the extent of its facilities in Cambodia were not minor or insignificant.[251]
- Considering that Commerce preliminarily determined that its nature of the production process in Cambodia was not minor or insignificant, NE Solar's data support a negative final determination.

**Commerce's Position:** Since we have made an affirmative final determination for NE Solar because of AFA, NextEra's argument is moot.

---

[247] *See Fish Fillets from Vietnam (Cambodia)*) IDM at Comment 2.
[248] *See Cambodia* PDM at 23; *see also* 19 CFR 351.226(f)(3).
[249] *See Nippon Steel*, 337 F.3d 1373, 1382; *Building Sys. De Mex.*, 567 F. Supp. 3d 1306, 1316; *Mukund CIT*, 37 C.I.T. 443, 452; and *Mukund Fed. Cir.*, 767 F.3d 1300, 1308 ("In general, use of partial facts available is not appropriate when the missing information is core to the antidumping analysis and leaves little room for the substitution of partial facts without undue difficulty.").
[250] *See* NextEra's March 24, 2023 Case Brief at 29-31.
[251] *See Preliminary Determinations*, 87 FR 75221, 75227.

## Comment 11. Whether to Include BYD HK's Tollers in Determining Whether the Process of Assembly or Completion is Minor or Insignificant

*BYD HK* [252] and *NextEra*[253]

- Commerce unlawfully accorded "particular importance" to BYD HK's use of toll processors in Cambodia rather than using its own production facilities in Cambodia. Commerce additionally accorded such importance to ownership of the production facilities particularly with respect to the level of investment and extent of production facilities in the foreign country.

- Exclusion of BYD HK's tollers is unlawful under section 781(b)(2) of the Act as the statute does not state or imply that the identity or ownership of the company performing the processing is relevant in determining whether the processing at issue is minor or insignificant.

- Commerce failed to fully and properly investigate whether the process of assembly is minor or insignificant by focusing on BYD HK's reliance on tolling and should properly follow the statute and consider BYD HK's tollers when evaluating the factors under 781(b)(2).

- Commerce provided no explanation as to why the tolling agreements had no bearing on the selection of BYD HK as a mandatory respondent but were pivotal to the preliminary affirmative determination.

- Commerce's minor or insignificant analysis with respect to BYD HK was inconsistent with a recent preliminary determination, *SSSS from China (Vietnam) Preliminary,* involving a respondent that was a trading company (Silverwood), and not the producer of the merchandise.[254]

- In *SSSS from China (Vietnam) Preliminary,* Commerce noted that "Silverwood reports that it operates solely as a trading company, engaged in back-to-back resales of finished stainless steel products which it purchases from POSCO VST, and that it did not import any stainless steel inputs from China nor perform any further processing on stainless steel merchandise in Vietnam. During the POR, Silverwood sold SSSS to the United States which it purchased and had shipped directly to the U.S. customer from POSCO VST. Therefore, the analysis to determine whether the SSSS sold to the United States by Silverwood is in-scope merchandise or merchandise circumventing the *Orders*, is an analysis of the SSSS products produced and sold by POSCO VST."[255]

- Although BYD engages in activities beyond what Silverwood reported in *SSSS from China (Vietnam) Preliminary* (*i.e.*, procuring inputs), Commerce preliminarily found that BYD HK is a trading company not involved in production operations related to solar cells and modules and, thus, it is fundamentally the same position as Silverwood. As a result, Commerce should incorporate the tollers' data when determining whether the merchandise exported by BYD is circumventing the orders.

- AD/CVD law supports taking into account the information of BYD's tollers.[256] In AD cases involving NMEs, Commerce requires trading companies or companies that use

---

[252] *See* BYD HK's March 24, 2023 Case Brief at 5, 8, 9 and 17-19.
[253] *See* NextEra's March 24, 2023 Case Brief at 14-20.
[254] *Id.* at 18 (citing *SSSS from China (Vietnam) Preliminary*).
[255] *Id.* at 18 (citing *SSSS from China (Vietnam) Preliminary* PDM at 10).
[256] *Id.* at 19 (citing section 773(c)(1) of the Act).

tollers to report the FOPs of not only itself but the respondent's supplier and tollers, because the FOPs are utilized to produce the merchandise that is exported by the respondent.[257]  In CVD cases, Commerce examines both the producing entity and the exporter, cumulating the subsidies received by the two entities.[258]

- It would be inconsistent for Commerce to require the information of a toller in an AD/CVD investigation or administrative review but disregard the tollers' data in a determination of whether the "process of assembly or completion" is minor or insignificant in a circumvention inquiry.

*Auxin*[259]

- Commerce should continue to center its analysis on BYD HK, because BYD HK, not its unaffiliated tollers, was selected for individual examination because it was the exporter of inquiry merchandise.
- In *SSSS from China (Vietnam)*, the respondent, Silverwood, was a trading company only engaged in back-to-back resales and the subject merchandise was produced by another mandatory respondent (POSCO Vietnam) whose information was on the record and verified.[260]  Unlike BYD HK, Silverwood did not procure any inputs for POSCO Vietnam, did not maintain ownership of the intermediary products, and did not supervise POSCO Vietnam's operations.  Moreover, BYD HK pays a processing fee to its three Cambodian tollers for their tolling services that covers the expenses and profits of the tollers, which Commerce appropriately considered in the analysis of the value of processing in Cambodia under section 781(b)(2)(E) of the Act.
- Commerce verified BYD HK's questionnaire responses, not those of the unaffiliated tollers.  Thus, the facts of this case are distinguishable from *SSSS from China (Vietnam).* As such, Commerce should continue focusing its analysis on BYD HK alone.

**Commerce's Position:**  We disagree with BYD HK and NextEra's argument that we should include BYD HK's unaffiliated tollers in our analysis of whether BYD HK's processing in Cambodia was minor or insignificant under section 781(b)(2) of the Act.

BYD HK and NextEra argue that Commerce's decision in the *Preliminary Determination* unlawfully accorded undue importance to BYD HK's reliance on toll processors as the Act neither states nor implies that the identity or ownership of the company performing the processing is important when evaluating whether the process of assembly or completion in the third country is minor or insignificant.  BYD HK and NextEra also argue that Commerce's treatment of BYD HK's tollers contradicts AD/CVD law and the treatment of the producer of the inquiry merchandise in *SSSS from China (Vietnam)*, a recent circumvention inquiry.

The SAA provides that, when evaluating whether the production in a third country is minor or insignificant, "Commerce will evaluate each of these factors as they exist either in the United

---

[257] *Id.* at 19 (citing *SDGE from China* IDM at 14-17 and 27-37; and *Tapered Roller Bearings from China* IDM at 6-7).
[258] *Id.* at 19-20 (citing 19 CFR 351.525(c)).
[259] *See* Auxin's April 3, 2023 Rebuttal Brief at 9-12.
[260] *Id.* at 11 (citing *SSSS from China (Vietnam) Preliminary* PDM at 3, 10, unchanged in *SSSS from China (Vietnam)*).

States or a third country, depending on the particular circumvention scenario."[261]  In this case, we based our evaluation, in part, on Auxin's allegation that third country companies are relying on affiliated upstream input affiliates in China to circumvent the existing *Orders*.  *See* Comment 4 for additional details.  BYD HK does not engage in production operations, have its own manufacturing equipment, or engage in R&D related to solar cells and modules.  Rather, BYD HK purchases inputs for the production of solar cells and modules and provides those inputs to unaffiliated tollers for further processing before exporting the finished merchandise.[262]  At no point after procuring them does BYD HK relinquish ownership of these inputs, and throughout the production process BYD HK supervises the production of the intermediary tollers for quality control purposes.[263]  We view these facts, which were verified by Commerce, to be highly relevant because they establish that our selected respondent, BYD HK, does not invest in production facilities or incur R&D expenses related to solar cells and modules in Cambodia.  Rather, in line with the circumvention fact pattern Auxin laid out in its circumvention request, BYD HK, working in tandem with its affiliated Chinese solar conglomerate, Shangluo BYD, ships Chinese inputs into Cambodia to circumvent the existing *Orders*.  Therefore, for section 781(b)(1)(C) of the Act and our analysis under sections 781(b)(2)(A), (B), and (D), we compared BYD HK's own investment, R&D, and production facilities in Cambodia to the reported investments of its affiliate, Shangluo BYD, in China.  We find that evaluation of these factors in this manner is appropriate based on the circumvention scenario evinced by BYD HK and Shangluo BYD, which involves the conveyance of Chinese inputs to Cambodia solely for purposes of assembly or completion.

Regarding BYD HK's and NextEra's arguments related to the treatment of tollers in the context of an AD/CVD investigation or review, we note that this is not an AD/CVD investigation or review.  Rather, this is a circumvention inquiry.  Commerce is not examining whether subject merchandise is being sold for less than fair value or calculating subsidies – instead, we are determining whether the process of assembly or completion is minor or insignificant using the factors enumerated in sections 781(b)(2)(A)-(E) of the Act.  We find it unreasonable to use the investments/production facilities of BYD HK's unaffiliated tollers as the basis for comparison in Cambodia when BYD HK contributed nothing to such investments/production facilities.  Nevertheless, we included the processing fee that BYD HK pays its tollers when evaluating the value of the processing occurring in Cambodia pursuant to section 781(b)(2)(E) of the Act.[264]

Additionally, at the time of respondent selection, we did not consider the toll processing agreements of BYD HK.  When selecting respondents, we relied upon entry data from CBP and Q&V questionnaires that were issued to Cambodian producers of solar cells and/or modules listed in Auxin's circumvention request to identify the largest exporters or producers of inquiry merchandise in Cambodia.[265]  We also invited parties to which we did not issue the Q&V questionnaire to provide a response by the deadline for responses.[266]  We stated at the time of respondent selection that section 781(b) of the Act "does not address how Commerce should

---

[261] *See* SAA at 893.
[262] *See* BYD HK Preliminary Analysis Memorandum at 2 (citing BYD HK Initial QR Part II at 1-2, 17-19).
[263] *See* BYD HK's Verification Report at 13.
[264] *See* BYD HK Preliminary Analysis Memorandum at 2 and 4.
[265] *See Cambodia* PDM at 1-2.
[266] *Id.* at 2.

51

select companies for individual examination under that provision."[267]  For Cambodia, we found that because of "the large number of exporters/producers of solar cells and solar modules from Cambodia," along with our initiation of a country-wide circumvention inquiry, it was appropriate to select respondents for individual examination using section 777A(c)(2)(B) as guidance.[268] Accordingly, the data received indicated that BYD HK was one of the largest exporters of Cambodian solar cells and modules to the United States and was subsequently chosen as a respondent in the circumvention inquiry.[269]

BYD HK and NextEra cite to *SSSS from China (Vietnam)* to argue that our treatment of BYD HK's tollers contradicts our previous determinations.  In *SSSS from China (Vietnam)*, Commerce noted that one respondent, Silverwood, operated solely as a trading company that sold SSSS to the United States which was produced by another respondent in the proceeding, POSCO VST.[270] When evaluating the factors under section 781(b)(2) of the Act, Commerce analyzed the SSSS products produced and sold by POSCO VST to determine whether the SSSS sold to the United States by Silverwood is merchandise circumventing the order.[271]  As such, BYD HK argues that its situation is similar to that of Silverwood in that it is also a trading company and Commerce should, therefore, incorporate the information of its tollers.  In *SSSS from China,* Commerce verified the questionnaire responses of POSCO VST because it was a mandatory respondent in that inquiry.  Unlike in *SSSS from China*, BYD's tollers were not separately selected as mandatory respondents and we were not able to verify its unaffiliated toll processors.[272] Therefore, the facts of *SSSS from China (Vietnam)* are inapplicable here.

Based on the information above, in the final determination, for section 781(b)(1)(C) of the Act, and our analysis under sections 781(b)(2)(A), (B), and (D), we continue to find it reasonable to compare BYD HK's own investment, R&D, and production facilities in Cambodia to the reported investments of its affiliate, Shangluo BYD, in China.

## Comment 12. Whether BYD HK's Process of Assembly in Cambodia is Minor or Insignificant Under Section 781(b)(1)(C) of the Act

*Auxin*[273]

- BYD HK's operations are minor when compared to the full solar cell and module production process or when compared with the production operations of BYD HK's affiliated Chinese ingot and wafer producer, Shangluo BYD.

*Level of Investment*

- Commerce correctly concluded that BYD HK is "a trading company involved in the sale of subject merchandise" that "does not engage in production operations" and "does not

---

[267] *See* Cambodia RSM at 6.
[268] *See* 19 CFR 351.226(f)(3).  The Secretary may limit issuance of questionnaires to a reasonable number of respondents.
[269] *See* Cambodia RSM at 7.
[270] *See SSSS from China (Vietnam) Preliminary* PDM at 10.
[271] *Id.*
[272] *See SSSS from China (Vietnam)* at 88 FR 18522; and BYD HK Preliminary Analysis Memorandum at 3.
[273] *See* Auxin's March 24, 2023 Case Brief at 17-19.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

have manufacturing equipment."[274]  Rather, "to produce solar cells and modules in Cambodia, BYD HK arranged tolling agreements with three unaffiliated Cambodian toll processors."[275]

- BYD HK "made no investments in Cambodia related to solar cells and modules" compared to its affiliate in China, Shangluo BYD, who made investments in China related to the ingots and wafer stages of production.[276]  Thus, BYD HK's "investments in Cambodia {are} minor or insignificant" within the meaning of section 781(b)(1)(C) of the Act.

*R&D*

- Commerce correctly concluded that BYD HK "is a trading company involved in the sale of subject merchandise" and "reports no R&D expenses with respect to manufacturing solar cells and modules."[277]  "With respect to BYD HK's affiliates' R&D in China, BYD HK indicated that its Chinese affiliates, Shangluo BYD and Shanghai BYD Company Limited, conduct R&D related to solar cells and modules."[278]

- Given "BYD HK's lack of R&D activities in Cambodia… BYD HK's R&D expenses in Cambodia during the inquiry period were minor or insignificant"[36] within the meaning of section 781(b)(1)(C) of the Act.[279]

*Extent of Production Facilities*

- Commerce correctly concluded that BYD HK "is a trading company involved in the sale of subject merchandise" but "does not invest in manufacturing equipment nor conduct R&D related to solar cells and modules" and, therefore, has no production facilities in Cambodia.[280]

- BYD HK's Chinese affiliate, Shangluo BYD, produces ingots and wafer in China.[281]  Accordingly, the extent of BYD HK's production facilities are minor or insignificant when compared to the extent of Shangluo BYD's production facilities in China under a merchandise-centric and affiliate-centric framework.

*BYD HK*[282] and *NextEra*[283]

*Level of Investment*

- Commerce's analysis of the level of investment in the foreign country in the *Preliminary Determination* is legally deficient.  Rather than analyze the investment in Cambodia as the foreign country at issue, and as the statute directs, Commerce instead evaluated BYD HK's own investments, excluding the investments of BYD HK's tollers.

---

[274] *Id.* (citing BYD HK Preliminary Analysis Memorandum at 3).
[275] *Id.*
[276] *Id.*; and *Cambodia* PDM at 14.
[277] *See* Auxin's March 24, 2023 Case Brief (citing BYD HK Preliminary Analysis Memorandum at 3).
[278] *Id.* (citing *Cambodia* PDM at 15).
[279] *Id.*
[280] *Id.* (citing BYD HK Preliminary Analysis Memorandum at 4).
[281] *Id.* (citing *Cambodia* PDM at 14).
[282] *See* BYD HK's March 24, 2023 Case Brief at 9-19.
[283] *See* NextEra's March 24, 2023 Case Brief at 22-26.

- There is no basis or support in the statute for Commerce to exclude from its assessment of the level of investment in the foreign country investments that were not made by BYD HK. Commerce must revise this level of investment analysis for the final determination to account for all of the investments associated with the processing performed in Cambodia, including those of the unrelated tollers.[284]
- When the unrelated tollers of BYD HK are taken into consideration, on a per-MW or absolute basis, the record demonstrates that the investments in manufacturing in Cambodia are very large and substantial. Thus, providing further significant support to a negative circumvention finding for BYD HK.

*Research and Development*

- BYD HK agrees with Commerce's analysis of 781(b)(2)(B), R&D, in the *Preliminary Determination*. Nevertheless, "no single factor, by itself, controls Commerce's determination of whether the process of assembly or completion in a third country is minor or insignificant."[285]
- Given the record evidence, Commerce cannot reasonably conclude that the process of assembly or completion of solar modules in Cambodia is minor or insignificant.
- Significant innovation in cell technology is generated outside of China.[286] Specifically, Germany, Belgium, the Netherlands, and Singapore have contributed to the development of new cell technologies.[287]
- Commerce recently determined that "{a} lack of research and development expenses does not necessarily mean that circumvention exists."[288] In this case, the level of R&D in Cambodia should not undermine the facts on the record as applied to the other statutory factors, which demonstrate that BYD HK's production process in Cambodia is not minor or insignificant.

*Extent of Production Facilities*

- Commerce's evaluation of 781(b)(2)(D), extent of production facilities in the foreign country, Cambodia, suffers from identical legal deficiencies as its analysis of the investments in Cambodia. Rather than following the language of the statute, Commerce limited its analysis to analyzing the production facilities owned by BYD HK in Cambodia. The production facilities in Cambodia actually used to process the inputs, the production facilities of BYD HK's unrelated toll processors, were improperly ignored in the *Preliminary Determination*.
- Commerce too narrowly focused on square footage, capacity, and number of employees when evaluating the extent of production facilities. Such an approach deviates from past practice where Commerce has examined both qualitative and quantitative factors when consider the nature of production processes and extent of production facilities.[289]

---

[284] *See* BYD HK's March 24, 2023 Case Brief (citing Section 781(b)(2)(A) of the Act).

[285] *Id*. (*citing Cambodia* PDM at 10).

[286] *See* NextEra's March 24, 2023 Case Brief (citing *NextEra's* May 2, 2022 Comments at 22-23).

[287] *Id.* (citing *NextEra's* May 2, 2022 Comments at Attachment 1).

[288] *Id.* (citing *Pipe and Tube from India (Oman and the UAE) Preliminary* PDM at 16, unchanged in *Pipe and Tube from India (Oman and the UAE)*).

[289] *Id.* (citing *Diamond Sawblades (Thailand)* IDM at 8)

54

- When the production facilities of BYD HK's tollers are properly taken into account, the figures demonstrate that the production facilities in Cambodia were extensive in their own right when compared to those of Shangluo BYD in China and favor a negative circumvention finding.

*Value of Processing*

- The value of processing performed in Cambodia is also substantial and compels a negative determination.
- Based on Commerce's determination in the *Preliminary Determination* with respect to 781(b)(2)(E), value of processing, the value of the processing in the third country must account for at least a majority of the total cost of the finish product, which goes against the statute. Such a standard is not consistent with the language of the statute that uses the terms "minor or insignificant."
- There are prior circumvention cases where Commerce determined that lower levels of value added, 12 to 26 percent,[290] 10-29 percent,[291] and 34 percent[292] did not support an affirmative circumvention finding. These prior decisions undermine Commerce's finding that BYD HK's value of processing is small, minor, or insignificant. Thus, it should be corrected in the final determination.
- In *Ferrovanadium from Russia Final Determination,* Commerce concluded that the value added of 15 to 20 percent did not constitute a small proportion pursuant to section 781(b)(2)(E) of the Act when viewed in conjunction with the processes involved in production.[293]
- The statute directs Commerce to determine whether the value of processing performed in the third country represents a small proportion of the value of the merchandise imported into the United States.[294] Congress has "directed {Commerce} to focus more on the nature of the production process and less on the difference in value between the subject merchandise and the parts and components imported into the processing country."[295]
- Congress has instructed Commerce to adopt "a more qualitative focus on the nature of the production process," rather than "a rigid numerical calculation of value-added."[296] Moreover, in past circumvention cases, Commerce has stated that circumvention inquiries "focus more on the nature of the production process and less on the difference in value between the subject merchandise and the imported parts or components."[297]
- Specifically, Commerce explained that Congress redirected the agency's value of processing focus to the nature of the production process.[298] In this circumvention inquiry,

---

[290] *See* BYD HK's March 24, 2023 Case Brief (citing *Ferrovanadium from Russia Preliminary Determination*; and *Ferrovanadium from Russia Final Determination*.

[291] *Id.* (citing *Hot-Rolled Lead and Bismuth* at 64 FR 40340).

[292] *See* NextEra's March 24, 2023 Case Brief (citing *Tissue Paper from China (Vietnam) Preliminary Determination*, 73 FR at 21585).

[293] *Id.* (citing *Ferrovanadium from Russia Preliminary Determination*, FR 77 FR 6541, 6542).

[294] *See* BYD HK's March 24, 2023 Case Brief (citing section 781(b)(2)(E) of the Act).

[295] *Id.* (citing *PET Film from UAE (Bahrain) Preliminary* PDM at 7).

[296] *Id.* (citing SAA at 893).

[297] *Id.* (citing *Hot-Rolled Lead and Bismuth*, 64 FR at 40347; *see also CORE from Taiwan (Malaysia) Preliminary* PDM).

[298] *Id.* (citing *SDGE from China (UK) Preliminary* at 33413; *see also Pasta from Italy (U.S.) Circumvention Preliminary* at 68 FR 46575, unchanged in *Pasta from Italy (U.S.) Circumvention*; and *CORE from Taiwan* at n. 85.

Commerce expressly acknowledged that the nature of production process in Cambodia was significant and complex.

*Nature of Production Process*

*NextEra*[299]

- Commerce correctly determined in the *Preliminary Determination* that "the nature of the production performed by the respondents in the third country is not minor or insignificant compared to either processing polysilicon into wafers, or ingots into wafers, in China, which does not weigh in favor of finding circumvention."[300]  As noted above, Commerce concluded that cell production is the "most capital intensive part of the manufacturing process," and "a highly automated, capital intensive, and technologically sophisticated process, requiring skilled technicians and employees with advanced degrees," and that "module production also involves a large number of varied inputs consumed in a complex, multi-step production process that requires precision, highly skilled workers, and accurate quality-testing equipment at multiple stages."[301]
- Having concluded that the nature of the production process in the inquiry country is not minor or insignificant and its "all-inclusive description of the production process … covers the range of the production scenarios applicable to various respondents,"[302] Commerce has authority to render a negative country-wide determination in this circumvention inquiry.
- Relying on the significant nature of the production process is consistent with past practice, the statute, and legislative history and alone supports a negative circumvention determination.[303]
- The SAA repeatedly refers to circumventing activity as the establishment of a "screwdriver operation" in the United States or third country, and also notes that it would be "relatively easy" for a foreign exporter to circumvent orders by establishing such screwdriver operations.[304]  The solar cell and module production in the targeted countries is clearly not a simple and small-scale "screwdriver operation" as described in the SAA.
- Commerce found that the process to produce a solar cell in the inquiry country is "where the essence of the solar module is realized."[305]

*BYD HK*[306]

- Commerce's finding that the nature of production performed by the respondents in the inquiry country is not minor or insignificant strongly supports a negative circumvention determination.
- Commerce has recognized that the essential component of a solar cell is the p/n junction.

---

[299] *See* NextEra's March 24, 2023 Brief at 5-13.
[300] *Id.* at 5 (citing *Cambodia* PDM at 18).
[301] *Id.* at 10 (citing *Cambodia* PDM at 17).
[302] *Id.* at 6 (citing *Cambodia* PDM at 15).
[303] *Id.* at 6-7 (citing *Aluminum Foil from China (Korea and Thailand)* IDM at 15).
[304] *Id.* at 8 (citing SAA at 893-94).
[305] *Id.* at 9 (citing *Cambodia* PDM at 17).
[306] *See* BYD HK's March 24, 2023 Brief at 9-1; *see also* BYD HK's April 3, 2023 Rebuttal Brief at 8-11.

56

- Prior to the process undertaken by BYD HK's tollers in Cambodia, raw wafers are inert minerals capable of generating solar power.
- The production of solar cells and solar modules in Cambodia is a multi-step, technologically complex, and sophisticated manufacturing process that requires expensive automated production lines.
- Auxin's arguments regarding Commerce's findings with respect to the nature of processing performed in Cambodia are erroneous.

*Silfab*[307]

- Commerce's finding that the nature of production performed by the respondents in the inquiry country is not minor or insignificant strongly supports a negative circumvention determination.
- Commerce appears to have never previously reached an affirmative circumvention determination while also concluding that the nature of the production process in the third country was not minor or insignificant.
  Commerce found the solar cells and solar module production process in the inquiry country significant activities to be multi-step, highly-technical, technically sophisticated, capital intensive, requiring highly skilled workers and skilled technicians and employees with advance degrees, thus making the process not minor or insignificant when compared to the production of polysilicon, ingots and wafers.

*Auxin*[308]

- Record evidence demonstrates that BYD HK's operations in Cambodia are minor or insignificant. Thus, BYD HK and NextEra's arguments are without merit.
- The ITC's report is outdated and does not reflect commercial reality. The *IEA Report* contradicts the ITC's analysis by demonstrating that the polysilicon, ingot and wafer production process is more capital intensive than the solar cells and solar module facilities.[309]
- NextEra's assertion that the CEA's market intelligence report demonstrates that solar cell production is the most capital-intensive part of the production process is false. The CEA did not provide any exhibits, or data underlying its analysis which it based on "estimates compiled by CEA from supplier announcements and press releases detailing factory investment disclosures."[310]
- Additionally, the CEA admitted that it "prepared {its} report for NextEra Energy" for use in this inquiry.[311] Commerce has previously recognized that "report{s} commissioned for the purposes of {a proceeding}… carry only limited weight given {their} potential for bias and conclusions that were tailored to generate a desired result."[312]
- No party cites to record evidence to support the finding that BYD HK's tollers solar cell and solar module production in Cambodia require a greater number of steps/stages than

---

[307] *See* Silfab's March 24, 2023 Brief at 15-18.
[308] *See* Auxin's April 3, 2023 Brief at 12-21.
[309] *Id.* at 15 (citing Auxin's July 29, 2022 Comments at Exhibit 1 (citing *IEA Report* at 17).
[310] *Id.* at 15-16 (citing Next Era's May 2, 2022 Submission at Attachment 2).
[311] *Id.* at 16 (citing Next Era's May 2, 2022 Submission at Attac
hment 2).
[312] *Id.* (citing *Softwood Lumber from Canada* IDM at Comment 45).

57

polysilicon, ingots, and wafer manufacturing in China.  Rather record evidence demonstrates that BYD HK's tollers production in Cambodia does not require more stages of production than polysilicon, ingot and wafer production in China.[313]

- Commerce, BYD HK and NextEra fail to recognize that the formation of a p/n junction resulting in a solar cell is only possible with solar-grade polysilicon and polysilicon wafers.  At best this factor is mixed and does not weigh in favor of, or against finding circumvention.

- Commerce has previously recognized that, "{b}y any reasonable measurement, polysilicon is the most important input used in solar modules."[314] The ITC,[315] the IEA,[316] the BNEF,[317] and SolarWorld[318] agree with the importance of polysilicon in the production of solar cells.

- With respect to labor intensity, the *IEA Report* is somewhat inconsistent with the DOE analysis of the number of direct manufacturing jobs required at each stage of the solar production process at one GW scale.  According to the DOE, 400-800 direct manufacturing jobs are required for the production of ingots and wafers, which is higher than 100-150 jobs in the production of solar cells and 500-700 than the production of solar modules.[319]

- Taking the IEA and the DOE analysis on the labor intensity for all the solar production stages, labor intensity does not weigh in favor of, or against, finding BYD HK's solar cell and solar module production in Cambodia to be minor or insignificant.

- Auxin does not dispute that solar cell and solar module production require a greater number of inputs.  However, compared to the technical hurdles, capital requirements, lead times and energy required to produce polysilicon, ingots, and wafers, using a greater number of inputs (most of which are sourced from China) do not weigh in favor of finding that the solar cell and solar module production in Cambodia is minor or insignificant compared with the production of polysilicon, ingots and wafers.

- Although the production of solar cells and solar modules may require more expensive and sophisticated equipment, this factor must be balanced against the fact that polysilicon, ingot, and wafer manufacturing facilities are more expensive to build and have higher capital requirements.[320]

*Auxin*[321]

*Level of Investment*
- In a response to a request from Commerce, Auxin filed a submission containing over 94 exhibits and an Excel database analyzing all major public announcements of solar investments in China for the last several years.[322]

---

[313] *Id.* at 21 (citing BYD HK IQR at Exhibit A20-2b)

[314] *Id.* at 22 (citing *Solar Cells from China 2017-2018 AR* IDM at Comment 4).

[315] *Id.* at 23 (citing *ITC Report* at VII-1).

[316] *Id.* (citing Auxin's July 29, Comments at Exhibit 1 (citing *IEA Report* at 7)).

[317] *Id.* (citing Auxin's Request at Exhibit 4).

[318] *Id.* (citing NextEra's May 2, 2022 Submission at Attachment 18).

[319] *Id.* at 25 (citing Auxin's May 16, 2022 Comments at Exhibit 5 (citing *DOE Solar Deep Dive* at 11)).

[320] *Id.* at 26 (citing Auxin's July 29, 2022 Comments at Exhibit 1 (citing *IEA Report* at 47)).

[321] *See* Auxin's April 3, 2023 Rebuttal Brief at 28-36 and 41-46.

[322] *Id.* (citing Auxin's July 29, 2022 Investment and R&D Submission).

- The record demonstrates that the level of investment in China to produce subject merchandise is enormous, with an average investment of $4.7 billion.
- Consistent with Commerce practice, this is the appropriate benchmark against which Commerce should compare BYD HK's investments for cell fabrication and module assembly in Cambodia.
- Commerce correctly found that BYD HK made no investments in Cambodia related to cell fabrication or module assembly and should continue to find that its level of investment is minor or insignificant.
- Even if Commerce includes BYD HK's tollers in their analysis, when compared to the level of investment for the full production process in China, the level of investment in Cambodia is minor or insignificant.
- Commerce's analysis excludes the polysilicon stage of production, which, if included, would result in the investment in the order country being greater than the investment in the third country.[323]

*Research and Development*
- Commerce should reject BYD HK and NextEra's arguments that attempt to trivialize the importance of R&D to the solar cell and module production process and continue to find the lack of any R&D being done in Cambodia supports a determination that the process of assembly in Cambodia is minor or insignificant.
- In a response to a request from Commerce, Auxin filed a submission containing publicly available data on R&D conducted in China for the full solar cell and module production process, from the solar-grade polysilicon through module assembly.[324]
- The record demonstrates that R&D is critical for the solar cell and module sector.  Record evidence demonstrates that Tongwei, GCL, Xinite Energy Co., Ltd., and the LONGi Group have spent millions conducting R&D related to solar cells and modules in China.[325]
- NextEra and Silfab USA fail to recognize that although "R&D might be a significant factor in some industries, it is not in others … the significance of its presence or absence depends on the industry and product under investigation."[326]
- The IEA explained that R&D has been key for technological advances throughout the solar supply chain increasing the conversion efficiency of solar cells, reduced material usage and improved energy efficiency per module.[327]  Without R&D, the solar would not be the most affordable electricity generating technology in many parts of the world.[328]
- Commerce appropriately found BYD HK's and its tollers' lack of R&D in Cambodia to be uniquely significant in this case and should continue to find this factor to support an affirmative finding of circumvention.

---

[323] *Id.* (citing NextEra's May 2, 2023 Comments at Attachment 2).
[324] *Id.* (citing Auxin's July 29, 2022 Investment and R&D Submission).
[325] *Id.* (citing Auxin's July 29 Investment and R&D Submission at Exhibit RD-1 at 180, RD-2, RD-4, and RD-5).
[326] *Id.* (citing *Hot-Rolled Lead and Bismuth* at Comment 8).
[327] *Id.* (citing Auxin's July 29, 2022 Investment and R&D Submission at Exhibit 1 at 121).
[328] *Id.*

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

*Extent of Production Facilities*

- Commerce correctly excluded BYD HK's unaffiliated tollers' production facilities in its analysis as BYD HK is the respondent in this inquiry, is the entity exporting merchandise to the United States and is the respondent that underwent verification.

- Nevertheless, BYD HK's tollers' facilities are minor when compared to production facilities for the full solar cell and module production process.  For example, JinkoSolar and BYD HK's Chinese affiliates have solar facilities in China that are larger than the tollers' respective facilities in Cambodia.[329]

- Commerce should continue to find that BYD HK's facilities in Cambodia are minor or insignificant.

*Value of Processing*

- Commerce should reject BYD HK's and NextEra's arguments that BYD HK's value of processing is not small.

- Commerce's value-added calculation overstates BYD HK's processing operations by including direct materials in its processing calculation, which is inconsistent with prior practice, and relying on BYD HK's sales value as the denominator.

- Although there is no bright-line test, Commerce has generally found processing operations to be "minor or insignificant" under section 781(b)(2)(E) of the Act even when the processing accounted for approximately one-third of the total value.[330]

- NextEra's reliance on *Tissue Paper from China (Vietnam)* is misplaced as the value added to the finished merchandise was 34 percent but Commerce "ranged the values by plus or minus 10 percent."[331]  Further, Commerce held "the statutory factor, section 781(b)(2)(E) of the Act, is inconclusive."[332]

- BYD HK's and NextEra's cites to *Ferrovanadium from Russia Final Determination*, and *Hot-Rolled Lead and Bismuth* are misplaced in this proceeding.  For *Ferrovanadium from Russia Final Determination*, Commerce acknowledged that the value of processing range of 12 to 26 percent "fell within the range of value-added percentages that the {Commerce} has found to be 'small' in previous cases."[333]  In *Hot-Rolled Lead and Bismuth*, Commerce again provided a value-added range of 10 to 29 percent and did not

---

[329] *Id.* (citing Circumvention Request at Exhibit 14; and BYD HK IQR Part I at Exhibits A22-1a and A22-1b).

[330] Auxin notes that in the *Preamble (Final Rule)* at 27329 Commerce explicitly rejected setting a bright line of 35 percent as determining whether the value of processing implicated circumvention explaining:  "to establish a 'safe harbor' or specific guidelines might result in the incorrect classification of substantial production operations as 'insignificant' and 'screwdriver' operations as 'significant."  In *CORE from China (Malaysia)*, Commerce noted that record evidence demonstrated "the value-added by CORE producers, such as those in the third countries, is approximately 10 percent to 31 percent … {which} support{ed} a finding that the completion process performed in Malaysia represents a small proportion of the merchandise exported to the United States" under section 781(b)(2)(E) of the Act.  *See CORE from China (Malaysia) Preliminary* PDM, unchanged in *CORE from China (Malaysia) Final.*

[331] *Id.* (citing *Tissue Paper from China (Vietnam) Preliminary Determination*, unchanged in *Tissue Paper from China (Vietnam) Final Determination*).

[332] *Id.* (citing *See Tissue Paper from China (Vietnam) Preliminary Determination*, 73 FR at 21585).

[333] *Id.* (citing *Ferrovanadium from Russia Preliminary Determination*, 77 FR 6359; unchanged in *Ferrovanadium from Russia Final Determination* IDM at Comment 1).

60

affirmatively find that a value-added in the United States as high as 29 percent was small.[334]

- Even taking BYD HK's value of processing in the *Preliminary Determination* at face value, Commerce followed prior practice and appropriately determined that BYD HK's value added in Cambodia was a small proportion of the value of the merchandise imported into the United States.

**Commerce's Position:** We continue to find that based on the totality of evidence gathered pursuant to section 781(b)(1)(C) of the Act and the factors specified under section 781(b)(2) of the Act, BYD HK's process of assembly or completion in Cambodia of the solar modules shipped to the United States is minor or insignificant. In the *Preliminary Determination*, we compared BYD HK's own investments, R&D, and production facilities in Cambodia related to the production of inquiry merchandise to the reported investments, R&D, and production facilities of its affiliate in China.[335] Additionally, "to determine the percentage of the value of imported inquiry merchandise represented by third country processing {781(b)(2)(E), value of processing}, we summed the per-unit costs incurred in the third country by each mandatory respondent for non-Chinese material inputs, labor, fixed and variable overhead, selling, general, and administrative items, and interest and divided the sum by the per-unit weighted-average value of the respondent's U.S. sales of inquiry merchandise during 2021."[336] For the final determination, we see no reason to depart from such analyses. *See* Comments 4, 6, 7, and 11 for further discussion. We also note no change with respect to our analysis and determination for section 781(b)(2)(C) of the Act, nature of the production process, and section 781(b)(2)(E) of the Act, value of processing. *See* Comment 5 for additional discussion.

*Level of Investment*

In BYD HK's Preliminary Analysis Memorandum, we noted that "BYD HK is a trading company not involved in production operations related to solar cells and modules."[337] Further, we preliminary found that "BYD HK has made no investments in Cambodia related to solar cells and modules and find BYD HK's investments in Cambodia to be minor or insignificant."[338] Thus, we preliminary found that BYD HK's investments in Cambodia were minor or insignificant, and thus, weighed in favor of finding circumvention.[339]

For the final determination, we continue to find that BYD HK is a trading company that has made no investments in Cambodia related to solar cells and modules. Therefore, we continue to find BYD HK's level of investment in Cambodia to be minor or insignificant, and thus,

---

[334] *Id.* (citing *Hot-Rolled Lead and Bismuth* 64 FR 40342).
[335] *See Cambodia* PDM at 14 and 18; and BYD HK Preliminary Analysis Memorandum at 4.
[336] *See Cambodia* PDM at 19; and BYD HK Preliminary Analysis Memorandum at 4. For BYD HK, to calculate the value of processing, "we summed the per-unit non-Chinese raw material input costs of BYD HK, the per-unit processing fee paid to the three Cambodian tollers, and any labor, fixed and variable overhead, selling, general, and administrative (SG&A) items, and interest incurred by BYD HK, and divided the sum by the per-unit weighted-average value of BYD HK's U.S. sales of inquiry merchandise during 2021"
[337] *See* BYD HK Preliminary Analysis Memorandum at 3.
[338] *Id.*
[339] *See Cambodia* PDM at 14; BYD HK Preliminary Analysis Memorandum at 3.

continues to weigh in favor of circumvention.  *See* Comment 11.

*Research and Development*

As stated in the *Preliminary Determination*, BYD HK reported that it "does not engage in research and development related to CSPV cells and/or modules."[340]  We preliminary found that "BYD HK reports no R&D expenses with respect to manufacturing solar cells and modules"[341]  Thus, we preliminary found that BYD HK's research and development in Cambodia were minor or insignificant, and thus, weighed in favor of finding circumvention.[342]

NextEra cites to *CORE from China (Vietnam)* where Commerce states that "{a} lack of research and development expenses does not necessarily mean that circumvention exists."[343]  Further, although BYD HK agrees with our finding with respect to section 781(b)(2)(B) of the Act, R&D, the company notes that "no single factor, by itself, controls Commerce's determination of whether the process of assembly or completion in a third country is minor or insignificant."[344]  However, Commerce has previously explained that the "importance of any one of {the section 781(b)(2)} criteria 'can vary from case to case depending on the particular circumstances unique to each circumvention inquiry.'"[345]  Accordingly, although "R&D might be a significant factor in some industries, it is not in others…the significance of its presence or absence depends on the industry and product under investigation."[346]  For this circumvention inquiry, we find R&D to be of preeminent importance in the solar industry.  Such a finding is supported by the *Bloomberg Report* which notes that R&D is of particular importance to solar makers, especially to ingot and wafer production that is exclusively done by the affiliate of BYD HK and not done in Cambodia.[347]  Moreover, the IEA explained that R&D has been key for technological breakthroughs in the solar cell and module industry.[348]  Nevertheless, our finding under section 781(b)(1)(C) of the Act and of circumvention involved a multi-factor test that was supported by many findings other than our analysis of 781(b)(2)(B).  Thus, we find BYD HK and NextEra's arguments to be misplaced.

For the final determination, we continue to find that BYD HK is a trading company that has conducted no R&D in Cambodia related to solar cells and modules.  Therefore, we continue to find BYD HK's R&D in Cambodia to be minor or insignificant, and thus, this factor continues to weigh in favor of circumvention.  *See* Comment 11.

---

[340] *See Cambodia* PDM at 15.

[341] *See* BYD HK Preliminary Analysis Memorandum at 3

[342] *See Cambodia* PDM at 15; BYD HK Preliminary Analysis Memorandum at 3.

[343] *See Pipe and Tube from India (Oman and the UAE)*.

[344] *See Cambodia* PDM at 10.

[345] *See Diamond Sawblades from China (Thailand)* IDM at Comment 5.

[346] *See Hot-Rolled Lead and Bismuth* IDM at Comment 8.

[347] *See* Circumvention Request at Exhibit 4.

[348] *See* Auxin's April 3, 2023 Rebuttal Brief (citing Auxin's July 29, 2022 Investment & R&D Submission at Exhibit 1 at 121).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

*Nature of the Production Process*

For the final determination, we continue to find the nature of production process in Cambodia to be significant, and thus, not weighing in favor of circumvention. *See* Comments 4 and 5 for additional discussion.

*Extent of Production Facilities*

As stated in the *Preliminary Determination*, we preliminary found that BYD HK is a trading company that is not involved in production operations.[349] Further, BYD HK does "not invest in manufacturing equipment or conduct R&D related to solar cells and modules."[350] We preliminary found the extent of BYD HK's production facilities to be minor when compared to the extent of Shangluo BYD's production facilities in China, and thus, this factor weighed in favor of finding circumvention.[351]

We disagree with NextEra that Commerce focused too narrowly on square footage, capacity, and number of employees when evaluating the extent of production facilities. In supporting its argument, NextEra cites to *Diamond Saw Blades from China (Thailand)* stating that our approach in the *Preliminary Determination* deviates from past practice where Commerce examined both qualitative and quantitative factors when considering the nature of the production process and extent of production facilities. Further, NextEra states that it is illogical for us to find the nature of the production process in Cambodia to be significant but the facilities to be insignificant. However, unlike *Diamond Saw Blades from China (Thailand)*, we did not combine 781(b)(2)(C), nature of the production process, and 781(b)(2)(D), extent of the production facilities when conducting our analysis under section 781(b)(2) of the Act. Thus, the facts of that case are not analogous to this current proceeding. Instead, we analyzed each factor separately, analyzing the nature of the production process via qualitative factors and viewing extent of production facilities as a quantitative scale-based analysis. With such an approach in mind, we decided that quantitative factors (*i.e.*, square footage, capacity, and number of employees) were an appropriate lens to gauge the extent of the production facilities in Cambodia. Nevertheless, this argument is rendered moot as we did not consider the tollers of BYD HK. *See* Comment 11.

For the final determination, we continue to find that BYD HK is a trading company with no production facilities, investments and R&D related to solar cells and modules. Therefore, we continue to find BYD HK's extent of production facilities in Cambodia to be minor or insignificant, and thus, this factor continues to weigh in favor of circumvention.

*Value of Processing*

Based on minor corrections submitted by BYD HK during the course of verification, the value of processing percentage for BYD HK has changed. In the *Preliminary Determination,* we preliminarily found that the value of processing performed in Cambodia by BYD HK was a small proportion of the value of the inquiry merchandise imported into the United States, and

---

[349] *See* BYD HK Preliminary Analysis Memorandum at 3.
[350] *Id.*
[351] *See Cambodia* PDM at 18; and BYD HK Preliminary Analysis Memorandum at 4.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

thus, weighed in favor of finding circumvention.[352]  This finding remains unchanged for the final determination.

Section 781(b)(2)(E) of the Act directs Commerce to determine "whether the value of the processing performed in the foreign country represents a small proportion of the value of the merchandise imported into the United States."  We find that in the context of section 781(b)(2)(E) of the Act, the word "value" denotes monetary value.  Consequently, section 781(b)(2)(E) of the Act directs Commerce to perform a quantitative, rather than a qualitative, evaluation of the value of third-country processing.

This interpretation is supported by 19 CFR 351.226(i), which provides that "{i}n determining the value of … processing performed … under section 781(b)(2)(E) of the Act, {Commerce} may determine the value of the part or component on the basis of the cost of producing the part or component under section 773(e) of the Act—or, in the case of nonmarket economies, on the basis of section 773(c) of the Act."  Costs are measured numerically, as is the value of merchandise.  Therefore, section 781(b)(2)(E) of the Act describes a quantitative measurement of the value of third-country processing.  This interpretation is reinforced by Congress' discussion of value under section 781(b)(1)(D) of the Act (determining whether the value of merchandise produced in the order country is a significant portion of the total value of the merchandise exported to the United States) when Congress noted that the statue did:

> not to establish a rigid numerical standard for determining "significance" nor does the Committee expect Commerce to establish a specific numerical test.  The determination of whether the value of the parts or components is a significant portion of the total value of the merchandise should be made on a case-by-case basis, looking at the totality of the circumstances.  However, where the proportion of the value is relatively high (*e.g.*, the value of a television tube in relation to a finished television set), the conclusion should be clear.[353]

In addition, Commerce's statement that Congress directed it to focus more on the nature of the production process and less on differences in value, concerned the overall decision of whether third-country processing was minor or insignificant rather than the value calculation described under section 781(b)(2)(E) of the Act.  When Commerce stated in *PET Film from the UAE Preliminary Determination*[354] that Congress directed it to focus more on the nature of the production process and less on differences in value, it referenced *Hangers from China (Vietnam)*[355], which referred to *Certain Pasta from Italy (U.S.) Circumvention*[356] and *Hot-Rolled Lead and Bismuth*.[357]

---

[352] *See Cambodia* PDM at 19; *See* BYD HK Preliminary Analysis Memorandum at 4.
[353] *See S. Rep. No. 103-412* at 82.
[354] *See PET Film from the UAE Preliminary Determination* PDM at 7.
[355] *See Hangers from China (Vietnam) Preliminary Determination*, 76 FR at 27011-27013; unchanged in *Hangers from China (Vietnam)*, 76 FR at 66895.
[356] *See Pasta From Italy (U.S.) Circumvention Preliminary*, 68 FR at 46575; unchanged in *Pasta From Italy (U.S.) Circumvention*, 68 FR at 54888.
[357] *See Hot-Rolled Lead and Bismuth*, 64 FR at 40347.

64

In *Certain Pasta from Italy (U.S.) Circumvention*, Commerce stated that:

> While some of the statutory factors are inconclusive, the information on the record tends to show that the repackaging operation in the United States *is minor and insignificant*. … Congress directed {Commerce} to focus more on the nature of the production process and less on the difference in value between the subject merchandise and the imported parts or components. *See S. Rep. No. 103-412*, at 81-82 (1994). Thus, we believe that it is appropriate to place more weight on the nature of the production and packaging process (the latter of which merely involves removing pasta from larger bags and placing it in smaller packages) rather than attempt to establish a numerical standard, which would be contrary to the intentions of Congress.[358]

In *Hot-Rolled Lead and Bismuth* Commerce stated that:

> The legislative history to section 781(a) establishes that Congress intended {Commerce} *to make determinations regarding circumvention* on a case-by-case basis in recognition that the facts of individual cases and the nature of specific industries vary widely. In particular, Congress directed {Commerce} to focus more on the nature of the production process and less on the difference in value between the subject merchandise and the imported parts or components. (*See S. Rep. No. 103-412*, 81-82 (1994)). Thus, we believe that any attempt to establish a numerical standard would be contrary to the intentions of Congress.

> The URAA, which became effective on January 1, 1995, redirected the focus of a circumvention inquiry away from a numerical calculation of value-added towards a more qualitative focus on the nature of the production process. Under the URAA, which provides the current statutory language for section 781 of the Act, the numerical calculation of value-added is just one of five factors {Commerce} is to examine in {its} determination of whether the processing undertaken in the United States is minor or insignificant.[359]

In these cases, Commerce applied Congress' direction to focus more on the nature of the production process and less on value with respect to the overall decision of whether processing is minor or insignificant or the overall determination of whether circumvention is occurring and not its determination under section 781(b)(2)(E) of the Act.

This is consistent with the explanation in *S. Rep. No. 103-412* cited in these cases. In *S. Rep. No. 103-412*, Congress noted that the provision in section 781(b)(1)(C) of the pre-URAA Act (*i.e.*, that there is a small difference between the value of the order country parts that were assembled in the inquiry country and the value of the finished merchandise imported into the United States) "has not proved effective in curbing the circumvention of antidumping and countervailing duty

---

[358] *See Pasta From Italy (U.S.) Circumvention Preliminary*, 68 FR at 46575 (emphasis added).
[359] *See Hot-Rolled Lead and Bismuth*, 64 FR at 40348 (emphasis added).

orders."[360]  Congress then explained that it was amending "sections 781(a) and (b) to shift the *focus of the anticircumvention inquiry* away from a test of the difference in value between the subject merchandise and the imported parts or components toward the nature of the process performed in the United States or a third country"[361] (emphasis added).  Thus, the shift in focus related to the overall circumvention inquiry.

Moreover, the shift away from a difference in value analysis toward a nature of the production process analysis was directed toward section 781(b)(1)(C) of the pre-URAA version of the Act, not section 781(b)(2)(E) of the current version of the Act.  In fact, section 781(b)(2) of the Act, including the numeric value determination under section 781(b)(2)(E) of the Act, were added "to focus the anticircumvention inquiry on the question of whether minor or insignificant assembly or completion is taking place,"[362] which is a consideration of the nature of the third-country processing.  Hence, we disagree with the respondents' claim that Commerce's analysis under section 781(b)(2)(E) of the Act wrongly centered on a quantitative measure, without considering the nature of the production process.

With regard to whether BYD HK's value of processing in the third country is minor or insignificant, BYD HK and NextEra cite to *Ferrovanadium from Russia Final Determination*, *Tissue Paper from China (Vietnam)*, and *Hot-Rolled Lead and Bismuth* for support that Commerce has found value of processing percentages lower than BYD HK's to be not minor.  However, as Auxin has noted, we have also found similar ratios to be minor.[363]  In *Tissue Paper from China (Vietnam)*, Commerce calculated a value added of 34 percent but noted that the values were ranged by plus or minus 10 percent.[364]  Further, Commerce held that the statutory factor, section 781(b)(2)(E) of the Act, was inconclusive.[365]  Rather, in making the circumvention determination, Commerce relied on the four other statutory factors under section 781(b)(2) of the Act, which favored a finding of circumvention.[366]  In *Hot-Rolled Lead and Bismuth*, Commerce again did not find circumvention with value-added ratios ranging between 10 to 29 percent.[367]  In fact, Commerce did not provide an explicit determination as to whether the value of processing was small.[368]  Rather, in reaching its circumvention determination, Commerce relied on the respondent not being affiliated with U.S. rerollers and their facilities being operational before the imposition of the orders.[369]

In *Ferrovanadium from Russia Preliminary Determination*, Commerce did not find circumvention despite the value added ratios ranging between 12 to 26 percent."[370]  However,

---

[360] *See* S. Rep. No. 103-412, 81 (1994)).

[361] *See* S. Rep. No. 103-412, 81-82 (1994)).

[362] *See* SAA at 894.

[363] *See CORE from China (Malaysia) Preliminary*, 85 FR at 8823, unchanged in *CORE from China (Malaysia) Final*.

[364] *See Tissue Paper from China (Vietnam) Preliminary Determination*, unchanged in *Tissue Paper from China (Vietnam) Final Determination*.

[365] *See Tissue Paper from China (Vietnam) Preliminary Determination*, 73 FR at 21585.

[366] *Id.*

[367] *See Hot-Rolled Lead and Bismuth*, 64 FR at 40340

[368] *Id.*, 64 FR at 40341-43

[369] *Id.*, 64 FR at 40342.

[370] *See Ferrovanadium from Russia Preliminary Determination*, 77 FR at 6359, unchanged in *Ferrovanadium from Russia Final Determination* IDM at Comment 1.

66

Commerce stressed in *Ferrovanadium from Russia Final Determination* that its finding with regard to the value added in in the third country was an anomaly.[371] Commerce specified "that the value of U.S. processing of vanadium pentoxide into ferrovanadium, as calculated by {Commerce}, fell within the range of value-added percentages that {Commerce} has found to be "small" in previous cases."[372] Thus, we do not find that our assessment of whether the value of BYD HK's inquiry country processing is a small proportion of the value of the inquiry merchandise imported into the United States is necessarily inconsistent with some of the "small" percentages found in *Ferrovanadium from Russia Final Determination*, *Tissue Paper from China (Vietnam)*, or *Hot-Rolled Lead and Bismuth* and find the facts of those case to be misplaced in this current circumvention inquiry. While Commerce ultimately determined in *Ferrovanadium from Russia Final Determination* that the value percentages were not small based on the extensive and substantial processing that occurred, as explained above we find it is appropriate to consider the nature of processing in the overall circumvention decision rather than in assessing the percentage calculated under section 781(b)(2)(E) of the Act.

In the discussion of changes to the Act, the SAA noted that "{t}hese new provisions do not establish rigid numerical standards for determining the significance of the assembly (or completion) activities …"[373] Here, we determined that the limited value percentage that we calculated for BYD HK's inquiry country processing is a small proportion of the value of the merchandise imported into the United States.[374] Where the value of the processing performed in the inquiry country is a small proportion of the value of the inquiry merchandise imported into the United States, this factor weighs in favor of finding circumvention.

Thus, for the final determination, and after careful consideration of the change to BYD HK's value of processing, we continue to find that the value of the processing performed in Cambodia by BYD HK is a small proportion of the value of the inquiry merchandise imported into the United States, and thus, weighs in in favor of finding circumvention. For a complete analysis of BYD HK's updated value of processing in Cambodia, *see* BYD HK's Final Analysis Memorandum.

Concerning the three factors under section 781(b)(3) of the Act (*i.e.*, pattern of trade and sourcing, affiliations, and whether imports of parts and components from China increased), as addressed in Comment 13, Commerce finds that each of these factors supports an affirmative determination of circumvention for BYD HK.

Therefore, after analyzing the five factors under 781(b)(2), we find that the an evaluation of the factors based on this particular circumvention scenario demonstrates that BYD HK's process of assembly or completion in Cambodia is minor or insignificant pursuant to section 781(b)(1)(C) of the Act.

---

[371] *See Ferrovanadium from Russia Final Determination* IDM at Comment 1.

[372] *Id.*

[373] *See* SAA at 894.

[374] *See* BYD HK Final Analysis Memorandum where we calculated a ratio similar to the *Preliminary Determination*.

**Overall Determination**

**Comment 13. Whether the Factors Under 781(b)(3) of the Act Justify an Affirmative Final Determination**

*NextEra*[375]

- Section 781(b)(3) of the Act directs Commerce to take into account three factors in determining whether the merchandise produced in a foreign country is within the scope of an order, but the record does not support an affirmative determination based on these factors.
- None of the factors under section 781(b)(3) are dispositive and should not override a finding that the processing in Cambodia is not minor or insignificant.
- Pursuant to section 781(b)(3)(A) of the Act, Commerce analyzed U.S. import statistics and the mandatory respondent's data to find that import volumes from Cambodia have increased since the *Orders* were imposed, while imports from China declined.[376]
- Imports from Cambodia increased in response to growing U.S. demand.
- The U.S. installed significantly more solar energy capacity in 2021 than it did in 2011. Thus, the patterns of trade reflect a growing domestic market and weighs against finding circumvention.
- Under section 781(b)(3)(B) of the Act, Commerce found that affiliation to suppliers in China weighs in favor of circumvention; however, only one of two mandatory respondents reported having affiliated suppliers in China.[377]
- Commerce has previously stated that such analysis is not conclusive of whether circumvention is occurring.[378]
- Demand has driven imports from Cambodia, not ties to China.  Commerce should reverse its finding with respect to affiliation in the final determination as not dispositive of circumvention.
- Under section 781(b)(3)(C) of the Act, Commerce examined the mandatory respondents' purchases of Chinese-produced inputs from 2008 to 2021 to determine whether shipments of inputs from China to Cambodia has increased.[379]
- Cell and module production in Cambodia is developed based on the industry's understanding of Commerce's interpretation of the *Orders* regarding the production stage in which the wafer is substantially transformed into a cell and therefore subject to the *Orders*.
- An affirmative determination would undermine this understanding.  Commerce should therefore not rely on section 781(b)(3) of the Act to find circumvention.
- If Commerce concludes that any of the factors in section 781(b)(3) of the Act weigh in favor of finding circumvention, Commerce should not base an affirmative determination solely on section 781(b)(3) of the Act.

---

[375] *See* NextEra's March 24, 2023 Case Brief.
[376] *Id.* (citing *Cambodia* PDM at 20).
[377] *Id.* (citing *Cambodia* PDM at 21).
[378] *Id.* (citing *PET Film from the UAE (Bahrain)*; and *CORE from China (Vietnam)*).
[379] *Id.* (citing *Cambodia* PDM at 21).

- A negative determination is required, in accordance with the statute and Commerce practice, because processing in Cambodia, per NextEra's arguments, is not minor or insignificant, and therefore not all of the mandatory criteria in section 781(b)(1) of the Act are met.
- Section 781(b)(1) of the Act lists five criteria that must be met before imports from a third country may be included within an existing order. In contrast, section 781(b)(3) of the Act references three factors that Commerce shall take into account.
- The phrase "take into account" is plainly different from the mandatory language in section 781(b)(1) of the Act, and thus, the section 781(b)(3) factors are clearly not dispositive.
- If processing in the third country is not minor or insignificant, then the factors listed under section 781(b)(3) of the Act are not relevant because not all of the mandatory statutory criteria have been met.
- Commerce has previously emphasized that circumvention determinations are based on the totality of circumstances and the facts of each case.[380]

*Auxin*[381]
- NextEra asserts that Commerce evaluated the factors under section 781(b)(3) of the Act in isolation without taking due consideration of various market conditions. Therefore, Commerce incorrectly found these factors to weigh in favor of finding circumvention.
- In 2021, U.S.-bound solar cell and module shipments from Cambodia exceeded U.S.-bound solar cell and module shipments from China. This represents a dramatic shift in the pattern of trade.
- Nonetheless, NextEra asserts that the changes in the pattern of trade simply reflect a growing domestic market. However, Chinese direct shipments have forgone this burgeoning market, and NextEra's assertion reflects a blindness to the deterioration of the U.S. solar industry precipitated by the Chinese government.
- Accordingly, the extraordinary shifts in the pattern of trade and sourcing patterns strongly support an affirmative determination.
- With respect to section 781(b)(3)(B) of the Act, Auxin agrees with NextEra that affiliation between Cambodian solar cell and module producers is not conclusive of circumvention. Although affiliation is a critical element to Commerce's circumvention evaluation, and circumvention may be more likely to occur via related parties, it is also possible for circumvention to involve unrelated companies.[382]
- However, Commerce did not find circumvention solely on account of affiliation. Commerce reasonably, and in accordance with practice, found that BYD HK's affiliation merely weighs in favor of finding circumvention.[383]
- Commerce should continue to find that BYD HK's affiliation with upstream Chinese suppliers weighs in favor of finding circumvention in the final determination.

---

[380] *Id.* (citing *Pipe and Tube from India (Oman and UAE)*).
[381] *See* Auxin's April 3, 2023 Rebuttal Brief.
[382] *See* Auxin's April 3, 2023 Rebuttal Brief (citing *CORE from China (Vietnam)*; *Tissue Paper from China (Vietnam) Preliminary Determination*; and *Brass Sheet and Strip from Canada* IDM).
[383] *Id.* (citing *Cambodia* PDM).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

- With respect to section 781(b)(3)(C) of the Act, NextEra found Commerce's finding to be improper because solar cell and module production in Cambodia developed based on the shared understanding of the industry from Commerce's interpretation and administration of the *Orders* regarding the stage in the production cycle that renders a product subject to the *Orders*. NextEra has failed to grasp the distinction between a substantial transformation finding and section 781(b) of the Act.
- Additionally, NextEra's admission that parties were searching for export platforms to imbue silicon wafers with a p/n junction admits to circumvention.

**Commerce's Position:** We conclude that the evidence on the record in the Cambodia segments regarding section 781(b)(3) of the Act supports those affirmative circumvention determinations. Therefore, Commerce appropriately issued affirmative determinations of circumvention in Cambodia based, in part, on consideration of the factors enumerated in section 781(b)(3) of the Act.

Section 781(b)(3) of the Act provides that, in determining whether to include merchandise assembled or completed in a third country in an AD/CVD order, Commerce shall consider the following additional factors: (A) the pattern of trade, including sourcing patterns; (B) whether the manufacturer or exporter of the merchandise is affiliated with the person who, in the third country, uses the merchandise to complete or assemble the merchandise which is subsequently imported into the United States; and (C) whether or not imports of the merchandise into the third country have increased after the initiation of the AD and/or CVD investigation that resulted in the issuance of an order.

In the *Preliminary Determinations*, Commerce analyzed section 781(b)(3)(A) of Act by examining the pattern of trade by each mandatory respondent and its Chinese affiliates since the initiation of the underlying investigation.[384] Commerce additionally examined the trade patterns of Chinese shipments of subject merchandise into the U.S. and Cambodian shipments of subject merchandise into the U.S. Commerce concluded that import volumes from Cambodia increased since the *Order* was imposed, while imports from China declined, and thus this pattern weighed in favor of circumvention.[385] NextEra contends that Commerce must not evaluate the patterns of trade within a vacuum and must consider the context of the global market. Notably, U.S. domestic demand has grown significantly since the imposition of the *Order*, as a result of multiple factors, including the Administration's focus on the development of renewable energy. As NextEra stated, deployment of solar energy capacity has grown significantly, and therefore imports from Cambodia have become increasingly important to fulfill U.S. demand. Therefore, Commerce must consider the growing U.S. domestic market within its analysis of trade patterns.

The plain language of the Act under section 781(b)(3)(A) directs Commerce to consider the pattern of trade since the initiation of the investigation of solar cells and modules. The evidence on the record for each mandatory respondent showed extraordinary shifts in the pattern of trade from China to Cambodia. U.S.-bound solar cell and module shipments from Cambodia replaced and exceeded U.S.-bound solar cell and module shipments from China.[386] Additionally, pursuant

---

[384] *See Cambodia* PDM at 20.
[385] *See* BYD HK Preliminary Analysis Memorandum.
[386] *Id.*

to section 781(b)(3)(A) of the Act, Commerce evaluated the specific sourcing patterns of the mandatory respondents in Cambodia. Evidence on the record further supported a shift in the pattern of trade from China to Cambodia.[387] Thus, the pattern of trade since the initiation of the investigation shows that this factor weighs in favor of finding circumvention.

In the *Preliminary Determinations*, Commerce analyzed section 781(b)(3)(B) of the Act by taking into consideration each mandatory respondent's affiliation with Chinese producers of solar cells, modules, ingots, and wafers.[388] NextEra stated that only BYD HK reported having affiliated suppliers in China, and further expressed that affiliation is not conclusive of whether circumvention is occurring. Consistent with past practice, we generally consider circumvention to be more likely to occur when the manufacturer of the subject merchandise is related to the third country assembler.[389] However, the lack of affiliation does not constitute evidence that circumvention is not occurring; therefore, affiliation is one of several factors that is considered when reaching our determination. We reach our determination regarding circumvention based on our consideration of all the 781(b)(3) factors, including affiliation. For all respondents in Cambodia, we find that sections 781(b)(3)(A) and 781(b)(3)(C) of the Act weigh in favor of circumvention, in addition to the mandatory findings listed in section 781(b)(1) of the Act. Therefore, we determine that record evidence as a whole supports a finding that weighs in favor of finding circumvention.

Commerce analyzed section 781(b)(3)(C) of the Act by taking into consideration whether the shipments of Chinese inputs that were used to complete or assemble the final product in Cambodia increased.[390] NextEra alleges that Commerce improperly found that this factor weighs in favor of circumvention, and that an affirmative determination would undermine the clear understanding of Commerce's interpretation regarding the stage in the production cycle that renders a product subject to the *Orders*. The plain language of the Act under section 781(b)(3)(C) instructs Commerce to examine whether imports of Chinese inputs into Cambodia used for the production of subject merchandise have increased after the initiation of the underlying investigation. Evidence on the record clearly shows that imports of Chinese inputs for all companies into Cambodia have increased since the year of the initiation of the investigation. Therefore, this factor weighs in favor of finding circumvention. Additionally, we agree with domestic parties that there is a clear distinction between a substantial transformation finding and section 781(b) of the Act. Although substantial transformation and circumvention inquiries may be similar, they are conducted pursuant to different regulatory standards and serve different purposes.[391] The purpose of a substantial transformation analysis is to determine a product's country of origin, while the purpose of a circumvention analysis is to counteract evasion of AD/CVD orders. Commerce may find a product that was substantially transformed to still be subject to an AD/CVD order after conducting a circumvention inquiry. Therefore, given the fact that Chinese inputs into Cambodia have increased since the year of the initiation of the *Orders*, we continue to find this factor to weigh in favor of circumvention.

---

[387] *Id.*

[388] *See Cambodia* PDM.

[389] *See CORE from China (Vietnam)*; *Tissue Paper from China (Vietnam) Preliminary Determination*; and *Brass Sheet and Strip from Canada* IDM.

[390] *See Cambodia* PDM.

[391] *See Bell Supply CAFC*; *see also* 19 CFR 351.225(j).

71

NextEra additionally argues that Commerce cannot base an affirmative determination solely on section 781(b)(3) of the Act, and that a final negative determination is required because the processing in Cambodia is not minor or insignificant and therefore not all of the mandatory criteria in section 781(b)(1) have been met.  Contrary to NextEra's arguments, we continue to find the process of assembly in Cambodia to be minor or insignificant for all mandatory respondents, and therefore, all mandatory criteria in section 781(b)(1) have been met.  For additional information, *see* Comment 12.

For Commerce to make an affirmative determination of circumvention, all elements under section 781(b)(1) of the Act must be satisfied, including the minor or insignificant criteria listed in section 781(b)(2) of the Act.  In contrast, section 781(b)(3) of the Act references three factors for Commerce to "take into account," a phrase plainly different from the mandatory language in section 781(b)(1) of the Act.  These factors are relevant to Commerce's holistic analysis but are not dispositive of whether circumvention is occurring.  Consistent with past practice, Commerce reaches its determination regarding circumvention based on the totality of the evidence for all factors, including those listed under section 781(b)(3) of the Act.[392]  Commerce agrees with NextEra that section 781(b)(3) of the Act does not overturn a negative determination under 781(b)(1) of the Act if the process of assembly or completion in the third country is found to be not minor or insignificant under section 781(b)(2).  Here, we have determined the process of assembly or completion in Cambodia to be minor or insignificant, and therefore a finding that solar cells and modules produced in Cambodia are circumventing the *Orders* is appropriate.

Based on the above analysis, we conclude that Commerce has correctly determined that the factors under section 781(b)(3) of the Act weigh in favor of circumvention and that Commerce appropriately issued an affirmative determination of circumvention in Cambodia based on a totality of the factors, including section 781(b)(3) and the determination that the process of assembly or completion in Cambodia is minor or insignificant.

## Comment 14. Whether Commerce's Country-wide Affirmative Circumvention Determination was Appropriate

*NextEra*[393]
- Commerce cannot reach a country-wide affirmative circumvention determination with respect to Cambodia because record evidence demonstrates that the process of assembling and completing solar cells and modules in Cambodia is not minor or insignificant.

No other interested party commented on this issue.

**Commerce's Position:**  We have addressed NextEra's argument in Comments 10 and 12.

---

[392] *See Pipe and Tube from India (Oman and UAE).*
[393] *See* NextEra's March 24, 2023 Case Brief at 3-38.

**Comment 15.  Affirmative Circumvention Determinations Would not be Appropriate Under Section 781(b)(1)(E) of the Act**

*BYD HK*[394]

- Commerce did not provide any meaningful discussion regarding the appropriateness of the action, as is required by the statute in the *Preliminary Determination* pursuant to section 781(b)(1)(E) of the Act.
- Commerce's affirmative determinations to expand the scope of the *Orders* contradict Commerce's longstanding precedents regarding the nature and significance of certain vital processes in the production of solar cells and modules.
- Commerce indicated in the AD investigation that converting Chinese-origin wafers into solar cells in a third country does not warrant circumvention inquiries, advising that "{p}etitioner has the option of bringing additional petitions to address any dumping concerns it has regarding solar modules/panels assembled from solar cells produced in a third country."[395]
- President Biden has made it clear that duties on imports from these inquiries are inappropriate in the face of the current energy emergency and, accordingly, waived new duties on solar modules from Thailand, Vietnam, Malaysia, and Cambodia for two years.[396]
- An affirmative determination would be contrary to Commerce's own recently-promulgated circumvention regulations because the purpose of the proposed modifications was not to penalize companies acting in good faith, but to ensure that circumvention determinations are properly applied to merchandise found to be circumventing an order.[397]

*NextEra*[398]

- Commerce can reach a negative final determination under section 781(b)(1)(E) of the Act, which states that Commerce "may" (not "shall" or "must") include products completed in third countries within the scope of an order.
- Including solar cells and modules produced in Cambodia, Malaysia, Thailand, and Vietnam within the scope of the *Orders* is not appropriate since there is no evasion to prevent when the processing that occurs in the third country is so significant.
- AD/CVD proceedings are not exempt from the directive to integrate climate considerations into its policies, strategic planning, and programs.[399]

---

[394] *See* BYD HK's March 24, 2023 Case Brief at 20-23.
[395] *Id.* (citing the *AD Order*, 77 FR at 73018).
[396] *Id.* (citing the *Proclamation Procedures*, 87 FR at 5686).
[397] *Id.* (citing *2021 Regulations Final Rule*, 86 FR at 52300, 52338).
[398] *See* NextEra's March 24, 2023 Case Brief at 31-33.
[399] *Id.* (citing NextEra's May 2, 2022 Comments at Att. 12 (U.S. Department of Commerce, Department Administrative Order 216-22, Addressing the Climate Crisis).

*Silfab*[400]

- The final determinations must address whether expanding the scope of the *Orders* to encompass cells manufactured in third countries (and the modules produced using those cells) would be appropriate under section 781(b)(1)(E) of the Act.
- Auxin and Commerce have not met the requirements for appropriateness because:  (1) no other U.S. producers support Auxin's petitions before Commerce; (2) an unwarranted expansion of the existing *Orders* would cause substantial harm to the U.S. solar industry; and (3) the requested relief would further impede the development of the U.S. solar industry, making it impossible to achieve the Biden administration's green energy initiatives.
- U.S. manufacturers have been denied due process in the form of procedural safeguards and eligibility requirements governing AD/CVD relief under U.S. law and Commerce's regulations.  Put simply, Auxin unlawfully made an end-run around the strict procedures and eligibility requirements governing AD/CVD relief under U.S. law, sections 701 and 703 of the Act and 19 CFR 351.203.
- U.S. manufacturers sourced cells from locations outside of China to enable U.S. manufacturing of solar modules in good-faith recognition of existing AD/CVD orders as they had been administered by Commerce and CBP for a decade.
- U.S. manufacturers were never given any notice that such cells could be circumventing the *Orders*.  In fact, as explained above, Commerce's administration of the *Orders* throughout this period consistently confirmed that such merchandise was not subject to the *Orders*.  Accordingly, affirmative final determinations would, without notice, potentially penalize Silfab for its good-faith efforts to comply with U.S. law and grow U.S. module manufacturing.
- Affirmative final determinations would contradict the emergency declared in *Proclamation 10414*.

*Auxin*[401]

- Commerce appropriately determined that a circumvention inquiry for the *Orders* is appropriate under section 781(b)(1)(E) of the Act.
- The arguments put forth by several interested parties that Commerce's actions are not "appropriate" notwithstanding Commerce's affirmative finding of circumvention are false.
- Commerce followed its practice in determining that action is appropriate to address circumvention pursuant to section 781(b)(1)(E) of the Act in the *Preliminary Determinations*.[402]
- Commerce and the CIT have held as a matter of statutory interpretation that Commerce's evaluation of whether action is appropriate to prevent evasion pursuant to section 781(b)(1)(E) of the Act is tied to consideration of the factors outlined in section 781(b)(3) of the Act.[403]

---

[400] *See* Silfab's March 6, 2023 Case Brief at 4 and Silfab's March 24, 2023 Cambodia Case Brief at 5-12.
[401] *See* Auxin's March 17, 2023 Rebuttal Brief at 28-30 and Auxin's April 3, 2023 Rebuttal Brief at 61-70.
[402] *See* Auxin's April 3, 2023 Rebuttal Brief (citing, *e.g.*, the *Cambodia* PDM at 23-26).
[403] *Id.* (citing *CORE from China (Vietnam)* IDM at 11; *CORE from China (Vietnam)* IDM at *Tung Mung CIT* 219 F. Supp. 3d 1333, 1343 and *Peer Bearing Co.*, 36 CIT 1700, 1707).

- Commerce did not address circumvention in the underlying investigation of the *Orders* because its substantial transformation analysis at that time was limited to comparing cell fabrication to module assembly and not comparing cell fabrication to module assembly to prior stages of solar cell production, which is the analysis Commerce is conducting now pursuant to 781(b)(1) of the Act.[404]

- Commerce stated in the *Solar Cells from China Investigation* that the "{p}etitioner has the option of bringing additional petitions to address any dumping concerns it has regarding solar modules/panels assembled from solar cells produced in a third country" which does not indicate that Commerce meant that future circumvention inquiries regarding solar cells would not be warranted.[405]

- The CAFC stated in *Bell Supply CAFC* that "if Commerce applies the substantial transformation test and concludes that the imported article has a country of origin different from the country identified in an AD or CVD order, then Commerce can include such merchandise within the scope of an AD or CVD order only if it finds circumvention under" section 781 of the Act.[406]

- Auxin is an interested party as defined by section 771(9)(C) of the Act and was, and is, well within its rights to request that Commerce initiate and conduct these circumvention inquiries.

- Congress rejected a standing requirement for circumvention inquiries when it enacted section 781(b) of the Act, which allows any interested party, including small and medium-size businesses like Auxin, to enforce U.S. trade laws.[407]

- Commerce does not have discretion under the statute to disregard circumventing behavior based on a concern that such a finding would impede other government policy objectives, or any other factor not explicitly provided for in the statute.

- Commerce previously rejected arguments that an affirmative final determination is not appropriate and would impose economic costs by stating that comments regarding economic impact address issues outside the purview of the analysis prescribed by section {781(b)} of the Act.[408]

- This circumvention inquiry does not threaten growth of U.S. solar deployment or hinder efforts to address climate change because, as noted by the DOE, there has been a steady increase in installed CSPV capacity from 2010-2020 in spite of the *Orders* and temporary safeguard measures.[409]

- The DOE confirmed that rehabilitating U.S. solar manufacturing by effectively enforcing U.S. trade laws and combatting climate change are not mutually exclusive.[410]

- Auxin's analysis of the solar cell production process is consistent with analyses from the DOE and the IEA, and was ultimately vindicated by Commerce's preliminary affirmative findings of circumvention.

- Silfab's argument that these circumvention queries violate its due process are unfounded since Congress enacted the circumvention section of the Act in 1988 in order to prevent

---

[404] *Id.* (citing *Solar Cells from China Investigation* IDM at Comment 1).
[405] *Id.* (citing *Solar Cells from China Investigation* IDM at Comment 1).
[406] *Id.* (citing *Bell Supply CAFC*, 888 F.3d 1222, 1230 and *Diamond Sawblades (Thailand)* IDM at Comment 3).
[407] *Id.* (citing 19 CFR 351.226(c)).
[408] *Id.* (citing *Ferrovanadium from Russia Final Determination* IDM at Comment 4).
[409] *Id.* (citing Auxin's May 16, 2023 Comments at Exhibit 5 (DOE Solar Deep Dive at 2)).
[410] *Id.* (citing Auxin's May 16, 2023 Comments at Exhibit 5 (DOE Solar Deep Dive at iv)).

75

evasion and circumvention of AD/CVD orders and did not establish an industry support requirement.

- Silfab's argument that its due process rights have been violated is belied by the fact that it has been allowed to participate in this inquiry from the very start.[411]
- Silfab USA's contention that affirmative final determinations would contradict the emergency declared in *Proclamation 10414* is similarly without merit because although the proclamation effectively eliminates the remedy that Auxin is entitled to by law, nothing in *Proclamation 10414* is inconsistent with an affirmative final determination in these inquiries.

**Commerce Position:** We disagree with BYD HK, NextEra, and Silfab's assertions that we did not determine the appropriateness of the instant circumvention inquiries pursuant to section 781(b)(1)(E) of the Act. As an initial matter, we conducted a full analysis pursuant to section 781(b) of the Act in order to determine if the merchandise assembled or completed in a foreign country is within the scope of the *Orders*.[412] Section 781(b)(1)(E) of the Act authorizes Commerce to include merchandise alleged to be circumventing in the scope of an order if Commerce "determines that action is appropriate … to prevent evasion of such order or finding." Commerce found that the criteria for a finding circumvention of the *Orders* was met, and further that the factors listed in section 781(b)(3) of the Act indicated that circumvention of the *Orders* was occurring. The statute does direct Commerce to consider factors other than whether action under the circumvention statute is appropriate to prevent evasion of the *Orders*. Here, because: we have found that the criteria for finding circumvention were met, and the factors under section 781(b)(3) of the Act further evinced the existence of circumventing behavior, and because no information on the record suggested that circumvention would cease absent inclusion of inquiry merchandise in the scope of the *Orders*, we find that action is appropriate under section 781(b)(1)(E) of the Act.

With respect to Auxin's standing to request a circumvention inquiry, there is no stipulation in the regulations regarding who can and cannot bring a circumvention inquiry beyond that it be an interested party. Pursuant to 19 CFR 351.226(c), an interested party may submit a circumvention inquiry request as long as it follows the proper procedures and include the requisite product information necessary for Commerce to make an initiation determination. In the instant case, we examined Auxin's circumvention requests and determined that it satisfied the criteria under 19 CFR 351.226(c), thus giving it standing to proceed.[413]

We also disagree with the arguments raised by BYD HK, NextEra, and Silfab that Commerce precluded future circumvention inquiries on the inquiry merchandise in the language of the investigation. In the investigation, we stated that there was the option for bringing additional petitions regarding assembly of solar cells and modules in a third country,[414] but did not prelude circumvention inquiries, which are requested in response to specific trade pattern and activities that may constitute circumvention as defined in the Act. As noted above, Auxin followed

---

[411] *Id.* (citing *Techsnabexport, Ltd.*, 16 CIT 420, 427 (noting the "essential elements of due process are notice and the opportunity to be heard")).
[412] *See Cambodia* PDM at the section, "Summary of Statutory Analysis."
[413] *See Initiation Notice*, 87 FR 19071, 19072.
[414] *See Solar Cells from China Investigation* IDM at Comment 1.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

Commerce's requisite procedures for requesting a circumvention inquiry and thus we proceeded accordingly.

We also disagree with Silfab's claim that it and other U.S. cell and module producers have been denied due process in the instant proceeding. Silfab claims that because U.S. manufacturers were never given any notice that their cells could be circumventing the *Orders,* their rights to due process were violated. The Act and Commerce's regulations provide for ample notification and comment on Commerce's *Preliminary Determinations* by interested parties. In accordance with the CIT's ruling in *Techsnabexport, Ltd.*, the "essential elements of due process are notice and the opportunity to be heard."[415] As evidenced by the case record of the instant circumvention inquiries, Silfab as well as both domestic and foreign solar cell producers have had ample opportunity to file comments and, thus, be heard throughout this inquiry.

Finally, we disagree with BYD HK, NextEra, and Silfab's contention that these circumvention inquiries contradict *Proclamation 10414*. Nothing in the proclamation states that Commerce cannot conduct circumvention inquiries with respect to solar cells and modules. In fact, in response to *Proclamation 10414*, Commerce added Part 362 to its regulations to implement the Proclamation and these regulations, as well as CBP instructions issued by Commerce, specify that no AD/CVD duties will be collected on solar cells and modules entering the United States to which *Proclamation 10414* applies.[416] Thus, Commerce's affirmative circumvention findings cannot be implemented until the provisions of the *Proclamation 10414* expire.

**Certification Issues**

**Comment 16. Whether Commerce Should Allow AFA Companies to Certify**

*NE Solar*[417]
- Commerce should not deny any party the eligibility to participate in its certification regime based on the application of AFA.
- In *Oman Fasteners*, the CAFC informed Commerce that an adverse inference rate cannot be punitive or aberrational.[418]
- The only conclusions that can result from Commerce's circumvention inquiries pursuant to section 781(b)(1)(A)-(E) of the Act is whether or not the inquiry merchandise is circumventing an existing order.
- Forbidding AFA companies from certifying entries with CBP is a punitive measure that goes beyond the statutory purpose of a circumvention inquiry especially since the certifying statements are subject to verification by CBP.[419]

---

[415] *See Techsnabexport, Ltd.*, 795 F.Supp at 428.
[416] *See Cambodia* PDM at the section, "Certification Process and Country-Wide Affirmative Determination of Circumvention" and *Appendix IV-Certification for "Applicable Entries."*
[417] *See* NE Solar's March 6, 2023 Case Brief at 2-5.
[418] *Id.* (citing *Oman Fasteners*, Slip Op. 23-17 at 20).
[419] *See Id.* (citing the *Preliminary Determinations*, 87 FR at Appendix VI(M) ("I understand that the claims made herein, and the substantiating documentation, are subject to verification by CBP and/or Commerce.")).

- Section 781 of the Act does not grant Commerce the authority to create a certification regime and then prospectively dismiss the veracity of certifications provided under that regime before those certifications are made.
- Commerce would be enforcing the *Orders* against specific companies rather than enforcing the existing *Orders* against merchandise covered by the scope of the *Orders* or the instant queries.

*Auxin*[420]

- Commerce should follow its longstanding, court-affirmed practice of precluding non-cooperative companies (either by not responding to the Q&V questionnaires or cancelling verification) from participation in any certification regime.
- Commerce's preliminary findings with respect to NE Solar was premised on its questionnaire responses being accurate, complete, and verified.  Thus, NE Solar's cancellation of verification warrants AFA pursuant to sections 776(a), (b) of the Act.
- Accordingly, Commerce should find, as AFA, that NE Solar is circumventing the *Orders* and should be precluded from participating in any resulting certification regimes.

**Commerce's Position:**  Commerce's decision to bar uncooperative respondents from the certification process is an agency practice affirmed by the CIT, is not impermissibly punitive, and minimizes the impact of AFA findings on parties not found circumventing, while ensuring that Commerce's AFA finding induces cooperation, consistent with Commerce's established practice.  As noted by Auxin, Commerce has the authority to and the discretion to determine the eligibility of parties to participate in the certification regime.[421]

Commerce notified interested parties that it was initiating the circumvention inquiry on a country-wide basis (*i.e.*, not exclusive to the producers mentioned) and would solicit information from certain Cambodian, Malaysian, Thai, and Vietnamese companies concerning their production and shipment of solar cells and modules to the United States.[422]  Commerce also stated in the *Initiation Notice* that a company's failure to completely respond to our request for information may result in the application of partial or total facts available which may include adverse inferences.[423]  In conducting a country-wide circumvention inquiry, Commerce must evaluate a representative selection of companies to determine whether merchandise has been completed or assembled in the third country, and must take necessary action to prevent evasion.[424]  Commerce is not required by the Act or regulations to impose a certification regime in instances where such a regime is inconsistent with preventing evasion and permits uncooperative parties to benefit from their lack of cooperation.  Commerce's previous findings that foreign producers' ability to "trace the country of origin of its shipments and identify which shipments to the United States are of Chinese origin on a transaction-specific basis," is crucial to administration of affirmative anti-circumvention findings.[425]  Commerce is not obligated to

---

[420] *See* Auxin's March 17, 2023 Rebuttal Brief at 23-26; and Auxin's March 24, 2023 Case Brief at 39-42.
[421] *See Cold-Rolled Steel from Korea* IDM at Comment 6.
[422] *See Initiation Notice*, 87 FR at 19072.
[423] *Id.*
[424] *See* Cambodia RSM at the section, "Selection of Respondents."
[425] *See Butt-Weld Pipe Fittings from China (Malaysia)* IDM at Comment 3; *Hangers from China (Vietnam)* IDM at Comment 4; and *Tissue Paper from China (India) Final Determination* IDM at Comment 2.

permit a previously uncooperative party to certify if that party has, by its unwillingness to cooperate, prevented Commerce from using that party's information to conduct its analysis, or to assess and verify such party's ability to trace its inputs to particular U.S. sales. Rather, Commerce's establishment of a certification process in which non-cooperative respondents may not participate is consistent with our obligation to administer the law in a manner that prevents evasion of the *Orders*.[426]

Thus, we disagree with the argument submitted by NE Solar that excluding uncooperative producers and their importers from the certification process is overly punitive and not supported by evidence. Commerce's decision to preclude uncooperative respondents from participating in the certification process is necessary to ensure cooperation and does not exceed what is minimally necessary and reasonable to ensure cooperation. The reliance on *Oman Fasteners* as an example of the CIT finding Commerce's decision to apply AFA as impermissibly punitive is inapplicable here, where the question is whether precluding companies from certifying based on an adverse inference is permissible; not whether the application of AFA itself is warranted.

Commerce has repeatedly applied certification requirements in other circumvention inquiries which were subject to an affirmative country-wide decision.[427] Therefore, in a case where the affirmative circumvention determination is made entirely on record evidence, uncooperative respondents would be able to benefit from their failure to cooperate (*e.g.*, not filing timely Q&Vs or not participating in verification) merely by the fact that they avoided the inconvenience and expense of participating, including being selected as a mandatory (complete questionnaire) respondent, knowing that their lack of participation might not (or would not) alter Commerce's finding of circumvention. Such non-cooperation could also frustrate Commerce's ability to conduct a circumvention inquiry, should the largest third-country producers fail to provide Q&V responses. Finally, an uncooperative respondent retains the right to participate in a future review, and thus remedy its uncooperative status and potentially gain the opportunity to participate in a certification regime. For these reasons, Commerce's decision to preclude non-cooperating respondents from the certification regime is legitimately based on the need to induce cooperation and is not punitive.

## Comment 17. Certification Requirements and Corrections

*BYD HK*[428]

- Commerce should simplify its certifications by replacing them with declarations from only importers that the entry(ies) meet the requirements for duty-free treatment based on the *Presidential Proclamation 10404* (*i.e.*, the entry is an "Applicable Entry") or Commerce's determinations in these circumvention inquiries (*i.e.*, either Commerce's negative circumvention determination applies to the entry or the merchandise that was entered into the United States meets the non-Chinese content requirements identified by Commerce).

---

[426] *See Butt-Weld Pipe Fittings from China (Malaysia) Preliminary* PDM at 12-13 and 22, unchanged in *Butt-Weld Pipe Fittings from China (Malaysia)*.
[427] *See Butt-Weld Pipe Fittings from China (Malaysia)*; *CRS from China (Vietnam)*; *CORE from China (Vietnam)*; and *CORE from China (UAE)*.
[428] *See* BYD HK's March 6, 2023 Case Brief at 2-3.

- CBP already enforces other duty exemptions using simplified certifications and requiring anything more than simple declarations will impede the flow of goods into the United States.
- Commerce should provide importers 60 days to provide simplified declarations for entries that have already been made.

*Jinko*[429]
- To avoid CBP requiring AD/CVD cash deposits on entries with deficient certifications: (1) an importer should be allowed to appeal CBP's decision that a certification is deficient to Commerce and submit a corrected certification, if necessary; (2) an importer should be allowed to submit corrected certifications in the absence of gross negligence or fraudulent intent; and (3) the documentation required to be maintained in connection with the certification should be limited to documents that demonstrate that the entry is an "Applicable Entry" (*i.e.*, the p/n junction in the solar cells was not formed in China) or not an entry of inquiry merchandise (*i.e.*, the solar cells do not contain wafers produced in China).

*Auxin*[430]
- Commerce should continue to require exporters to complete the requisite certifications because:  (1) Commerce's preliminary affirmative country-wide circumvention determination applies to all exporters in the inquiry countries; (2) exporters possess certain information necessary for completing the certifications that imports may not have; and (3) BYD HK never explained why requiring certifications from exporters would be burdensome.
- Contrary to BYD HK's claim that "there is no legitimate need or purpose for Commerce to require certifications from exporters or to require the level of factual detail specified in the current certifications," Commerce has specifically stated that the "addition of the certification requirements … strengthens the administration and enforcement of the AD and CVD orders by reducing the possibility that entries may be inaccurately classified by importers."[431]

**Commerce's Position:**  We have decided not to revise the certifications as suggested by BYD HK because requiring exporters to complete the certifications is consistent with Commerce's practice and is necessary, and because BYD HK never explicitly identified which parts of the certifications are too burdensome.  Commerce has a history of requiring both importers and exporters of goods that are entered into the United States to complete and maintain certifications in certain proceedings or proceeding segments, including as a result of circumvention inquiries.[432]  Certifications from exporters are particularly important for implementing the results of this circumvention inquiry because whether merchandise is inquiry merchandise is based on the country where the merchandise was produced and whether certain inputs into that

---

[429] *See* Jinko's March 6, 2023 Case Brief at 1-5.
[430] *See* Auxin's March 17, 2023 Rebuttal Brief at 26-28.
[431] *Id.* at 27 (citing *Core from China (Vietnam)* IDM at Comment 4.
[432] *See CORE from China (UAE)*; *see also Aluminum Extrusions from China Minor Alterations Circumvention Final*, 82 FR at 34631-34632.

merchandise were produced in China.[433]  Neither of these characteristics can be determined through a physical inspection of the merchandise at the border.  Moreover, entry documents that are typically available to the importer may not be helpful in identifying where certain inputs in the imported merchandise were produced, as the source of such inputs may not be apparent from invoices, bills of lading, *etc.*, especially where the input passed through multiple parties (producer, exporter, trading company).  As Commerce noted in the Preamble to its regulations:

> Given the complex supply chains that may be involved with certain types of subject merchandise (which may involve input producers, intermediate processors, producers, exporters, trading companies, importers, *etc.*), certifications provide additional assurance that the producer, exporter, and/or importer sought adequate information regarding the relevant product in order to accurately certify a particular entry as not subject to an order.[434]

Requiring exporters to complete and maintain certifications provides the added assurance that adequate information was obtained to accurately certify to the facts listed in the certifications. Moreover, simply requiring "declarations" from importers that an entry qualifies as an "Applicable Entry" or meets the non-Chinese content requirements does not provide the same level of assurance that the entry meets those requirements as the certifications that Commerce developed for this circumvention inquiry.  Commerce's certifications contain a list of each requirement that must be met to make clear that the importer and exporter have been informed of each requirement by way of the certification and both have specifically certified that each and every requirement has been met.

Furthermore, we disagree that it is inappropriate for Commerce to "require the level of factual detail specified in the current certifications" as argued by BYD HK.[435]

> As a general matter, importers are expected to perform their due diligence and exercise reasonable care {when completing entry documents} … . {A} reasonable importer may be expected to know, at a minimum, the identity of certain parties in the transaction chain, understand the imported product, including where it was made, how it was made, and the components of the product (and, in some instances, the source of those components).[436]

Commerce's certifications do not go beyond these already existing expectations for importers. Hence, we have not revised the certifications as suggested or waived the certification requirement with respect to exporters.

We next turn to the comments regarding deficient or incorrect certifications and the documentation that must be maintained in connection with the certifications.  If CBP determines that an importer or exporter's certification does not conform to Commerce's requirements, such that the entry is subject to the *Orders*, the importer or exporter can request an administrative

---

[433] *See Preliminary Determinations*, 87 FR at Appendix IV.
[434] *See 2021 Regulations Final Rule*, 87 FR at 52364.
[435] *See* BYD HK's March 6, 2023 Case Brief at 3.
[436] *See 2021 Regulations Final Rule*, 87 FR at 52347-48.

81

review of that entry wherein Commerce will determine the appropriate AD/CVD duty assessment for the entry.  Regarding corrections to certifications, CBP already has provisions in place for importers to correct entry summary information, including certification information, through such means as a post summary correction or a prior disclosure.

With respect to documentation requirements, parties who complete the "Applicable Entries" certification must certify to more than the fact that the solar cells or solar modules were not already subject to the *Orders*; or the AD order on certain crystalline silicon photovoltaic products from Taiwan (certain existing solar orders).  For example, such parties must certify that the solar cells and/or solar modules will be utilized in the United States by no later than 180 days after the earlier of June 6, 2024, or the date the emergency described in *Presidential Proclamation 10414* is terminated.

Similarly, parties who complete the "Chinese Component" certification must certify to more than the fact that the solar cells or solar modules do not contain wafers produced in China.  For example, such parties must certify that the solar cells and/or solar modules were not already subject to the *Orders*.

Consequently, it would not be appropriate to limit the documentation requirements as suggested by Jinko.  Commerce noted in the certifications that the certifying party "is required to maintain a copy of this certification and sufficient documentation supporting this certification (*i.e.*, documents maintained in the normal course of business, or documents obtained by the certifying party, for example, product specification sheets, customer specification sheets, production records, invoices, *etc.*)."[437]  This means that the certifying party must maintain sufficient documentation to support the certification in its entirety.  Therefore, we have not limited the documentation requirement as requested by Jinko.

### Comment 18. Whether Commerce Can Require Certifications for U.S. Entries of Merchandise Not Covered by the *Orders*

*NE Solar*[438]
- Commerce cannot require exporters of solar cells or solar modules that were not manufactured using Chinese wafers to certify to that fact because such merchandise is not subject to the circumvention inquiry.  Commerce cannot change the language of the *Orders* or interpreted that language "in a way contrary to {its} terms.[439]
- Thus, Commerce should revise its certifications to remove references to merchandise that is outside the scope of the circumvention inquiries and that is not subject to the underlying *Orders* (*i.e.*, language in the certification that the imported or exported solar cells and solar modules were not manufactured using wafers produced in China).

No other interested party commented on this issue.

---

[437] *See Preliminary Determinations*, 87 FR at Appendix VI.
[438] *See* NE Solar's March 6, 2023 Case Brief at 5-8.
[439] *Id*. at 5-7 (citing *Wheatland*, 161 F.3d at 1370 (quoting *Smith Corona*, 915 F.2d at 686; and *Ericsson*, 60 F.3d at 782).

**Commerce's Position:** We disagree with NE Solar's claim that Commerce cannot place certification requirements on interested parties who exported solar cells and/or solar modules to the United States that were produced in the countries under consideration that do not meet the definition of inquiry merchandise. Section 351.226(m)(1)(iv) of Commerce's regulations provides that, "{i}n conducting a circumvention inquiry under this section, the Secretary shall consider, based on the available record evidence, the appropriate remedy to address circumvention and to prevent evasion of the order. Such remedies may include … {t}he implementation of a certification requirement under 19 CFR 351.228." Under 19 CFR 351.228, Commerce may require "an importer or other interested party" to "{m}aintain a certification for entries of merchandise into the customs territory of the United States" and that if such certificate is not maintained or is false, Commerce "may instruct the Customs Service to suspend liquidation of entries of the importer or entries associated with the other interested party and require a cash deposit of estimated duties at the applicable rate …"

Thus, the certification described in 19 CFR 351.228 relates to an entry that was not declared as subject to antidumping or countervailing duties, such as the entries described by NE Solar, as only if the certification was not maintained or was found to be false would such duties be imposed. This interpretation is consistent with Commerce's statement in the Preamble to the regulations that "Commerce uses the certification program, as described in {19 CFR 351.228}, to allow parties who have not engaged in the practices which Commerce determined were circumventing an order to certify that they did not participate in such conduct." Therefore, requiring importers and exporters to certify that the imported/exported solar cells or solar modules produced in the countries under consideration were not manufactured using wafers produced in China is entirely consistent with Commerce's regulations and its authority to administer the Act in a manner that prevents evasion of its determinations, including developing certifications that it finds will be effective in preventing such evasion. As the CIT noted, "Commerce has a certain amount of discretion to act in order to 'prevent {} the intentional evasion or circumvention' of the Act … . To that end, Commerce may impose measures such as mandatory certification programs where it believes they will be effective in preventing future circumvention of its orders."[440]

Such certifications are particularly important in this circumvention inquiry because inquiry merchandise is not physically distinguishable from non-inquiry merchandise (inquiry and non-inquiry merchandise only differ with respect to the countries where certain materials in the merchandise were produced). As Commerce noted in the Preamble to its regulations:

> We note that Commerce frequently imposes certifications in instances in which CBP may not be able to ascertain certain identifying details relevant to the product's classification as either subject to, or not subject to, an AD and/or CVD proceeding through physical inspection or the relevant sales documentation accompanying the entry summary, and, thus, could not confirm through these means alone whether a particular entry has been properly designated as {subject

---

[440] *See Appleton Papers Inc.*, 929 F. Supp. 2d at 1337 (citing *Tissue Paper from China (Vietnam) Final Determination* IDM at 9-12); *Solar Cells from China Investigation* IDM at 80-81 (finding that a certification regime is necessary and appropriate to prevent evasion of the antidumping and countervailing duty orders on solar cells); *CORE from China (UAE)*, 85 FR at 41957, 41958.

to antidumping or countervailing duties}. In such instances, both CBP and Commerce would rely on the certifications as an additional tool to ascertain whether the entry correctly was filed as an entry type not subject to an AD and/or CVD proceeding.[441]

Commerce went on to note in the Preamble that:

> … enforcement of the AD/CVD laws, including taking steps to prevent evasion and circumvention of AD and CVD orders by producers, exporters, and importers, is well within Commerce's authority and is of paramount importance to Commerce.  The addition of a certification requirement, where necessary based on a given case, strengthens the administration and enforcement of the AD and CVD orders by reducing the possibility that entries may be inaccurately filed by importers.  Given the complex supply chains that may be involved … certifications provide additional assurance that the producer, exporter, and/or importer sought adequate information regarding the relevant product in order to accurately certify a particular entry as not subject to an order.[442]

Revising the certification as suggested by NE Solar by removing statements that the imported/exported merchandise was not manufactured using wafers, and/or certain other materials, produced in China would contravene the purpose of the certification at issue which is to "provide additional assurance that the producer, exporter, and/or importer sought adequate information regarding the relevant product in order to accurately certify a particular entry as not subject to an order."[443]

Lastly, Commerce's certifications do not redefine the scope of the *Orders* or inquiry merchandise.  Rather, the certifications are tools used to enforce the *Orders* and the circumvention determination in this proceeding so as to prevent evasion of such determinations.

### Comment 19. Whether Exporters and Importers Should be Permitted to Submit Multiple Certifications, as Applicable

*BYD HK*[444] and *CSIL*[445]
- Commerce should clarify that exporters and importers eligible to complete both the Appendix IV "Certification for 'Applicable Entries' Under 19 CFR Part 362 Importer Certification" and Appendix VI "Certification Regarding Chinese Components Importer Certification" certifications may file both certifications.
- Commerce's clarification would provide certainty to importers whose imports comply with the conditions of both certifications should *Presidential Proclamation 10414* and/or Commerce's related September 16, 2022 Final Rule be amended or terminated.[446]

---

[441] *See Adoption of CFR 351.228*, 86 FR at 52364.
[442] *Id.*
[443] *Id*.
[444] *See* BYD HK's March 6, 2023 Case Brief at 4-6.
[445] *See* CSIL's March 6, 2023 Case Brief at 3-4.
[446] *See* BYD HK's March 6, 2023 Case Brief (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56868).

- There is no principled basis for Commerce to preclude parties from filing two certifications and clarifying an importer's ability to submit more than one certification would assist in Commerce's administration of the final determination in these inquiries.
- Commerce should amend its certifications and related appendices to allow importers to submit both the Appendix IV "Certification for 'Applicable Entries' Under 19 CFR Part 362 Importer Certification" and Appendix VI "Certification Regarding Chinese Components Importer Certification" certifications to clarify the certification regime, and in turn, promote its administrability.

No other interested party commented on this issue.

**Commerce's Position:**  We confirm that importers and exporters may complete certifications under ***both*** Appendix IV and Appendix VI of the *Preliminary Determination.*  Following the release of the *Preliminary Determinations*, Commerce informed interested parties of the certification requirement[447] and established the following types of certifications to administer *Presidential Proclamation 10414* and the findings from the *Preliminary Determinations*:  (1) importer and exporter certifications that specific entries meet the regulatory definition of "Applicable Entries"; (2) importer and exporter certifications that specific entries are not subject to suspension of liquidation or the collection of cash deposits based on the preliminary negative circumvention determinations (in combination with certain of its wafer exporters); and (3) importer and exporter certifications that specific entries of inquiry merchandise are not subject to suspension of liquidation or the collection of cash deposits pursuant to this preliminary country-wide affirmative determination of circumvention because the merchandise was not manufactured using certain components produced in China.[448]

Copies of the certifications and information regarding the certification requirements were provided in the Appendices to the *Preliminary Determination.*[449]  Appendix IV of the *Preliminary Determinations* related to the certification for "Applicable Entries" under 19 CFR Part 362, whereas Appendix VI relates to the certification regarding Chinese components.  We acknowledge that exporters/importers shipping inquiry merchandise from the four countries subject to the circumvention inquiry (*i.e.*, Cambodia, Malaysia, Thailand, and Vietnam) may qualify under the "Applicable Entries" Appendix IV certification related to the *Presidential Proclamation 10414* and the Chinese components Appendix VI certification.  Thus, exporters/importers may elect to complete both the Appendix IV and Appendix VI certifications.

---

[447] *See Preliminary Determination* 87 FR at 75225.
[448] *See Cambodia* PDM at 23-24.
[449] *See Preliminary Determination* 87 FR at 75227-75231.

**Comment 20. Whether or Not Companies Found Not to Be Circumventing Should Be Required to Certify and to Identify Their Wafer Suppliers**

*Hanwha*[450]

*Commerce Should Not Request Certifications for Companies Found Not to Be Circumventing the Orders*

- The significance of a negative determination of circumvention is that merchandise exported by a respondent found not to be circumventing the orders is not within the scope of the relevant AD/CVD orders.[451]  Yet, contrary to law, Commerce has imposed a certification regime on Hanwha's entries.
- Commerce has the discretion to act to prevent the evasion or circumvention of antidumping duty law.[452]  Commerce may impose measures such as a certification regime if they believe it will be effective in the prevention of future circumvention.[453]
- Hanwha was found not to be circumventing and, thus, Commerce should not require any certification on exports of solar cells and modules produced by Hanwha because they are not subject merchandise.
- Commerce's stated objective is to craft certification language that targets as closely as possible the merchandise that is circumventing the *Orders*.  Imposing a certification requirement on merchandise exported by Hanwha is contrary to this principle.
- Commerce should take reasonable steps to ensure that merchandise from an exporter found not to be circumventing the orders is not subject to suspension of liquidation and ADs/CVDs.[454]
- In prior negative circumvention determinations, Commerce has consistently not adopted any certification requirements.[455]  Therefore, companies for which Commerce reaches a negative determination should be exempt from a certification requirement.
- Commerce may implement a certification requirement under 19 CFR 351.228 if Commerce finds the merchandise subject to the inquiry pursuant to 19 CFR 351.226(m)(1)(iv).  However, neither the statue nor Commerce's regulations require a certification requirement in the event of a negative circumvention determination.
- If Commerce makes a negative determination, it is required to terminate the inquiry and terminate the suspension of liquidation with a refund of any cash deposit.[456]  Therefore, if Commerce makes a negative final circumvention determination, that merchandise must not be included in the *Orders* or subject to duties.
- Because Hanwha is not disclosing its wafer suppliers it is unfairly placed in the same position as the respondents for which Commerce made an affirmative circumvention finding.  This is inconsistent with the statute and Commerce's own regulations, which

---

[450] *See* Hanwha's March 6, 2023 Case Brief at 2-15.
[451] *Id.* (citing 19 CFR 351.226(g)(2)).
[452] *Id.* (citing *Tung Mung CIT*).
[453] *Id.* (citing *Butt-Weld Pipe Fittings from China (Malaysia)*).
[454] *Id.* (citing *Mitsubishi Heavy Industries*).
[455] *Id.* (citing *CORE from China (Guatemala)*; *CORE from China (South Africa)*; *PET Film from the UAE (Bahrain)*; and *Pipe and Tube from India (Oman and UAE)*).
[456] *Id.* (citing section 731(c)(3) of the Act).

86

requires Commerce to terminate the suspension of liquidation in the event of a negative determination in an antidumping investigation.

*Commerce Has Requested Certifications Where Exporters Reported No Shipments but that Situation is Not Analogous to a Negative Determination*

- Commerce has previously imposed certification requirements on companies found to have no shipments in affirmative circumvention determinations. Those scenarios are not the same as a negative circumvention determination.[457]
- In these cases, Commerce found the companies to have no shipments, finding that there are no reviewable entries or no reviewable shipments and not investigating a company's books and records to determine if it is circumventing pursuant to section 781(b) of the Act.
- Conversely, a negative circumvention determination is made after Commerce has analyzed a respondent's information. Hanwha has provided multiple questionnaire responses, thousands of pages of confidential information, and conducted verification of all information needed.
- In *Pipe and Tube from India (Oman and UAE)*, Commerce reached a negative country-wide determination and did not impose any certification requirements.[458] Similar to this, Hanwha was found not to be circumventing, a certification is not required and requiring one is contrary to law.

*If Commerce Continues to Require Certifications for Companies Found Not to Be Circumventing, Commerce Should Modify the Appendix V Certification Requirement and Allow Hanwha to Certify Without Disclosing the Identity of its Wafer Exporters*[459]

- Hanwha objects to the requirement of publicly disclosing the names of its wafer exporters in order to use the certification regime imposed in the *Preliminary Determination*, as it is contrary to Commerce's APO practice and imposes significant harm to Hanwha's business relationships.
- Specifically, 19 CFR 351.105(c)(6) states that Commerce will normally consider the names of particular customers, distributors or suppliers as BPI if so designated by the submitter. Hanwha has properly requested BPI treatment of the names of its unaffiliated suppliers.
- Requiring Hanwha to disclose the identity of its wafer exporters is therefore inconsistent with the APO, and also seems to violate the spirit of the Trade Secrets Act.
- The identity of wafer exporters/suppliers is extremely sensitive for a variety of commercial reasons, making it virtually impossible for Hanwha to comply.
- None of the five statutory factors under section 781(b)(1)(C) of the Act required an examination of the identity of Hanwha's wafer exporters/suppliers, beyond the fact that the wafers were of Chinese origin.

---

[457] *Id.* (citing *Butt-Weld Pipe Fittings from China (Malaysia)*; and *CORE from China (UAE)*).

[458] *Id.* (citing *Pipe and Tube from India (Oman and UAE)*).

[459] Hanwha refers to the wafer exporters (the companies that ship the wafers from China to Malaysia) as wafer suppliers. For our analysis these terms are interchangeable. We note that the Appendix V certification asks for companies to confirm their wafer "exporter."

- Commerce should allow Hanwha to certify that the solar cells and modules are produced in the same general manner as examined in the investigation, without requiring it to trace such exports to a specific wafer supplier.
- The identity of the wafer exporters/suppliers also has no bearing on Commerce's analysis with respect to section 781(b)(1)(D) of the Act.
- In past cases where Commerce has established certification requirements, such as in *CORE from China (UAE)*, respondents were not required to provide the names of their substrate providers. The respondents were simply required to certify that the substrate was not Chinese.
- The identity of an input supplier has never been part of any certification regime in a circumvention inquiry.
- The proposed certification regime does not take into account that Hanwha and others may qualify new wafer suppliers. Hanwha seeks confirmation that it will not be barred from using new wafer suppliers for future shipments, should Commerce continue to require the identification of wafer suppliers.
- If Commerce believes a certification regime is necessary, Commerce should modify the certification language and allow a company who received a negative determination to certify that the subject merchandise was produced by that company using a substantially similar production process, without having to publicly disclose the identity of its wafer suppliers.
- Companies found not to be circumventing should be allowed to certify that cells exported to the U.S. are for use in modules produced by affiliated parties in the U.S. Such a certification would be easy to enforce and administer by CBP and would not be detrimental to the U.S. industry in any way as the cells would be dedicated for consumption by an affiliated supplier to produce U.S. modules.
- While Hanwha's inability to use the Appendix V certification could be mitigated by using the Applicable Entries certification, it is inadequate for a company found not to be circumventing.

*Boviet*[460]
- The inclusion of a specific wafer supplier requirement is unnecessary to prevent circumvention, is unrelated to the reasoning underlying Commerce's negative determination, imposes an unnecessary burden on Boviet, and complicates administrability for CBP.
- Commerce reached a *Preliminary Determination* that Boviet is not circumventing, based on a number of factors, none of which has any connection to the identity of the Chinese exporter supplying Boviet wafers.
- Boviet's wafer supplier was not a part of Commerce's negative determination for Boviet, and as it is not related to Commerce's determination, Commerce should remove this aspect of the certification requirement.
- The wafer supplier restriction unnecessarily complicates Boviet's compliance with and CBP's administration of Commerce's certification. It hinders Boviet's ability to make normal commercial decisions regarding its supply of wafers.

---

[460] *See* Boviet's March 6, 2023 Case Brief at 1-4.

- Boviet requests that Commerce modify the Appendix V certification to exclude the wafer exporter/supplier requirement for the importer in paragraph F(3) and for the exporter in paragraph D(3), if not remove the certification requirement altogether.

*Auxin*[461]

- Commerce should not weaken its certification regime by carving out certain solar producers, exporters, or importers, making certain requested changes, or delaying its implementation.
- Hanwha argues that Commerce should not impose a certification requirement for companies that received a negative circumvention determination, but because of Commerce's preliminary country-wide affirmative circumvention findings, such a certification regime is necessary to give full effect to Commerce's determination.
- Auxin's proposed certification regime as provided in section II of the rebuttal brief, should make certification easy for companies like Hanwha that have been found to not be circumventing.
- Allowing a producer temporary or permanent exemption from the affirmative ruling and its certification requirements because it is not currently relying on Chinese substrate creates the possibility of future circumvention by that producer.[462]
- With respect to *CORE from China (Guatemala)*, *CORE from China (South Africa)*, *PET film from the UAE (Bahrain)*, and *Pipe and Tube from India (UAE)*, these were negative country-wide circumvention determinations, and therefore, Commerce did not institute certification regimes.
- Where a certification requirement is imposed, it must be imposed on a country-wide basis to avoid evasion of the order and circumvention findings.
- Commerce should alter its certification regime by applying rules proposed by Auxin. Adopting these rules would obviate respondents' arguments regarding the need to publicly identify their wafer suppliers, provide flexibility to respondents in qualifying new wafer suppliers, allow respondents to make commercial decisions, and simplifies the records importers are required to maintain.
- Auxin's proposal is better because it:  (1) avoids the need for respondents to publicly identify their wafer suppliers; (2) provides flexibility to respondents so they are not locked into certain wafer suppliers; (3) allows respondents to determine what is best for their commercial interests when securing Chinese inputs; and (4) simplifies the types of records needed to be maintained by importers.

**Commerce's Position:**  We continue to find the certification requirements implemented in the *Preliminary Determinations* to be adequate and appropriate.  For the final determinations, we have made slight modifications regarding the wafer exporter language included in the certifications at Appendix V.

Based on record information, Commerce initiated a country-wide circumvention inquiry to determine whether imports of solar cells and modules exported from, and produced in,

---

[461] *See* Auxin's March 17, 2023 Rebuttal Brief at 17-21.
[462] *Id.* (citing *CRS from China (Vietnam)*).

Cambodia, Malaysia, Thailand, and Vietnam were circumventing the *Orders*.[463]  On December 8, 2022, we preliminarily found that solar cells and modules from Cambodia, Malaysia, Thailand, and Vietnam were circumventing the *Orders* on a country-wide basis.  Under 19 CFR 351.226(m)(1), Commerce is authorized to take the appropriate remedy to address circumvention and prevent evasion of an order, including the application of a determination on a country-wide basis.  Therefore, Commerce applied the affirmative determination of circumvention to all shipments of inquiry merchandise from all four countries on or after April 1, 2022, the date of publication of the *Initiation Notice.*

As stated in the *Preliminary Determination*, we determined that shipments of inquiry merchandise by Hanwha, in combination with certain wafer exporters, completed in Malaysia using certain parts and components manufactured in China are not circumventing the *Orders*.  In order to administer the country-wide affirmative determination of circumvention, and the company-specific negative determinations of circumvention, Commerce established the certification regime.  The certification regime was implemented to ensure that the merchandise from Hanwha using the specific supply-chain that was found to be not circumventing the *Orders*, is not improperly subject to the *Orders*.

Hanwha argues that companies found not to be circumventing the *Orders* should not be required to certify, as the negative determination of circumvention means that the merchandise exported by the respondent is not within the scope of the relevant order.  In previous negative circumvention determinations, Hanwha notes, Commerce has not adopted any certification requirements.[464]  Additionally, Hanwha contends that in accordance with section 735(c)(2) of the Act, Commerce is required to terminate the inquiry following a negative determination, and to terminate the suspension of liquidation.  The CIT has held that Commerce is expected to take reasonable steps to prevent the suspension of liquidation of non-subject merchandise.  According to Hanwha, based on past precedent where Commerce reached a negative determination, Commerce has indicated that importers and exporters are no longer required to certify their products, lifted the suspension of liquidation, and ordered CBP to refund any cash deposits.[465]

As stated above, Commerce is authorized under 19 CFR 351.226(m)(1) to take the appropriate remedy to address circumvention, including the application of the determination on a country-wide basis to all products from the same country as the product at issue.  Accordingly, Commerce initiated these circumvention inquiries on a country-wide basis and reached an affirmative country-wide determination in its *Preliminary Determinations*.  Therefore, we find the facts of the cases cited by Hanwha not to be analogous to these proceedings.  Commerce did not require certifications in *CORE from China (Guatemala)*, *CORE from China (South Africa)*, and *Pipe and Tube from India (UAE and Oman)* because these were negative country-wide determinations.  In *PET Film from UAE (Bahrain)*, the inquiry was initiated on a specific respondent, not on a country-wide basis.  Commerce has repeatedly applied certification requirements in other circumvention inquiries which were subject to an affirmative country-wide

---

[463] *See Initiation Notice.*
[464] *See* Hanwha's March 6, 2023 Case Brief (citing *CORE from China (Guatemala)*; *CORE from China (South Africa)*; *Pipe and Tube from India (UAE)*; and *PET Film from the UAE (Bahrain)*).
[465] *See* Hanwha's March 6, 2023 Case Brief (citing *Shelter Forest*).

decision.[466]  Hanwha also asserted that the facts in *Butt-Weld Pipe Fittings from China (Malaysia)* and *CORE from China (UAE)* were not relevant because the respondents reported no shipments.  However, we find these cases to be relevant, as they were circumvention inquiries initiated on a country-wide basis and found to be affirmative.  The country-wide affirmative decision was what resulted in the need for certifications for importers and exporters.

Given the affirmative country-wide determinations in the instant inquiries, there is no basis for Commerce to terminate the inquiries, and instead, pursuant to section 781(b)(1)(E) of the Act and 19 CFR 351(m)(1)(iv), Commerce deems a certification regime to be necessary and appropriate administer the determinations and prevent evasion of the *Orders* in the future.  The certification regime allows companies found not to be circumventing the *Orders* opportunities to avoid the application of ADs/CVDs.  As such, we find the certification regime to be a reasonable step to prevent the suspension of liquidation of non-subject merchandise.  Thus, requiring Hanwha to complete certification requirements is not equivalent to treating Hanwha as an affirmative company, but a measure to ensure that Hanwha can certify entries that are not subject to the *Orders* as a consequence of the negative determination regarding Hanwha, while also allowing for the continued administration and enforcement of *Orders*.  If Hanwha and other parties are accurately filling out the certifications, they will not be subject to the *Orders*.  The facts of this case do not resemble those of *Shelter Forest* as we reached an affirmative country-wide determination in this case.  In *Shelter Forest*, Commerce made a negative determination and as a result, indicated that respondents no longer needed to certify, lifted the suspension of liquidation, and ordered CBP to refund any cash deposits.[467]  Therefore, we find the facts of *Shelter Forest* to not be relevant.

Hanwha next argues that should Commerce continue to require companies found not to be circumventing, Commerce should modify the Appendix V certification and allow Hanwha to certify without disclosing the identity of its wafer suppliers/exporters.  Specifically, Hanwha notes that requiring it to publicly disclose the names of its wafer suppliers/exporters is contrary to APO practice, and pursuant to 19 CFR 351.105(c)(6), a supplier's identity should be treated as BPI.  Additionally, per Hanwha, the identity of specific wafer suppliers has no bearing on Commerce's analysis under sections 781(b)(1)(C) and 781(b)(1)(D) of the Act.  Boviet further contends that the inclusion of a specific wafer supplier is unnecessary and is unrelated to the reasoning underlying Commerce's determination.

Commerce finds the request to treat the names of wafer exporters/suppliers as BPI within the Appendix V certification to be appropriate and has modified the certification accordingly.  19 CFR 351.105(c)(6) states that Commerce will normally consider the names of particular customers, distributors, or suppliers to be BPI, if so designated by the submitter.  As Hanwha has requested the business proprietary treatment of its unaffiliated wafer suppliers, the regulations state that Commerce will normally treat it as BPI.  Therefore, Commerce has modified the certification under Appendix V to allow the business proprietary treatment of wafer exporters for all respondents found not to be circumventing.  Certifications submitted to CBP as part of an

---

[466] *See Butt-Weld Pipe Fittings from China (Malaysia)*; *CRS from China (Vietnam)*; *CORE from China (Vietnam)*; and *CORE from China (UAE)*.
[467] *See Shelter Forest.*

entry package are not made publicly available, and such information will not be publicly disclosed.

With respect to arguments related to the inclusion of specific wafer exporters in the certification, we continue to find it necessary for the names of specific wafer exporters to still be required on the certification under Appendix V, with the modification for BPI treatment described above. In the *Preliminary Determinations*, and as affirmed in this final determination, we performed an analysis based on the particular supply chains of each mandatory respondent. The *Preliminary Determination* specifically states that we determined that Hanwha's exports of inquiry merchandise produced with wafers exported by the specific parties reported in their questionnaire responses are not subject to the *Orders*. Therefore, the certification under Appendix V is established to provide companies found not to be circumventing on a company-specific basis to certify that their specific supply chain is not subject to the *Orders*. As a result, Commerce continues to require respondents found not to be circumventing to include the names of its wafer exporters in the certification. Our analysis under section 781(b)(2) of the Act is done at an exporter-specific level and the country of origin of the wafer is a critical aspect of our analysis. Because we are permitting parties to certify shipments as not circumventing only if the shipment utilizes the supply chain examined in this inquiry and we are requiring both the exporter and importer to certify this, the exporter may need to disclose their wafer supplier to their importer. Should respondents wish to use new wafer suppliers for future shipments, the certifications under Appendix IV and Appendix VI remain available to all companies found not to be circumventing.

Lastly, Auxin argues that Commerce should alter its certification regime by adopting the rules it proposed. Doing so, according to Auxin, would obviate the need for respondents to publicly identify their wafer suppliers, provide flexibility to respondents in qualifying new wafer suppliers, allow respondents to make commercial decisions, and simplifies the records importers are required to maintain. Commerce has addressed this proposed certification under Comment 24.

Based on the analysis above, Commerce finds the certification regime established at the *Preliminary Determinations* to be appropriate. With respect to the certification listed under Appendix V, Commerce continues to require the names of specific wafer exporters but will allow respondents to treat them as BPI.

## Comment 21. Whether Commerce Should Reconsider Certification Eligibility in Changed Circumstances Reviews

*Vina/LONGi*[468]
- A changed circumstances review is preferable to an administrative review as a proceeding segment in which Commerce could reconsider a company's eligibility to participate in the solar circumvention certification regime.

---

[468] *See* Vina/LONGi's March 6, 2023 Case Brief at 3-6.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

- The Act and Commerce's regulations indicate that administrative reviews are used to determine final liabilities for ADs and CVDs, not to address matters related to circumvention inquiries.[469]
- It would take too long for a company to gain access to the solar circumvention certification regime through an administrative review and the company would need to participate in multiple administrative reviews.
- For example, under *Presidential Proclamation 10414* and Commerce's implementing regulations (which provide that Commerce will instruct CBP to discontinue suspension of liquidation and the collection of cash deposits on "Applicable Entries" of inquiry merchandise on or before June 6, 2024, (the current Date of Termination of *Presidential Proclamation 10414*)), unless a company incorrectly declared that it had a reviewable suspended entry before June 6, 2024, it will not have any reviewable entries until the twelfth administrative review of the *AD Order* (which covers the period December 1, 2023, through November 30, 2024).  The final results of 2023-2024 AD review may not be issued until as late as June 2026.  Meanwhile, the company would not be able to use solar circumvention certifications during the POR of the thirteenth administrative review of the *AD Order* (covering the period December 1, 2024, through November 30, 2025) and would need to request that its shipments/entries during the 2024-2025 POR be reviewed.  The final results of that review may not be issued until as late as June 2027.
- Moreover, if a company in an inquiry country requested an administrative review and was selected as a mandatory respondent, it would be a waste of resources to conduct a complete analysis of the company's exports/entries when the reason the company requested the review was to establish its eligibility to certify that its solar cells and/or solar modules are not inquiry merchandise subject to review.
- In contrast, in changed circumstances reviews Commerce does not need to issue a questionnaire,[470] or conduct the full analysis performed for mandatory respondents but may focus on the precise reason the company was determined to be ineligible to participate in the solar circumvention certification regime.
- In a changed circumstances review a company could be given the opportunity to establish its eligibility to participate in the solar circumvention certification regime by demonstrating that it is able to trace the components in solar cells or modules to the country in which the wafer and other significant material inputs were produced and thus satisfy the certification requirements.
- Thus, Commerce can address a "change" in its determination that a company was not eligible to participate in the solar circumvention certification regime in a changed circumstances review.  Commerce followed this approach in *OCTG from China CCR*.[471]
- Commerce should consider examining certification eligibility in changed circumstances reviews as an alternative to reviewing such eligibility in administrative reviews.

No other interested party commented on this issue.

---

[469] *Id.* (citing section 751(a)(A)-(B) of the Act).
[470] *Id.* at 5 (citing 19 CFR 351.221(c)(3)(iii)).
[471] *Id.* at (citing *OCTG from China CCR*, 87 FR at 15915).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

**Commerce's Position:** We disagree with Vina/LONGi's position that Commerce should reconsider a company's ineligibility to participate in the solar circumvention certification regime in changed circumstances reviews. Rather, Commerce will consider requests for eligibility to participate in the solar circumvention certification regime in administrative reviews.

Section 751(b)(1) of the Act provides that "{w}henever {Commerce} receives information concerning, or a request from an interested party for a review of {a final determination, suspension agreement, or continued investigation} which shows changed circumstances sufficient to warrant a review of such determination or agreement, {Commerce} shall conduct a review of the determination or agreement …" The phrase "changed circumstances" is not defined in the Act, the SAA, or Commerce's regulations and none of those primary and secondary sources contain an explanation of what aspects of a determination may be reconsidered in light of changed circumstances. While Commerce has broad discretion in determining whether to initiate a changed circumstances review and in deciding the range of matters that can be considered in such a proceeding, its discretion is limited by the statutory requirement that there be "changed circumstances sufficient to warrant a review" of the antidumping order.[472] In practice, Commerce has conducted changed circumstances reviews to address a wide variety of issues, some of which could also be addressed in the context of an administrative review.[473] Commerce's practice is to determine, on a case-by-case basis, whether changed circumstances sufficient to warrant a review exist.[474]

Here, Vina/LONGi failed to identify any circumstance that has changed. Rather, Vina/LONGi argued that "… a changed circumstances review can address a "change" in Commerce's determination that a company was not eligible to participate in its certification program." However, the circumstance that led Commerce to prohibit importers/exporters from certifying as to the non-Chinese content in inquiry merchandise from certain companies[475] is the fact that those companies did not cooperate in the circumvention inquiry (they either failed to respond to Commerce's quantity and value questionnaire or failed to permit Commerce to verify their questionnaire responses). The fact that these companies did not cooperate in the inquiry has not changed. Without any changed circumstances, we find no basis for conducting a changed circumstances review.

In contrast, in *OCTG from China CCR*, the case cited by Vina/LONGi to support its position, there was a change in the facts underlying Commerce's determination. Specifically, in the underlying circumvention inquiry, Commerce did not implement certifications "because the HLD companies were "unable to track welded OCTG to the country of origin of inputs used in

---

[472] *See* 751(b)(1) of the Act.
[473] *See, e.g.,* *Aluminum Extrusions from China Preliminary CCR*, 83 FR at 34548 (finding sufficient information to initiate a changed circumstances review to recalculate certain cash deposit rates); *see also Nails from Malaysia CCR Initiation*, 80 FR at 71772 (finding sufficient information and "good cause" to initiate a changed circumstances review to evaluate whether a company was properly utilizing the correct cash deposit rate); and *Pure Magnesium from Canada CCR Initiation*, 57 FR at 41473 (finding sufficient information and "good cause" to initiate a changed circumstances review to evaluate changes to the major subsidy program at issue in the underlying investigation).
[474] *See Tapered Roller Bearings from China*, 67 FR at 10665.
[475] Commerce did not prohibit exporters or importers from certifying that an entry was an "Applicable Entry" under 19 CFR 362.102.

the production of welded OCTG …"[476]  In the related changed circumstances review Commerce found that there was a change in circumstances because "the HLD companies are now able to identify and effectively segregate welded OCTG produced by either HLDS (B) in Brunei or HLD Clark in the Philippines using non-Chinese hot-rolled steel from other OCTG produced at their facilities."[477]  We do not have this fact pattern in this circumvention inquiry, and *OCTG from China CCR* did not involve or address companies that failed to cooperate in the earlier circumvention inquiry.

Our approach is consistent with *Plywood from China (Vietnam)* where Commerce stated that "we decline to reconsider eligibility for the certification programs established by these circumvention inquiries in the context of a CCR and instead, determine that the appropriate mechanism by which to assess previously ineligible exporters' eligibility for the certification programs for purposes of this proceeding is in the ongoing ARs of the *Orders*."[478]  In that case, Commerce explained that in contrast to other cases where companies subsequently claimed that they had changed the methods by which they tracked their raw materials, and Commerce conducted CCRs to verify these new facts, "companies always had the ability to participate or to provide accurate data, and we do not see this as a change in the future."[479]

Vina/LONGi contends that it is preferable for Commerce to consider a company's eligibility to participate in the solar circumvention certification regime in a changed circumstance review, rather than an administrative review for a number of reasons.  Specifically, Vina/LONGi contends that the purpose of an administrative review is to determine final liabilities for ADs and CVDs, not to address matters related to circumvention inquiries. Moreover, Vina/LONGi maintains that it would take too long and require multiple reviews to gain access to the certification regime, and it could lead to significant and unnecessary work and analysis (*e.g.*, a party simply seeking access to the certification regime may have to file a separate rate application and could be selected as a mandatory respondent).  We have responded to those concerns below.

First, Commerce must determine if entries of solar cells or modules are inquiry merchandise or not, and how to assess duties on merchandise deemed subject to these circumvention inquiries. Certifications are relevant to that decision because whether or not importers and exporters have met the certification requirements affects whether or not AD/CVDs will be assessed on the entries.  Because the Act directs Commerce to determine final assessment rates in administrative reviews, we find that considering certification eligibility in administrative reviews is consistent with the purpose of that proceeding segment as provided in the Act.

Second, we do not find that our decision to reconsider certification eligibility in an administrative review places importers or exporters of inquiry merchandise from AFA companies in a different position, in terms of timing or requesting multiple reviews, than if they were to import or export subject merchandise from a company that currently has a dumping margin based on AFA.  In both cases, parties would need to wait until the anniversary month of the

---

[476] *See OCTG from China CCR*, 87 FR at 15915.

[477] *Id.*, 87 FR at 15916.

[478] *See Plywood from China (Vietnam) Final* IDM at Comment 13.

[479] *Id.*

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

AD/CVD order to request an administrative review and then would need to wait until the final results of that review were published before, depending on the outcome of the review, entries may no longer be subject to an AFA rate.  Exporters/producers seeking reconsideration with respect to certification eligibility would face a similar timeline before certifications could be used.

Moreover, Commerce did not prohibit importers/exporters from certifying that entries of inquiry merchandise from AFA companies are "Applicable Entries" under 19 CFR 362.102.[480]  Thus, importers and exporters of inquiry merchandise from AFA companies may currently participate in that part of the certification regime and do not need to wait for an administrative review. Furthermore, in the *Preliminary Determination*, which was issued on December 1, 2022, Commerce noted that:

> If it is determined that an importer and/or exporter has not met the certification and/or related documentation requirements for certain entries, Commerce intends to instruct CBP to suspend, pursuant to these preliminary country-wide affirmative determinations of circumvention and the *Orders*, all unliquidated entries for which these requirements were not met and require the importer to post applicable AD and CVD cash deposits equal to the rates noted above.[481]

> Interested parties that wish to have their suspended non-"Applicable Entries," if any, reviewed, and their ineligibility for the certification program re-evaluated, should request an administrative review of the relevant suspended entries during the next anniversary month of these *Orders* (*i.e.*, December 2022 for the *Solar Cells AD Order* and December 2023 for the *Solar Cells CVD Order*).[482]

As indicated above, Vina/LONGi claims that unless a company incorrectly declared that it had a reviewable suspended entry before June 6, 2024, it will not have any reviewable suspended entries until the 12th administrative review of the *AD Order* (which covers the period December 1, 2023, through November 30, 2024) and could not request an administrative review until December 2024.  Under section 751(a) of the Act, Commerce does not conduct an administrative review of an exporter/producer absent a suspended entry of subject merchandise from that exporter/producer.[483]  However, a U.S. entry of inquiry merchandise made prior to the date of termination of the Proclamation (currently June 6, 2024), that does not meet the "Applicable Entries" certification requirements, could be suspended by CBP.  Specifically, 19 CFR 362.103(b)(iii) provides that "{i}n the event of an affirmative preliminary or final determination of circumvention in the Solar Circumvention Inquiries, the Secretary will direct CBP to suspend liquidation of entries of, and collect cash deposits of estimated duties on, imports of Southeast Asian-Completed Cells and Modules that are not Applicable Entries."  Commerce has so directed

---

[480] *See Preliminary Determinations*, 87 FR at 75221, 75223.  "Applicable Entries" are not subject to suspension of liquidation or the collection of ADs or CVDs.
[481] *See Preliminary Determinations*, 87 FR at 75221, 75225.
[482] *Id*., 87 FR at 75223.
[483] *See Shanghai Sunbeauty Trading Co.*, 380 F. Supp. 3d. 1328 (CIT 2019) (affirming Commerce's decision not to conduct a review absent a suspended entry).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

CBP.[484]  Therefore, an AFA company could have a reviewable suspended entry before the AD administrative review covering the period December 1, 2023, through November 30, 2024.

Furthermore, as explained above, if such a company's inquiry merchandise was entered into the United States as an "Applicable Entry" before the date of termination of the Proclamation, such an entry will not be subject to ADs or CVDs.  In other words, "Applicable Entries" of Vina/LONGi's inquiry merchandise prior to June 2024 are not treated any differently in a substantive way than if the company had been able to participate in the components portion of the certification program.

Lastly, as noted above, Vina/LONGi expressed concerns that if a party requests an administrative review of an AFA company for Commerce to reconsider certification ineligibility, the AFA company could be selected as a mandatory respondent or need to unnecessarily complete a separate rate application.  In such cases, the requestor should note in the request for an administrative review that it believes that all the imported merchandise from the AFA company would meet the certification requirements and it is seeking a review in order for Commerce to reconsider the exporters/producer's eligibility to certify to that fact.  Commerce could then establish segment-specific procedures in the administrative review for addressing such situations.

In sum, neither the facts in this case, nor Vina/LONGi's arguments, provide a basis for reconsidering certification ineligibility for AFA companies in a changed circumstances review. As noted in the *Preliminary Determination*, "{i}nterested parties that wish to have their … ineligibility for the certification program re-evaluated, should request an administrative review of the relevant suspended entries during the next anniversary month of these *Orders*."[485]

## Comment 22. Whether Cadmium Telluride Thin Film Solar Products are Covered by Affirmative Final Determinations or Related Certification Requirements

*First Solar Malaysia*[486] and *First Solar Vietnam*[487]
- Commerce did not include CdTe thin film photovoltaic products in its definition of inquiry merchandise.
- Because CdTe thin film photovoltaic products were excluded from the definition of inquiry merchandise and are explicitly excluded from the *Orders* scope language, the circumvention inquiries do not cover CdTe thin film photovoltaic products.
- The ITC intentionally excluded CdTe thin film products from its injury analysis in the underlying affirmative final material injury determinations.[488]
- Given the ITC's intentional exclusion of CdTe products, Commerce cannot lawfully include CdTe thin film products in its circumvention inquiries.[489]

---

[484] *See* CBP Messages Memorandum atmsg. no. 3041408 at paragraphs 5, 9, and 12b.
[485] *See Preliminary Determinations*, 87 FR at 75221, 75223.
[486] *See* First Solar Malaysia's March 6, 2023 Case Brief at 2-6.
[487] *See* First Solar Vietnam's March 6, 2023 Case Brief at 2-6.
[488] *See* First Solar Malaysia's March 6, 2023 Case Brief at 3 (citing *ITC Solar Final* at Attachment 37-A.).
[489] *Id.* (citing *Wheatland*, 161 F.3d at 1371).

- Auxin limited its request for circumvention inquiries to CSPV products and Commerce initiated on that request stating that the class or kind of circumventing merchandise is identical to the CSPV products completed in China that are subject to the *Orders*.[490]
- The certification requirements in the *Preliminary Determination* do not apply to CdTe thin film products.  The three certifications created by Commerce are instead meant to cover CSPV cells or modules.
- The *Preliminary Determination* and its certification requirements do not pertain to CdTe thin film products.  However, given the language of the certifications, it is possible for mistakes to occur, such as a misinterpretation of the term "solar cells and/or solar modules."
- Commerce should take steps to minimize the risk that any affirmative final determination and related certification requirements would be misinterpreted to extend beyond certain CSPV products.
- Should Commerce continue using terms such as "solar cells and modules" or "solar cells and/or solar modules", Commerce should clearly define such terms upon first use to indicate that the terms only pertain to CSPV products.[491]

No other interested party commented on this issue.

**Commerce's Position:**  We confirm that the final affirmative determinations and the related certification requirements apply only to CSPV cells and modules but disagree with First Solar Malaysia and First Solar Vietnam that an affirmative determination of circumvention could be inadvertently applied to non-CSPV products.  As described in the *Preliminary Determinations*, the scope of the *Orders* explicitly exclude "thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide."[492]  When discussing the merchandise subject to the circumvention inquiry, the *Cambodia* PDM and accompanying *Federal Register* notice described that "{t}his circumvention inquiry covers, "crystalline silicon photovoltaic cells that meet the physical description of crystalline silicon photovoltaic cells in the scope of the underlying AD/CVD orders, subject to the exclusions therein, whether or not partially or fully assembled into other products, that were produced in {Cambodia, Malaysia, Thailand, and Vietnam} from wafers produced in China."[493]  Therefore, CdTe thin film solar products are not covered by the final affirmative determinations and the related certification requirements.  Given the exclusionary language referenced within the scope of the *Orders*, we find it unnecessary to update the language included in the certifications.

**Comment 23. Clarification and Enforcement of the Utilization Requirement**

To qualify to enter inquiry merchandise under *Presidential Proclamation 10414* without regard to ADs and CVDs inquiry merchandise imported into the United States after November 15, 2022, but on or before the Date of Termination of the proclamation, must be used or installed in the

---

[490] *Id.* (citing Initiation Memorandum at 6).
[491] *See* First Solar Malaysia's March 6, 2023 Case Brief at 6.
[492] *See Cambodia* PDM at 5.
[493] *Id.* at 7.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

United States by no later than 180 days after the Date of Termination of the proclamation (the Utilization Expiration Date).[494]

*Auxin*[495]

- Commerce and CBP cannot administer or enforce the use provision in Part 362 of the regulations because:  (1) the Utilization Expiration Date is unknown at the time of importation (the *Presidential Proclamation 10414* can be terminated before the stipulated June 6, 2024, date); (2) the definition of "utilization and utilized" is too vague; and (3) no enforcement mechanism has been provided (CBP possesses limited means to track how inquiry merchandise is used once it is entered into the United States).  These deficiencies in the regulation create an enormous loophole through which parties can enter inquiry merchandise without regard to AD and CVDs.[496]
- Commerce could redress these deficiencies by implementing the provisions under 19 CFR 358, which include, among other things, use of importer- or exporter-specific duty waiver requests that contain detailed information related to intended uses of the imported product and other relevant information.  19 CFR 358 also includes an enforcement mechanism to address abuses and violations that could include seizures and other penalties.[497]
- Commerce should not consider the resale of inquiry merchandise to an unaffiliated U.S. customer who commits to use the merchandise within 180 days of the Date of Termination of the *Presidential Proclamation 10414*, as use.  Commerce specifically stated in 19 CFR 362.102 that resales do not constitute use for this provision.  Additionally, it is not clear how Commerce or CBP could confirm that the purchaser honored its commitment.[498]

*TTL*[499]

- Commerce must provide guidance on how to comply with the use requirement in 19 CFR 362 because the requirement could be interpreted in multiple ways.
- Principally, Commerce must confirm that reselling inquiry merchandise to another party does not automatically mean that the use requirement is not met.  Because most importers of solar modules do not use the solar modules but sell them to other parties, this interpretation must be correct because to interpret the use requirement otherwise would mean that the requirement limits the precise activity that *Presidential Proclamation 10414* was intended to permit (it was intended to allow sufficient U.S. imports of solar modules from the inquiry countries).
- Even if U.S. resale is permissible, but insufficient to demonstrate use, under 19 CFR 362, further clarification is required regarding how parties engaged in resales can comply with the use requirement.

---

[494] *See* 19 CFR 362.102.
[495] *See* Auxin's March 6, 2023 Case Brief at 24-26; *see also* Auxin's March 17, 2023 Rebuttal Brief at 31.
[496] *Id.* (citing CBP Messages Memorandum at msg. no. 3041408).
[497] *See* Auxin's March 6, 2023 Case Brief at 25-26 (citing *Procedures for Importation of Supplies for Use in Emergency Relief Work*, 71 FR 63230).
[498] *See* Auxin's March 17, 2023 Rebuttal Brief at 32 (citing *Preliminary Determinations*, 87 FR 75223).
[499] *See* TTL's March 6, 2023 Case Brief at 8-13.

99

- The majority of parties who import solar modules do not install the solar modules that they import, but resell them directly, or indirectly, to other parties in diverse distribution networks that include utility developers, distributors, contractors, subcontractors, and residential and commercial installers.  It is unreasonable, and would be an unprecedented burden, to require the companies, most of which do not have access to entry documents, to maintain records for at least five years that allow them to track the installation dates for specific solar modules and link those dates to specific entries of solar modules.  This is an unnecessary burden and cost, especially considering the limited possibility that distributors and contractors would stockpile solar modules.

- Thus, Commerce must clarify that the use requirement in 19 CFR 362 is met if evidence is maintained that shows:  (1) solar modules sold to utility developers were sold for a specific project; (2) the unaffiliated purchaser committed, either by contract or certification, to install the purchased solar modules within 180 days after the Date of Termination of the *Presidential Proclamation 10414*; or (3) imported solar cells were incorporated in a solar module in the United States within 180 days after the Date of Termination.

*BYD HK*[500]

- Commerce must clarify that the use requirement of 19 CFR 362 is met if the inquiry merchandise is used or installed in the United States within 180 days after the Date of Termination of *Presidential Proclamation 10414*, even if another entity takes ownership of the merchandise and is responsible for its use or installation.

*NextEra*[501]

- Auxin's arguments regarding administration of the use requirement in 19 CFR 362 are unpersuasive.

- Contrary to Auxin's claim, the Utilization Expiration Date is known because it is specified in 19 CFR 362 as 180 days after the Date of Termination of *Presidential Proclamation 10414*.  In the unlikely event that *Presidential Proclamation 10414* is terminated before the currently specified termination date, provisions could be made at the time to address Auxin's concerns.

- While Auxin claims that the definition of "utilization and utilized" is too vague, those terms are clearly defined in 19 CFR 362 as "used or installed in the United States." However, Commerce should clarify that "used" includes solar modules that are dedicated to a particular project or delivered to a project site by the utilization expiration date.

- Although Auxin contends that Commerce did not provide any mechanism for enforcing the provisions of 19 CFR 362, Commerce followed its practice by requiring certifications for entries that purportedly qualify for duty free treatment under *Presidential Proclamation 10414*.  In those certifications, importers and exporters must certify to various facts regarding the relevant entries and acknowledge that they are "aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make materially false statements to the U.S.

---

[500] *See* BYD HK's March 6, 2023 Case Brief at 4.
[501] *See* NextEra's March 17, 2023 Rebuttal Brief at 19-23.

government.”[502]  This passage provides an adequate deterrence against parties submitting fraudulent certifications.

- Part 358 of the regulations contains nothing to improve enforcement of *Presidential Proclamation 10414* and Commerce specifically noted in 19 CFR 362.103(a) that “Part 358 of this chapter shall not apply to {duty free imports under Part 362}.”[503]

**Commerce's Position:**  Interested parties have raised concerns and certain questions regarding the use requirement in 19 CFR Part 362.  We have addressed those concerns and questions below.

The waiver of ADs and CVDs and estimated duties pursuant to 19 CFR Part 362 only applies to certain Southeast Asian-Completed solar cells and modules that are entered into the United States, or withdrawn from warehouse, for consumption before the termination of *Presidential Proclamation 10414*, and, for entries after November 15, 2022, are used in the United States by no later than 180 days after termination of the emergency described in *Presidential Proclamation 10414* (the Utilization Expiration Date).  In the Preamble to 19 CFR Part 362, Commerce also used the word “utilized” when it noted that the duty waiver provided by this part of the regulations applies only to Southeast Asian-Completed solar cells and modules entered into the United States after November 15, 2022, “that are utilized in the United States by the Utilization Expiration Date.”  Under 19 CFR 362.102, Commerce defines “utilized and “utilization” as follows:

> Utilization and utilized means the Southeast Asian-Completed Cells and Modules will be used or installed in the United States. Merchandise which remains in inventory or a warehouse in the United States, is resold to another party, is subsequently exported, or is destroyed after importation is not considered utilized for purposes of these provisions.

“Used” means the solar cells or solar modules are in operation or functioning in the United States by the Utilization Expiration Date.  “Installed” means the solar cells or solar modules have been affixed to the structure or in the system in the United States on which, or in which, they will operate by the Utilization Expiration Date, but they are not in operation by that date.  The mere sale of solar modules to a party for a specific project, incorporating solar cells into a solar module in the United States, dedicating solar cells or solar modules to a particular project, or delivering solar cells or solar modules to a project site do not constitute being “used” or “installed.”  Additionally, as noted in 19 CFR 362.102, “{m}erchandise which remains in inventory or a warehouse in the United States, is resold to another party, is subsequently exported, or is destroyed after importation is not considered utilized for purposes of these provisions.”

The use requirement in 19 CFR Part 362 was added because this part of the regulations was “not intended to benefit those who would stockpile {Southeast Asian}-Completed Cells and Modules for an extended period of time … .  It is not Commerce's goal to have merchandise that enters

---

[502] *See* NextEra's March 17, 2023 Rebuttal Brief at 22 (citing *Preliminary Determinations*, 87 FR 75228-29).
[503] *Id.* at 20.

before the Date of Termination be used in projects long into the future, as the emergency declared by the President exists at this very moment."[504]

The act of reselling solar cells or solar modules to another party who will use or install the merchandise does not, in itself, mean that the use requirement in 19 CFR Part 362 cannot be met. However, in order for an importer who sells the solar cells or solar modules that it imported to accurately certify that the solar cells and/or solar modules will be utilized in the United States by no later than 180 days after the earlier of June 6, 2024, or the date the emergency described in *Presidential Proclamation 10414* is terminated, the importer must have knowledge of, and documentation supporting, this fact. TTL has argued that a commitment by a purchaser, either by contract or certification, to install the purchased solar modules within 180 days after the Date of Termination of the *Presidential Proclamation 10414*, should satisfy this documentation requirement. However, the documentation that must be maintained is documentation that supports the actual use or installation of the solar cells or solar module by the Date of Termination and that will allow the party completing the certification to certify to the use or installation by that date. Parties that falsify such certifications will be in violation of U.S. law (including, but not limited to, 18 USC section 1001) that imposes criminal sanctions on individuals who knowingly and willfully make materially false statements to the U.S. government. Given the range of companies that could be involved in the transaction chain between the importer of the solar cells and solar modules and the ultimate end-user of those solar cells and solar modules and the potential complexity of the supply chain, we find that it is not feasible for Commerce to list specific types of supporting documentation.

We disagree with Auxin's claim that the use provision in Part 362 of the regulations cannot be administered because the Date of Termination of *Presidential Proclamation 10414* could change and thus the Utilization Expiration Date is unknown at the time of importation. The Date of Termination is not a constantly changing date but is presently a fixed date, June 6, 2024, that has been publicly announced and thus is known to importers. In the Preamble to Part 362 of the regulations, Commerce noted that in setting a suspension of liquidation and collection of cash deposit date upon early termination of the Presidential Proclamation, it would "consider the implementation and direction of the President in terminating the emergency."[505] Similarly, if *Presidential Proclamation 10414* is terminated early, at that time, Commerce will "consider the implementation and direction of the President in terminating the emergency" when determining what additional guidance, if any, should be provided regarding the impact of such an early termination on other provisions and requirements in Part 362 of the regulations.

We also disagree with Auxin's claim that no enforcement mechanism has been provided with respect to the use requirement. U.S. law (including, but not limited to, 18 U.S.C. section 1001) imposes criminal sanctions on individuals who knowingly and willfully make materially false statements to the U.S. government, including fines and imprisonment for not more than 5 years. Moreover, 19 USC section 1592 provides civil penalties for fraud, gross negligence, and negligence. Thus, there are enforcement mechanisms in place and significant consequences for parties who falsely certify that the use requirement will be met.

---

[504] *See Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56879.
[505] *Id.*, 87 FR at 56880.

102

Additionally, Commerce informed certifying parties that they must maintain sufficient documentation supporting the facts to which the party certified for the later of five years after the last entry covered by the certification or three years after the conclusion of any litigation in United States courts regarding such entries.[506]  Commerce also informed certifying parties that they are required to provide CBP and/or Commerce with any documents supporting the certification upon the request of either agency and that the claims made in the certification are subject to verification by CBP and/or Commerce.[507]  In addition, Commerce informed certifying parties that failure to maintain the required certifications and supporting documentation, failure to substantiate the claims made in the certifications, or not allowing CBP and/or Commerce to verify the claims made in the certifications, may result in suspension of liquidation of all unliquidated entries for which the requirements were not met, the importer being required to post antidumping duty and countervailing duty cash deposits on those entries, and the importer being precluded from participating in the certification process.[508]  These certification provisions mirror Commerce's regulations at 19 CFR 351.228, which provide that Commerce may instruct CBP to suspend liquidation of entries and required cash deposits of estimated ADs or CVDs where, among other things, "the certification contained materially false, fictitious or fraudulent statements or representations, or contained material omissions."  Therefore, contrary to Auxin's claim, Commerce clearly explained the requirements that must be fulfilled to ensure compliance with the certification regime, including the end use provision, and the consequences of not meeting those requirements.  Hence, Commerce has instituted enforcement mechanisms with respect to the certifications.

While Auxin contends that CBP possesses limited means to track how inquiry merchandise is used once it is entered into the United States, it is incumbent on importers and exporters to maintain sufficient documentation to substantiate their claims in the certifications, including their claims regarding the use requirement.  Moreover, CBP has experience administering similar certifications, namely end-use certifications, in other proceedings,[509] and experience in this proceeding where importers and exporters must track the source of the solar cells used in solar modules imported into the United States in order to certify that the solar cells were not produced in China.

Finally, we disagree with Auxin that provisions in 19 CFR Part 358 should be applied here.  As an initial matter, according to 19 CFR 362.103(a), "Part 358 of this chapter shall not apply to {the importation of Applicable Entries}."  In addition, as Commerce explained in the Preamble to Part 362 of its regulations, "{t}he purpose of the {Presidential} Proclamation is to increase the supply of United States solar energy for electricity generation purposes… and "to allow for more imports …"[510] Part 358 of the regulations, which covers the importation of supplies used for emergency relief work free of AD/CVDs, requires that a party mail an advance request, in triplicate, to the Secretary of Commerce in which the party asks for approval to import the

---

[506] See Preliminary Determinations, 87 FR at, e.g., Appendix VI.
[507] Id.
[508] Id.
[509] See Wire Rod from Korea and United Kingdom CCR, 84 FR 13888 ("Consequently, we are changing the scope of the orders on wire rod from Korea and the United Kingdom by adding exclusion language related to grade 1078 and higher tire cord quality wire rod and requiring that a certification of end-use be filed with CBP at the time of the filing of the Entry Summary with CBP as provided in the Attachment to this notice.")
[510] See Presidential Proclamation 10414 Final Rule Preamble, 87 FR at 56878.

merchandise free of AD/CVDs, and supplies detailed information about the shipment such as the price, quantity, proposed date of entry, mode used to transport, the destination, and the intended uses of, the imported merchandise and other relevant information, much of which does not relate to the date of use.  Part 358 of the regulations also includes an enforcement mechanism to address abuses and violations of Section 318(a) of the Act that could include seizures and other penalties.[511]  Requirements such as these, including the need for Commerce to specifically approve the importation of solar cells/solar modules free of AD/CVDs for each and every entry, could reduce, rather than increase, the supply of United States solar energy for electricity generation purposes and thus is not in keeping with the purpose of *Presidential Proclamation 10414* .  Moreover, Commerce typically requires CBP to suspend liquidation and collect AD/CVD cash deposits for entries where the certification requirement was not met, rather than seizing the imported merchandise.  Therefore, we have not implemented the requirements of Part 358 of the regulations in this case.

## Comment 24. Whether the "Wafer-Plus-Three" Requirement is Appropriate

In the *Preliminary Determination*, Commerce stated that a solar module produced in one of the inquiry countries would be subject to its affirmative circumvention determination only if the solar module contains solar cells produced from Chinese-produced wafers and three or more of the following components in the module were produced in China:  (1) silver paste; (2) aluminum frames; (3) glass; (4) backsheets; (5) ethylene vinyl acetate sheets; and (6) junction boxes. Below we have referred to this prerequisite as the "Wafer-Plus-Three" requirement.

*Auxin*[512]
- Commerce's "Wafer-Plus-Three" requirement is arbitrary, inconsistent with how it has applied the *Orders* in the past, and allows companies to use a high percentage of Chinese components and not be covered by Commerce's affirmative circumvention determination.
- Commerce arbitrarily selected the six components used and the four non-Chinese component rule in its requirement without any explanation.
- Commerce previously determined that if a solar module contains subject solar cells, it is subject to the *Orders*, regardless of the country where the solar module was produced. Commerce should follow that rule here.  Because Commerce reached an affirmative circumvention determination that solar cells produced in Cambodia, Malaysia, Thailand, or Vietnam from Chinese-produced wafers are covered by the scope of the *Orders*, solar modules produced from those solar cells must be subject to the *Orders* irrespective of Commerce's "Wafer-Plus-Three" requirement.
- The "Wafer-Plus-Three" requirement provides an inexpensive path for companies to continue to evade the *Orders* by continuing to heavily rely on Chinese-produced components while sourcing the four least expensive components outside of China.[513]
- Commerce should discard its "Wafer-Plus-Three" requirement and determine that a solar module produced in a third country that contains in-scope solar cells is also in scope. Alternatively, Commerce should determine that only solar modules where at least 50

---

[511] *See generally* 19 CFR 358.103.
[512] *See* Auxin's March 6, 2023 Case Brief at 9-17; *see also* Auxin's March 17, 2023 Rebuttal Brief at 5-6.
[513] *Id.* at 15 (citing the *Preliminary Determination* calculations for all four determinations).

percent of the value of the solar module comes from components produced outside of China are not subject to Commerce's affirmative circumvention determination.

- A percentage of value test is administrable (companies maintain the records required by CBP) and has been used before (*e.g.*, the United States-Mexico-Canada Agreement).
- Moreover, a percentage of value test benefits exporters/producers because: (1) there is no need for them to use certain wafer suppliers or publicly identify their wafer supplier; (2) it provides them with the flexibility to determine which inputs they will obtain from inside, or outside, of China; and (3) it simplifies the types of records that importers must maintain.

*BYD HK*,[514] *CSIL*,[515] *Jinko*,[516] *NextEra*,[517] *Risen*,[518] and *TTL*[519]

- Contrary to Auxin's claim, Commerce did not arbitrarily select the six components that it used in the Wafer-Plus-Three requirement.  Rather, Commerce selected these components because it knows, based on information in this segment of the proceeding (including Auxin identifying these components as the "most important and significant" factors of production) and its experience in other segments of the proceeding, that these are the most significant components used to produce solar modules.[520]
- By requiring at least four of the six components to be sourced from outside China, Commerce's "Wafer-Plus-Three" requirement ensures that a substantial portion of value of the module is added in the inquiry country.
- Based on the scope of the *Orders*, modules produced in a third-country from solar cells produced in China (subject solar cells) are covered by the *Orders* (*i.e.*, solar modules with subject solar cells are covered by the *Orders*).  Meanwhile solar modules not containing subject solar cells are not covered by the *Orders*.  Commerce's "Wafer-Plus-Three" requirement is consistent with this principle because Commerce indicated that the solar cells in a solar module that meets the "Wafer-Plus-Three" requirement are not covered by the circumvention inquiry and the solar module is also not covered by the circumvention inquiry (the solar cells are not in-scope merchandise and the solar module is not in-scope merchandise).
- Auxin has made contradictory arguments.  On the one hand, Auxin requested a circumvention inquiry, which resulted in Commerce ignoring the scope of the *Orders* that requires subject solar modules to contain Chinese produced subject solar cells (subject solar cells).  Subsequent to Commerce's finding that solar cells produced in Southeast Asian countries from Chinese wafers are "subject solar cells," Auxin argues that Commerce must return to the "subject solar cell requirement" in the scope of the *Orders* and find that all modules, irrespective of where they are manufactured and the other components that they contain, are subject merchandise if they contain Southeast Asian produced "subject solar cells."

[514] *See* BYD HK's March 17, 2023 Rebuttal Brief at 7-13.

[515] *See* CSIL's March 17, 2023 Rebuttal Brief at 10-14.

[516] *See* Jinko's March 17, 2023 Rebuttal Brief at 5-13.

[517] *See* NextEra's March 17, 2023 Rebuttal Brief at 6-11.

[518] *See* Risen's March 17, 2023 Rebuttal Brief at 2-3.

[519] *See* TTL's March 17, 2023 Rebuttal Brief at 6-10.

[520] *See* Risen's March 17, 2023 Rebuttal Brief at 2; *see also* NextEra's March 17, 2023 Rebuttal Brief at 8-9.

- Auxin's argument that solar modules containing solar cells with Chinese-produced wafers should be subject to Commerce's affirmative circumvention determination, regardless of the other components that they contain, contradicts its own allegation that companies are circumventing the *Orders* by using various Chinese components to produce solar modules in the inquiry countries.  Moreover, Auxin's argument is inconsistent with Commerce's approach in this inquiry of examining the module production process to determine whether parties selling modules to the United States that were produced in an inquiry county are circumventing the *Orders*, rather than making that determination based on the solar cells in the solar module.[521]

- Auxin's percentage of value test should be rejected because Auxin arbitrarily determined the 50 percent requirement.[522]  There is no precedent, or basis in the Act or Commerce's regulations, for using such a test, which would require Commerce to speculate as to future values of solar module components and use a yet undetermined certification.[523]

- Moreover, Auxin failed to consider that significant swings in market prices could skew the test and dramatic changes in surrogate values may mean that the actual value added in the third country is not properly reflected by the test.[524]

- Auxin's percentage of value test is also contrary to Commerce's practice of conducting a qualitative, rather than a quantitative (*e.g.*, a value added) analysis of third-country processing.[525]

- Auxin's percentage of value test means that even if as much as 49.99 percent of the value of the solar module was added outside of China (such as in an inquiry country) the module would be covered by Commerce's affirmative circumvention determination, thus, indicating that the third-country processing of the module was "minor or insignificant." This is illogical.[526]

- Furthermore, Auxin failed to adequately support its argument that the "Wafer-Plus-Three" requirement allows a significant proportion of Chinese components to be used if the four least expensive components out of the six components in that requirement are sourced from outside of China.  Auxin's argument is based on erroneous calculations and incorrect figures.[527]  Additionally, expenses, such as conversion costs[528] and G&A expenses, are missing from Auxin's calculations, and the source of certain figures that Auxin used in its calculations is unclear.[529]  Auxin's argument also ignores its claim that these six inputs are the "principal" and some of the "most important and significant" factors of production.[530]  It is commercially unrealistic to conclude that companies in the inquiry countries would suddenly source all their raw materials from China.[531]

---

[521] *See* NextEra's March 17, 2023 Rebuttal Brief at 7-8.
[522] *See* NextEra's March 17, 2023 Rebuttal Brief at 10.
[523] *See* BYD HK's March 17, 2023 Rebuttal Brief at 9.
[524] *See* Jinko's March 17, 2023 Rebuttal Brief at 8-10.
[525] *See* BYD HK's March 17, 2023 Rebuttal Brief at 9-10 (citing *Pasta from Italy Circumvention*); *see also* Jinko's March 17, 2023 Rebuttal Brief at 10-12; and CSIL's March 17, 2023 Rebuttal Brief at 12.
[526] *See* BYD HK's March 17, 2023 Rebuttal Brief at 10.
[527] *Id.* at 11-12 and Exhibit 1 (citing Auxin's March 6, 2023 Case Brief at 13-17).
[528] *See* Risen's March 17, 2023 Rebuttal Brief at 2.
[529] *See* BYD HK's March 17, 2023 Rebuttal Brief at 11-12; *see also* CSIL's March 17, 2023 Rebuttal Brief at 13; and TTL's March 17, 2023 Rebuttal Brief at 8-9.
[530] *See* NextEra's March 17, 2023 Rebuttal Brief at 9-10.
[531] *See* Risen's March 17, 2023 Rebuttal Brief at 2-3.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

- Because China is a NME country, Commerce uses surrogate values to determine the cost of material inputs from China. Auxin's percentage of value test is not administrable because Commerce/CBP would need to verify the prices of, and surrogate values for, solar module components. CBP is not structured to handle certifications based on value[532] and, because it has no experience selecting and applying, surrogate values, it would not be able to verify the accuracy of such value-added based certifications.[533]
- Additionally, no parties, including Commerce and CBP, would know the appropriate surrogate values for solar module components when the solar module was exported to, or imported into, the United States. This information is needed to determine the Chinese and non-Chinese content percentages required for Auxin's test.[534] Alternatively, Commerce would have to use actual costs in China to implement Auxin's percentage of value test, which is contrary to its practice.[535]
- Auxin's claim that its percentage of value test is administrable based on the procedures that CBP uses for the United States-Mexico-Canada Agreement is misplaced. CBP evaluates regional value content under the United States-Mexico-Canada Agreement, but this is not certified on an entry-by-entry basis.[536] Confirming the sources of materials is less burdensome than establishing valuation.[537]

**Commerce's Position:** We disagree with Auxin's contention that, based on Commerce's affirmative circumvention determination, solar modules produced in the inquiry countries, or any country, using solar cells from the inquiry countries made from Chinese-produced wafers are automatically covered by the *Orders*. Auxin based its argument on a mischaracterization and misapplication of Commerce's country-of-origin determination from the investigations underlying these *Orders*. In the underlying investigations, Commerce conducted a substantial transformation analysis and determined "that where solar cell production occurs in a different country from solar module assembly, the country-of-origin of the solar modules/panels is the country in which the solar cell was produced."[538]

The purpose of a substantial transformation analysis is to determine whether merchandise that is further processed outside the order country remains the product of the order country, and thus subject merchandise. The purpose of the analysis conducted under section 781(b) of the Act is to determine whether minor assembly or completion of merchandise from the order country in a third-country was used to circumvent the order. As Commerce noted in the Preamble to its regulations "Commerce's substantial transformation analysis under {19 CFR} 351.225(j) and the test for determining whether a product was completed or assembled in other foreign countries under {19 CFR} 351.226(i) (and section 781(b) of the Act) are two distinct analyses used for different purposes … "[539]

---

[532] *See* BYD HK's March 17, 2023 Rebuttal Brief at 9-13; *see also* TTL's March 17, 2023 Rebuttal Brief at 9.

[533] *See* NextEra's March 17, 2023 Rebuttal Brief at 11.

[534] *See* Jinko's March 17, 2023 Rebuttal Brief at 12 and NextEra's March 17, 2023 Rebuttal Brief at 11.

[535] NextEra's March 17, 2023 Rebuttal Brief at 11.

[536] *See* TTL's March 17, 2023 Rebuttal Brief at 9.

[537] *Id*.

[538] *See* Trina's May 2, 2022 Comments at Attachment 8, page 8.

[539] *See 2021 Regulations Final Rule*, 86 FR at 52342.

Nowhere in the Act or Commerce's regulations is there a provision to use a substantial transformation analysis to identify circumvention. To determine whether solar modules are covered by this affirmative circumvention determination based on Commerce's country-of-origin rule from the underlying investigations ignores the criterion in section 781(b) of the Act, including determining whether the value of the order country merchandise that is assembled in the third country is a significant portion of, and the value of the third-country processing is a small proportion of, the total value of the solar module. Moreover, in applying Commerce's country-of-origin rule to identify solar modules covered by the affirmative circumvention determination, Auxin has ignored the Chinese content of the solar module. Auxin's approach is inconsistent with how Commerce has analyzed circumvention in other circumvention inquiries (*i.e.*, Commerce applies the circumvention criteria to the merchandise entering the United States, in this case the solar module, and not a component within the imported product, the solar cell, and determines whether the order country input(s) is a significant share, and the processing in the third country is a minor or insignificant share, of the value of the merchandise entering the United States)[540] and disregards the very nature of the alleged circumvention that Auxin requested that Commerce investigate. Specifically, Auxin requested "that Commerce promptly initiate an anti-circumvention inquiry concerning {solar} cells and modules assembled and completed in Malaysia, Thailand, Vietnam, and Cambodia using Chinese-produced inputs."[541] In contrast to Auxin's approach of focusing on the solar cell, Commerce's "Wafer-Plus-Three" requirement focuses on the Chinese content of the solar module and reflects the nature of the production in the third-country. Furthermore, the "Wafer-Plus-Three" requirement is consistent with section 781(b)(1) of the Act, which requires Commerce's circumvention determination to be made with respect to the "merchandise imported into the United States." Hence, when a solar module is the merchandise that is imported into the United States, Commerce must examine the components of that solar module, not the solar cells alone.

In its Circumvention Request, Auxin simply described inquiry merchandise as solar modules assembled and completed in one of the inquiry countries using Chinese-produced inputs.[542] This broad description of inquiry merchandise could have the unintended consequence of including solar modules with miniscule Chinese content (such as a bolt and a screw) as inquiry merchandise. Therefore, Commerce found it necessary to define the relevant Chinese content to consider a solar module as inquiry merchandise.[543] As explained in more detail below, we find that it is reasonable, and consistent with Auxin's Circumvention Request, to use the "Wafer-Plus-

---

[540] *See e.g., CORE from China (UAE) Preliminary* PDM at 1 and 27-28 (unchanged in *CORE from China (UAE)*) where we determined whether exporters of CORE from the UAE to the United States must pay AD duties based on whether the CORE contains Chinese hot-or cold-rolled steel. The certification requirement in that case was based on a determination that "the value of hot-or cold-rolled steel represents a significant portion of the total value of the {CORE} exported to the United States." *See CORE from China (UAE) Preliminary* PDM at 23. However, the solar cells that Auxin argues we should solely consider when determining whether the solar module containing such solar cells is covered by the circumvention determination, are not entirely made in China (as opposed to the hot-or cold-rolled steel in *CORE from China (UAE)*) and Auxin has not explained to what extent the solar cell should contain Chinese inputs to be considered covered by the *Orders*. Auxin has additionally failed to explain, contrary to Commerce determinations in *CORE from China (UAE)* and other circumvention proceedings, why such solar cell content is a sufficient basis for determining that the solar module should be covered by the *Orders*.
[541] *See* Circumvention Request at 88.
[542] *Id*.
[543] *See Preliminary Determinations*, 87 FR at 75221, 75222.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

Three" requirement to define solar modules as inquiry merchandise where the wafer and at least three of the other primary materials in the solar module were produced in China.

We did not arbitrarily select the seven material inputs used in the "Wafer-Plus-Three" requirement, but based our selection on record evidence, including data provided by the respondents and solar industry surveys in which wafers and the six material inputs used in the "Wafer Plus Three" requirement are identified as major solar cell/module inputs.[544] Auxin itself identified the primary materials from the order country that it claims were being assembled and completed in the inquiry countries to circumvent the *Orders*. Specifically, Auxin stated that "reasonably available evidence indicates that the primary direct material used to complete {solar} cells in the subject third countries, *i.e.*, wafers, silane, phosphorus oxychloride (POC13), aluminum and/or silver paste, and the additional components used to assemble the {solar} cells into modules, *i.e.*, solar glass, EVA, backsheet, aluminum frames, and junction boxes, were sourced from China, the country subject to *the Orders*."[545] We did not include silane and phosphorus oxychloride (POC13) in the "Wafer-Plus-Three" requirement because, as opposed to wafers and the six other inputs identified in the "Wafer-Plus-Three" requirement, they were not identified as major inputs in the majority of the solar industry reports/surveys that are on the record and no parties argued that other material inputs should be included in the requirement or that some of the material inputs should be removed from the requirement.

We determine that the "Wafer-Plus-Three" requirement is appropriate on a qualitative basis. The circumvention activity alleged by Auxin involves Chinese-produced wafers being converted into solar cells and solar modules in a third country using additional and substantial Chinese-origin components. Commerce's "Wafer-Plus-Three" requirement directly addresses the situation described by Auxin in its Circumvention Request because it requires producers in the inquiry countries to either no longer use Chinese wafers, which are the products that are being assembled and completed in the inquiry country, or to source less than half of the other major components that are required to convert the wafers into solar cells/modules from China. We have determined that this qualitative approach to defining inquiry merchandise is reasonable because it focuses on the number of major components sourced from China. This approach is also consistent with the concerns described by Auxin that led it to request the circumvention inquiries, namely its claim that "the vast majority — if not all — of the other materials used to convert the Chinese wafers to cells and then assemble the cells into modules in Malaysia, Thailand, Vietnam, and Cambodia

---

[544] *See*, *e.g.*, the *Bloomberg Report* below Figure 17 (identifying aluminum frames, glass; backsheets, ethylene vinyl acetate sheets, and junction boxes as the most important solar module inputs) and above Figure 12 (identifying silver as the costliest input added at the cell processing stage). The *Bloomberg Report* also emphasizes the importance of wafers and indicates the importance of these aforementioned seven inputs in making solar modules; *see also* the *NREL 2018 Report* at 37 (identifying wafers, metallization pastes (silver), glass, backsheets and junction boxes as the costliest items to produce solar modules) and 33 (identifying the principal solar module input materials as cell stringing and tabbing ribbons, front glass, backsheet, ethylene-vinyl acetate (EVA), encapsulant (2 sheets), AI (aluminum) frame and edge sealant, junction box, junction box potting agent and tape, and coded module sticker label), and the *DOE Solar Deep Dive* at iii ({s}ilicon wafers are processed to make the solar cells that are interconnected and sandwiched between glass and plastic sheets to make c-Si modules"), 36 ("{s}ilver paste is an important component in c-Si solar cells") and 44 (identifying the aluminum frame, glass, backsheet, encapsulant ("the predominant resins used to make encapsulant are ethylene vinyl acetate (EVA) …" (*see* page 19)), and the junction box as the components of a solar module).
[545] *See* Circumvention Request at 73.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

are obtained from China."[546]  Under the "Wafer-Plus-Three" requirement, where the majority of the major inputs used to convert the Chinese wafers to cells and then assemble the cells into modules were obtained from (produced in) China, the module is inquiry merchandise and will be subject to Commerce's affirmative circumvention determination.

Further, Auxin itself noted that where:

> the primary direct material inputs used to complete {solar} cells in the subject third countries, *i.e.*, wafers, silane, phosphorus oxychloride (POCI3), aluminum and/or silver paste, and the additional components used to assemble the {solar} cells into modules, *i.e.*, solar glass, EVA, backsheet, aluminum frames, and junction boxes, were sourced from China…a qualitative analysis itself would be sufficient to conclude that the value of processing in {the inquiry countries}" would represent "a small proportion of the value of the merchandise imported to the United States.[547]

Thus, by limiting the amount of Chinese content in the solar module, the "Wafer-Plus-Three" requirement addresses, on a qualitative basis, Auxin's concern and increases the non-Chinese portion of the value of the merchandise.

We also determine that the "Wafer-Plus-Three" requirement is appropriate on a quantitative basis.  Under the "Wafer-Plus-Three" requirement, a solar module is not inquiry merchandise if it has no Chinese-produced wafers, or where four of its six major inputs, other than the wafer, were not produced in China.  Based on record evidence regarding the value of wafers and conversion costs in a solar module,[548] and the statement in the *Bloomberg Report* that "Southeast Asian nations account for just 27% of the value of a typical {solar} module exported to the U.S."[549] we find that the "Wafer-Plus-Three" requirement would not result in a small value of inputs from outside of China as contended by Auxin.[550]

Moreover, we find there are flaws with the analysis that Auxin provided to support its claim that the "Wafer-Plus-Three" requirement would continue to allow a solar module to contain a significant proportion of Chinese inputs and not be subject to Commerce's affirmative circumvention determination.  Specifically, Auxin provided a table of per-unit costs for the inputs identified in the "Wafer-Plus-Three" requirement showing that a solar module could contain Chinese components that represent a high percentage of the total per-unit direct material cost of a solar module and yet, under the "Wafer-Plus-Three" requirement, the solar module would not be considered inquiry merchandise.[551]  Besides the questions raised by certain respondents regarding the source of Auxin's per-unit costs, we find that Auxin failed to account for other

---

[546] *Id.* at 30.

[547] *Id.* at 73.

[548] *See* our summary of the data in the *DOE Solar Deep Dive, IEA Report*, and Bloomberg Report, as well as our calculations based on these reports showing the costs of the wafers and other six inputs in the Solar Survey Analysis Memorandum.

[549] *See* the *Bloomberg Report* at the narrative below Figure 22. that "Southeast Asian nations account for just 27% of the value of a typical PV module exported to the U.S."

[550] *See* Auxin's March 6, 2023 Case Brief at 15 and Solar Survey Analysis Memorandum.

[551] *Id.*

material costs and conversion costs incurred in the inquiry countries in its analysis.  Further, if one accounts for these additional material and conversion costs, even relying on Auxin's per-unit costs, non-Chinese inputs would comprise much more than the "small" percentage of total value claimed by Auxin.[552]

Thus, we find that Auxin's analysis does not provide the proper measure of the extent to which companies in an inquiry country are using Chinese-produced inputs to convert wafers into solar modules.  In contrast, by defining solar modules subject to the inquiry as solar modules where the wafer and at least three of the other major inputs were produced in China, Commerce has addressed Auxin's concern that "major Chinese companies have set up minor assembly operations in Southeast Asia — using their existing dedicated supply base in China for almost the entirety of the bill of materials — to circumvent the Orders …"[553]  Also the "Wafer-Plus-Three" requirement is consistent with Congressional direction away from a rigid numerical approach.[554]  This approach is also consistent with how Commerce has identified inquiry merchandise in other circumvention inquiries, namely based on whether certain content in the merchandise came from the order country.[555]

We also find that Auxin's percentage of value test is not administrable.  Because the *Orders* apply to China, an NME country, Chinese-produced components are valued based on surrogate values.[556]  However, Auxin never explained how Commerce's NME methodology would be used in its proposed percentage of value test.  For example, Auxin never explained, under its proposal, whether surrogate values would be used to determine total value and, if so, how importers and exporters would properly select any surrogate values used.  Commerce normally selects surrogate values in a proceeding segment after considering record evidence and comments provided by interested parties.[557]  However, Auxin never explained how Commerce would evaluate any surrogate values used in the percentage of value test, or the type proceeding in which Commerce would conduct such an evaluation.  Furthermore, it is not feasible for Commerce to evaluate and examine potentially numerous surrogate value calculations that could change from entry to entry.

Auxin claimed that "{g}iven the records kept and maintained by the foreign producers, these data can be supplied to CBP to validate the value-added calculation."[558]  However, applying Commerce's NME methodology to the percentage of value test would require the use of surrogate values.  CBP is not charged with evaluating surrogate value selections, and it cannot be expected to validate a value-added test based on surrogate values.  Additionally, we find it would not be feasible for exporters and importers that are unfamiliar with Commerce's NME methodology to select the appropriate surrogate values to determine the percentage of a solar module's total value represented by Chinese components.  Thus, we find that it is unclear how

---

[552] *Id.*

[553] *See* Circumvention Request at 32.

[554] *See* SAA at 893-94.

[555] *See e.g.*, *CORE from China (UAE) Preliminary* PDM at 1, 23, and 27-28 (unchanged in *CORE from China (UAE)*).

[556] *See* section 773(c) of the Act.

[557] *See Cambodia* PDM at 3-4 and 7-9.

[558] *See* Auxin's March 6, 2023 Case Brief at 16.

Auxin's proposed percentage of value test would be implemented in light of Commerce's NME methodology.

Lastly, Auxin maintains that its proposed percentage of value test benefits exporters/producers because there is no need for them to publicly identify their wafer supplier and simplifies the types of records that importers must maintain. Neither claim is valid. Exporters do not need to publicly identify their wafer supplier(s) under Commerce's "Certification Regarding Chinese Components."[559] Thus, in this regard, Auxin's proposed percentage of value test, in which exporters would not need to publicly identify their wafer supplier(s), does not provide any benefit to exporters that is not already in place. Further, it is unclear how Auxin's proposed percentage of value test would simplify record keeping when solar modules can have hundreds of inputs and exporters/producers would need to maintain records to determine whether each input was produced in China or outside of China and to calculate the value of the non-Chinese and/or Chinese inputs in the solar module. Moreover, under Auxin's proposed approach, a number of records, such as surrogate value information, that are generally not kept in the ordinary course of business would need to be maintained. In contrast, when using the "Certification Regarding Chinese Components" parties need to maintain records to determine where only the seven inputs listed in Commerce's "Wafer-Plus-Three" requirement were produced.

**Other Issues**

**Comment 25. Whether Commerce Properly Placed *Ex Parte* Memoranda on the Record that Concerned the Circumvention Inquiries**

*Auxin*[560]
- Commerce unlawfully omitted communication related to the issuance of *Proclamation 10414* and Commerce's final rule implementing aspects of that proclamation.[561]
- Commerce's omission resulted in an incomplete administrative record for the circumvention inquiries.

No other interested party commented on this issue.

**Commerce's Position:** We disagree. By statute, Commerce shall maintain a record of any *ex parte* meeting between interested parties or other persons providing factual information in connection with a segment of an AD/CVD proceeding and the person charged with making the determination if information relating to that AD/CVD proceeding was presented or discussed at such meeting.[562] Throughout the course of the circumvention inquiries, Commerce consistently

---

[559] *See Preliminary Determinations*, 87 FR at Appendix VI.
[560] *See* Auxin's March 24, 2023 Case Brief at 43; Auxin's April 19, 2023 Case Brief at 80; Auxin's April 24, 2023 Case Brief at 58-59; and Auxin's April 26, 2023 Case Brief at 79.
[561] *See* Auxin's March 24, 2023 Case Brief, Auxin's April 19, 2023 Case Brief, Auxin's April 24, 2023 Case Brief, and Auxin's April 26, 2023 Case Brief (citing *Presidential Proclamation 10414*, 87 FR 35067; and *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR 56868).
[562] *See* section 777(a)(3) of the Act ("{AD/CVD} proceedings are investigatory rather than adjudicatory in nature, and {the ex parte} provision is intended to ensure that all parties to the preceeding {*sic*} are more fully aware of the

112

placed summaries of *ex parte* contacts concerning the circumvention inquiries on the administrative record.[563]  Commerce was not required to memorialize for the record communications on matters distinct from the AD/CVD proceedings at hand, including Presidential *Proclamation 10414* or the rulemaking resulting from that Proclamation.[564]

## Comment 26. Whether Commerce's Determination to Apply *Presidential Proclamation 10414* Retroactively is Contrary to Law

*Auxin*[565]

- Commerce unlawfully retroactively applied regulations developed pursuant to the declaration of emergency announced in *Presidential Proclamation 10414*.  Specifically, Commerce waived application of affirmative circumvention findings to all entries of inquiry merchandise after initiation of these inquiries on April 1, 2022, but before the Presidential Proclamation was issued on June 6, 2022.[566]

- The retroactive application of *Presidential Proclamation 10414* is:  "(a) *ultra vires* because Commerce possesses no independent legal authority to issue an emergency declaration; (b) is contrary to the explicit wording of *Presidential Proclamation 10414*; (c) is unlawful under the statutory authority under which the proclamation was issued, and (d) is otherwise inconsistent with Commerce's circumvention regulations, which require Commerce to issue suspension of liquidation and cash deposit instructions to CBP in the event of an affirmative finding of circumvention."[567]

- Commerce should "follow its regulations and request that CBP suspend liquidation and collect cash deposits on all entries after April 1, 2022, until June 6, 2022."[568]

- In the *Preliminary Determinations*, Commerce stated that entries prior to the Date of Termination that have met the certification requirements will not be subject to suspension of liquidation, or the cash deposit requirements described above.[569]  Commerce justified this departure from its practice and regulations by citing 19 CFR Part 362.

- Commerce specifically stated that pursuant to 19 CFR 362.103(b)(1)(i), "Commerce will direct U.S. Customs and Border Protection (CBP) to discontinue the suspension of liquidation and collection of cash deposits that were ordered based on Commerce's initiation of these circumvention inquiries.  In addition, pursuant to 19 CFR 362.103(b)(1)(ii) and (iii), Commerce will not direct CBP to suspend liquidation, and

---

presentation of factual information to the administering authority or the ITC"); and S. Rep. No. 96-249, at 99-100 (1979); *F Lli De Cecco*, 980 F. Supp 485.

[563] *See, e.g.*, Auxin November 9, 2022 *Ex Parte* Memorandum and NE Solar January 29, 2023 *Ex Parte* Memorandum.

[564] *See Baker Hostetler*, 473 F.3d 312 (conversations focused on matters other than AD/CVD proceedings do not fall under the section 777(a)(3) *ex parte* provision).

[565] *See* Auxin's March 6, 2023 Case Brief at 17-24.

[566] *Id.* at 17-18 and n. 41.  "In making this argument and stating that June 6, 2022, is the operable date for lifting of suspension and collection of cash deposits, Auxin is not suggesting in any way that *Presidential Proclamation 10414* and/or Commerce's implementing regulations are lawful. Indeed, Auxin has explained in detail in previous submissions on this record and in response to Commerce's request for comments why *Presidential Proclamation 10414* and Commerce's regulations were devoid of any factual underpinnings to support the purported emergency and that Commerce superseded existing regulations to implement the proclamation."

[567] *Id.* (citing 19 CFR 351.226(l)(2)(ii) and 19 CFR 351.226(l)(2)(iii)).

[568] *Id.*

[569] *Id.* (citing *Preliminary Determinations*, 87 FR at 75224).

require cash deposits, of estimated ADs and CVDs based on these affirmative preliminary determinations of circumvention on, any 'Applicable Entries.'"[570]

- Commerce confirmed that "suspension of liquidation procedures would only apply to 'imports of Southeast Asian-Completed solar cells and modules that are not 'Applicable Entries' that were entered, or withdrawn from warehouse, for consumption on or after April 1, 2022."[571]

- First, Commerce possesses no legal authority to declare a national emergency and does not cite any such authority in its *Preliminary Determination.*  Commerce explicitly expanding the scope of *Presidential Proclamation 10414* by applying it to entries of inquiry merchandise that entered the United States prior to the identification of the emergency while lacking such legal authority renders the decision *ultra vires.*[572]

- Second, Commerce's retroactive actions are not consistent with the authority relied upon for adoption of Part 362 of its regulations:  *Presidential Proclamation 10414.*  The Proclamation does not authorize retroactive effect of the national emergency declared on June 6, 2022.[573]

- *Presidential Proclamation 10414* specifically states that any actions taken by Commerce to permit duty-free entries of solar cells and modules from Cambodia, Malaysia, Thailand, and Vietnam last "until 24 months *after* the date of this proclamation or until the emergency declared herein has terminated, whichever occurs first."[574]

- *Presidential Proclamation 10414* does not authorize any actions for entries before the June 6, 2022, date.  Thus, *Presidential Proclamation 10414* does not authorize Commerce to take any action affecting entries before June 6, 2022.

- Third, section 318(a) of the Act, the statutory authority under which *Presidential Proclamation 10414* was issued, does not allow action before the declaration of an emergency, and only authorizes action "*during* the continuance of" an emergency "declare{d}" by presidential proclamation.[575]  No emergency was declared prior to June 6, 2022.

- The *Preliminary Determination* is inconsistent with the statute and regulations as Commerce's circumvention regulations state that following an affirmative preliminary determination:  (1) the Secretary will direct the Customs service to continue the suspension of liquidation and apply the applicable cash deposit rate; and (2) direct the Customs service to begin the suspension of liquidation and require a cash deposit of estimated duties, at the applicable rate, for each unliquidated entry on or after the date of publication of the notice of initiation of the inquiry.[576]

- In the *Initiation Notice,* Commerce notified all interested parties of the initiation of circumvention inquiries, including a description of the products subject to the inquiries and an explanation of the reasons for Commerce's decision to initiate such inquiries.[577]

---

[570] *Id*. (citing *Preliminary Determinations*, 87 FR at 75223).

[571] *Id.* (citing *Clarification of Product Coverage Memorandum* at 2).

[572] *Id.* (citing *Cf. Stark v. Wickard*, 321 U.S at 288; *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. at 1679).

[573] *Id.* (citing *Presidential Proclamation 10414*, 87 FR at 35067-69).

[574] *Id.* (citing *Presidential Proclamation 10414*, 87 FR at 35068).

[575] *Id.* (citing Section 318(a) of the Act).

[576] *Id.* (citing 19 CFR 351.226(1)(2)(i)-(ii)).

[577] *Id.* (citing *Initiation Notice,* 87 FR at 19072).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

- With respect to suspension of liquidation, Commerce explained that it would follow 19 CFR 351.226(l)(1), notifying CBP of its initiation and direct CBP to continue suspension of liquidation and apply the cash deposit rate that would be applicable if the products were determined to be covered by the scope of the *Orders*. Commerce also mentioned that it would follow the suspension of liquidation rules under 19 CFR 351.226(l)(2)-(4) should it issue preliminary or final circumvention determinations.[578]

- Thus, Commerce provided all interested parties with notice of initiation, the reasons for initiation, and Commerce's intention to suspend liquidation for merchandise that entered after the date of initiation, April 1, 2022, consistent with Commerce's regulations. As such, suspension of liquidation retroactive to the date of initiation was appropriate and lawful.[579]

- Commerce's failure to suspend liquidation and collect cash deposits from April 1, 2022, through June 6, 2022, is unlawful for many reasons and should be reversed in the final determination.

*NextEra*,[580] *BYD HK*,[581] *CSIL*,[582] *TTL*,[583] *Silfab*,[584] and *Risen*[585]

- Auxin's argument that Commerce "unlawfully retroactively applied" its regulations in 19 CFR Part 362 has no place in these circumvention inquiries, which are meant to examine whether circumvention has taken place under the relevant statute and regulations, and not to assess whether Commerce's regulations are proper.

- Commerce has no basis to disregard the 19 CFR Part 362 regulations that exempt entries between April 1, 2022, and June 6, 2022 (and certain entries made after June 6, 2022) from any suspension of liquidation, cash deposit requirements, or duty assessment resulting from these inquiries, without engaging in a new notice-and-comment procedure separate from this circumvention inquiry.

- Although Auxin urges Commerce to suspend liquidation and collect cash deposits on merchandise entered between April 1, 2022, and June 6, 2022, it is unlawful for Commerce to do so as "Commerce, like other agencies, must follow its own regulations."[586]

- Pursuant to 19 CFR Part 362, entries between April 1, 2022, and June 6, 2022, are exempt from any suspension of liquidation, cash deposit requirements, or duty assessment resulting from this circumvention inquiry. Specifically, 19 CFR 362.103 exempts "Applicable Entries" from those obligations. 19 CFR 362.102 defines "Applicable Entries" as "entries of Southeast Asian-Completed Cells and Modules that

---

[578] *Id.*

[579] *Id.* (citing *Aluminum (Taishan)*, 983 F.3d 487).

[580] *See* Next Era's March 17, 2023 Case Brief at 11-18.

[581] *See* BYD HK's March 17, 2023 Rebuttal Brief at 13-18.

[582] *See* CSIL's March 17, 2023 Rebuttal Brief at 14-20.

[583] *See* TTL's March 17, 2023 Rebuttal Brief at 10-11.

[584] *See* Silfab's March 17, 2023 Rebuttal Brief at 8-13.

[585] *See* Risen's March 17, 2023 Rebuttal Brief at 3-4.

[586] *See* NextEra's March 17, 2023 Rebuttal Brief (citing *See Torrington*, 82 F.3d at 1049; *see also, e.g., Fort Stewart*, 495 U.S. at 654 ("It is a familiar rule of administrative law that an agency must abide by its own regulations."); and *Saddler*, 68 F.3d at 1358 (finding that agency "must abide by its own regulation")).

are entered into the United States, or withdrawn from warehouse, for consumption before the Date of Termination."[587]

- Commerce's regulations apply to all entries made prior to the "Date of Termination," and there is no basis to limit application of the exemptions to entries made after June 6, 2022. Moreover, the *Presidential Proclamation 10414 Final Rule Preamble* confirms that the 19 CFR Part 362 regulations are intended to apply to entries made between April 1, 2022, and June 6, 2022.[588]

- Given that "agency regulations are to be interpreted in a similar manner to statutes, which includes a consideration of the text, history, and purpose of a regulation, 19 CFR Part 362 clearly requires Commerce to exempt entries between April 1, 2022, and June 6, 2022, from any suspension of liquidation, cash deposits, or final duties resulting from these inquiries."[589]

- Commerce "promulgated the Part 362 regulations through notice-and-comment rulemaking.[590]  The APA requires notice-and-comment procedures to be followed not only when rules are formulated, but also when they are amended or repealed."[591]

- Commerce cannot amend and implement regulations without a new informal rulemaking process under the APA.[592]

- The U.S. Supreme Court has explained that the APA requires agencies to "use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance."[593]

- Commerce may not repeal or amend the portions of 19 CFR Part 362 exempting entries between April 1, 2022, and June 6, 2022, from duties as part of its final determination in this circumvention inquiry.  Instead, Commerce would be required to publish a notice of proposed rulemaking informing the public that it is considering a change to 19 CFR Part 362 of its regulations, allow an opportunity for comment, and then publish a final rule responding to such comments.[594]  There is no basis for Commerce to depart from 19 CFR Part 362 in the final determination until Commerce does so.

- Although Auxin claims that Commerce has no legal authority to declare a national emergency and expanded the scope of *Presidential Proclamation 10414* or acted inconsistently with *Presidential Proclamation 10414* by extending the duty waiver to entries made between April 1, 2022, and June 6, 2022, Commerce did not declare a national emergency.  Instead, it was the President that made the declaration in *Presidential Proclamation 10414*, as allowed by section 318(a) of the Act.

---

[587] *Id.*  "Date of Termination" in turn is defined as "June 6, 2024, or the date the emergency described in *Presidential Proclamation 10414* has been terminated, whichever occurs first."  *See also* 19 CFR 362.102.

[588] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877).

[589] *Id.* (citing *Kisor*, 139 S. Ct. at 2423-24).

[590] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble*; and *Presidential Proclamation 10414 Proposed Rule*).

[591] *See* BYD HK's March 17, 2023 Rebuttal Brief (citing 5 USC 551(5); and 5 USC 553).

[592] *Id.* (citing *Alaska*, 177 F.3d at 1033-34, 1036:  In clarifying this requirement, the Supreme Court has interpreted the APA to require the same procedures when an agency amends or repeals a rule as to when the agency issued that rule)).

[593] *Id.* (citing *Perez*, 575 U.S. at 101; *see also Ass'n of Priv. Sector*, 681 F.3d at 462-63 (finding that agency violates the APA when it does not give notice of proposed rule and opportunity to affected parties to comment); *Invenergy*, 422 F. Supp. 3d at 1285 ("The court concludes that the Exclusion constituted agency rulemaking. Repealing the rule, therefore, also requires rulemaking subject to APA notice and comment.")).

[594] *Id.* (citing 5 USC 553).

116

- Commerce addressed the arguments regarding the consistency of 19 CFR Part 362 with *Presidential Proclamation 10414* when it promulgated the regulation.  Commerce is "taking action now (*i.e.*, during the period of the emergency) to extend the period before it directs CBP to suspend liquidation and collect cash deposits and to waive any AD/CVD estimated duties and duties for these unliquidated goods."[595]

- Commerce's Part 362 regulations are prospective in application because "Commerce's regulation stated prior to the imposition of duties that there would be no such duties, and because Commerce was extending the deadline for actions that it had not yet taken."[596]

- Commerce also explained that the authorization to waive duties under *Presidential Proclamation 10414* "until 24 months after the date of this proclamation or until the emergency declared herein has terminated" specified only the end date for duty-free treatment, without specifying a start date or limiting application of the waiver to entries made after the *Presidential Proclamation 10414.*[597]

- Commerce recognized that providing duty-free treatment to entries made prior to June 6, 2022, furthers the emergency relief goals reflected in *Presidential Proclamation 10414* (specifically, the market uncertainty caused by the initiation of these circumvention inquiries).[598]

- Subjecting entries made prior to June 6, 2022, to AD/CVD cash deposit rates that were unknown at the time of entry and to assessment rates that would not be determined until many months or even years in the future would have increased, not decreased, the market uncertainty the *Presidential Proclamation 10414* and Commerce's Part 362 were seeking to address.[599]  Such an application would limit the capital available to complete solar projects and otherwise build capacity.[600]

- Auxin's arguments regarding the scope of authority provided in section 318(a) of the Act are also meritless as Auxin reads far too much into the following statutory language:  the President "may authorize the Secretary of the Treasury to extend during the continuance of such emergency the time herein prescribed for the performance of any act."[601]  At most this provision of the statute prevents extension of deadlines after the emergency subsided.

- The provision noted by Auxin does not prohibit the application of the statute to entries that remain unliquidated at the time of the emergency declaration and Commerce's extension of deadlines for ordering cash deposits and assessment of duties occurred after the emergency was declared.

- Section 318(a) of the Act contains two separate grammatical clauses stating what the President may authorize the Secretary to do:  (1) the President "may authorize the Secretary of the Treasury to extend during the continuance of such emergency the time herein prescribed for the performance of any act"; and (2) the President "may authorize the Secretary of the Treasury to permit, under such regulations as the Secretary of the Treasury may prescribe, the importation free of duty of food, clothing, and medical,

---

[595] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877).
[596] *Id.*
[597] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877 and 56878).
[598] See NextEra's March 17, 2023 Rebuttal Brief (citing *Presidential Proclamation 10414 Proposed Rule*, 87 FR at 39430; *see also Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56872, 56875-77).
[599] *Id.* (citing *See Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56875-78).
[600] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble,* 87 FR at 56878).
[601] *Id.* (citing Auxin March 17, 2023 Case Brief at 20).

surgical, and other supplies for use in emergency relief work." The use of the word "authorize" a second time in a separate clause indicates that the authority in the second clause is distinct from the first.

- The language "during the continuance of such emergency" qualifies only the authority in the first clause (the authority to extend deadlines), not the second (the separate authority to waive duties). Therefore, the authority to permit the duty-free importation of supplies for emergency relief work is less constrained than the authority to extend deadlines under the Tariff Act.[602]

- Commerce explained in the *Presidential Proclamation 10414 Final Rule Preamble* that applying the waiver to entries that remained unliquidated at the time of the President's Proclamation harmonizes the authority provided under section 318(a) of the Tariff Act with the retrospective AD/CVD system, which is also part of the Tariff Act.

- Even if Commerce did not have authority under section 318(a) to waive duties on entries made prior to *Presidential Proclamation 10414*, Commerce possesses separate authority to exempt such entries from ADs/CVDs.

- Commerce invoked its authority to issue regulations pertaining to section 781 of the Act when it promulgated 19 CFR Part 362 of its regulations.[603] Section 781 of the Act states that Commerce "may include within the scope" merchandise completed or assembled in other foreign countries if certain criteria are met.[604] Thus, even if the criteria for an affirmative circumvention determination are found, section 781 provides Commerce with the discretion to determine whether to include merchandise within the scope of an AD/CVD order.

- Section 781 is silent on when an order will be applied after Commerce determines to extend the order to cover merchandise completed or assembled in other foreign countries. Commerce exercised its gap-filling authority regarding the administration of section 781 by issuing 19 CFR 351.226. However, nothing in the statute mandates the particular procedures that Commerce adopted in 19 CFR 351.226 and that Auxin would like Commerce to apply.

- Commerce is free to adopt additional regulations through notice-and-comment rule making that supersede the provisions in 19 CFR 351.226 in order to address the policy issues raised by this case. Commerce recognized this in the *Presidential Proclamation Final Rule 10414 Preamble.*[605]

- It was reasonable for Commerce to exempt merchandise entered prior to June 6, 2022, from duties when that merchandise was outside of the scope of the *Orders* as a matter of law at the time of entry and the nature of the cell and/or module production process occurring in Southeast Asia is significant.

- Auxin does not cite any language from the AD/CVD statute or section 318(a) requiring Commerce to apply AD/CVD duties to pre-*Presidential Proclamation 10414* entries. Additionally, Auxin does not cite any authority that would require Commerce to suspend liquidation, apply cash deposit, and duty assessment provisions in 19 CFR 351.226(1) instead of the exception to those rules found in Part 362.

---

[602] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877-78).

[603] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877-78; and *Presidential Proclamation 10414 Proposed Rule*, 87 FR at 39429).

[604] *Id.* (citing 19 CFR 351.226(b)(1)).

[605] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56876-78).

- 19 CFR Part 362 regulations were adopted following notice-and-comment rulemaking to address the situation presented in these circumvention inquiries and should prevail over general provisions in 19 CFR 351.226(1).[606] Moreover, the 19 CFR Part 362 regulations make it clear that they are intended to be employed as an exception to any otherwise applicable rules found within 19 CFR 351.226 through the language "notwithstanding § 351.226(l) of this chapter."
- Given that 19 CFR Part 362 is explicitly identified as an exception to 19 CFR 351.226(l), Auxin's argument that Commerce was required to follow 19 CFR 351.226(l) is incorrect.
- *Presidential Proclamation 10414, Presidential Proclamation 10414 Final Rule Preamble,* Commerce's affirmative circumvention determinations, and the accompanying instructions issued to CBP by Commerce, clearly state that merchandise entered for consumption between April 1, 2022, and June 6, 2022, are not subject to AD/CVD liability.[607]
- Auxin's argument that Commerce unlawfully retroactively applied regulations promulgated pursuant to the declaration of emergency announced in *Presidential Proclamation 10414* is not made in the proper forum. Commerce is bound by law to follow the requirements of *Presidential Proclamation 10414* and 19 CFR Part 362 of its regulations.
- This policy, combined with the meaning of 19 CFR Part 362, means that Commerce cannot retroactively impose duties on imports designated as "Applicable Entries" in the final determinations, especially given the general presumption against retroactive applications of law.[608]
- Amending or repealing 19 CFR Part 362 in the context of these circumvention inquiries would create unfair surprise and deprive parties of a meaningful opportunity to comment on a significant change in Commerce's regulations.[609]
- Commerce should continue to exempt entries made between April 1, 2022, and June 6, 2022, from any suspension of liquidation, cash deposit requirements, or duty assessment resulting from these circumvention inquiries.

**Commerce's Position:** Commerce disagrees with Auxin that the regulations promulgated under *Presidential Proclamation 10414* are unlawfully retroactive. Auxin makes four primary claims that the regulations are unlawful, none of which we find to be persuasive or sufficient to change our reasoning with respect to this circumvention inquiry.

First, Auxin claims that Commerce possesses no legal authority to declare a national emergency, yet "explicitly expanded the scope" of *Presidential Proclamation 10414 ultra vires* by applying it to inquiry merchandise that entered the United States "prior to the identification of the emergency."[610] However, as Auxin notes, Commerce has already addressed the legality of its

---

[606] *Id.* (citing *Romani*, 523 U.S. at 532 (later, more specific statute governs); *Fourco Glass Co.,* 353 U.S. at 228 ("However inclusive may be the general language of a statute, it will not be held to apply to a matter specifically dealt with in another part of the same enactment.")).

[607] *See* BYD HK's March 17, 2023 Rebuttal Brief (citing CBP MSGs Memorandum at Message No. 3047409).

[608] *Id.* (citing *Bowen*, 488 U.S. at 208; and *I.N.S.*, 533 U.S. at 316.

[609] *Id.* (citing *Kisor*, 139 S Ct. at 2418-2419); *see also* CSIL's March 17, 2023 Rebuttal Brief (citing *Skidmore*, 323 U.S. at 140 (1944); and *Cathedral Candle*, 400 F.3d at 1366).

[610] *See* Auxin's March 6, 2023 Case Brief at 17-18.

119

authority to issue the regulations under *Presidential Proclamation 10414 Final Rule Preamble*, itself.[611]  That rule, which was issued pursuant to lawful notice and comment process, confirms that "Commerce is taking action now (*i.e.*, during the period of the emergency) to extend the period before it directs CBP to suspend liquidation and collect cash deposits and to waive any AD/CVD estimated duties and duties for these unliquidated goods."[612]  "In other words, the final rule stated, ahead of any imposition of such duties, that there will be no such duties."[613]  Such a statement is not expanding the scope of the emergency retroactively; rather, "such a decision is prospective in its application"[614] because it concerns the establishment of duties that have not yet been determined but may be determined during the course of the emergency.

Second, Auxin argues that the retroactive application of *Presidential Proclamation 10414* is contrary to the explicit wording of the proclamation itself, because it only authorizes Commerce to take actions to permit duty-free entries of solar cells "until 24 months after the date of this proclamation."[615]  Auxin argues that because the *Presidential Proclamation 10414* only authorizes Commerce to take action *after* the date of *Presidential Proclamation 10414*, Commerce is precluded from taking action with respect to entries prior to June 6, 2022.[616]  Commerce addressed this argument in the notice and comment period, as discussed in the *Presidential Proclamation 10414 Final Rule Preamble*.[617]  While the *Presidential Proclamation 10414* does declare an end date to the time period of duty-free treatment, it did not specify a start date, nor did it limit the application of the waiver to only entries made after *Presidential Proclamation 10414*.[618]  Additionally, the goods that entered the country prior to *Presidential Proclamation 10414* remain unliquidated, and have yet to have a final decision with respect to applicable duties.  By taking action with respect to those goods, in accordance with the regulations promulgated in *Presidential Proclamation 10414 Final Rule*, Commerce is not acting retroactively:  before any duties were determined to be applicable to these entries, the regulations stated that there would be no duties imposed on these entries.[619]  We also agree with the respondents that the actions taken by Commerce in enacting this rule to provide duty-free treatment to entries prior to June 6, 2022, furthers the relief goals for the national emergency declared in *Presidential Proclamation 10414*, and subjecting entries made prior to June 6, 2022, to duties would increase uncertainty in the market for solar cells and run contrary to the intent of *Presidential Proclamation 10414*.[620]

Third, Auxin argues that the *Presidential Proclamation 10414 Final Rule* is inconsistent with *Presidential Proclamation 10414* and the authority under which it was issued (*i.e.*, section 318(a) of the Act), which provides for action to be taken "during" an emergency.  Auxin states that there was no emergency declared prior to June 6, 2022; therefore, the Act does not allow Commerce

---

[611] *Id.*
[612] *See Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877.
[613] *Id.*, 87 FR at 56877.
[614] *Id.*
[615] *See* Auxin's March 6, 2023 Case Brief (quoting *Presidential Proclamation 10414*, 87 FR at 35068).
[616] *Id.* at 20.
[617] *See Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877.
[618] *Id.*, 87 FR at 56877-78.
[619] *Id.*, 87 FR at 56877.
[620] *Id.*, 87 FR at 56875-78.

act before that date.[621]  We disagree with this interpretation.  Section 318(a) of the Act states "{w}henever the President shall by proclamation declare an emergency to exist … he may authorize the Secretary of the Treasury to extend during the continuance of such emergency the time herein prescribed for the performance of any act, and may authorize the Secretary of the Treasury to permit, under such regulations as the Secretary of the Treasury may prescribe, the importation free of duty of food, clothing, and medical, surgical, and other supplies for use in emergency relief work."[622]  This provision contains two distinct clauses:  (1) authorizing the Secretary to "extend during the continuance of such emergency the time … for the performance of any act," and (2) authorizing the Secretary to "permit … the importation free of duty of food, clothing, and medical, surgical, and other supplies."[623]  We agree with respondents' argument that the grammatical construction of the statute, in particular using the word "authorize" in each of the two clauses, indicates that the authority in the second clause is independent from the authority in the first.  Accordingly, the President may authorize individually each of these two actions, or both, and the actions are not necessarily required to be implemented in unison or otherwise qualify each other.  In any event, Auxin's interpretation of the phrase "during the continuance of such emergency" is misleading.  Because these two clauses are independent, the phrase "during the continuance of such emergency" applies only to the first clause and does not limit the second clause concerning the waiver of duties.  Additionally, while it is true that the entries in question entered the country prior to June 6, 2022, Commerce's *taking action* with respect to setting a definitive amount of duties for those entries (which were unliquidated at the time of the rule, with no final amount of duties set) is not retroactive in nature as it is occurring during the continuance of the emergency as declared by the President.[624]

We also disagree with Auxin's reading of section 318 of the Act as prohibiting the retrospective application of duties (or lack thereof) to unliquidated merchandise because the general operation of the AD/CVD system in the United States is a retrospective one.  The "final liability for duties is determined after the merchandise is imported," and under this system entries are suspended and cash deposits are collected in order to wait for the final ascertainment of duties at a later time.[625]  That is the same situation of "retrospective" application of duties that Auxin is concerned about here; that merchandise entered the country and remains unliquidated while awaiting the final amount of duties owed.  To argue that section 318 of the Act prohibits this type of action is to ignore the fact that the passage by Congress of these provisions underpinning the AD/CVD system in the same Act supports reading them in harmony.[626]

Fourth, Auxin argues that the regulations promulgated under the *Presidential Proclamation 10414* are inconsistent with Commerce's circumvention regulations, which require Commerce to issue suspension of liquidation and cash deposit instructions to CBP in the event of an

---

[621] *See* Auxin's March 6, 2023 Case Brief at 20.

[622] *See* section 318(a) of the Act.

[623] *Id.*

[624] *See Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877.

[625] *Id.*, 87 FR at 56877 (citing 19 CFR 351.212(a) and sections 703(d), 705(c), 706, 733(d), 735(c), and 736 of the Act).

[626] *Id.*, 87 FR at 56877 (citing *FDA v. Brown & Williamson*, 529 U.S. at 132-133 ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme … .  A court must therefore interpret the statute as a symmetrical and coherent regulatory scheme … and fit, if possible, all parts into an harmonious whole.")).

affirmative finding of circumvention.[627]  Auxin also states that this language was also included in Commerce's *Initiation Notice* and *Preliminary Determination*, which supposedly means that any failure to suspend liquidation and collect cash deposits from April 1, 2022, to June 6, 2022 is unlawful and should be reversed in the final determination.[628]  We disagree that Commerce must continue to follow the liquidation and cash deposit rules provided for in 19 CFR 351.226 in this specific case.  The 19 CFR Part 362 regulations carve out an exception to otherwise applicable rules (*i.e.*, those found in 19 CFR 351.226).[629]  Specifically, the 19 CFR Part 362 regulations state that "notwithstanding 351.226(l) … the Secretary shall instruct CBP to discontinue the suspension of liquidation of entries and collection of cash deposits for any Southeast-Asian-Completed Cells and Modules that were suspended pursuant to {section} 351.226(l) of this chapter."[630]  If Commerce were to follow the liquidation and cash deposit rules provided for in 19 CFR 341.226, it would be acting contrary to the explicit language of the 19 CFR Part 362 regulations.  Furthermore, in situations in which a regulation is adopted following a notice and comment process and is more specific than an existing regulation, the more specific regulation prevails.[631]  Therefore, if a conflict arises between 19 CFR 362 and 19 CFR 351.226, the stipulations of 19 CFR 362 prevail.

## Comment 27. Whether Third-Country Exporters Without an AD Rate Should Receive the Separate Rate

*NextEra*[632]
- If Commerce reaches a country-wide affirmative circumvention determination, it should permit third-country exporters that neither have their own AD cash deposit rate, nor use a wafer exporter in China with its own AD cash deposit rate, to deposit ADs based on the separate rate determined in the China AD solar cells proceeding, rather than deposit ADs at the cash deposit rate of the China-wide entity.
- In *CORE from China (Vietnam)*, Commerce applied the AD cash deposit rate of Chinese companies granted a separate rate in the China AD investigation to imports of CORE produced in Vietnam using Chinese substrate."[633]
- Commerce cannot assume that companies in a third-country are part of the China-wide entity like it does for companies in China that cannot demonstrate their independence from the Chinese government.  Moreover, Commerce should not apply its NME methodology to companies in Cambodia, Malaysia, or Thailand, which are independent market economy countries.
- Commerce clearly explained in the *AD Order* that the China-wide AD rate is based on AFA.  The purpose of the statutory AFA provision is to encourage respondents' cooperation and ensure that they do not obtain a more favorable result by failing to

---

[627] *See* Auxin's March 6, 2023 Case Brief at 18 (citing 19 CFR 351.226(l)(2)(ii) and (iii)).

[628] *Id.* at 20-21.

[629] *See* 19 CFR 362.103(b)(1).

[630] *See* 19 CFR 362.103(b)(1)(i).

[631] *See Romani*, 523 U.S. at 532 (discussing the statutory canon that a later, more specific statute governs in the case of conflict); *Fourco Glass Co.*, 353 U.S. at 228 (holding that the general language of a statute "will not be held to apply to a matter specifically dealt with in another part of the same enactment."); *see also Roberto*, 440 F.3d at 1350 ("{t}he rules of statutory construction apply when interpreting an agency regulation.").

[632] *See* NextEra's March 6, 2023 Case Brief at 4-8.

[633] *Id.* (citing *CORE from China (Vietnam)* IDM at Comment 3).

122

cooperate than if they had cooperated.[634]  The third-country exporters fully cooperated with Commerce's requests for information in the circumvention inquires, and thus, there is no reason to apply an AFA rate, *i.e.*, the China-wide rate, to these exporters.

- Secretary Raimondo testified before Congress that a tariff rate in the range of 200 percent is "excessive" and "exceedingly unlikely."[635]  The China-wide AD cash deposit rate is 238.95 percent.  To avoid uncertainty and limit the damage to solar deployment in the United States, Commerce should permit third-country companies without their own AD rate, or without a Chinese wafer exporter with its own AD rate, to deposit ADs at the cash deposit rate of companies granted a separate rate in the China AD solar cells proceeding.

- Alternatively, Commerce should establish a procedure for companies to obtain separate rate status either by submitting separate rate applications in this inquiry, submitting separate rate applications in the ongoing AD administrative review in this proceeding, even if the exporter is not under review, or requesting a changed circumstances review to establish separate rate status on an expedited basis.

*Auxin*[636]

- Consistent with its long-standing practice, Commerce should continue to assign exporters without an individual AD rate or without a separate AD rate, the China-wide AD rate.[637]

- Commerce applied that practice in *CRS from China (Vietnam)*,[638] and contrary to NextEra's claim, in *CORE from China (Vietnam)*.[639]

- The purpose of a circumvention inquiry is to determine whether circumvention of an order has occurred, not conduct a separate rates analysis.  If Commerce reaches an affirmative circumvention determination, then it will order the suspension of liquidation of entries of inquiry merchandise and the collection of AD/CVD cash deposits pending conduct of an administrative review where Commerce will, among other things, determine the appropriate cash deposit rates and conduct separate rate analyses.[640]

**Commerce's Position:**  We disagree with NextEra.  Pursuant to Commerce's affirmative country-wide circumvention determinations, duties under the *Orders* will apply to U.S. entries of inquiry merchandise from Cambodia, Malaysia, Thailand, and Vietnam unless at least one of the certification requirements is met.  Because the applicable *Orders* are on China, in this circumvention inquiry Commerce followed the methodology that it employs in AD proceedings involving China to determine the appropriate AD cash deposit rate for U.S. entries of inquiry merchandise.  Commerce considers China to be an NME country.[641]  In proceedings involving NME countries, Commerce maintains a rebuttable presumption that all exporters are subject to government control and, thus, should be assigned a single antidumping duty deposit rate. It is Commerce's policy to assign all exporters of subject merchandise this single rate unless an exporter can demonstrate that it is sufficiently independent so as to be entitled to a separate

---

[634] *Id.* (citing SAA at 200; and *Changzhou Wujin Fine Chem*, 701 F.3d at 1378).

[635] *Id.* (citing NextEra's May 19, 2022 Comments at Attachment 3).

[636] *See* Auxin's March 17, 2023 Rebuttal Brief at 13-16.

[637] *Id.* (citing *Preliminary Determinations*, 87 FR at 75224; and Policy Bulletin 05.1).

[638] *Id.* (citing *CRS from China (Vietnam)*, 83 FR at 23892).

[639] *Id.* (citing *CORE from China AD Investigation*, 81 FR at 35318).

[640] *Id.* (citing *Tissue Paper from China (Vietnam) Final Determination* IDM at Comment 5; and *Hangers from China (Vietnam)* IDM at Comment 5).

[641] *See Aluminum Foil* PDM at the section, "China's Status as a Non-Market Economy."

rate.[642]  Therefore, as we explained in the *Preliminary Determination*, entries from Cambodia, Malaysia, Thailand, and Vietnam will be assessed at the China-wide entity rate unless either:  (1) the relevant cell or module exporter from Cambodia, Malaysia, Thailand, or Vietnam has its own company-specific AD and/or CVD rate under the *Orders* or; (2) if it does not, the Chinese company that exported the wafers to that third-country cell/module exporter has its own company-specific AD and/or CVD rate under the *Orders*.[643]

Although NextEra asserts that Commerce cannot assume that companies in a third-country are part of the China-wide entity, Commerce's position in AD proceedings involving China is clear - "'the {China}-wide rate applies to all entries of subject merchandise' unless Commerce has determined a firm is eligible for a separate rate … .  If a third-country exporter of subject merchandise wishes to have its own rate, it is incumbent upon that exporter to request a review."[644]

While exporters that are wholly-foreign owned do not need to demonstrate *de jure* and *de facto* independence from government control to receive a separate rate, they must nonetheless demonstrate that they are wholly owned by entities located in market-economy countries and that their ultimate owners are located in market-economy countries to receive a separate rate.[645]  Such entities must demonstrate this by completing the relevant portions of Commerce's separate rate application.[646]  As the CIT explained, while "… Commerce recognizes that companies organized outside of China are *per se* independent from the control of the {Chinese} government" it is only "{o}nce a party demonstrates that it is foreign owned, {that} Commerce accords that company a rate separate from the {China}-wide rate."[647]  Thus, Commerce's practice in NME cases is to require exporters inside and outside the NME country to demonstrate that they are not part of the NME-wide entity in order to obtain separate rate status.

There is no basis in this circumvention inquiry to grant separate rate status to companies that currently do not have a separate rate, or whose wafer suppliers do not have a separate rate. Commerce does not conduct a separate rates analysis in circumvention inquiries and did not do so here.  The purpose of the circumvention statute is to give Commerce the authority, and the criteria to follow, to administer "AD and {CVD} orders in such a way as to prevent circumvention and diversion of U.S. law."[648]  Therefore, Commerce focused its analysis in the circumvention inquiry on applying the relevant methodology in section 781 of the Act to

---

[642] *See Sparklers from China*, 56 FR 20588; s*ee also Silicon Carbide from China*, 59 FR 22585; and 19 CFR 351.107(d).

[643] *See Preliminary Determinations*, 87 FR at 75224.

[644] *See Xanthan Gum from China 2016-2017* IDM at Comment 1.

[645] *See Chlorinated Isocyanurates from China 2019-2020 Preliminary Results* PDM ("{t}o establish whether a company is sufficiently independent to be eligible for a separate, company-specific rate, Commerce analyzes each exporting entity in an NME country under the test established in *Sparklers* as amplified in *Silicon Carbide*, and further refined by *Diamond Sawblades*.  However, if Commerce determines that a company is wholly foreign-owned or located in a market economy (ME) country, then a separate-rate analysis is not necessary to determine whether it is independent from government control."); unchanged in *Chlorinated Isocyanurates from China 2019-2020 Final Results*.

[646] *See* https://enforcement.trade.gov/nme/nme-sep-rate.html.

[647] *See Decca Hospitality Furnishings*, 391 F. Supp. 2d at 1300.

[648] *See Senate Report 100-71* at 101; *see also Tissue Paper from China (Vietnam) Final Determination* at Comment 1 ("The overall purpose of an anti-circumvention inquiry is to prevent the evasion of an AD order").

124

determine whether circumvention was occurring and did not conduct a separate rates analysis. Commerce conducts separate rates analyses in administrative reviews.[649]  Commerce conducts administrative reviews to determine "the amount of any antidumping duty,"[650] and a separate rates analysis is integral to this.  Separately, Commerce conducts circumvention inquiries to establish whether certain goods must be subject to an order,[651] not to establish the duty rates for those goods.  Further, Commerce's application of the China-wide entity AD rate to exporters that do not have their own separate rate, or whose wafer suppliers do not have a separate rate, in this circumvention inquiry is consistent with its practice in other circumvention inquiries involving China including, contrary to NextEra's claim, *CORE from China (Vietnam)* in which Commerce stated that it "will instruct CBP to require AD cash deposits equal to the rate established for the China-wide entity (199.43 percent) …"[652]

We disagree with NextEra's claim that Commerce reached a determination based on adverse facts available with respect to certain cooperative third-country exporters that do not have a separate rate by requiring cash deposits equal to the China-wide rate on U.S. entries of their inquiry merchandise.  Commerce made determinations based on adverse facts available only with respect to uncooperative companies.  As adverse facts available, Commerce determined that the uncooperative companies "exported inquiry merchandise and that U.S. entries of that merchandise are circumventing the *Orders*."[653]  Additionally, Commerce prohibited importers and exporters from using certain certifications with respect to U.S. entries of inquiry merchandise from the uncooperative companies.[654]  Commerce did not require a cash deposit equal to the China-wide rate on U.S. entries of inquiry merchandise from any company as part of an adverse facts available determination.  Rather, Commerce required that importers deposit ADs equal to the China-wide rate on entries of inquiry merchandise from cooperative third-country exporters only where the third-country exporters or their Chinese wafer supplier(s) do not have a separate rate.  In fact, a company that is barred from certifying that its exports contain no Chinese wafers or module components may still receive a company-specific rate if it already has such a rate under the *Orders* or if its Chinese wafer exporter has its own rate under the *Orders*.[655]

Both the CIT and the CAFC recognized that even if Commerce based the China-wide entity's dumping margin on adverse facts available, that "does not change its applicability to an NME

---

[649] *See Tissue Paper from China (Vietnam) Final Determination* IDM at Comment 5 ("{c}ontrary to MFVN's suggestion, in conducting this inquiry, the Department has not determined a cash deposit rate, conducted a separate rate analysis, or calculated an individual margin of dumping for MFVN, which is done during an administrative review.").

[650] *See* section 751(a)(1)(B) of the Act.

[651] *See* section 781(b) of the Act; *see also Bell Supply CAFC.*

[652] *See CORE from China (Vietnam)*, 83 FR at 23896; *see also CORE from China AD Investigation*, 81 FR at 35318; *Tissue Paper from China (India) Final Determination* IDM at 15*; Aluminum Extrusions from China (Vietnam),* 84 FR at 39806*; Butt-Weld Pipe Fittings from China (Malaysia)*, 84 FR at 29165; and *SDGE from China (UK)* IDM at Comment 5.

[653] *See Preliminary Determinations*, 87 FR at 75221, 75223.

[654] *Id.*

[655] *See Preliminary Determinations*, 87 FR at 75224; *see also* the section "Entries on or After Termination of the Proclamation" in the *Federal Register* notice accompanying this memorandum.

entity that cooperated, but ultimately failed to qualify for a separate rate."[656]  For example, in *Advanced Technology*, the CIT stated:

> Commerce did not apply adverse facts available to {respondent}, Commerce rather found that {respondent} had not rebutted the presumption of state control and assigned it the {China}-wide rate.  These are two distinct legal concepts:  a separate AFA rate applies to a respondent who has received a separate rate but has otherwise failed to cooperate to the best of its ability whereas the {China}-wide rate applies to a respondent who has not received a separate rate. [657]

Consequently, we will continue to instruct CBP to require a cash deposit equal to the China-wide rate on U.S. entries of inquiry merchandise from any company that neither has its own AD cash deposit rate, nor uses a wafer exporter in China with its own AD cash deposit rate.

## XII.    RECOMMENDATION

Based on our analysis of the comments received and our findings at verification, we recommend adopting the above positions.  Additionally, we recommend finding that Sonali's solar cells and modules produced in Cambodia from silicon wafers imported from China are not subject to the scope of the *Orders*.  However, we recommend finding, based on the analysis and findings detailed above and in the *Preliminary Determination*, that imports of solar cells and modules, completed in Cambodia using certain parts and components manufactured in China, are circumventing the *Orders*, except for shipments complying with the certification requirements described in the *Federal Register* notice.

If this recommendation is accepted, we will publish the final determination in these inquiries in the *Federal Register*.

☒                              ☐
_____            _____
Agree                       Disagree

8/17/2023

X   _Lisa W. Wang_____

Signed by: LISA WANG

Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance

---

[656] *See Walk-Behind Lawn Mowers from China* IDM at Comment 9 (citing *Diamond Sawblades Coalition*, 866 F.3d at 1313).

[657] *Id.* at Comment 9 (citing *Advanced Technology*, 938 F. Supp. 2d  at 1351 (citing *Watanabe Group*, 34 CIT 1545, Slip Op. 10-139 at 9, n. 8)).

**Appendix I - Acronyms/Abbreviations**

| Acronym/Abbreviation | Complete Name |
|---|---|
| $ | United States Dollars |
| ACCESS | Antidumping and Countervailing Duty Centralized Electronic Service System |
| AD | Antidumping Duty |
| AFA | Adverse Facts Available |
| APA | Administrative Procedure Act |
| APO | Administrative Protective Order |
| AR | Administrative Review |
| Auxin | Auxin Solar Inc. |
| bn | Billion |
| Boviet | Boviet Solar Technology Co., Ltd. |
| BPI | Business Proprietary Information |
| BYD HK | BYD (H.K.) Co., Ltd. |
| Shangluo BYD | BYD (Shangluo) Industrial Co., Ltd. |
| CAFC | U.S. Court of Appeals for the Federal Circuit |
| Cambodia | Kingdom of Cambodia |
| Canadian Solar or the Canadian Solar Group | Canadian Solar International Limited; Canadian Solar Manufacturing (Changshu) Inc.; Canadian Solar Manufacturing (Luoyang) Inc.; CSI Cells Co., Ltd.; CSI Solar Co., Ltd.; CSI Manufacturing (Fu Ning) Co., Ltd.; Canadian Solar Manufacturing (Thailand) Co., Ltd.; and Canadian Solar Manufacturing Vietnam Co., Ltd. |
| CBP | U.S. Customs and Border Protection |
| CCR | Changed Circumstances Review |
| CdTe | Cadmium Telluride |
| CEA | Clean Energy Associates, LLC |
| China | The People's Republic of China |
| CIT | U.S. Court of International Trade |
| COM | Cost of manufacturing |
| Commerce | The U.S. Department of Commerce |
| CORE | Certain Corrosion-Resistant Steel Products |
| CRS | Certain Cold-Rolled Steel Flat Products |
| CSIL | Canadian Solar International Limited |
| CSIL | Canadian Solar International Limited. Also, any reference to the author of case briefs and rebuttals submitted by CSIL and any member of the Canadian Solar Group. |

| | |
|---|---|
| CSPV | Crystalline Silicon Photovoltaic |
| CVD | Countervailing Duty |
| Date of Termination | Date of termination of Presidential Proclamation 10414 |
| DOE | United States Department of Energy |
| EPCG | Export Promotion Capital Goods |
| ET | Eastern Time |
| EVA | Ethylene Vinyl Acetate |
| FA | Facts Available |
| First Solar Malaysia | First Solar Malaysia Sdn. Bhd. |
| First Solar Vietnam | First Solar Vietnam Manufacturing Co., Ltd. |
| FY | Fiscal Year |
| GW | Gigawatt |
| G&A | General and Administrative Expenses |
| Hanwha | Hanwha Q Cells Malaysia Sdn. Bdh. |
| HFC | Hydrofluorocarbon |
| HRS | Hot Rolled Steel |
| HTS | Harmonized Tariff Schedule |
| IDM | Issues and Decision Memorandum |
| IEA | International Energy Agency |
| Inquiry Countries | Cambodia, Malaysia, Thailand and Vietnam |
| ITC | U.S. International Trade Commission |
| Jinko | Jinko Solar Technology Sdn. Bhd./ Jinko Solar (Malaysia) Sdn. Bhd. |
| Le Shan Jinko | Jinko Solar (Le Shan) Co., Ltd |
| KHR | Cambodian Riel |
| LONGi | LONGi (H.K) Trading Limited in the Vietnam segment, and LONGi (Kuching) Sdn. Bhd. and LONGi Technology (Kuching) Sdn. Bhd. in the Malaysia segment |
| LWRPT | Light-Walled Rectangular Pipe and Tube |
| Maxeon | Maxeon Solar Technologies, Ltd. |
| mn | Million |
| MW | Megawatts |
| MYR | Malaysian Ringgit |
| NE Solar | New East Solar Energy (Cambodia) Co., Ltd. |
| NextEra | NextEra Energy Constructors, LLC |
| Ningbo Kyanite | Ningbo Kyanite International Trade Co., Ltd |
| NME | non-market economy |

| | |
|---|---|
| OCTG | Oil Country Tubular Goods |
| p/n | Positive/Negative |
| PDM | Preliminary Decision Memorandum |
| PERC | Passivated Emitter and Rear Contact |
| PET Film | Polyethylene Terephthalate Film, Sheet, and Strip |
| PLI | Product-Linked Incentive |
| POR | Period of Review |
| Q&V | Quantity and Value |
| R&D | Research and Development |
| Red Sun | Red Sun Energy Long An Company Limited |
| Risen | Risen Solar Technology Sdn. Bhd |
| RMB | Renminbi |
| Silfab | Silfab Solar WA Inc. |
| solar cells and modules | certain crystalline silicon photovoltaic cells, whether or not assembled into modules |
| Sonali | Sonali Energees USA LLC |
| Tata Power | Tata Power Solar System Limited |
| TBH | Thai Bhat |
| Thailand | Kingdom of Thailand |
| the Act | Tariff Act of 1930, as amended |
| The LONGi Group | LONGi (Kuching) Sdn. Bhd., LONGi Technology (Kuching) Sdn. Bhd. , LONGi (H.K.) Trading Limited, LONGi Solar Technology (H.K.) Limited, LONGi Solar Technology (U.S.) Inc. |
| THSM | Canadian Solar Manufacturing (Thailand) Co., Ltd. |
| Trina or the Trina Group | Trina Solar (Vietnam) Science & Technology Co., Ltd, Trina Solar Energy Development Company Limited, and Trina Solar Co., Ltd. in Vietnam segment and Trina Solar Science & Technology (Thailand) Ltd. in Thailand segment |
| TTL | Trina Solar Science & Technology (Thailand) Ltd. |
| TTL | Trina Solar Science & Technology (Thailand) Ltd. Also, any reference to the author of case briefs and rebuttals submitted by TTL and any member of the Trina Group. |
| TSSD | Trina Solar (Singapore) Science & Technology Pte. Ltd. |

| | |
|---|---|
| TCZ | Trina Solar Co., Ltd. |
| URAA | Uruguay Round Agreements Act |
| Vietnam | Socialist Republic of Vietnam |
| Vina | Vina Solar Technology Company Limited |
| Vina Cell | Vina Cell Technology Company Limited |
| VND | Vietnamese Dong |
| VSUN | Vietnam Sunergy Joint Stock Company |
| Websol Energy | Websol Energy System Limited |

**Appendix II - Court and Case Citation Table**
**This Section is Sorted by Short Citation**

| Short Citation | Administrative Case Determinations |
|---|---|
| *2003 Policy Bulletin* | *Proposed Policies Regarding the Conduct of Changed Circumstance Reviews of the Countervailing Duty Order on Softwood Lumber from Canada (C 122 839)*, 68 FR 37456 (June 24, 2003) |
| *2021 Regulations Final Rule* | *Regulations to Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 FR 52300 (September 20, 2021) |
| *Activated Carbon from China* | *Certain Activated Carbon from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2016-2017,* 83 FR 53214 (October 22, 2018), and accompanying IDM |
| *Orders* | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from the People's Republic of China:  Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 77 FR 73018 (December 7, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Countervailing Duty Order*, 77 FR 73017 (December 7, 2012) |
| *AD Order* | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from the People's Republic of China:  Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 77 FR 73018 (December 7, 2012) |
| *Adoption of CFR 351.228* | *Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 FR 52300 (September 20, 2021) |
| *Advanced Technology* | *Advanced Technology & Materials Co. v. United States*, 938 F. Supp. 2d 1342, 1351 (CIT 2013) (citing Watanabe Group v. United States, 34 CIT 1545 (CIT 2010), Slip Op. 10-139 |
| *Ajmal Steel* | *Ajmal Steel Tubes & Pipes Indus. LLC v. United States,* Slip Op. 22-121 (CIT October 28, 2022) |
| *AK Steel Corp.* | *AK Steel Corp. v. United States*, 192 F.3d 1367 (Fed. Cir. 1999) |
| *Al Ghurair CAFC 2023* | *Al Ghurair Iron & Steel LLC v. United States*, 65 F.4th 1351 (Fed. Cir. 2023) |
| *Al Ghurair CIT 2021* | *Al Ghurair Iron & Steel LLC v. United States*, 536 F. Supp. 3d 1357 (CIT 2021) |

| | |
|---|---|
| *Alaska* | *Alaska Pro. Hunters Ass'n v. FAA*, 177 F.3d 1030, 1033-34, 1036 (D.C. Cir. 1999) |
| *Albemarle Corp.* | *Albemarle Corp. & Subsidiaries v. United States*, 821 *F.3d 1345 (Fed. Cir. 2016)* |
| *Allegheny v. U.S.* | *Allegheny Ludlum Corp. v. United States*, 346 F.3d 1368 (Fed. Cir. 2003) |
| *Aluminum (Taishan) Co.* | *Aluminum (Taishan) Co. v. United States,* 983 F.3d 487 (Fed. Cir. 2020) |
| *Aluminum Extrusions from China* | *Aluminum Extrusions from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 76 FR 18524 (April 4, 2011) |
| *Aluminum Extrusions from China (Vietnam)* | *Aluminum Extrusions from the People's Republic of China:  Final Affirmative Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders, and Partial Rescission*, 84 FR 39805 (August 12, 2019) |
| *Aluminum Extrusions from China Minor Alterations Circumvention Final* | *Aluminum Extrusions from the People's Republic of China:  Affirmative Final Determination of Circumvention of the Antidumping and Countervailing Duty Orders and Rescission of Minor Alterations Anti-Circumvention Inquiry*, 82 FR 34630 (July 26, 2017), and accompanying IDM |
| *Aluminum Extrusions from China Preliminary CCR* | *Aluminum Extrusions from the People's Republic of China:  Initiation and Preliminary Results of Expedited Changed Circumstances Review*, 83 FR 34548 (July 20, 2018) |
| *Aluminum Foil from China* | *Certain Aluminum Foil from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 83 FR 9282 (March 5, 2018) |
| *Aluminum Foil from China (Korea and Thailand)* | *Antidumping and Countervailing Duty Orders on Certain Aluminum Foil from the People's Republic of China:  Preliminary Affirmative Determinations of Circumvention With Respect to the Republic of Korea and the Kingdom of Thailand,* 88 FR 17177 (March 22, 2023) |
| *Aluminum Foil from China (Korea and Thailand) Preliminary* | *Antidumping and Countervailing Duty Orders on Certain Aluminum Foil from the People's Republic of China:  Preliminary Affirmative Determinations of Circumvention With Respect to the Republic of Korea and the Kingdom of Thailand*, 88 FR 17177 (March 22, 2023), and accompanying PDM |
| *Aluminum Foil from Oman* | *Certain Aluminum Foil from the Sultanate of Oman: Final Affirmative Countervailing Duty Determination*, 86 FR 52888 (September 23, 2021) |

| | |
|---|---|
| *Aluminum Foil PDM* | *Antidumping Duty Investigation of Certain Aluminum Foil from the People's Republic of China:  Affirmative Preliminary Determination of Sales at Less-Than-Fair Value and Postponement of Final Determination*, 82 FR 50858, 50861 (November 2, 2017), and accompanying PDM (citing Memorandum, "China's Status as a Non-Market Economy," dated October 26, 2017) |
| *Aluminum Sheet from Bahrain* | *Common Alloy Aluminum Sheet from Bahrain:  Final Affirmative Countervailing Duty Determination*, 86 FR 13333 (March 8, 2021) |
| *Amanda Foods CIT* | *Amanda Foods (Vietnam) Ltd. v. United States*, 647 F. Supp. 2d at 1381 |
| *Antidumping and Countervailing Duties FR* | *Antidumping Duties; Countervailing Duties*, 61 FR 7308 (February 27, 1996) |
| *Antidumping Duties; Countervailing Duties; Final Rule* | *Antidumping Duties; Countervailing Duties; Final Rule*, 62 FR 27296, 27340 (May 19, 1997) |
| *API v. U.S.* | *API v. United States EPA*, 52 F.3d 1113, 1119 (D.C. Cir. 1995) |
| *Appelton Papers Inc.* | *Appelton Papers Inc. v. United States*,  37 CIT 1034 Slip Op.13-87 (July 2013) |
| *Archer Daniels* | *Archer Daniels Midland Co. v. United States*, 968 F. Supp. 2d 1269, 1279 (CIT 2014) |
| *Ass'n of Priv. Sector* | *Ass'n of Priv. Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 462-63 (D.C. Cir. 2012) |
| *Ausimont* | *Ausimont United States v. United States*, 882 F. Supp. 1087, 1098 (CIT 1995) |
| *B.F. Goodrich v. U.S.* | *B.F. Goodrich Co. v. United States*, 794 F. Supp. 1148 (CIT 1992) |
| *Baker Hostetler* | *Baker Hostetler v. United States*, 473 F.3d 312 (D.C. Cir. 2006) |
| *Ball Bearings from Thailand* | *Final Affirmative Countervailing Duty Determination and Partial Countervailing Duty Order:  Ball Bearings and Parts Thereof from Thailand; Final Negative Countervailing Duty Determinations:  Antifriction Bearings (Other Than Ball or Tapered Roller Bearings) and Parts Thereof from Thailand*, 54 FR 19130 (May 3, 1989) |
| *Beijing Tianhai* | *Beijing Tianhai Industry Co. v. United States*, 52 F. Supp. 3d 1351 (CIT 2015) |
| *Bell Supply CAFC* | *Bell Supply Co., LLC v. United States*, 888 F.3d 1222 (Fed. Cir. 2018) |

| | |
|---|---|
| *Bethlehem Steel v. U.S.* | *Bethlehem Steel Corp. v. United States*, 140 F. Supp. 2d 1354 (CIT 2001) |
| *Bloomberg Report* | BloombergNEF, Solar PV Trade and Manufacturing: A Deep Dive (2021) |
| *BMW of N. Am. LLC* | *BMW of N. Am. LLC v. United States*, 926 F.3d 1291 (Fed. Cir. 2019) |
| *Bomont Indus.* | *Bomont Indus. v. United States*, 733 F. Supp. 1507 (CIT 1990) |
| *Borusan v. American Cast Iron Pipe* | *Borusan Mannesmann Boru Sanayi v. American Cast Iron Pipe Co.*, Ct. No. 20-2014 2021 U.S. App. (Fed. Cir. 2021) |
| *Borusan  2015* | *Borusan Mannesmann Boru Sanayi v Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306 (CIT 2015) |
| *Borusan  2017* | *Borusan Mannesmann Boru Sanayi v Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306, 1327-30, *aff'd* 857 F.3d 1353 (Fed. Cir. 2017) |
| *Bowen* | *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) |
| *Brass Sheet and Strip from Canada* | *Brass Sheet and Strip from Canada:  Final Affirmative Determination of Circumvention of Antidumping Duty Order,* 58 FR 33610 (June 18, 1993), and accompanying IDM |
| *Building Sys. De Mex.* | *Building Sys. De Mex., S.A. de C.V. v. United States*, 567 F. Supp. 3d 1306, 1316 (CIT 2022) |
| *Butt-Weld Pipe Fittings from China (Malaysia)* | *Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China:  Final Affirmative Determination of Circumvention of the Antidumping Duty Order*, 84 FR 29164 (June 21, 2019) |
| *Butt-Weld Pipe Fittings from China (Thailand)* | *See Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China; Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 59 FR 15155 (March 31, 1994) |
| *Canada – Feed-In Tariff Program* | *Canada – Measures Relating to the Feed-In Tariff Program, (WT/DS426/AB/R)*, adopted May 6, 2013 |
| *Canadian Solar CAFC* | *Canadian Solar, Inc. v. United States*, 918 F.3d 909, 919 (Fed. Cir. 2019) |
| *Carbon and Alloy Steel Wire Rod from Italy* | *Countervailing Duty Investigation of Carbon and Alloy Steel Wire Rod from Italy:  Final Affirmative Determination*, 83 FR 13242 (March 28, 2018) |
| *Carbon Steel Flanges from Italy* | *Finished Carbon Steel Flanges from Italy:  Final Determination of Sales at Less Than Fair Value*,  82 FR 29481 (June 29, 2017), and accompanying IDM |

| | |
|---|---|
| *Carlisle Tire & Rubber v. U.S.* | *Carlisle Tire & Rubber Co. v. United States*, 564 F. Supp. 834 (CIT 1983) |
| *Cathedral Candle* | *Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*, 400 F.3d 1352, 1366 (Fed. Cir. 2005) |
| *Celik Halat* | *Celik Halat ve Tel Sanayi A.S. v. United States*, 557 F. Supp. 3d 1348 (CIT 2022) |
| *Ceramica Regiomontana* | *Ceramica Regiomontana, S.A. v. United States*, 636 F. Supp. 961, 966 (CIT 1986) |
| *Certain Pasta from Italy AR11* | *Certain Pasta from Italy:  Final Results of the Eleventh (2006) Countervailing Duty Administrative Review*, 74 FR 5922 (February 3, 2009) |
| *Certain Pasta from Italy AR7* | *Certain Pasta from Italy:  Final Results of the Seventh Countervailing Duty Administrative Review*, 69 FR 70657 (December 7, 2004) |
| *Certain Steel Products from Korea* | *Final Affirmative Countervailing Duty Determinations and Final Negative Critical Circumstances Determinations:  Certain Steel Products from Korea*, 58 FR 37338 (July 9, 1993) |
| *Certain Wheat from Canada* | *Final Affirmative Countervailing Duty Determinations: Certain Durum Wheat and Hard Red Spring Wheat from Canada*, 68 FR 52747 (September 5, 2003) |
| *Cf. Stark v. Wickard* | *Cf. Stark v. Wickard,* 321 U.S. 288 (1944) |
| *CFS from China* | *Coated Free Sheet Paper from the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, 72 FR 60645 (October 25, 2007) |
| *Changzhou Trina Solar Energy v. U.S. (2016)* | *Changzhou Trina Solar Energy Co. v. United States*, 195 F. Supp. 3d 1334 (CIT 2016) aff'd 264 F. Supp. 3d 1325, 1334 (CIT 2017) |
| *Changzhou Trina Solar Energy v. U.S. (2018)* | *Changzhou Trina Solar Energy Co. Ltd. v. United States*, 352 F. Supp. 3d 1316 (CIT 2018) |
| *Changzhou Trina Solar Energy v. U.S. (2020)* | *Changzhou Trina Solar Energy Co. v. United States*, 466 F. Supp. 3d 1287 (CIT 2020) |
| *Changzhou Wujin Fine Chem* | *Changzhou Wujin Fine Chem. Factory Co. v. United States,* 701 F.3d 1367 (Fed. Cir. 2012) |
| *Chevron* | *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984) |
| *Chlorinated Isocyanurates from China* | *Chlorinated Isocyanurates from the People's Republic of China:  Final Results of Countervailing Duty Administrative Review, and Partial Rescission of Countervailing Duty Administrative Review*, 82 FR 27466 (June 15, 2017) |

| | |
|---|---|
| *Chlorinated Isocyanurates from China 2019-2020 Final Results* | *Chlorinated Isocyanurates from the People's Republic of China:  Final Determination of No Shipments; 2019–2020 Administrative Review*, 86 FR 36253 (July 9, 2021) |
| *Chlorinated Isocyanurates from China 2019-2020 Preliminary Results* | *Chlorinated Isocyanurates from the People's Republic of China:  Preliminary Determination of No Shipments; 2019-2020*, 86 FR 13291 (March 8, 2021) |
| *Cinsa* | *Cinsa, S.A. de C.V. v. United States*, 966 F. Supp. 1230 (CIT 1997) |
| *Circular Welded Carbon-Quality Steel Pipe from China (Vietnam) Preliminary* | *Circular Welded Carbon Quality Steel Pipe from the People's Republic of China:  Preliminary Affirmative Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders*, 88 FR 21975 (April 12, 2023) |
| *Circular Welded Carbon-Quality Steel Pipe from Oman* | *Circular Welded Carbon-Quality Steel Pipe from the Sultanate of Oman:  Final Affirmative Countervailing Duty Determination*, 77 FR 64473 (October 22, 2012) |
| *CITIC Trading Company, Ltd. Remand* | *Final Results of Redetermination Pursuant to Court Remand, CITIC Trading Company, Ltd. v. United States of America and ABC Coke, et al:  Final Results Pursuant to Remand*, Court No. 01-00901, Slip Op. 03-23 (CIT March 4, 2003), dated June 17, 2003, available at https://access.trade.gov/resources/remands/03-23.pdf |
| *Citric Acid from China* | *Citric Acid and Certain Citrate Salts from the People's Republic of China:  Final Results of Countervailing Duty Administrative Review*, 77 FR 72323 (December 5, 2012) |
| *COALITION I* | *Comm. Overseeing Action for Lumber Int'l Trade Investigations v. United States*, 483 F. Supp. 3d 1253 (CIT 2020) |
| *COALITION II* | *Comm. Overseeing Action for Lumber Int'l Trade Investigations v. United States*, 535 F. Supp. 3d 1336 (CIT 2021) |
| *Coated Paper from China* | *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, 75 FR 59212 (September 27, 2010) |
| *Cold Rolled Steel from China (Vietnam) Preliminary* | *Certain Cold-Rolled Steel Flat Products from the People's Republic of China:  Affirmative Preliminary Determination of Anti-Circumvention Inquiries on the Antidumping Duty and Countervailing Duty Orders*, 82 FR 58178 (December 11, 2017) |

| | |
|---|---|
| *CORE from China (Guatemala)* | *Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Negative Final Determination of Circumvention Involving Guatemala,* 85 FR 41954 (July 13, 2020) |
| *CORE from China (Guatemala) Preliminary* | *Negative Preliminary Determination of Circumvention Involving Guatemala:  Certain Corrosion-Resistant Steel Products from the People's Republic of China*, 85 FR 8840 (February 18, 2020) |
| *CORE from China (Malaysia) Final* | *Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Affirmative Final Determination of Circumvention Involving Malaysia*, 86 FR 30263 (June 7, 2021) |
| *CORE from China (Malaysia) Preliminary* | *Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Affirmative Preliminary Determination of Circumvention Involving Malaysia*, 85 FR 8823 (February 18, 2020) |
| *CORE from China (South Africa)* | *Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Negative Final Determination of Circumvention Involving South Africa*, 86 FR 30253 (June 7, 2021), and accompanying IDM |
| *CORE from China (South Africa) Preliminary* | *Negative Preliminary Determination of Circumvention Involving South Africa:  Certain Corrosion-Resistant Steel Products from the People's Republic of China*, 85 FR 8844 (February 18, 2020) |
| *CORE from China (UAE)* | *Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Affirmative Final Determination of Circumvention Involving the United Arab Emirates*, 85 FR 41957 (July 13, 2020) |
| *CORE from China (UAE) Preliminary* | *Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Affirmative Preliminary Determination of Circumvention Involving the United Arab Emirates*, 85 FR 8841 (February 18, 2020) |
| *CORE from China (Vietnam)* | *Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Affirmative Final Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders*, 83 FR 23895 (May 23, 2018) |

| | |
|---|---|
| CORE from China AD Investigation | *Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value, and Final Affirmative Critical Circumstances Determination, in Part*, 81 FR 35316 (June 2, 2016) |
| CORE from Korea (Vietnam) | *Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Affirmative Final Determinations of Circumvention of the Antidumping Duty and Countervailing Duty Orders*, 84 FR 7034 (December 26, 2019) |
| CORE from Taiwan (Malaysia) | *Certain Corrosion-Resistant Steel Products from Taiwan:  Affirmative Final Determination of Circumvention Involving Malaysia*, 86 FR 30257 (June 7, 2021) |
| CORE from Taiwan Final | *Certain Corrosion-Resistant Steel Products from Taiwan:  Affirmative Final Determination of Circumvention Inquiry on the Antidumping Duty Order*, 84 FR 70937 (December 26, 2019) |
| CORE from Taiwan Preliminary Determination | *Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Affirmative Preliminary Determination of Anti-Circumvention Inquiries on the Antidumping Duty and Countervailing Duty Orders*, 84 FR 32875 (July 10, 2019) |
| CRS from Brazil | *Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from Brazil:  Final Affirmative Determination,* 81 FR 49940 (July 29, 2016), and accompanying IDM |
| CRS from China (Vietnam) | *Certain Cold-Rolled Steel Flat Products from the People's Republic of China:  Affirmative Final Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders*, 83 FR 23891 (May 23, 2018) |
| CRS from Korea (Vietnam) | *Certain Corrosion-Resistant Steel Products from the Republic of Korea:  Affirmative Final Determinations of Anti-Circumvention Inquiries on the Antidumping Duty and Countervailing Duty Orders*, 84 FR 70948 (December 26, 2019) |
| CRS from Korea (Vietnam) Preliminary | *Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Affirmative Preliminary Determination of Anti-Circumvention Inquiries on the Antidumping Duty and Countervailing Duty Orders*, 84 FR 32875 (July 10, 2019) |

| | |
|---|---|
| *CVD Order* | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Countervailing Duty Order*, 77 FR 73017 (December 7, 2012) |
| *CVP 23 from China* | *Carbazole Violet Pigment 23 from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review*, 75 FR 36630 (June 28, 2010) |
| *CWCS from India (Oman and India) Final* | *Certain Welded Carbon Steel Standard Pipes and Tubes from India: Final Negative Determinations of Circumvention of the Antidumping Duty Order*, 88 FR 12917 (March 1, 2023) |
| *CWCS from India (Oman and India) Preliminary* | *Preliminary Negative Determinations of Circumvention of the Antidumping Order:  Certain Welded Carbon Steel Standard Pipes and Tubes from India*, 87 FR 52507 (August 26, 2022) |
| *DAK Americas* | *DAK Americas LLC v. United States*, 517 F. Supp. 3d 1349, 1360 (CIT 2021) |
| *Decca Hospitality Furnishings* | *Decca Hospitality Furnishings, LLC, et al. v. United States*, 391 F. Supp. 2d 1298 (August 2005) |
| *Diamond Sawblades (Thailand)* | *Diamond Sawblades and Parts Thereof from the People's Republic of China:  Final Determination of AntiCircumvention Inquiry*, 84 FR 33920 (July 16, 2019) |
| *Diamond Sawblades (Thailand) Preliminary* | *Diamond Sawblades and Parts Thereof from the People's Republic of China:  Preliminary Affirmative Determination of Circumvention*, 83 FR 57425 (November 15, 2018) |
| *Diamond Sawblades Coalition* | *Diamond Sawblades Manufacturers Coalition v. United States*, 866 F.3d 1304, 1313 (Fed. Cir. 2017) |
| *Diamond Sawblades Coalition CIT* | *Diamond Sawblades Manufacturers Coalition v. United States*, 816 F. Supp. 2d 1342 (CIT January 2012) |
| *Dillinger France* | *Dillinger France S.A. v. United States*, 981 F.3d 1318, 1322 (Fed. Cir. 2020) |
| *Dongtai Peak* | *Dongtai Peak Honey Indus. v. United States*, 777 F.3d 1343 (Fed. Cir. 2015) |
| *Encino Motorcars* | *Encino Motorcars, LLC v. Navarro*, 570 U.S. 211 (2016) |
| *Ericsson* | *Ericsson GE Mobile Commc'ns, Inc. v. United States*, 60 F.3d 778, 782 (Fed. Cir. 1995) |
| *Essar Steel* | *Essar Steel Ltd. v. United States*, 678 F.3d 1268 (Fed. Cir. 2012) |

| | |
|---|---|
| *F Lli De Cecco* | *F. Lli De Cecco Di Filippo Fara San Martino S.P.A. v. United States*, 980 F. Supp 485 (CIT 1997) |
| *F Lli De Cecco Fed. Cir.* | *F. Lli De Cecco Di Filippo Fara San Martino S.P.A. v. United States*, 216 F.3d 1027 (Fed. Cir. 2000) |
| *FDA v. Brown & Williamson* | *FDA v. Brown & Williamson Tobacco*, 529 U.S. 120 (2000) |
| *PSF from Korea* | *Fine Denier Polyester Staple Fiber from the Republic of Korea:  Final Affirmative Determination of Sales at Less Than Fair Value*, 83 FR 24743 (May 30, 2018) |
| *PSF from Taiwan* | *Fine Denier Polyester Staple Fiber from Taiwan: Final Affirmative Determination of Sales at Less Than Fair Value*, 83 FR 24745 (May 30, 2018) |
| *Federal–Mogul Corp.* | Federal–Mogul Corp. v. United States, 63 F.3d 1572, 1575 (Fed. Cir. 1995) |
| *Ferrostaal Metals GmbH* | *Ferrostaal Metals GmbH v. United States*, 518 F. Supp. 3d 1357 (CIT 2021) |
| *Ferrovanadium from China Final Determination* | *Notice of Final Determination of Sales at Less Than Fair Value:  Ferrovanadium from the People's Republic of China*, 67 FR 71137 (November 29, 2002) |
| *Ferrovanadium from China Preliminary Determination* | *Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination:  Ferrovanadium from the People's Republic of China*, 67 FR 45088 (July 8, 2002) |
| *Ferrovanadium from Russia Final Determination* | *Ferrovanadium and Nitrided Vanadium from the Russian Federation:  Negative Final Determination of Circumvention of the Antidumping Duty Order*, 77 FR 46712 (August 6, 2012) |
| *Ferrovanadium from Russia Preliminary Determination* | *Preliminary Negative Determination and Extension of Time Limit for Final Determination of Circumvention of the Antidumping Duty Order on Ferrovanadium and Nitrided Vanadium from the Russian Federation*, 77 FR 6537 (February 8, 2012) |
| *Fish Fillets from Vietnam* | *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Final Results of Antidumping Duty Administrative Review and New Shipper; 2010-2011*, 78 FR 17350 (March 21, 2013), and accompanying IDM |

| | |
|---|---|
| *Fish Fillets from Vietnam (Cambodia)* | *Circumvention and Scope Inquiries on the Antidumping Duty Order on Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Partial Affirmative Final Determination of Circumvention of the Antidumping Duty Order, Partial Final Termination of Circumvention Inquiry and Final Rescission of Scope Inquiry*, 71 FR 38608 (July 7, 2006) |
| *Fort Stewart* | *Fort Stewart Schs. v. Fed. Labor Relations Auth.*, 495 U.S. 641, 654 (1990) |
| *Fource Glass Co.* | *Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222 (1957) |
| *Gallant Ocean (Thai.) Co.* | *Gallant Ocean (Thai.) Co., v. United States*, 602 F.3d 1319 (Fed. Cir. 2010) |
| *Glycine from China (India)* | *Glycine from the People's Republic of China:  Final Partial Affirmative Determination of Circumvention of the Antidumping Duty Order*, 77 Fed. Reg. 73,426 (December 10, 2012) |
| *Glycine from India CVD* | *Glycine from India:  Final Results of Countervailing Duty Administrative Review; 2020,* 87 FR 76611 (December 15, 2022) |
| *Granular PTFE Resin from Italy* | *Polytetrafluoroethylene Resin from Italy:  Final Affirmative Determination of Circumvention of Antidumping Duty Order*, 58 FR 26100 (April 30, 1993) |
| *Graphite Electrodes from China (U.K.) Prelim* | *Small Diameter Graphic Electrodes from the People's Republic of China:  Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order and Extension of Final Determination*, 77 FR 33405, 33413 (June 6, 2012) |
| *Grobest* | *Grobest & I-Mei Industries (Vietnam) Co., Ltd. v. United States*, 815 F. Supp. 2d 1342 (CIT 2012) |
| *Hangers from China (Vietnam)* | *Steel Wire Garment Hangers from the People's Republic of China:  Affirmative Final Determination of Circumvention of the Antidumping Duty Order, 76* FR 66895 (October 28, 2011), and accompanying IDM |
| *Hangers from China (Vietnam) Preliminary Determination* | *Steel Wire Garment Hangers from the People's Republic of China:  Affirmative Preliminary Determination of Circumvention of the Antidumping Order and Extension of Final Determination*, 76 FR 27007 (May 10, 2011) |

| | |
|---|---|
| Hardwood Plywood from China | *Certain Hardwood Plywood Products from the People's Republic of China: Final Scope Determination and Affirmative Final Determination of Circumvention of the Antidumping and Countervailing Duty Orders*, 88 FR 46470 (July 20, 2023) |
| HFCs from China (India) | *Hydrofluorocarbon Blends from the People's Republic of China: Final Negative Scope Ruling on Gujarat Fluorochemicals Ltd.'s R-401A Blend; Affirmative Final Determination of Circumvention of the Antidumping Duty Order by Indian Blends Containing Chinese Components*, 85 FR 61930 (October 1, 2020) |
| HFCs from China (India) Preliminary | *Hydrofluorocarbon Blends from the People's Republic of China: Preliminary Scope Ruling on Gujarat Fluorochemicals Ltd.'s R-410A Blend; Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order for Indian Blends Containing Chinese Components*, 85 FR 20244 (April 10, 2020) |
| Hot-Rolled Lead and Bismuth | *Hot-Rolled Lead and Bismuth Carbon Steel Products from Germany and the United Kingdom; Negative Final Determinations of Circumvention of Antidumping and Countervailing Duty Orders*, 64 FR 40336 (July 26, 1999) |
| Hot-Rolled Steel from Korea AD | *Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 FR 32720 (July 9, 2019) |
| Huvis | *Huvis Corp. v. United States*, 570 F.3d 1347, 1356 (Fed. Cir. 2009) |
| Hyundai Electricity CAFC | *Hyundai Elec. & Energy Sys. Co. v. United States*, 15 F.4th 1078 (Fed. Cir. 2021) |
| Hyundai Electricity CIT | *Hyundai Electric & Energy Systems Co., Ltd v. United States*, 477 F. Supp.3d 1324, 132 (CIT 2020) |
| I.N.S. | *I.N.S. v. Enrico St. Cyr*, 533 U.S. 289, 316 (2001) |
| Initiation Notice Dated February 2, 2023 | *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 FR 7060, 71062 (February 2, 2023) |
| Inmax SDN | *Inmax SDN v. United States,* 277 F. Supp. 3d 1367 (CIT 2017) |
| Invenergy | Invenergy Renewables LLC v. United States, 422 F. Supp. 3d 1255, 1285 (CIT 2019) |
| Jiasheng | *Jiangsu Jiasheng Photovoltaic Technology Co., Ltd. v. United States,* 28 F. Supp. 3d 1317 (CIT 2014) |
| Kisor | *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) |

| | |
|---|---|
| KYD, Inc. | *KYD, Inc. v. United States*, 607 F.3d 760, 767-68 (Fed. Cir. 2010) |
| Lined Paper Products from India | *Certain Lined Paper Products from India: Notice of Final Results of the First Antidumping Duty Administrative Review*, 74 FR 17149 (April 14, 2009) |
| LWR from China (Vietnam) Preliminary | *Light-Walled Rectangular Pipe and Tube from the People's Republic of China: Preliminary Affirmative Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders*, 88 FR 21985 (April 12, 2023) |
| LWR from Taiwan (Vietnam) Preliminary | *Light-Walled Welded Rectangular Carbon Steel Tubing from Taiwan: Preliminary Affirmative Determination of Circumvention of the Antidumping Duty Order*, 88 FR 21980 (April 12, 2023) |
| Macao CIT | *Macao Commer. & Indus. Spring Mattress Mfr. v. United States,* 437 F. Supp. 3d 1324 (CIT 2020) |
| Max Fortune Indus. Co. | *Max Fortune Indus. Co. v. United States*, Slip Op. 13-52 (CIT 2013), 37 CIT 549, 560-62 (CIT 2013) |
| Merck Sharp & Dohme Corp. v. Albrecht | *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1679 (2019) |
| Michigan | *Michigan v. EPA*, 576 U.S. 743, 752 (2015) |
| Mid Continent | *Mid Continent Steel & Wire, Inc. v. United States*, Slip Op. 2023-45 (CIT 2023) |
| Mitsubishi Elec. Corp. | *Mitsubishi Elec. Corp. v. United States,* 700 F. Supp. 538, 555 (CIT 1988), *aff'd* 898 F. 2d 1577 (Fed. Cir. 1990) |
| Mitsubishi Heavy Industries | *Mitsubishi Heavy Industries v. United States,* 986 F. Supp. 1428 (CIT 1997) |
| Mukund CIT | *Mukand, Ltd. v. United States*, 37 CIT 443, 452 (CIT 2013) |
| Mukund Fed. Cir. | *Mukand, Ltd. v. United States*, 767 F.3d 1300, 1308 (Fed. Cir. 2014) |
| Nails from Malaysia CCR Initiation | *Certain Steel Nails from Malaysia: Initiation of Antidumping Duty Changed Circumstances Review*, 80 FR 71772 (November 17, 2015) |
| Nails from Oman | *Final Results of Antidumping Duty Administrative Review; 2021: Certain Steel Nails from the Sultanate of Oman*, 87 FR 78639 (December 22, 2022) |
| Nippon Steel | *Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003) |

| | |
|---|---|
| *OCTG from China (Brunei and Philippines)* | *Oil Country Tubular Goods from the People's Republic of China: Final Affirmative Determinations of Circumvention*, 86 FR 67443 (November 26, 2021) |
| *OCTG from China (Brunei and Philippines) Preliminary* | *Oil Country Tubular Goods from the People's Republic of China: Preliminary Affirmative Determinations of Circumvention*, 86 FR 43627 (August 10, 2021) |
| *OCTG from China CCR* | *Oil Country Tubular Goods from the People's Republic of China: Final Results of Antidumping and Countervailing Duty Changed Circumstances Reviews*, 87 FR 15915 (March 21, 2022) |
| *Off-the-Road Tires from China* | *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 FR 40485 (July 15, 2008), and accompanying IDM |
| *Oman Fasteners* | *Oman Fasteners LLC v. United States*, Slip Op. 23-17 (February 22, 2023) |
| *Omnibus Trade & Competitiveness Act* | Conference Report to the 1988 Omnibus Trade & Competitiveness Act, H.R. Rep. No. 100-576, (1988), at 590, reprinted in 1988 U.S.C.C.A.N. 1547, 1623-24 |
| Omnibus Trade Act, Report of the Senate Finance Committee | Omnibus Trade Act, Report of the Senate Finance Committee, S. Rep. No. 71, 100th Cong., 1st Sess. 100 (1987) |
| *Paper from Brazil SII* | *Certain Uncoated Paper from Brazil: Preliminary Results of the Antidumping Duty Administrative Review and Preliminary Successor-in-Interest Determination; 2019-2020*, 86 FR 30000 (June 4, 2021), unchanged in *Certain Uncoated Paper from Brazil: Final Results of Antidumping Duty Administrative Review; 2019-2020*, 86 FR 55820 (October 7, 2021) |
| *Pasta from Italy (U.S.) Circumvention* | *Certain Pasta from Italy: Affirmative Final Determinations of Circumvention of Antidumping and Countervailing Duty Orders*, 68 FR 54888 (September 19, 2003) |
| *Pasta from Italy (U.S.) Circumvention Preliminary* | *Certain Pasta from Italy: Affirmative Preliminary Determinations of Circumvention of Antidumping and Countervailing Duty Orders*, 68 FR 46571 (August 6, 2003) |
| *Pasta from Italy Circumvention Final* | *Anti-Circumvention Inquiry of the Antidumping Duty Order on Certain Pasta from Italy: Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 63 FR 54672 (October 13, 1998) |

| | |
|---|---|
| *Pasta from Italy Circumvention Preliminary* | *Anti-Circumvention Inquiry of the Antidumping Duty Order on Certain Pasta from Italy: Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order*, 63 FR 18364 (April 15, 1998) |
| *Peer Bearing Co.* | *Peer Bearing Co. v. United States*, 36 CIT 1700 (2012) |
| *Perez* | *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015) or *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1206 (2015) |
| *Pesquera Mares* | Pesquera Mares Australes Ltda. v. United States, 266 F.3d 1372, 1380 (Fed. Cir. 2001) |
| *PET Film from India* | *Polyethylene Terephthalate Film, Sheet, and Strip from India: Preliminary Results of Countervailing Duty Administrative Review, and Rescission, in Part; 2020,* 87 FR 48453 (August 9, 2022), and accompanying PDM |
| *PET Film from India Final* | *Polyethylene Terephthalate Film, Sheet, and Strip (PET Film) from India: Final Results of Countervailing Duty Administrative Review; 2020,* 87 FR 76024 (December 12, 2022), and accompanying IDM |
| *PET Film from the UAE Preliminary Determination* | *Preliminary Negative Determination of Circumvention of the Antidumping Order on Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab Emirates*, 80 FR 26229 (May 7, 2015) |
| *PET Film from the UAE (Bahrain)* | *Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab Emirates: Negative Final Determination of Circumvention of the Antidumping Duty Order*, 80 FR 47463 (August 7, 2015) |
| *Pipe and Tube from India (Oman and UAE)* | *Certain Welded Carbon Steel Standard Pipes and Tubes from India: Final Negative Determinations of Circumvention of the Antidumping Order*, 88 FR 12917 (March 1, 2023) |
| *Pipe and Tube from India (Oman and UAE) Preliminary* | *Certain Welded Carbon Steel Standard Pipes and Tubes from India: Preliminary Negative Determinations of Circumvention of the Antidumping Order*, 87 FR 52507 (August 26, 2022) |
| *Plywood from China (Vietnam) Final* | *Certain Hardwood Plywood Products from the People's Republic of China: Final Scope Determination and Affirmative Final Determination of Circumvention of the Antidumping and Countervailing Duty Orders,* 88 FR 46740 (July 20, 2023), and accompanying IDM |

| | |
|---|---|
| *Plywood from China (Vietnam) Preliminary* | *Certain Hardwood Plywood Products from the People's Republic of China:  Preliminary Scope Determination and Affirmative Preliminary Determination of Circumvention of the Antidumping and Countervailing Duty Orders,* 87 FR 45753 (July 29, 2022), and accompanying PDM |
| Policy Bulletin 05.1 | Enforcement and Compliance's Policy Bulletin No. 05.1, regarding, "Separate-Rates Practice and Application of Combination Rates in Investigations involving Non-Market Economy Countries," (April 5, 2005), available on Commerce's website at https://www.trade.gov/policy-bulletin-051 |
| Policy Bulletin 94.1 | Enforcement and Compliance's Policy Bulletin No. 94.1, regarding, "Cost of Production - Standards for Initiation of Inquiry," (March 25, 1994), available on Commerce's website at https://www.trade.gov/policy-bulletin-941 |
| *Polyvinyl Alcohol from China Final Determination* | *Notice of Final Determination of Sales at Less Than Fair Value:  Polyvinyl Alcohol from the People's Republic of China,* 68 FR 47538 (August 11, 2003) |
| *Polyvinyl Alcohol from China Preliminary Determination* | *Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination:  Polyvinyl Alcohol from the People's Republic of China,* 68 FR 13674 (March 20, 2003) |
| *Preamble (Final Rule)* | *Antidumping Duties; Countervailing Duties,* 62 FR 27296 (May 19, 1997) |
| *Preserved Mushrooms from China* | *Certain Preserved Mushrooms from the People's Republic of China:  Final Results and Final Partial Rescission of the Sixth Administrative Review,* 71 FR 40477 (July 17, 2006) |
| *Presidential Proclamation 10414* | *Proclamation No. 10414, Declaration of Emergency and Authorization for Temporary Extensions of Time and Duty-Free Importation of Solar Cells and Modules from Southeast Asia,* 87 FR 35067 (June 9, 2022) |
| *Presidential Proclamation 10414 Final Rule Preamble* | *Procedures Covering Suspension of Liquidation, Duties and Estimated Duties in Accord With Presidential Proclamation 10414,* 87 FR 56868 (September 16, 2022) |
| *Presidential Proclamation 10414 Proposed Rule* | *Procedures Covering Suspension of Liquidation, Duties and Estimated Duties in Accord With Presidential Proclamation 10414:  Proposed Rule,* 87 FR 39426 (July 1, 2022) |

| | |
|---|---|
| *PrimeSource Bldg. Prods.* | *PrimeSource Bldg. Prods. v. United States*, 497 F. Supp. 3d 1333 (CIT 2021) (citing U.S. Const. art I, § 8, cl. 1 & cl. 3) |
| *Procedures for Importation of Supplies for Use in Emergency Relief Work* | *Procedures for Importation of Supplies for Use in Emergency Relief Work*, 71 FR 63230 (October 30, 2006) |
| *Pure Magnesium from Canada CCR Initiation* | *Initiation of Changed Circumstances Countervailing Duty Administrative Reviews; Pure Magnesium and Alloy Magnesium from Canada*, 57 FR 41473 (September 10, 1992) |
| *QSPs from China CCRs* | *Certain Quartz Surface Products from the People's Republic of China:  Initiation of Antidumping and Countervailing Duty Changed Circumstances Reviews; Global Stone,* 88 FR 41377 (June 26, 2023); and *Certain Quartz Surface Products from the People's Republic of China:  Initiation of Antidumping and Countervailing Duty Changed Circumstances Reviews; AM Stone,* 88 FR 41386 (June 26, 2023) |
| *Retail Carrier Bags from Taiwan Final Determination* | *Polyethylene Retail Carrier Bags from Taiwan: Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 79 FR 61056 (October 9, 2014)) |
| *Retail Carrier Bags from Taiwan Preliminary Determination* | *Polyethylene Retail Carrier Bags from Taiwan: Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order*, 79 FR 31302 (June 2, 2014) |
| *Roberto* | *Roberto v. Dep't of Navy*, 440 F.3d 1341 (Fed. Cir. 2006) |
| *Romani* | *United States v. Est. of Romani*, 523 U.S. 517 (1998) |
| S. Rep. No. 103-412 | Joint Report of the Committee on Finance, Committee on Agriculture Nutrition and Forestry, Committee on Governmental Affairs of the United States Senatre to Accompany S. 2467, Uruguay Round Agreements Act |
| SAA | Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, Vol. I (1994) |
| *Saddler* | *Saddler v. Dep't of the Army*, 68 F.3d 1357, 1358 (Fed. Cir. 1995) |
| *Save Domestic Oil* | *Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1283 (Fed. Cir. 2004) |
| *SDGE from China* | *Small Diameter Graphite Electrodes from the People's Republic of China:  Final Results of the First Administrative Review of the Antidumping Duty Order and Final Rescission of the Administrative Review, in Part,* 76 FR 56397 (September 13, 2011) |

| | |
|---|---|
| *SDGE from China (UK)* | *Small Diameter Graphite Electrodes from the People's Republic of China: Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 77 FR 47596 (August 9, 2012) |
| *Senate Report 100-71* | *U.S. Senate, Committee on Finance, Omnibus Trade Act of 1987*, S. Rep. No. 100-71, at 101 (1987) |
| *Shakeproof Tool Works, Inc.* | *Shakeproof Assembly Components, Div. of Ill. Tool Works, Inc. v. United States*, 268 F.3d 1376 (Fed. Cir. 2001) |
| *Shanghai Sunbeauty Trading Co.* | *Shanghai Sunbeauty Trading Co. v. United States*, 380 F. Supp. 3d. 1328 (CIT 2019) |
| *Shelter Forest CIT* | *Shelter Forest Int'l Acquisition, Inc. v. United States*, Slip Op. 2021-90 (CIT 2021) |
| *Shenzhen Xinboda* | *Shenzhen Xinboda Industrial Co., Ltd. v. United States*, 494 F. Supp. 3d 1347 (CIT 2021) |
| *Shrimp from China* | *Certain Frozen Warmwater Shrimp from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019*, 85 FR 83891 (December 23, 2020), and accompanying IDM |
| *Silicon Carbide from China* | *Notice of Final Determination of Sales at Less Than Fair Value: Silicon Carbide from the People's Republic of China*, 59 FR 22585 (May 2, 1994), |
| *Silicon Metal from Brazil* | *Silicon Metal from Brazil: Final Affirmative Countervailing Duty Determination*, 83 FR 9838 (March 8, 2018), and accompanying IDM |
| *SKF CIT* | *SKF USA Inc. v. United States*, 675 F. Supp. 2d 1264 (CIT 2009) |
| *Skidmore* | *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) |
| *Smith Corona* | *Smith Corona Corp. v. United States*, 915 F.2d 683, 686 (Fed. Cir. 1990)) |
| *Softwood Lumber from Canada* | *Certain Softwood Lumber Products from Canada: Final Affirmative Countervailing Duty Determination, and Final Negative Determination of Critical Circumstances*, 82 FR 51814 (November 8, 2017), and accompanying IDM |
| *Solar Cells from China 2017-2018 AR* | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017-2018*, 85 FR 62275 (October 2, 2020), and accompanying IDM |
| *Solar Cells from China Investigation* | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Determination of Sales at Less Than* |

| | |
|---|---|
| | *Fair Value, and Affirmative Final Determination of Critical Circumstances, in Part*, 77 FR 63791 (October 17, 2012) |
| *Solar Products from China* | *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China:  Final Determination of Sales at less Than Fair Value*, 79 FR 76970 (December 23, 2014) |
| Solaria Scope Ruling | Memorandum, "The Solaria Corporation Scope Ruling," dated April 8, 2021 (placed on the record in NextEra's Letter, "Pre-Preliminary Determination Comments," dated October 20, 2022, at Attachment 22 |
| *Sonali Scope Application* | Memorandum, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China:  Sonali Scope Application," dated January 25, 2023 |
| *Sonali Scope Inquiry* | Memorandum, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China:  Sonali Scope Inquiry," dated January 20, 2023 |
| *Soybean Meal from India AD* | *Final Affirmative Determination of Sales at Less than Fair Value:  Organic Soybean Meal from India*, 87 FR 16458 (March 23, 2022) |
| *Soybean Meal from India CVD* | *Final Affirmative Countervailing Duty Determination of Sales at Less than Fair Value:  Organic Soybean Meal from India*, 87 FR 16453 (March 23, 2022) |
| *Sparklers from China* | *Notice of Final Determination of Sales at Less Than Fair Value:  Sparklers from the People's Republic of China*, 56 FR 20588 (May 6, 1991) |
| *SSF from India SII* | *Stainless Steel Flanges from India:  Preliminary Results of Antidumping Duty Administrative Review, Preliminary Successor-in-Interest Determination, and Partial Rescission; 2019-2020,* 86 FR 60792 (November 4, 2021), unchanged in *Stainless Steel Flanges from India:  Final Results of Antidumping Duty Administrative Review; 2019–2020*, 87 FR 27568 (May 9, 2022) |
| *SSSS from China (Vietnam)* | *Stainless Steel Sheet and Strip from the People's Republic of China:  Final Scop Ruling and Final Affirmative Determination of Circumvention for Exports from the Socialist Republic of Vietnam*, 88 FR 18521 (March 29, 2023) |
| *SSSS from China (Vietnam) Preliminary* | *Stainless Steel Sheet and Strip from the People's Republic of China:  Scope Ruling and Preliminary Affirmative Determination of Circumvention for Exports from the Socialist Republic of Vietnam*, 87 FR 56626 (September 15, 2022) |

| Steel Flanges from India | *Finished Carbon Steel Flanges from India: Preliminary Results of Countervailing Duty Administrative Review; 2019*, 86 FR 500032 (September 7, 2021), and accompanying PDM |
|---|---|
| Steel Flanges from India Final | *Finished Carbon Steel Flanges from India: Final Results of Countervailing Duty Administrative Review; 2019*, 86 FR 67909 (November 30, 2021), and accompanying IDM |
| Steel Flanges from Spain AD | *Finished Carbon Steel Flanges from Spain: Final Results of Antidumping Duty Administrative Review; 2017–2018*, 85 FR 7919 (February 12, 2020) |
| Steel Threaded Rod from Thailand Final | *Steel Threaded Rod from Thailand: Final Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances*, 79 FR 14476 (March 14, 2014) |
| Steel Threaded Rod from Thailand Preliminary | *Steel Threaded Rod from Thailand: Preliminary Determination of Sales at Less Than Fair Value and Affirmative Preliminary Determination of Critical Circumstances*, 78 FR 79670 (December 31, 2013) |
| Steel Tubing from Taiwan Preliminary Results (Taiwan) | *Light-Walled Welded Rectangular Carbon Steel Tubing from Taiwan*, 88 FR 21980 (April 12, 2023) |
| Tapered Roller Bearings from China | *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 74 FR 3987 (January 22, 2009) |
| Tapered Roller Bearings from China | *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results of New Shipper Reviews*, 67 FR 10665 (March 8, 2002) |
| Techsnabexport, Ltd. | *Techsnabexport, Ltd. v. United States*, 795 F.Supp. 428 (CIT 1992) |
| Timken Co. | *Timken Co. v. United States*, 968 F. Supp. 2d 1279 (2014), *aff'd* 589 F. App'x 995 (Fed. Cir. 2015) |
| Tissue Paper from China (India) Final Determination | *Certain Tissue Paper Products from the People's Republic of China: Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 83 FR 40101 (July 3, 2013) |
| Tissue Paper from China (India) Preliminary Determination | *Certain Tissue Paper Products from the People's Republic of China: Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order*, 78 FR 14514 (March 6, 2013), and accompanying IDM |
| Tissue Paper from China (Thailand) Final Determination | *Certain Tissue Paper Products from the People's Republic of China: Affirmative Final Determination of* |

| | |
|---|---|
| | *Circumvention of the Antidumping Duty Order*, 74 FR 29172 (June 19, 2009) |
| *Tissue Paper from China (Vietnam) Final Determination* | *Certain Tissue Paper Products from the People's Republic of China:  Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 73 FR 57591 (October 3, 2008) |
| *Tissue Paper from China (Vietnam) Preliminary Determination* | *Certain Tissue Paper Products from the People's Republic of China:  Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order and Extension of Final Determination*, 73 FR 21580 (April 22, 2008) |
| *Torrington* | U.S. Senate, Committee on Finance, Omnibus Trade Act of 1987, S. Rep. No. 100-71, at 101 (1987) |
| *TPP from China (Thailand)* | *Affirmative Final Determinations of Circumvention of the Antidumping Order:  Certain Tissue Paper Products from the People's Republic of China*, 73 FR 57591 (October 3, 2008) |
| *Tung Mung CIT* | *Tung Mung Dev. Co. v. United States*, 219 F. Supp. 3d 1333, 1343 (CIT 2002) |
| *U.K. Carbon and Graphite* | *U.K. Carbon and Graphite Co., Ltd. v United States*, 931 F. Supp. 2d 1322 (CIT 2013) |
| *Uncoated Paper from China Final Determination* | *Certain Uncoated Paper from Brazil, the People's Republic of China, and Indonesia:  Affirmative Final Determinations of Circumvention of the Antidumping Duty Orders and Countervailing Duty Orders for Certain Uncoated Paper Rolls*, 86 FR 71025 (December 14, 2021) |
| *Uncoated Paper from China Preliminary Determination* | *Certain Uncoated Paper from the People's Republic of China:  Affirmative Preliminary Determinations of Circumvention of the Antidumping and Countervailing Duty Orders for Uncoated Paper Rolls*, 85 FR 72624 (November 13, 2020) |
| *Uncovered Innerspring Units from China (Malaysia) Final Determination* | *Uncovered Innerspring Units from the People's Republic of China:  Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 80 FR 74758 (November 30, 2015) |
| *Uncovered Innerspring Units from China (Malaysia) Preliminary Determination* | *Uncovered Innerspring Units from the People's Republic of China:  Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order*, 80 FR 64392, 64393 (October 23, 2015) |
| *USITC Solar 2021 Determination* | *Crystalline Silicon Photovoltaic Cells and Modules from China*, Inv. No. TA-201-75 (Extension), USITC Pub. 5266 (December 2021) |

| | |
|---|---|
| *USITC Solar Investigation Final* | *Crystalline Silicon Photovoltaic Cells and Modules from China*, Inv. No. TA-481 and 731-TA-1190 (Final), USITC Pub. 4360 (November 2012) |
| *Uyghur Forced Labor Prevention Act: U.S. Customs and Border Protection Operational Guidance for Importers* | *Uyghur Forced Labor Prevention Act: U.S. Customs and Border Protection Operational Guidance for Importers June 13, 2022*, CBP Publication No. 1793-0522 |
| *Vietnam Finewood* | *Vietnam Finewood Company Limited, et.al v. United States*, 466 F. Supp. 3d 1273 (CIT 2023) |
| *Walk-Behind Lawn Mowers from China* | *Certain Walk-Behind Lawn Mowers and Parts Thereof from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 FR 27384 (May 20, 2021) |
| *Walk-Behind Lawn Mowers from China Circumvention Rescission* | *Certain Walk-Behind Lawn Mowers and Parts Thereof from the People's Republic of China: Notice of Intent to Rescind Circumvention Inquiry on the Antidumping and Countervailing Duty Orders*, 88 FR 13434 (March 3, 2023) |
| *Walgreen Co.* | *Walgreen Co. v. United States*, 620 F.3d 1350, 1357 (Fed. Cir. 2010) |
| *Wantanabe Group* | *Watanabe Group v. United States*, 34 CIT 1545, Slip Op. 10-139 (CIT 2010) |
| *Wheatland* | *Wheatland Tube Co. v. United States* 161 F.3d 1365, 1371 (Fed. Cir. 1998) |
| *Wire Rod from Korea and United Kingdom CCR* | *Carbon and Alloy Steel Wire Rod from the Republic of Korea and the United Kingdom: Notice of Final Results of Antidumping Duty Changed Circumstances Review*, 84 FR 13888 (April 8, 2019) |
| *Xanthan Gum from China 2016-2017* | *Xanthan Gum from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Partial Discontinuation of Antidumping Duty Administrative Review; 2016-2017*, 83 FR 65142 (December 19, 2018) |
| *Yangtai CIT* | *Yantai Oriental Juice Co. v. United States*, Slip Op. 03-33 (CIT March 21, 2003) |
| *Yangzhou CAFC* | *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013) |
| *Youngstown Sheet & Tube Co.* | *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) |

## Appendix III -Documents on Record
## This Section is Sorted by Short Citation

| Short Citation | Document Title and Date |
|---|---|
| *Appendix IV-Certification for "Applicable Entries"* | *Preliminary Determination at Appendix IV; Certification for "Applicable Entries"* |
| *Appendix V-Certification for Non-Circumventing Companies* | *Preliminary Determination at Appendix IV; Certification for Entries of Inquiry Merchandise from Companies Preliminarily Found Not to Be Circumventing* |
| *Appendix VI-Certification Regarding Chinese Components* | *Preliminary Determination at Appendix IV; Certification Regarding Chinese Component* |
| Auxin November 9, 2022 *Ex Parte* Memorandum | Memorandum, "Meeting with Counsel for Auxin," dated November 14, 2022 |
| Auxin's April 26, 2023  Case Brief | Auxin's Letter, "Auxin's Case Brief (Tranche 2)—Thailand," dated April 26, 2023 |
| Auxin's April 26, 2023 Case Brief | Auxin's Letter, "Auxin's Case Brief (Tranche 2)—Thailand," dated April 26, 2023 |
| Auxin's August 3, 2022 SV Rebuttal Comments | Auxin's Letter, "Rebuttal Surrogate Value Comments and Information," dated August 3, 2022 |
| Auxin's March 24, 2023 Case Brief | Auxin's Letter,  "Auxin's Case Brief (Tranche 2)," dated March 24, 2023 |
| Auxin's April 19, 2023 Case Brief | Auxin's Letter, "Auxin's Case Brief (Tranche2)—Vietnam," dated April 19, 2023 |
| Auxin's April 24, 2023 Case Brief | Auxin's Letter, "Auxin's Case Brief (Tranche 2) - Malaysia," dated April 24, 2023 |
| Auxin's April 27, 2023 Rebuttal Brief | Auxin's Letter, "Auxin's Case Brief (Tranche2)—Thailand," dated April 27, 2023 |
| Auxin's April 28, 2023 Rebuttal Brief | Auxin's Letter, "Auxin's Rebuttal Brief (Tranche 2)—Vietnam," dated April 28, 2023 |
| Auxin's April 3, 2023 Rebuttal Brief | Auxin's Letter, "Auxin's Rebuttal Brief (Tranche 2)," dated April 3, 2023 |
| Auxin's Hearing Request | Auxin's Letter, "Auxin Solar, Inc.'s Request for Public Hearing," dated December 29, 2022 |
| Auxin's Investment and R&D Information | Auxin's Letter, "Submission of Investment and Research and Development Information," dated July 29, 2022 |
| *Auxin's ITC Posthearing Brief* | *Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products): Posthearing Brief on Behalf of Auxin Solar Inc.*, Inv. No. TA-201-75 (Safeguard Extension) (November 2021) |
| *Auxin's ITC Prehearing Brief* | *Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products): Prehearing Brief on Behalf of Auxin Solar Inc.*, Inv. No. TA-201-75 (Safeguard Extension) (October 2021) |

| | |
|---|---|
| Auxin's July 27, 2022 SV Comments | Auxin's Letter, "Submission of Surrogate Value Information for Vietnamese Factors of Production," dated July 27, 2022 |
| Auxin's July 29, 2022 Comments | Auxin's Letter, "Submission of Investment and Research and Development Information," dated July 29, 2022 |
| Auxin's March 17, 2023 Rebuttal Brief | Auxin's Letter, "Auxin's Rebuttal Brief (Tranche 1)," dated March 17, 2023 |
| Auxin's March 24, 2023 Case Brief | Auxin's Letter, "Auxin's Case Brief (Tranche 2)," dated March 24, 2023 |
| Auxin's March 6, 2023 Case Brief | Auxin's Letter, "Auxin's Case Brief (Tranche 1)," dated March 6, 2023 |
| Auxin's March 7, 2022 Submission | Auxin's Letter, "Response to NextEra's Request to Reject Anti-Circumvention Ruling Requests," March 7, 2022 |
| Auxin's May 16, 2022 Comments | Auxin's Letter, "Auxin's Response to Rebuttal Comments and Factual Information," dated May 16, 2022 |
| Auxin's May 5, 2023 Rebuttal Brief | Auxin's Letter, "Auxin's Rebuttal Brief (Tranche 2) - Malaysia," dated May 5, 2023 |
| Auxin's May 9, 2023 Rebuttal Brief | Auxin's Letter, "Auxin's Rebuttal Brief (Tranche 2)," dated May 9, 2023 |
| Auxin's October 20, 2023 Pre-Preliminary Comments | Auxin's Letter, "Pre-Preliminary Comments Concerning Jinko Solar Technology Sdn. Bhd. and Hanwha Q Cells Malaysia Sdn. Bhd.," dated October 20, 2022 |
| *Bloomberg Report* | BloombergNEF *Solar PV Trade and Manufacturing:  A Deep Dive* (2021) |
| Boviet 1st SQR | Boviet's Letter, "Boviet First Supplemental Questionnaire Response," dated August 11, 2022 |
| Boviet 2nd SQR | Boviet's Letter, "Boviet Second Supplemental Questionnaire Response," dated August 12, 2022 |
| Boviet 3rd SQR | Boviet's Letter, "Boviet Third Supplemental Questionnaire Response," dated October 7, 2022 |
| Boviet 4th SQR | Boviet's Letter, "Boviet Fourth Supplemental Questionnaire Response," dated November 2, 2022 |
| Boviet Final Analysis Memorandum | Memorandum, "Final Analysis Memorandum for Boviet Solar Technology Co., Ltd.," dated concurrently with this memorandum |
| Boviet Preliminary Analysis Memorandum | Memorandum, "Preliminary Analysis Memorandum for Boviet Solar Technology Co., Ltd.," dated December 1, 2022 |
| Boviet's May 5, 2023 Rebuttal Brief | Boviet's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China:  Second Tranche Rebuttal Brief," dated May 5, 2023 |

| | |
|---|---|
| Boviet's April 28, 2023 Rebuttal Brief | Boviet's Letter, "Boviet Rebuttal Brief re Tranche II," dated April 28, 2023 |
| Boviet's August 3, 2022 SV Rebuttal Comments | Boviet's Letter, "Boviet Rebuttal Surrogate Value Information," dated August 3, 2022 |
| Boviet's IQR Part I | Boviet's Letter, "Boviet Initial Circumvention Inquiry Questionnaire Response," dated June 3, 2022 |
| Boviet's IQR Part II | Boviet's Letter, "Boviet Circumvention Inquiry Questionnaire Response – Part II," dated June 23, 2022 |
| Boviet's July 27, 2020 SV Comments | Boviet's Letter, "Boviet Surrogate Value Information," dated July 27, 2022 |
| Boviet's March 17, 2023 Rebuttal Brief | Boviet's Letter, "Boviet's Letter in Lieu of Rebuttal Brief re Tranche 1," dated March 17, 2023 |
| Boviet's March 6, 2023 Case Brief | Boviet's Letter, "Boviet Case Brief re Tranche 1," dated March 6, 2023 |
| BYD HK Final Analysis Memorandum | Memorandum, "Circumvention Inquiry with Respect to Cambodia: Final Analysis Memorandum for BYD (H.K.) Co., Ltd.," dated concurrently with this memorandum |
| BYD HK Hearing Request | BYD HK's Letter, "Request for Hearing," dated January 6, 2023 |
| BYD HK Initial QR Part I | BYD HK's Letter, "Response to Initial Questionnaire," dated June 7, 2022 |
| BYD HK Initial QR Part II | BYD HK's Letter, "Response to Second Circumvention Inquiry Questionnaire," dated June 23, 2022 |
| BYD HK 1st SQR | BYD HK's Letter, "Response to First Supplemental Questionnaire," dated August 9, 2022 |
| BYD HK 2nd SQR | BYD HK's Letter, "Response to Second Supplemental Questionnaire," dated August 19, 2022 |
| BYD HK 3rd SQR | BYD HK's Letter, "Response to Third Supplemental Questionnaire," dated October 12, 2022 |
| BYD HK Verification Exhibits | BYD HK's Letter, "Verification Exhibits of BYD (HK) Co., Ltd.," dated February 16, 2023 |
| BYD HK's Verification Report | Memorandum, "Verification of the Questionnaire Responses of BYD (H.K.) Co., Ltd. in the Circumvention Inquiry of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China - with Respect to Cambodia," dated March 15, 2023 |
| BYD HK Preliminary Analysis Memorandum | Memorandum, "Circumvention Inquiry with Respect to Cambodia: Preliminary Analysis Memorandum for BYD (H.K.) Co., Ltd.," dated December 1, 2022 |
| BYD HK's April 3, 2023 Rebuttal Brief | BYD HK's Letter, "Second Tranche Rebuttal Brief of BYD HK," dated April 3, 2023 |

| | |
|---|---|
| BYD HK's March 17, 2023 Rebuttal Brief | BYD HK's Letter, "First Tranche Rebuttal Brief of BYD," dated March 17, 2023 |
| BYD HK's March 24, 2023 Case Brief | BYD HK's Letter, "Second Tranche Case Brief," dated March 24, 2023 |
| BYD HK's March 6, 2023 Case Brief | BYD HK's Letter, "First Tranche" Letter in Lieu of Case Brief of BYD," dated March 6, 2023 |
| *Cambodia* PDM | Memorandum, "Preliminary Decision Memorandum for the Circumvention Inquiry With Respect to the Kingdom of Cambodia," dated December 1, 2022 |
| Cambodia RSM | Memorandum, "Circumvention Inquiry with Respect to Cambodia:  Respondent Selection," dated May 12, 2022 |
| CBP Data Release Memorandum | Memorandum," Release of Customs and Border Protection Entry Data," dated March 29, 2022 |
| CBP Messages Memorandum | Memorandum, "Placement of Customs and Border Protection (CBP) Messages on Record of Proceedings," dated February 17, 2023 |
| *CEA Report* | Clean Energy Associates, *Crystalline Silicon PV - Sector Background* (2022) |
| Circumvention Questionnaires | Circumvention Inquiry Questionnaire," dated May 13 and 16, 2022 |
| Circumvention Request | Auxin's Letter, "Auxin Solar's Request for an Anti-Circumvention Ruling to Section 781(b) of the Tariff Act of 1930, As Amended," dated February 8, 2022 |
| Clarification of Product Coverage Memorandum | Memorandum, "Clarification of Product Coverage," dated December 19, 2022 |
| May 2, 2022 Memorandum | Memorandum, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China:  Comments on Potential Certification Requirements," dated May 19, 2022 Circumvention Inquiries With Respect to Cambodia, Malaysia,  Thailand, and Vietnam – Potential Certification Requirements," dated May 2, 2022 |
| Commerce's December 1, 2022 Rejection Letter | Commerce's Letter, "Rejection Letter of Red Sun's Q&V Questionnaire Response," dated December 1, 2022 |
| CSIL Final Analysis Memorandum | Memorandum, "Circumvention Inquiry with Respect to Thailand:  Final Analysis Memorandum for Canadian Solar International Limited," dated concurrently with this memorandum |
| CSIL's 1st SQR | CSIL's Letter, "Response to First Supplemental Questionnaire," dated August 8, 2022 |
| CSIL's 2nd SQR | CSIL's Letter, "Response to Second Supplemental Questionnaire," dated August 12, 2022 |
| CSIL's 3rd SQR | CSIL's Letter, "Response to Third Supplemental Questionnaire," dated October 7, 2022 |

| | |
|---|---|
| CSIL's 4th SQR | CSIL's Letter, "Response to Fourth Supplemental Questionnaire," dated November 2, 2022 |
| CSIL's April 19, 2023 Case Brief | CSIL's Letter, "Second Tranche Case Brief of Canadian Solar International Limited," dated April 19, 2023 |
| CSIL's April 26, 2023 Rebuttal Brief | CSIL's Letter, "Second Tranche Case Brief of Canadian Solar International Limited," dated April 26, 2023 |
| CSIL's April 27, 2023 Case Brief | CSIL's Letter, "Second Tranche Case Brief of Canadian Solar International Limited," dated April 27, 2023 |
| CSIL's Hearing Request | CSIL's Letter, "Request for Hearing," dated January 6, 2023 |
| CSIL's IQR Part I | CSIL's Letter, "Response to Circumvention Inquiry Questionnaire," dated June 3, 2022 |
| CSIL's IQR Part II | CSIL's Letter, "Response to Second Circumvention Inquiry Questionnaire," dated June 23, 2022 |
| CSIL's March 17, 2023 Rebuttal Brief | CSIL's Letter, "First Tranche Rebuttal Brief," dated March 17, 2023 |
| CSIL's March 6, 2023 Case Brief | CSIL's Letter, "First Tranche Case Brief," dated March 6, 2023 |
| CSIL's May 9, 2023 Rebuttal Brief | CSIL's Letter, "Second Tranche Rebuttal Case Brief of Canadian Solar International Limited," dated May 9, 2023 |
| CSIL's October 20, 2022 Pre-Preliminary Comments | CSIL's Letter, "Comments in Advance of the Preliminary Determination," dated October 20, 2022 |
| CSIL Preliminary Analysis Memorandum | Memorandum, "Circumvention Inquiry with Respect to Thailand: Preliminary Analysis Memorandum for Canadian Solar International Limited," dated December 1, 2022 |
| CSIL's Verification Exhibits | CSIL's Letter, "Verification Exhibits," dated February 22, 2023 |
| CSIL's Verification Report | Memorandum, "Verification of the Information Reported by Canadian Solar International Limited," dated April 19, 2023 |
| *Denis De Ceuster Report* | Denis De Ceuster and DDC Solar LLC, *Crystalline Silicon Photovoltaic Supply Chain: from Polysilicon to Solar Panel* (2022) |
| DHS Order Re: Forced Labor in Xinjiang | The Department of Homeland Security Issues Withhold Release Order on Silica-Based Products Made by Forced Labor in Xinjiang," U.S CUSTOMS AND BORDER PROTECTION (June 24, 2021), available at https://www.cbp.gov/newsroom/national-media-release/departmenthomeland- security-issues-withhold-release-order-silica |

| | |
|---|---|
| *DOE Solar Deep Dive* | *U.S. Department of Energy Response to Executive Order 14017 "America's Supply Chains," Solar Photovoltaics: Supply Chain Deep Dive Assessment* (February 24, 2022) included in the memorandum, "Meeting with the Department of Energy," dated June 3, 2022 |
| ET Solar Scope Ruling | Memorandum, "Final Scope Ruling on the Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells from the People's Republic of China: ET Solar Inc.," dated June 15, 2021 |
| Factor Valuation Memorandum | Memorandum, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China - Circumvention Inquiries with Respect to Cambodia, Malaysia and Thailand: Factor Valuation Memorandum," dated December 1, 2022 |
| First Solar Malaysia's April 24, 2023 Case Brief | First Solar Malaysia's Letter, "Letter in Lieu of Case Brief for Second Tranche of Issues," dated April 24, 2023 |
| First Solar Malaysia's Hearing Request | First Solar Malaysia's Letter, "Request to Participate at Hearing," dated January 6, 2023 |
| First Solar Malaysia's March 17, 2023 Rebuttal Brief | First Solar Malaysia's Letter, "Letter in Lieu of Rebuttal Brief for First Tranche of Issues," dated March 17, 2023 |
| First Solar Malaysia's March 6, 2023 Case Brief | First Solar Malaysia's Letter, "Case Brief for First Tranche of Issues," dated March 6, 2023 |
| First Solar Malaysia's May 5, 2023 Case Brief | First Solar Malaysia's Letter, "Letter in Lieu of Rebuttal Brief for Second Tranche of Issues," dated May 5, 2023 |
| First Solar Vietnam's April 28, 2023 Rebuttal Brief | First Solar Vietnam's Letter, "Letter in Lieu of Rebuttal Brief for Second Tranche of Issues," dated April 28, 2023 |
| First Solar Vietnam's March 17, 2023 Rebuttal Brief | First Solar Vietnam's Letter, "Letter in Lieu of Rebuttal Brief for First Tranche of Issues," dated March 17, 2023 |
| First Solar Vietnam's March 6, 2023 Case Brief | First Solar Vietnam's Letter, "Case Brief for First Tranche of Issues," dated March 6, 2023 |
| First Solar's April 28, 2023 Rebuttal Brief | First Solar Vietnam's Letter, "Letter in Lieu of Rebuttal Brief of Second Tranche of Issues," dated April 28, 2023 |
| First Tranche Briefing Schedule | Memorandum, "Announcement of Briefing Schedule for First Tranche of Case and Rebuttal Briefs," dated February 22, 2023 |
| *FTI Report* | FTI Consulting, Inc., *The Photovoltaic Value Chain In Southeast Asia: Response to BloombergNEF's Solar PV Trade and Manufacturing: Deep Dive* (2021) |

| | |
|---|---|
| Hanwha Final Analysis Memorandum | Memorandum, "Hanwha Q CELLS Malaysia Sdn. Bhd. (Hanwha) – Final Analysis Memorandum," dated concurrently with this memorandum |
| Hanwha IQR Part I | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Response to Circumvention Inquiry Questionnaire (Part I)," dated June 3, 2022 |
| Hanwha IQR Part II | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Response to Circumvention Inquiry Questionnaire (Part II)," dated June 23, 2022 |
| Hanwha's 1st SQR | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s First Supplemental Questionnaire Response," dated August 9, 2022 |
| Hanwha's 2nd SQR | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Second Supplemental Questionnaire Response," dated August 19, 2022 |
| Hanwha's 3rd SQR | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Fourth Supplemental Questionnaire Response," dated October 11, 2022 |
| Hanwha Preliminary Analysis Memorandum | Memorandum, "Hanwha Q CELLS Malaysia Sdn. Bhd. (Hanwha) – Preliminary Analysis Memorandum," dated December 1, 2022 |
| Hanwha's April 24, 2023 Case Brief | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Case Brief Regarding Comments on Certification Issues (Second Tranche)," dated April 24, 2023 |
| Hanwha's December 14, 2022 Certification Comments | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd's Comments on Proposed Certification Process," dated December 14, 2022 |
| Hanwha's Hearing Request | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Hearing Request," dated January 6, 2023 |
| Hanwha's March 17, 2023 Rebuttal Brief | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Rebuttal Brief Regarding Comments on Certification Issues (First Tranche)," dated March 17, 2023 |
| Hanwha's March 6, 2023 Case Brief | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Case Brief Regarding Comments on Certification Issues (First Tranche)," dated March 6, 2023 |
| Hanwha's May 5, 2023 Rebuttal Brief | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Rebuttal Brief (Second Tranche)," dated May 5, 2023 |
| Hearing Transcript | Hearing Transcript, "Solar Cells from China Circumvention Inquiries covering Cambodia, Malaysia, Thailand and Vietnam," dated July 25, 2023 |
| *IEA Report* | International Energy Agency, *Solar PV Global Supply Chains* (2022) |

| | |
|---|---|
| Initiation Memorandum | Memorandum, "Initiation of Circumvention Inquiries," dated March 25, 2022 |
| *Initiation Notice* | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Initiation of Circumvention Inquiry on the Antidumping Duty and Countervailing Duty Orders*, 87 FR 19071 (April 1, 2022) |
| ITC Notification Letter | Commerce's Letter, "Notification of Affirmative Preliminary Determinations of Circumvention," dated May 30, 2023 |
| *ITC Solar Final* | *Crystalline Silicon Photovoltaic Cells and Modules from China,* Inv. No. 701-TA-481 and 731-TA-1190 (Final), USITC Pub. 4360 (November 2012) |
| *ITC Solar Monitoring* | *Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled into Other Products: Monitoring Developments in the Domestic Industry,* Inv. No. TA-201-75 (Monitoring), USITC Pub. 5021 (February 2020) |
| *ITC Solar Safeguard Proceeding 2017* | *Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products),* Inv. No. TA-201-75 (Safeguard), USITC Pub. 4739 (November 2017) |
| *ITC Solar Safeguard Proceeding 2019* | *Crystalline Silicon Photovoltaic Cells and Modules from China,* Inv. No. 701-TA-481 and 731-TA-1190 (Review), USITC Pub. 4874 (March 2019) |
| JA Solar, LONGi, VINA and VSUN's March 17, 2023 Rebuttal Brief | VSUN's Letter, "Letter in Lieu of Rebuttal Brief," dated March 17, 2023 |
| JA Solar's Hearing Request | JA Solar's Letter, "JA Solar's Request for Hearing," dated January 6, 2023 |
| JA Solar's May 2, 2022 Comments | JA Solar's Letter, "JA Solar Comments and Rebuttal Factual Information on Anti-Circumvention Inquiry Request," dated May 2, 2022 |
| Jinko Final Analysis Memorandum | Memorandum, "Jinko Solar Technology Sdn. Bhd. and Jinko Solar (Malaysia) Sdn. Bhd. – Final Analysis Memorandum," dated concurrently with this memorandum |
| Jinko IQR Part I | Jinko's Letter, "Jinko Initial Questionnaire Part I Questionnaire Response," dated June 6, 2022 |
| Jinko IQR Part II | Jinko's Letter, "Jinko Initial Questionnaire Part II Questionnaire Response," dated June 23, 2022 |
| Jinko's 1st SQR | Jinko's Letter, "Jinko First Supplemental Questionnaire Response," dated August 8, 2022 |

| | |
|---|---|
| Jinko's 2nd SQR | Jinko's Letter, "Jinko Second Supplemental Questionnaire Response," dated August 19, 2022 |
| Jinko's 3rd SQR | Jinko's Letter, "Jinko Third Supplemental Questionnaire Response," dated October 11, 2022 |
| Jinko's 4th SQR | Jinko's Letter, "Jinko Fourth Supplemental Questionnaire Response," dated November 2, 2022 |
| Jinko Preliminary Analysis Memorandum | Memorandum, "Jinko Solar Technology Sdn. Bhd. and Jinko Solar (Malaysia) Sdn. Bhd. – Preliminary Analysis Memorandum," dated December 1, 2022 |
| Jinko Verification Report | Memorandum, "Verification of the Questionnaire Responses of Jinko," dated April 12, 2023 |
| Jinko's April 24, 2023 Case Brief | Jinko's Letter, "Jinko Second Tranche Case Brief," dated April 24, 2023 |
| Jinko's Hearing Request | Jinko's Letter, "Jinko Request to Participate at Hearing," dated January 6, 2023 |
| Jinko's March 17, 2023 Rebuttal Brief | Jinko's Letter, "Jinko First Tranche Rebuttal," dated March 17, 2023 |
| Jinko's March 6, 2023 Case Brief | Jinko's Letter, "Jinko First Tranche Letter Concerning Certification Requirements," dated March 6, 2023 |
| Jinko's May 5, 2023 Rebuttal Brief | Jinko's Letter, "Jinko Second Tranche Rebuttal Brief," dated May 5, 2023 |
| *Malaysia* PDM | Memorandum, "Preliminary Decision Memorandum for the Circumvention Inquiry With Respect to Malaysia," dated December 1, 2022 |
| Malaysia RSM | Memorandum, "Circumvention Inquiries With Respect to Malaysia:  Respondent Selection," dated May 12, 2022 |
| Maxeon's Hearing Request | Maxeon's Letter, "Request to Appear at Public Hearing," dated January 2, 2023 |
| Maxeon's March 17, 2023 Rebuttal Brief | Maxeon's Letter, "Maxeon's Rebuttal Brief," dated March 17, 2023 |
| Maxeon's March 6, 2023 Case Brief | Maxeon's Letter, "Maxeon's Case Brief," dated March 6, 2023 |
| NE Solar IQR Part I | NE Solar's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China; Circumvention Inquiry Initial Questionnaire Response," dated June 3, 2022 |
| NE Solar IQR Part II | NE Solar's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China;-Circumvention Inquiry Initial Questionnaire Response," dated June 23, 2022 |

Appx444

| NE Solar Hearing Request | NE Solar's Letter, "New East Solar Energy's Request to Participate in Hearing," dated January 6, 2023 |
|---|---|
| NE Solar January 29, 2023 *Ex Parte* Memorandum | Memorandum, "Meeting with Counsel for New East Solar," dated January 29, 2023 |
| NE Solar Preliminary Analysis Memorandum | Memorandum, "Preliminary Analysis Memorandum for New East Solar (Cambodia) Co., Ltd.," dated December 1, 2022 |
| NE Solar's August 17, 2022 SQR | NE Solar's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China; Circumvention Inquiry Supplemental Surrogate Value Questionnaire Response," dated August 17, 2022 |
| NE Solar's November 4, 2022 SQR | NE Solar's Letter, " Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China; Circumvention Inquiry Supplemental Questionnaire Response," dated November 4, 2022 |
| NE Solar's October 11, 2022 SQR | NE Solar's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China; Circumvention Inquiry Supplemental Questionnaire III Response," dated October 11, 2022 |
| NE Solar's August 8, 2022 SQR | NE Solar's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China; Circumvention Inquiry Supplemental Questionnaire I Response," dated August 8, 2022 |
| NE Solar's March 6, 2023 Case Brief | NE Solar's Letter, "New East Solar Energy's Case Brief," dated March 6, 2023 |
| Next Era's March 17, 2023 Rebuttal Brief | Next Era's Letter, "First Tranche Rebuttal Brief," dated March 17, 2023 |
| Next Era's March 6, 2023 Case Brief | Next Era's Letter, "Tranche 1 Case Brief," dated March 6, 2023 |
| NextEra's April 28, 2023 Rebuttal Brief | NextEra's Letter, "Second Tranche Rebuttal Brief," dated April 28, 2023 |
| NextEra's April 3, 2023 Rebuttal Brief | NextEra's Letter, "Second Tranche Rebuttal Brief," dated April 3, 2023 |
| NextEra's May 19, 2022 Comments | NextEra's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Comments on Potential Certification Requirements," dated May 19, 2022 |
| NextEra's May 9, 2023 Rebuttal Brief | NextEra's Letter, "Second Tranche Rebuttal Brief," dated May 9, 2023 |

| NextEra's April 19, 2023 Case Brief | NextEra's Letter, "Second Tranche Case Brief," dated April 19, 2023 |
|---|---|
| NextEra's April 24, 2023 Case Brief | NextEra's Letter, "Second Tranche Case Brief," dated April 24, 2023 |
| NextEra's April 26, 2023 Case Brief | NextEra's Letter, "Second Tranche Case Brief," dated April 26, 2023 |
| NextEra's April 28, 2023 Rebuttal Brief | NextEra's Letter, "Second Tranche Rebuttal Brief," dated April 28, 2023 |
| NextEra's Hearing Request | NextEra's Letter, "Request to Appear at Hearing," dated January 6, 2023 |
| NextEra's March 24, 2023 Case Brief | NextEra's Letter, "Second Tranche Case Brief," dated March 24, 2023 |
| NextEra's May 2, 2022 Comments | NextEra's letter, "NextEra Comments on Auxin's Circumvention Ruling Request," dated May 2, 2022 |
| NextEra's May 2, 2022 Submission | NextEra's Letter, "NextEra Comments on Auxin's Circumvention Ruling Request," dated May 2, 2022 |
| NextEra's May 5, 2023 Rebuttal Brief | NextEra's Letter, "Second Tranche Rebuttal Brief," dated May 5, 2023 |
| NREL 2018 Report | National Renewable Energy Laboratory, *Crystalline Silicon Photovoltaic Module Manufacturing Costs and Sustainable Pricing* (February 2020) at Attachment 24 of NextEra's 5.2.22 Submission |
| NREL Report | National Renewable Energy Laboratory, *Crystalline Silicon Photovoltaic Module Manufacturing Costs and Sustainable Pricing* (2020) |
| Preliminary Determinations | *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Preliminary Affirmative Determinations of Circumvention With Respect to  Cambodia, Malaysia, Thailand, and Vietnam*, 87 FR 75221 (December 8, 2022) |
| Preliminary Determination Corrections | Memorandum, "Preliminary Determinations Corrections," dated January 24, 2023 |
| Q&V Questionnaire | Quantity and Value Questionnaire for Circumvention Inquiries With Respect to Cambodia, Malaysia, Thailand, and Vietnam, dated March 30, 2022 |
| Q&V Questionnaire Deadline Extension | Memorandum, "Extension of the Deadline to Respond to the Quantity and Value Questionnaire," dated April 20, 2022 |
| Red Sun's April 19, 2023 Case Brief | Red Sun's Letter, "Red Sun's Second Tranche Case Brief," dated April 19, 2023 |

| | |
|---|---|
| Red Sun's January 6, 2023 Request Letter | Red Sun's Letter, "Request to Supplement Rejection Memo and Place Correspondence with Red Sun on the Record," dated January 6, 2023 |
| Request for Comments on Surrogate Countries | Memorandum, "Request for Economic Development, Surrogate Country Comments and Information," dated May 13, 2022 |
| Risen's March 17, 2023 Rebuttal Brief | Risen's Letter, "Risen Solar Rebuttal Brief – Tranche 1," dated March 17, 2023 |
| Risen's March 6, 2023 Case Brief | Risen's Letter, "Risen Solar Case Brief – Tranche 1," dated March 6, 2023 |
| Risen's May 5, 2023 Rebuttal Brief | Risen's Letter, "Risen Solar Rebuttal brief - Tranche II," dated May 5, 2023 |
| Second Tranche Briefing Schedule for Cambodia | Memorandum, "Announcement of Briefing Schedule for Second Tranche of Case and Rebuttal Briefs for Cambodia," dated March 15, 2023 |
| Second Tranche Briefing Schedule for Malaysia | Memorandum, "Announcement of Briefing Schedule for Second Tranche of Case and Rebuttal Briefs for Malaysia," dated April 12, 2023 |
| Second Tranche Briefing Schedule for Thailand | Memorandum, "Briefing Schedule for Second Tranche of Case and Rebuttal Briefs for the Circumvention Inquiry Covering the Kingdom of Thailand (Thailand)," dated April 19, 2023 |
| Second Tranche Briefing Schedule for Vietnam | Memorandum, "Briefing Schedule for Second Tranche of Case and Rebuttal Briefs for the Circumvention Inquiry Covering the Socialist Republic of Vietnam (Vietnam)," dated April 12, 2023 |
| Silfab's April 19, 2023 Case Brief | Silfab's Letter, "Second Tranche Case Brief of Silfab Solar WA Inc.," dated April 19, 2023 |
| Silfab's April 24, 2023 Case Brief | Silfab's Letter, "Second Tranche Case Brief of Silfab Solar WA Inc., "dated April 24, 2023 |
| Silfab's April 26, 2023 Case Brief | Silfab's Letter, "Second Tranche Case Brief of Silfab Solar WA Inc.," dated April 26, 2023 |
| Silfab's Hearing Request | Memorandum, "Request for Hearing," dated January 6, 2023 |
| Silfab's March 17, 2023 Rebuttal Brief | Silfab's Letter, "Letter in Lieu of First Tranche Rebuttal Brief of Silfab Solar WA Inc.," dated March 17, 2023 |
| Silfab's March 24, 2023 Case Brief | Silfab's Letter, "Second Tranche Case Brief of Silfab Solar WA Inc.," dated March 24, 2023 |
| Silfab's March 6, 2023 Case Brief | Silfab's Letter, "First Tranche Letter in Lieu of Case Brief of Silfab Solar WA Inc.," dated March 6, 2023 |

| | |
|---|---|
| Silfab's May 2, 2022 Comments | Silfab's Letter, "Comments and Factual Information to Rebut, Clarify and Correct Factual Information Contained in Auxin's Request for a Circumvention Ruling, dated May 2, 2022 |
| *Solar CCR Excluding Certain Off-Grid Solar Products* | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Changed Circumstances Reviews, and Revocation of Antidumping and Countervailing Duty Orders, in Part*, 86 FR 71616, 71617 (December 17, 2021) (excluding certain off-grid CSPV) |
| Solar Surveys Analysis Memorandum | Memorandum, "Analysis Memorandum Regarding Solar Industry Surveys," dated concurrent with this memorandum. |
| Solar Investigation Scope Clarification Memorandum | Memorandum, "Scope Clarification: Antidumping and Countervailing Duty Investigations of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China, A-570-979, C-570-980," dated March 19, 2012. |
| Solaria Scope Ruling | Memorandum, "Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells from the People's Republic of China, and Certain Crystalline Silicon Photovoltaic Product from Taiwan: The Solar Corporation Scope Ruling," dated April 8, 2021 |
| SunSpark Scope Ruling | Memorandum, "SunSpark Technology Inc. Scope Ruling," dated October 23, 2020 |
| *Thailand* PDM | Memorandum, "Preliminary Decision Memorandum for the Circumvention Inquiry With Respect to the Kingdom of Thailand," dated December 1, 2022 |
| Thailand RSM | Memoranda, "Circumvention Inquiry With Respect to Thailand: Respondent Selection," dated May 12, 2022 |
| Third Supplemental Questionnaire | Commerce's Letter, "Third Supplemental Questionnaire," dated September 23, 2022 |
| Trina's April 19, 2023 Case Brief | Trina's Letter, "Trina's Second Tranche Case Brief," dated April 19, 2023 |
| Trina's March 17, 2023 Rebuttal Brief | Trina's Letter, "Trina's First Tranche Rebuttal Brief," dated March 17, 2023 |
| Trina's March 6, 2023 Case Brief | Trina's Letter, "First Tranche Case Brief of Trina," dated March 6, 2023 |
| Trina's May 2, 2022 Comments | Trina's Letter, "Trina's Comments on Auxin's Circumvention Inquiry Request and Factual Information Submission to Rebut, Clarify, or Correct Facial Information Contained in Auxin's Request," dated May 2, 2022 |

| | |
|---|---|
| TTL Final Analysis Memorandum | Memorandum, "Circumvention Inquiry with Respect to Thailand: Final Analysis Memorandum for Trina Solar Science & Technology (Thailand) Ltd.," dated concurrently with this memorandum |
| TTL IQR Part II | TTL's Letter, "May 16, 2022 Anti-Circumvention Inquiry Initial Questionnaire Response," dated June 23, 2022 |
| TTL Preliminary Analysis Memorandum | Memorandum, "Circumvention Inquiry with Respect to Thailand: Preliminary Analysis Memorandum for Trina Solar Science & Technology (Thailand) Ltd.," dated December 1, 2022 |
| TTL's May 9, 2023 Rebuttal Brief | TTL's Letter, "TTL's Second Tranche Rebuttal Brief," dated May 9, 2023 |
| TTL's 1st SQR | TTL's Letter, "First Supplemental Questionnaire," dated August 8, 2022 |
| TTL's 2nd SQR | TTL's Letter, "Second Supplemental Questionnaire," dated August 9, 2022 |
| TTL's 3rd SQR | TTL's Letter, "Third Supplemental Questionnaire," dated October 7, 2022 |
| TTL's 4th SQR | TTL's Letter, "Fourth Supplemental Questionnaire," dated November 2, 2022 |
| TTL's April 26, 2023 Case Brief | TTL's Letter, "TTL's Second Tranche Case Brief," dated April 26, 2023 |
| TTL's April 27, 2023 Rebuttal Brief | TTL's Letter, "Trina's First Tranche Rebuttal Brief," dated April 27, 2023 |
| TTL's Hearing Request | Memorandum, "Request for Public Hearing," dated January 6, 2023 |
| TTL's IQR Part I | TTL's Letter, "May 13, 2022 Anti-Circumvention Inquiry Initial Questionnaire Response," dated June 3, 2022 |
| TTL's May 19, 2022 Comments | TTL's Letter, "Trina's Comments on Potential Certification Requirements," dated May 19, 2022, Thailand. |
| TTL's Verification Report | Memorandum, "Verification of the Information Reported by Trina Solar Science & Technology (Thailand) Co. Ltd.," dated April 19, 2023 |
| Uyghur Forced Labor Prevention Act | Uyghur Forced Labor Prevention Act," U.S CUSTOMS AND BORDER PROTECTION, available at https://www.cbp.gov/trade/forced-labor/UFLPA |
| *Vietnam* PDM | Memorandum, "Preliminary Decision Memorandum for the Circumvention Inquiry With Respect to the Socialist Republic of Vietnam," dated December 1, 2022 |
| Vietnam Preliminary SV Memo | Commerce's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not, Assembled Into Modules, from the People's Republic of China - Circumvention |

| | |
|---|---|
| | Inquiries with Respect to the Socialist Republic of Vietnam:  Factor Valuation Memorandum," dated December 1, 2022 |
| Vietnam RSM | Memoranda, "Circumvention Inquiry With Respect to the Socialist Republic of Vietnam:  Respondent Selection," dated May 12, 2022 |
| Vina Cell's Q&V Questionnaire | Commerce's Letter, "Vina Cell re:  Quantity and Value Questionnaire for Circumvention Inquiries with Respect to Cambodia, Malaysia, Thailand, and Vietnam," dated March 30, 2022 |
| Vina Cell's Q&V Response | Vina Cell's Letter, "Quantity and Value Questionnaire," dated April 21, 2022 |
| Vina Preliminary Analysis Memorandum | Memorandum, "Circumvention Inquiry with Respect to Vietnam:  Preliminary Analysis Memorandum for Vina Solar Technology Company Limited," dated December 1, 2022 |
| Vina/LONGi's March 6, 2023 Case Brief | Vina/LONGi's Letter, "Case Brief on General Issues," dated March 6, 2023 |
| Vina's 1st SQR | Vina's Letter, "Vina Solar's Response to the Department's First Supplemental Questionnaire," dated August 10, 2022 |
| Vina's April 19, 2023 Case Brief | Vina's Letter, "Letter in Lieu of Case Brief on Additional Issues," dated April 19, 2023 |
| Vina's April 28, 2023 Rebuttal Brief | Vina's Letter, "Rebuttal Case Brief (Tranche 2) - Vietnam," dated April 28, 2023 |
| Vina's Initial Questionnaire | Commerce's Letter, "Vina Circumvention Inquiry Questionnaire," dated May 16, 2022 |
| Vina's IQR Part I | Vina's Letter, "Vina Solar's Response to Part 1 of the Department's Questionnaire," dated June 7, 2022 |
| Vina's IQR Part II | Vina's Letter, "Vina Solar's Response to Part 2 of the Department's Questionnaire," dated June 23, 2022 |
| Vina's Q&V Questionnaire | Commerce's Letter, "Vina Solar re:  Quantity and Value Questionnaire for Circumvention Inquiries with Respect to Cambodia, Malaysia, Thailand, and Vietnam," dated March 30, 2022 |
| Vina's Q&V Response | Vina's Letter, "Quantity and Value Questionnaire," dated April 21, 2022 |
| Vina's Verification Agenda | Commerce's Letter, "Verification of Vina Solar Technology Company Limited's Questionnaire Responses," dated February 2, 2023 |
| Vina's Verification Memorandum | Memorandum, "Verification of Vina Solar Technology Company Limited," dated April 12, 2023 |
| Vina's Verification Questionnaire | Commerce's Letter, "Verification Preparedness Questionnaire," dated October 12, 2022 |

| | |
|---|---|
| VSUN's March 6, 2023 Case Brief | VSUN's Letter, "VSUN's Letter in Lieu of Case Brief," dated March 6, 2023 |


Forum to the maximum extent permitted by law and consistent with the need for balanced industry representation. Where possible, the Department of Commerce will also consider the ethnic, racial, and gender diversity of the United States.

U.S. Section members will receive no compensation for their participation in Forum-related activities. Individual members will be responsible for all travel and related expenses associated with their participation, including attendance at Forum and Section meetings. At the meetings, the U.S. and Indian Sections will be expected to offer recommendations to the U.S. and Indian governments. Only appointed members may participate in official Forum meetings; substitutes and alternates may not participate. U.S. Section members will serve until December 31, 2024. Members serve at the discretion of the Secretary.

This notice supersedes the notices announcing membership opportunities for appointment, or reappointment, to the U.S. Section of the Forum published in the **Federal Register** on February 18, 2022 (87 FR 9318) and March 23, 2022 (87 FR 16455).

To be considered for membership in the U.S. Section, please submit the following information as instructed in the **ADDRESSES** and **DATE** captions above: Name and title of the applicant; the applicant company's name, place of incorporation, main headquarters address, and principal place of business address (if different); size of the company; size of company's export trade, investment, and nature of operations or interest in India; and a brief statement describing the candidate's qualifications that should be considered, including information about the candidate's ability to initiate and be responsible for activities in which the Forum will be active. The application should also include sufficient information to demonstrate the applicant's company is U.S.-owned or controlled, which may include, for example, an affirmation from the company that a majority of its voting stock is owned by U.S. citizens or other U.S. entities, an affirmation that a majority of its board of directors are U.S. citizens, or other indicia of U.S. ownership or control. Candidates who applied under a previous notice will need to submit a new application if they want to be considered. All candidates will be notified once selections have been made.

Dated: August 17, 2023.

**Valerie Dees,**

*Director of the Office of South Asia.*

[FR Doc. 2023–18076 Filed 8–22–23; 8:45 am]

**BILLING CODE 3510–HE–P**

---

# DEPARTMENT OF COMMERCE

## International Trade Administration

### [A–570–979, C–570–980]

### Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Scope Determination and Final Affirmative Determinations of Circumvention With Respect to Cambodia, Malaysia, Thailand, and Vietnam

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The U.S. Department of Commerce (Commerce) determines that, except as noted below, imports of certain crystalline silicon photovoltaic cells, whether or not assembled into modules (solar cells and modules), that have been completed in the Kingdom of Cambodia (Cambodia), Malaysia, the Kingdom of Thailand (Thailand), or the Socialist Republic of Vietnam (Vietnam), using parts and components produced in the People's Republic of China (China), as specified below, that are then subsequently exported from Cambodia, Malaysia, Thailand, or Vietnam to the United States are circumventing the antidumping duty (AD) and countervailing duty (CVD) orders on solar cells and modules from China.

**DATES:** Applicable August 23, 2023.

**FOR FURTHER INFORMATION CONTACT:** Jose Rivera, Peter Shaw, or Toni Page (Cambodia and Malaysia) or Jeff Pedersen or Paola Aleman Ordaz (Thailand and Vietnam), Offices VII and IV, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–0842, (202) 482–1398, (202) 482–0697, (202) 482–2769, and (202) 482–4031, respectively.

**SUPPLEMENTARY INFORMATION:**

## Background

On December 8, 2022, Commerce published the preliminary

determinations [1] of the circumvention inquiries of the AD and CVD orders on solar cells and modules from China. The circumvention inquiries concern solar cells and modules which were completed in Cambodia, Malaysia, Thailand, or Vietnam using parts and components manufactured in China.[2] We invited parties to comment on the *Preliminary Determinations.*

On December 23, 2022, Sonali Energees USA LLC (Sonali) filed a Scope Ruling Application in which it requested that Commerce determine that the solar modules that it imports into the United States from Cambodia are outside the scope of the *Orders.*[3] On January 20, 2023, Commerce notified all interested parties that it would address Sonali's scope ruling request in the circumvention inquiry covering Cambodia.[4]

A summary of events that occurred since Commerce published the *Preliminary Determinations,* as well as a full discussion of the issues raised by parties for these final determinations, may be found in the Issues and Decision Memoranda.[5] Commerce conducted the

[1] *See Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Preliminary Affirmative Determinations of Circumvention With Respect to Cambodia, Malaysia, Thailand, and Vietnam,* 87 FR 75221 (December 8, 2022) (*Preliminary Determinations*), and accompanying Preliminary Decision Memoranda (PDM).

[2] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order,* 77 FR 73018 (December 7, 2012) (*AD Order*); *see also Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Countervailing Duty Order,* 77 FR 73017 (December 7, 2012) (*CVD Order*) (collectively, *Orders*).

[3] *See* Sonali's Letter, "Sonali Energees USA LLC's Scope Ruling Application for Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Request for Scope Ruling on Certain Solar Modules and Cells Manufactured in Cambodia," dated December 23, 2022.

[4] *See* Memorandum, "Sonali Scope Inquiry," dated January 20, 2023.

[5] *See* Memoranda, "Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Issues and Decision Memorandum for the Circumvention Inquiry With Respect to the Kingdom of Cambodia" (Cambodia IDM); "Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Issues and Decision Memorandum for the Circumvention Inquiry With Respect to Malaysia"; "Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Issues and Decision Memorandum for the Circumvention Inquiry With Respect to the

Continued

scope inquiry in accordance with 19 CFR 351.225(c) and (h) and these circumvention inquiries in accordance with section 781(b) of the Tariff Act of 1930, as amended (the Act) and 19 CFR 351.226.

## Scope of the Orders

The products subject to the *Orders* are solar cells and modules. For a full description of the scope of the *Orders, see* the Issues and Decision Memoranda.[6]

## Scope Ruling

The scope ruling covers certain solar modules that have been completed in Cambodia, using wafers from China, that are subsequently exported from Cambodia to the United States.

## Merchandise Subject to the Circumvention Inquiries

The circumvention inquiries cover certain solar cells and modules that have been completed in Cambodia, Malaysia, Thailand, or Vietnam, using parts and components from China, as specified below, that are subsequently exported from Cambodia, Malaysia, Thailand, or Vietnam to the United States (inquiry merchandise).

Specifically, these circumvention inquiries cover: (A) crystalline silicon photovoltaic cells that meet the physical description of crystalline silicon photovoltaic cells in the scope of the underlying *Orders,* subject to the exclusions therein, whether or not partially or fully assembled into other products, that were produced in Cambodia, Malaysia, Thailand, or Vietnam, from wafers produced in China; and (B) modules, laminates, and panels consisting of crystalline silicon photovoltaic cells, subject to the exclusions for certain panels in the scope of the underlying orders, whether or not partially or fully assembled into other products, that were produced in Cambodia, Malaysia, Thailand, or Vietnam from wafers produced in China and where more than two of the following components in the module/laminate/panel were produced in China: (1) silver paste; (2) aluminum frames; (3) glass; (4) backsheets; (5) ethylene vinyl acetate sheets; and (6) junction boxes.

If modules, laminates, and panels consisting of crystalline silicon photovoltaic cells do not meet both of the conditions in item (B) above, then these circumvention inquiries do not cover the modules, laminates, and panels, or the crystalline silicon photovoltaic cells within the modules, laminates, and panels, even if those crystalline silicon photovoltaic cells were produced in Cambodia, Malaysia, Thailand, or Vietnam from wafers produced in China. Wafers produced outside of China with polysilicon sourced from China are not considered to be wafers produced in China for purposes of these circumvention inquiries.

## Methodology

Commerce made the final scope determination in accordance with 19 CFR 351.225. Commerce made these final circumvention findings in accordance with section 781(b) of the Act and 19 CFR 351.226.

## Analysis of Comments Received

All issues raised in the case and rebuttal briefs submitted by parties in these inquiries are addressed in the Issues and Decision Memoranda. Commerce did not receive any comments on Sonali's Scope Ruling Application. A list of topics included in the Issues and Decision Memoranda are included as Appendix I to this notice. The Issues and Decision Memoranda are public documents and are on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *https://access.trade.gov.* In addition, complete versions of the Issues and Decision Memoranda can be accessed directly at *https://access.trade.gov/ public/FRNoticesListLayout.aspx.*

## Final Scope Ruling

As detailed in the Cambodia IDM, we find that the merchandise described in Sonali's Scope Ruling Application is not covered by the scope of the *Orders.* However, Sonali's merchandise is subject to Commerce's determination in the circumvention inquiry involving Cambodia.

## Final Determinations of Circumvention

As detailed in the Issues and Decision Memoranda for Cambodia, Malaysia, and Vietnam, and in the *Preliminary Determination* for Thailand, with the exception of certain U.S. importers from the exporters identified in Appendix III to this notice, we determine that U.S. imports of inquiry merchandise are

circumventing the *Orders* on a country-wide basis. As a result, we determine that this merchandise is covered by the *Orders.*

We determine, pursuant to section 781(b) of the Act and 19 CFR 351.225(g), that solar cells/solar modules exported from, and produced in, Malaysia, or Vietnam by the entities listed for each of those countries in Appendix III to this notice, using wafers produced in China that were exported by specific companies are not circumventing the *Orders.*

After considering comments from interested parties, we determine to not apply adverse facts available to Vietnam Sunergy Joint Stock Company.[7]

*See* the "Suspension of Liquidation and Cash Deposit Requirements" section below for details regarding suspension of liquidation and cash deposit requirements. *See* the "Certification" and "Certification Requirements" section below for details regarding the use of certifications.

## Use of Adverse Facts Available

In the *Preliminary Determinations,* we relied on the facts available under section 776(a) of the Act, including facts available with adverse inferences under section 776(b) of the Act, where appropriate. In particular, we requested information from certain companies in each of the examined countries, including the quantity and value (Q&V) of their exports during the inquiry period for purposes of respondent selection. In the Q&V questionnaire, Commerce explained that, if the company to which Commerce issued the questionnaire fails to respond to the questionnaire, or fails to provide the requested information, Commerce may find that the company failed to cooperate by not acting to the best of its ability to comply with the request for information, and may use an inference that is adverse to the company's interests in selecting from the facts otherwise available. Certain companies to which Commerce issued the Q&V questionnaire in the Malaysia, Thailand, and Vietnam inquiries received, but failed to timely respond to, the Q&V questionnaire.[8]

Additionally, New East Solar Energy (Cambodia) Co., Ltd.[9] and Vina Solar Technology Co., Ltd.[10] refused to participate in verification.

---

Kingdom of Thailand"; and "Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Issues and Decision Memorandum for the Circumvention Inquiry With Respect to the Socialist Republic of Vietnam" (Vietnam IDM); all dated concurrently with, and hereby adopted by, this notice (collectively, Issues and Decision Memoranda).

[6] *Id.*

[7] *See* Vietnam IDM at Comment 8.

[8] *See* Appendix II for a list of companies that failed to respond to Commerce's request for Q&V information.

[9] *See* Cambodia IDM at Comment 9.

[10] *See* Memorandum, "Verification of Vina Solar Technology Company Limited," dated April 12, 2023.

Therefore, we find that necessary information is not available on the record and that the companies that failed to timely respond to the Q&V questionnaire withheld requested information, failed to provide requested information by the deadline or in the form and manner requested, significantly impeded these inquiries, and that the companies that refused to be verified significantly impeded these inquiries and provided information that could not be verified, within the meaning of sections 776(a)(2)(A)–(D) of the Act. Moreover, we find that these companies failed to cooperate to the best of their ability to provide the requested information, within the meaning of section 776(b) of the Act, because they either did not provide a timely response to Commerce's Q&V questionnaire or did not allow their submitted information to be verified. Consequently, we have used adverse inferences with respect to these companies in selecting from among the facts otherwise available on the record, pursuant to sections 776(a) and (b) of the Act.

Based on the adverse facts available used, we determine that the companies listed in Appendix II to this notice exported inquiry merchandise and that U.S. entries of that merchandise are circumventing the *Orders.* As noted above, we are no longer applying adverse facts available to Vietnam Sunergy Joint Stock Company and this company has been removed from the list in Appendix II.[11] Additionally, with the exception of the "Applicable Entries" certification, which is described in the "Certifications" section below, we are precluding the companies listed in Appendix II to this notice from participating in the certification programs that we are establishing for exports of solar cells and modules from Cambodia, Malaysia, Thailand, and Vietnam.

U.S. entries of inquiry merchandise made on or after April 1, 2022, that are ineligible for certification based on the failure of the companies listed in Appendix II to cooperate, or for other reasons, shall remain subject to suspension of liquidation until final assessment instructions on those entries are issued, whether by automatic liquidation instructions, or by instructions pursuant to the final results of an administrative review. After considering comments from interested parties, we determined that interested parties that wish to have their suspended non-"Applicable Entries," if any, reviewed, and/or their ineligibility

for the certification program re-evaluated, should request an administrative review of the relevant suspended entries during the next anniversary month of these *Orders* (*i.e.,* December 2023).[12] The requestor should note in the request for an administrative review that: (1) it believes that all the imported merchandise from the company identified in Appendix II would meet the certification requirements in Appendix VI of this **Federal Register** notice; and (2) that the requestor is seeking a review in order for Commerce to reconsider the exporter/producer's eligibility to certify to that fact.

## Suspension of Liquidation and Cash Deposit Requirements

On June 6, 2022, the President of the United States signed *Presidential Proclamation 10414,* "Declaration of Emergency and Authorization for Temporary Extensions of Time and Duty-Free Importation of Solar Cells and Modules from Southeast Asia."[13] In *Presidential Proclamation 10414,* the President directed the Secretary of Commerce (the Secretary) to:

consider taking appropriate action under section 1318(a) of title 19, United States Code, to permit, until 24 months after the date of this proclamation or until the emergency declared herein has terminated, whichever occurs first, under such regulations and under such conditions as the Secretary may prescribe, the importation, free of the collection of duties and estimated duties, if applicable, under sections 1671, 1673, 1675, and 1677j of title 19, United States Code, {(sections 701, 731, 751 and 781 of the Act)} of certain solar cells and modules exported from the Kingdom of Cambodia, Malaysia, the Kingdom of Thailand, and the Socialist Republic of Vietnam, and that are not already subject to an antidumping or countervailing duty order as of the date of this proclamation . . .

On September 12, 2022, Commerce added Part 362 to its regulations to implement *Presidential Proclamation 10414.* Pursuant to 19 CFR 362.103(b)(1)(i), Commerce will direct U.S. Customs and Border Protection (CBP) to discontinue the suspension of liquidation and collection of cash deposits that were ordered based on Commerce's initiation of these circumvention inquiries. In addition, pursuant to 19 CFR 362.103(b)(1)(ii) and

(iii), Commerce will not direct CBP to suspend liquidation, and require cash deposits, of estimated ADs and CVDs based on these affirmative determinations of circumvention on, any "Applicable Entries." However, Commerce will direct CBP to suspend liquidation, and collect cash deposits, of estimated ADs and CVDs based on these affirmative determinations of circumvention on, imports of "Southeast Asian-Completed cells and modules" that are not "Applicable Entries."

Pursuant to 19 CFR 362.102, 'Southeast Asian-Completed Cells and Modules'' are:

crystalline silicon photovoltaic cells, whether or not assembled into modules (solar cells and modules), which are completed in the Kingdom of Cambodia, Malaysia, the Kingdom of Thailand, or the Socialist Republic of Vietnam using parts and components manufactured in the People's Republic of China, and subsequently exported from Cambodia, Malaysia, Thailand, or Vietnam to the United States. These are cells and modules subject to the Solar Circumvention Inquiries. Southeast Asian-Completed Cells and Modules does not mean solar cells and modules that, on June 6, 2022, the date Proclamation 10414 was signed, were already subject to Certain Solar Orders.[14]

"Applicable Entries means the entries of Southeast Asian-Completed Cells and Modules that are entered into the United States, or withdrawn from warehouse, for consumption before the Date of Termination and, for entries that enter after November 15, 2022, are used in the United States by the Utilization Expiration Date."[15] The "Date of Termination" is "June 6, 2024, or the date the emergency described in *Presidential Proclamation 10414* has been terminated, whichever occurs first."[16] The "Utilization Expiration Date" is "the date 180 days after the Date of Termination."[17] "Utilization and utilized means the Southeast Asian-Completed Cells and Modules will be used or installed in the United States. Merchandise which remains in inventory or a warehouse in the United States, is resold to another party, is subsequently exported, or is destroyed after importation is not considered utilized for purposes of" the provisions in Part 362 of the regulations.[18]

---

[11] *See* Vietnam IDM at Comment 8.

[12] *See* Issues and Decisions Memoranda at the Comment entitled "Whether Commerce Should Reconsider Certification Eligibility in Changed Circumstances Reviews."

[13] *See* Proclamation No. 10414, *Declaration of Emergency and Authorization for Temporary Extensions of Time and Duty-Free Importation of Solar Cells and Modules from Southeast Asia,* 87 FR 35067 (June 9, 2022) (*Proclamation 10414*).

[14] "Certain Solar Orders" refers to the following orders: (1) *Solar Cells AD Order;* (2) *Solar Cells CVD Order;* and (3) *Certain Crystalline Silicon Photovoltaic Products from Taiwan: Antidumping Duty Order,* 80 FR 8596 (February 18, 2015).

[15] *See* 19 CFR 362.102.

[16] *Id.*

[17] *Id.*

[18] *Id.*

Therefore, based on these affirmative determinations of circumvention, Commerce will direct CBP to continue to suspend liquidation of, and collect cash deposits of the applicable estimated ADs and CVDs on, U.S. imports of Southeast Asian-completed solar cells and solar modules that are not ''Applicable Entries'' that were entered, or withdrawn from warehouse, for consumption on or after April 1, 2022, the date of publication of initiation of these circumvention inquiries in the **Federal Register**,[19] but prior to the Date of Termination of *Presidential Proclamation 10414.* Specifically, with the exception of the entries for which the importer and exporter have met the requirements of the relevant certifications described in the ''Certified Entries'' section of this notice below, Commerce will direct CBP to implement the following cash deposit requirements for U.S. entries of ''Southeast Asian-completed cells and modules'' that are not ''Applicable Entries'': (1) for exporters of the solar cells or solar modules that have a company-specific cash deposit rate under the *AD Order* and/or *CVD Order,* the cash deposit rate will be the company-specific AD and/or CVD cash deposit rate established for that company in the most recently-completed segment of the solar cells proceedings; (2) for exporters of the solar cells or solar modules that do not have a company-specific cash deposit rate under the *AD Order* and/or *CVD Order,* the cash deposit rate will be the company-specific cash deposit rate established under the *AD Order* and/or *CVD Order* for the company in China that exported the wafers to the producer/exporter in the relevant third country (*i.e.,* Cambodia, Malaysia, Thailand, or Vietnam) that were incorporated in the imported solar cells or solar modules; and (3) if neither the exporter of the solar cells or solar modules nor the exporter of the wafers described in item (2) above has a company-specific cash deposit rate, the AD cash deposit rate will be the China-wide rate (238.95 percent), and the CVD cash deposit rate will be the all-others rate (15.24 percent). Commerce has established the following third-country case numbers in the Automated Commercial Environment (ACE) for such entries: Cambodia—A–555–902–000/C–555–903–000; Malaysia—A–557–988–000/C–557–989–000; Thailand—A–

549–988–000/C–549–989–000; and Vietnam—A–552–988–000/C–552–989–000. If the exporter of the wafers described in the cash deposit requirements above has its own company-specific cash deposit rate under the *Orders,* the importer, producer, or exporter of inquiry merchandise containing those wafers may file a request in ACCESS on the record of the applicable proceeding segment that Commerce establish a case number in ACE for the *Orders* for the applicable third-country that is specific to the Chinese wafer exporter. CBP may also submit such a request to Commerce through the ACE AD/CVD Portal Inquiry System.

**Entries on or After Termination of Presidential Proclamation 10414**

Upon termination of the *Presidential Proclamation 10414,* Commerce will issue instructions to CBP that are described in 19 CFR 362.103(b)(2). Further, consistent with 19 CFR 362.103(b)(3), after the *Preliminary Determinations,* Commerce issued instructions to CBP pursuant to 19 CFR 362.103(b)(3).[20]

**Certified Entries**

Entries prior to the Date of Termination for which the importer and exporter have met the certification requirements described below and in Appendix IV, V, or VI to this notice, and entries on or after the Date for Termination for which the importer and exporter have met the certification requirements described below and in Appendix V or VI to this notice, will not be subject to suspension of liquidation, or the cash deposit requirements described above. Failure to comply with the applicable requisite certification requirements may result in the merchandise being subject to ADs and CVDs.

**Certifications**

In order to administer these country-wide affirmative determinations of circumvention, and the company-specific negative determinations of circumvention, and to implement *Presidential Proclamation 10414,* Commerce has established the following types of certifications: (1) importer and exporter certifications that specific entries meet the regulatory definition of ''Applicable Entries'' (*see* Appendix IV to this notice); (2) importer and exporter certifications that specific entries are not subject to suspension of liquidation or the collection of cash deposits based

on the negative circumvention determinations with respect to the exporters listed in Appendix III to this notice in combination with certain wafer exporters (*see* Appendix V to this notice); and (3) importer and exporter certifications that specific entries of solar cells or solar modules from Cambodia, Malaysia, Thailand, or Vietnam are not subject to suspension of liquidation or the collection of cash deposits pursuant to these country-wide affirmative determinations of circumvention because the merchandise meets the component content requirements described in the certification (*see* Appendix VI to this notice). The non-cooperative companies listed in Appendix II are not eligible to use the certification described in items (2) or (3) above for the relevant inquiry country.[21]

Importers and exporters that claim that: (1) an entry of ''Southeast Asian-completed cells and modules'' is an ''Applicable Entry''; (2) an entry of solar cells or solar modules is not subject to suspension of liquidation or the collection of cash deposits based on the negative circumvention determination with respect to one of the companies listed in Appendix III; or (3) the entry of solar cells or solar modules is not subject to suspension of liquidation or the collection of cash deposits based on the inputs used to manufacture such merchandise, must complete the applicable certification and meet the certification and documentation requirements described below, as well as the requirements identified in the applicable certification.

**Certification Requirements**

Importers are required to complete and maintain the applicable importer certification, and maintain a copy of the applicable exporter certification, and retain all supporting documentation for both certifications. For entries of inquiry merchandise more than 14 days after the date of publication of the notice of Commerce's *Preliminary Determinations* of circumvention in the **Federal Register,** the applicable importer certification must be completed and signed by the time the entry summary is filed for the relevant entry. For entries

[19] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Initiation of Circumvention Inquiry on the Antidumping Duty and Countervailing Duty Orders,* 87 FR 19071 (April 1, 2022).

[20] *See Preliminary Determinations,* 87 FR at 75224.

[21] *See Preliminary Determinations* PDM at the section titled ''Use of Facts Available with an Adverse Inference''; and, *e.g., Anti-circumvention Inquiry of the Antidumping Duty Order on Certain Pasta from Italy: Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order,* 63 FR 18364, 18366 (April 15, 1998), unchanged in *Anti-Circumvention Inquiry of the Antidumping Duty Order on Certain Pasta from Italy: Affirmative Final Determination of Circumvention of the Antidumping Duty Order,* 63 FR 54672, 54675–76 (October 13, 1998).

of inquiry merchandise during the period April 1, 2022, (the date of initiation of these circumvention inquiries) through the 14th day after the date of publication of the notice of Commerce's *Preliminary Determinations* of circumvention in the **Federal Register**, where the entry has not been liquidated (and entries for which liquidation has not become final), the applicable importer certification should have been completed and signed by no later than 45 days after the date of publication of the notice of Commerce's *Preliminary Determinations* of circumvention in the **Federal Register**. For entries of inquiry merchandise during the period April 1, 2022, through the 14th day after the date of publication of the notice of Commerce's *Preliminary Determinations* of circumvention in the **Federal Register**, importers have the option to complete a blanket certification covering multiple entries, individual certifications for each entry, or a combination thereof.

The importer, or the importer's agent, must submit both the importer's certification and the exporter's certification to CBP as part of the entry process by uploading them into the document imaging system (DIS) in ACE. Where the importer uses a broker to facilitate the entry process, it should obtain the entry summary number from the broker. Agents of the importer, such as brokers, however, are not permitted to certify on behalf of the importer.

Exporters are required to complete and maintain the applicable exporter certification and provide the importer with a copy of that certification and all supporting documentation (*e.g.*, invoice, purchase order, production records, *etc.*). For shipments of inquiry merchandise more than 14 days after the date of publication of the notice of Commerce's *Preliminary Determinations* of circumvention in the **Federal Register**, the applicable exporter certification must be completed and signed, and a copy of the certification provided to the importer, on, or prior to, the date of shipment. For entries during the period April 1, 2022, (the date of initiation of these circumvention inquiries) through the 14th day after the date of publication of the notice of Commerce's *Preliminary Determinations* of circumvention in the **Federal Register**, the applicable exporter certification should have been completed and signed, and a copy of the certification provided to the importer, by no later than 45 days after the date of publication of the notice of Commerce's *Preliminary Determinations* of circumvention in the **Federal Register**. For shipments of inquiry

merchandise during the period April 1, 2022, through the 14th day after the date of publication of the notice of Commerce's *Preliminary Determinations* of circumvention in the **Federal Register**, exporters have the option to complete a blanket certification covering multiple entries, individual certifications for each entry, or a combination thereof.

The exporter certification should be completed by the party selling the solar cells or solar modules to the United States that were manufactured in Cambodia, Malaysia, Thailand, or Vietnam.

Additionally, the claims made in the certifications and any supporting documentation are subject to verification by Commerce and/or CBP. Importers and exporters are required to maintain the certifications and supporting documentation for the later of: (1) the date that is five years after the latest entry date of the entries covered by the certification; or (2) the date that is three years after the conclusion of any litigation in United States courts regarding such entries.

For unliquidated entries (and entries for which liquidation has not become final) of solar cells and solar modules that were declared as non-AD/CVD type entries (*e.g.*, type 01) and were entered, or withdrawn from warehouse, for consumption in the United States during the period April 1, 2022, (the date of initiation of these circumvention inquiries) through the date of publication of the *Preliminary Determinations* in the **Federal Register**, for which none of the above certifications may be made, importers must file a Post Summary Correction with CBP, in accordance with CBP's regulations, regarding conversion of such entries from non-AD/CVD type entries to AD/CVD type entries (*e.g.*, type 01 to type 03). Importers should report those AD/CVD type entries using the following third-country case numbers: Cambodia—A–555–902–000/ C–555–903–000; Malaysia—A–557– 988–000/C–557–989–000; Thailand—A– 549–988–000/C–549–989–000; and Vietnam—A–552–988–000/C–552–989– 000. Other third-country case numbers may be established following the process described above. The importer should pay cash deposits on those entries consistent with the regulations governing post summary corrections that require payment of additional duties.

If it is determined that an importer and/or exporter has not met the certification and/or related documentation requirements for certain entries, Commerce intends to instruct

CBP to suspend, pursuant to these country-wide affirmative determinations of circumvention and the *Orders*,[22] all unliquidated entries for which these requirements were not met and require the importer to post applicable AD and CVD cash deposits equal to the rates noted above.

**Administrative Protective Order**

This notice will serve as the only reminder to all parties subject to an administrative protective order (APO) of their responsibility concerning the destruction of proprietary information disclosed under an APO in accordance with 19 CFR 351.305(a)(3). Timely written notification of return/ destruction of APO materials or conversion to judicial protective order is hereby requested. Failure to comply with the regulations and the terms of an APO is a sanctionable violation.

**Notification to Interested Parties**

These determinations are issued and published in accordance with section 781(b) of the Act and 19 CFR 351.226(g)(2).

Dated: August 17, 2023.

**Lisa W. Wang,**

*Assistant Secretary for Enforcement and Compliance.*

APPENDICES

| Appendix No. | Appendix name |
|---|---|
| I .................... | List of Topics Discussed in the Issues and Decision Memoranda |
| II ................... | List of Companies to Which Commerce Applied AFA |
| III .................. | List of Companies Found Not To Be Circumventing |
| IV .................. | Certification for "Applicable Entries" |
| V ................... | Certification for Entries of Inquiry Merchandise From Companies Found Not To Be Circumventing |
| VI .................. | Certification Regarding Chinese Components |

**Appendix I**

**List of Topics Discussed in the Issues and Decision Memoranda**

**Cambodia**

I. Summary
II. Background
III. Merchandise Subject to the Scope Inquiry
IV. Scope of the *Orders*
V. Regulatory Framework for Scope Inquiry
VI. Interested Party Scope Comments
VII. Scope Determination
VIII. Scope of the Circumvention Inquiry
IX. Period of the Circumvention Inquiry

---

[22] *See Orders.*

X. Changes Since the *Preliminary Determination*

XI. Discussion of the Issues

Comment 1. Whether Solar Cells With a p/n Junction Formed Outside of China Should Be Subject to the Circumvention Inquiries

Comment 2. Whether a Wafer Should Be Considered a Chinese Input Where Either the Wafer or the Polysilicon in the Wafer was Produced Outside of China

Comment 3. Whether Commerce Should Analyze Investment Data on a Per-Unit Basis

Comment 4. Whether to Depart from the Section 781(b)(2) "Minor or Insignificant" Methodology Applied in the *Preliminary Determinations*

Comment 5. Whether the Nature of Third-Country Processing Indicates the Processing is Minor or Insignificant Under Section 781(b)(2)(C) of the Act

Comment 6. How to Value U.S. Imports of Solar Cells and Modules for Purposes of Section 781(b)(2)(E) of the Act

Comment 7. Whether Material Costs Should be Included in the Value of Third-Country Processing

Comment 8. Whether Commerce Should Rely on Surrogates To Value Chinese Inputs Consumed in the Inquiry Country

Comment 9. Whether Commerce Should Apply AFA to NE Solar

Comment 10. Whether NE Solar's Production Process Data Support a Negative Final Determination

Comment 11. Whether To Include BYD HK's Tollers in Determining Whether the Process of Assembly or Completion is Minor or Insignificant

Comment 12. Whether BYD HK's Process of Assembly in Cambodia is Minor or Insignificant Under Section 781(b)(1)(C) of the Act

Comment 13. Whether the Factors Under 781(b)(3) of the Act Justify an Affirmative Final Determination

Comment 14. Whether Commerce's Country-Wide Affirmative Circumvention Determination was Appropriate

Comment 15. Affirmative Circumvention Determinations Would not be Appropriate Under Section 781(b)(1)(E) of the Act

Comment 16. Whether Commerce Should Allow AFA Companies To Certify

Comment 17. Certification Requirements and Corrections

Comment 18. Whether Commerce Can Require Certifications for U.S. Entries of Merchandise Not Covered by the *Orders*

Comment 19. Whether Exporters and Importers Should be Permitted To Submit Multiple Certifications, as Applicable

Comment 20. Whether or Not Companies Found Not To Be Circumventing Should Be Required To Certify and To Identify Their Wafer Suppliers

Comment 21. Whether Commerce Should Reconsider Certification Eligibility in Changed Circumstances Reviews

Comment 22. Whether Cadmium Telluride Thin Film Solar Products are Covered by Affirmative Final Determinations or Related Certification Requirements

Comment 23. Clarification and Enforcement of the Utilization Requirement

Comment 24. Whether the "Wafer-Plus-Three" Requirement is Appropriate

Comment 25. Whether Commerce Properly Placed *Ex Parte* Memoranda on the Record That Concerned the Circumvention Inquiries

Comment 26. Whether Commerce's Determination To Apply *Presidential Proclamation 10414* Retroactively is Contrary to Law

Comment 27. Whether Third-Country Exporters Without an AD Rate Should Receive the Separate Rate

XII. Recommendation

## Malaysia

I. Summary

II. Background

III. Scope of the *Orders*

IV. Scope of the Circumvention Inquiry

V. Period of the Circumvention Inquiry

VI. Changes Since the *Preliminary Determination*

VII. Discussion of the Issues

Comment 1. Whether Solar Cells With a p/n Junction Formed Outside of China Should Be Subject to Circumvention Inquiries

Comment 2. Whether a Wafer Should Be Considered a Chinese Input Where Either the Wafer or the Polysilicon in the Wafer was Produced Outside of China.

Comment 3. Whether Commerce Should Analyze Investment Data on a Per-Unit Basis

Comment 4. Whether To Depart From the Section 781(b)(2) "Minor or Insignificant" Methodology Applied in the Preliminary Determinations

Comment 5. Whether the Nature of Third-Country Processing Indicates the Processing is Minor or Insignificant Under Section 781(b)(2)(C) of the Act

Comment 6. Whether Material Costs Should be Included in the Value of Third-Country Processing

Comment 7. Whether Commerce Should Correct Certain Ministerial Errors and Minor Verification Corrections

Comment 8. Whether Jinko's Cell and Module Manufacturing is Minor or Insignificant Under Section 781(b)(1)(C) of the Act

Comment 9. Whether Hanwha's Cell and Module Manufacturing is Minor or Insignificant under Section 781(b)(1)(C) of the Act

Comment 10. Whether Hanwha's Shipments of Chinese Inputs Weighs in Favor of Circumvention Under Section 781(b)(3)(C) of the Act

Comment 11. Whether Commerce's Country-Wide Affirmative Circumvention Determination Was Appropriate

Comment 12. Affirmative Circumvention Determinations Would Not Be Appropriate Under Section 781(b)(1)(E) of the Act

Comment 13. Whether Commerce Should Allow AFA Companies To Certify

Comment 14. Certification Requirements and Corrections

Comment 15. Whether Commerce Can Require Certifications for U.S. Entries of Merchandise Not Covered by the Orders

Comment 16. Whether Exporters and Importers Should be Permitted To Submit Multiple Certifications, as Applicable

Comment 17. Whether or Not Companies Found Not To Be Circumventing Should be Required To Certify and To Identify Their Wafer Suppliers

Comment 18. Whether Commerce Should Reconsider Certification Eligibility in Changed Circumstances Reviews

Comment 19. Whether Cadmium Telluride Thin Film Solar Products are Covered by Affirmative Final Determinations or Related Certification Requirements

Comment 20. Clarification and Enforcement of the Utilization Requirement

Comment 21. Whether the "Wafer-Plus-Three" Requirement is Appropriate

Comment 22. Whether Commerce Properly Placed Ex Parte Memoranda on the Record That Concerned the Circumvention Inquiries

Comment 23. Whether Commerce's Determination to Apply *Presidential Proclamation 10414* Retroactively is Contrary to Law

Comment 24. Whether Third-Country Exporters Without an AD Rate Should Receive the Separate Rate

VIII. Recommendation

## Thailand

I. Summary

II. Background

III. Scope of the *Orders*

IV. Scope of the Circumvention Inquiry

V. Period of the Circumvention Inquiry

VI. Changes Since the *Preliminary Determination*

VII. Discussion of the Issues

Comment 1. Whether Solar Cells With a p/n Junction Formed Outside of China Should Be Subject to Circumvention Inquiries

Comment 2. Whether a Wafer Should Be Considered a Chinese Input Where Either the Wafer or the Polysilicon in the Wafer was Produced Outside of China.

Comment 3. Whether Commerce Should Analyze Investment Data on a Per-Unit Basis

Comment 4. Whether to Depart from the Section 781(b)(2) "Minor or Insignificant" Methodology Applied in the Preliminary Determinations

Comment 5. How to Value U.S. Imports of Solar Cells and Modules for Purposes of Section 781(b)(2)(E) of the Act

Comment 6. Whether Material Costs Should Be Included in the Value of Third-Country Processing

Comment 7. Whether Commerce Should Rely on Surrogates To Value Chinese Inputs Consumed in the Inquiry Country

Comment 8. Whether Third Country Processing was Minor-General

Comment 9. Whether the Factors Under 781(b)(3) of the Act Justify an Affirmative Final Determination

Comment 10. Affirmative Circumvention Determinations Would Not Be

Appropriate Under Section 781(b)(1)(E) of the Act

Comment 11. Whether Commerce Should Allow AFA Companies To Certify

Comment 12. Certification Requirements and Corrections

Comment 13. Whether Commerce Can Require Certifications for U.S. Entries of Merchandise Not Covered by the *Orders*

Comment 14. Whether Exporters and Importers Should Be Permitted To Submit Multiple Certifications, as Applicable

Comment 15. Whether or Not Companies Found Not To Be Circumventing Should be Required to Certify and to Identify Their Wafer Suppliers

Comment 16. Whether Commerce Should Reconsider Certification Eligibility in Changed Circumstances Reviews

Comment 17. Whether Cadmium Telluride Thin Film Solar Products are Covered by Affirmative Final Determinations or Related Certification Requirements

Comment 18. Clarification and Enforcement of the Utilization Requirement

Comment 19. Whether the ''Wafer-Plus-Three'' Requirement is Appropriate

Comment 20. Whether Commerce Properly Placed Ex Parte Memoranda on the Record That Concerned the Circumvention Proceedings

Comment 21. Whether Commerce's Determination To *Apply Presidential Proclamation 10414* Retroactively is Contrary to Law

Comment 22. Whether Third-Country Exporters Without an AD Rate Should Receive the Separate Rate

VIII. Recommendation

## Vietnam

I. Summary
II. Background
III. Scope of the *Orders*
IV. Scope of the Circumvention Inquiry
V. Period of the Circumvention Inquiry
VI. Changes Since the *Preliminary Determination*
VII. Discussion of the Issues

Comment 1. Whether Solar Cells With a p/n Junction Formed Outside of China Should Be Subject to Circumvention Inquiries

Comment 2. Whether a Wafer Should Be Considered a Chinese Input Where Either the Wafer or the Polysilicon in the Wafer was Produced Outside of China.

Comment 3. Whether Commerce Should Analyze Investment Data on a Per-Unit Basis

Comment 4. Whether To Depart From the Section 781(b)(2) ''Minor or Insignificant'' Methodology Applied in the Preliminary Determinations

Comment 5. How To Value U.S. Imports of Solar Cells and Modules for Purposes of Section 781(b)(2)(E) of the Act

Comment 6. Whether Material Costs Should Be Included in the Value of Third-Country Processing

Comment 7. Whether Third Country Processing was Minor-General

Comment 8. Whether VSUN Is Eligible to Participate in the Certification Program

Comment 9. Whether Commerce's Rejection of Red Sun Q&V Submission was Proper

Comment 10. Whether Commerce Should Base Surrogate Financial Ratios on Websol Energy's Financial Statements

Comment 11. Whether Commerce's Country-Wide Affirmative Circumvention Determination Appropriate

Comment 12. Affirmative Circumvention Determinations Would not Be Appropriate Under Section 781(b)(1)(E) of the Act

Comment 13. Whether Commerce Should Allow AFA Companies to Certify

Comment 14. Whether Commerce Should Allow Vina's Affiliates to Certify

Comment 15. Certification Requirements and Corrections

Comment 16. Whether Commerce Can Require Certifications for U.S. Entries of Merchandise Not Covered by the *Orders*

Comment 17. Whether Exporters and Importers Should be Permitted to Submit Multiple Certifications, as Applicable

Comment 18. Whether or Not Companies Found Not to Be Circumventing Should be Required to Certify and to Identify Their Wafer Suppliers

Comment 19. Whether Commerce Should Reconsider Certification Eligibility in Changed Circumstances Reviews

Comment 20. Whether Cadmium Telluride Thin Film Solar Products are Covered by Affirmative Final Determinations or Related Certification Requirements

Comment 21. Clarification and Enforcement of the Utilization Requirement

Comment 22. Whether the ''Wafer-Plus-Three'' Requirement is Appropriate

Comment 23. Whether Commerce Properly Placed Ex Parte Memoranda on the Record That Concerned the Circumvention Proceedings

Comment 24. Whether Commerce's Determination To Apply *Presidential Proclamation 10414* Retroactively is Contrary to Law

Comment 25. Whether Third-Country Exporters Without an AD Rate Should Receive the Separate Rate

VIII. Recommendation

## Appendix II—List of Companies to Which Commerce Applied AFA

### Cambodia

1. New East Solar Energy (Cambodia) Co., Ltd.

### Malaysia

1. AMC Cincaria Sdn Bhd
2. Flextronic Shah Alam Sdn. Bhd.
3. Funing Precision Component Co., Ltd.
4. Samsung Sds Malaysia Sdn. Bhd.
5. Vina Solar Technology Co., Ltd.

### Thailand

1. Celestica (Thailand) Limited
2. Green Solar Thailand Co., Ltd.
3. Lightup Creation CO., Ltd.
4. Thai Master Frame Co., Ltd.
5. Three Arrows (Thailand) Co., Ltd.
6. Yuan Feng New Energy
7. Solar PPM.

8. Sunshine Electrical Energy Co., Ltd.

### Vietnam

1. Cong Ty Co Phan Cong Nghe Nang (Global Energy)
2. GCL System Integration Technology
3. Green Wing Solar Technology Co., Ltd.
4. HT Solar Vietnam Limited Company
5. Irex Energy Joint Stock Company
6. S-Solar Viet Nam Company Limited
7. Venergy Solar Industry Company
8. Red Sun Energy Co., Ltd.
9. Vina Solar Technology Co., Ltd.

## Appendix III—List of Companies Found Not To Be Circumventing

### Malaysia

1. Hanwha Q CELLS Malaysia Sdn. Bhd.
2. Jinko Solar Technology Sdn. Bhd./Jinko Solar (Malaysia) Sdn. Bhd.

### Vietnam

1. Boviet Solar Technology Co., Ltd.

## Appendix IV

### Certification for ''Applicable Entries'' Under 19 CFR Part 362 Importer Certification

I hereby certify that:

(A) My name is {IMPORTING COMPANY OFFICIAL'S NAME} and I am an official of {NAME OF IMPORTING COMPANY}, located at {ADDRESS OF IMPORTING COMPANY}.

(B) I have direct personal knowledge of the facts regarding importation of the solar cells and solar modules produced in {SELECT ONE OF THE FOLLOWING COUNTRIES: KINGDOM OF CAMBODIA, MALAYSIA, THE KINGDOM OF THAILAND, OR THE SOCIALIST REPUBLIC OF VIETNAM } that were entered into the Customs territory of the United States under the entry summary number(s) identified below which are covered by this certification. "Direct personal knowledge" refers to the facts the certifying party is expected to have in its own records. For example, the importer should have direct personal knowledge of the exporter and/or seller's identity and location.

(C) If the importer is acting on behalf of the first U.S. customer, include the following sentence as paragraph C of this certification:

The solar cells and/or solar modules covered by this certification were imported by {NAME OF IMPORTING COMPANY} on behalf of {NAME OF U.S. CUSTOMER}, located at {ADDRESS OF U.S. CUSTOMER}.

If the importer is not acting on behalf of the first U.S. customer, include the following sentence as paragraph C of this certification:

{NAME OF IMPORTING COMPANY} is not acting on behalf of the first U.S. customer.

(D) The solar cells and/or solar modules covered by this certification were shipped to {NAME OF PARTY IN THE UNITED STATES TO WHOM THE MERCHANDISE WAS FIRST SHIPPED}, located at {U.S. ADDRESS TO WHICH MERCHANDISE WAS SHIPPED}.

(E) I have personal knowledge of the facts regarding the production and exportation of the solar cells and modules identified below. "Personal knowledge" includes facts obtained from another party, (*e.g.,*

correspondence received by the importer (or exporter) from the producer of the imported products regarding production).

(F) The imported solar cells and/or solar modules covered by this certification:

1. Were produced in {SELECT ONE OF THE FOLLOWING COUNTRIES: KINGDOM OF CAMBODIA, MALAYSIA, THE KINGDOM OF THAILAND, OR THE SOCIALIST REPUBLIC OF VIETNAM} using parts and components manufactured in the People's Republic of China;

2. Were exported to the United States from {SELECT ONE OF THE FOLLOWING COUNTRIES: KINGDOM OF CAMBODIA, MALAYSIA, THE KINGDOM OF THAILAND, OR THE SOCIALIST REPUBLIC OF VIETNAM} without further assembly in another country;

3. Absent the affirmative determination of circumvention, are not covered by the antidumping duty or countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China;

4. Are not covered by the antidumping duty order on certain crystalline silicon photovoltaic products from Taiwan;

5. Were entered into the United States, or were withdrawn from warehouse, for consumption before 06/06/2024, or before the date the emergency described in *Presidential Proclamation 10414* is terminated, whichever occurs first; and

6. If entered, or withdrawn from warehouse, after November 15, 2022, the solar cells and/or solar modules will be utilized in the United States by no later than 180 days after the earlier of 06/06/2024, or the date the emergency described in *Presidential Proclamation 10414* is terminated. Utilized means the solar cells or solar modules will be used or installed in the United States. Solar cells or solar modules which remain in inventory or in a warehouse in the United States, are resold to another party, are subsequently exported, or are destroyed after importation are not considered utilized.

(G) This certification applies to the following entries (repeat this block as many times as necessary):

Entry Summary #:

Applicable Line Item # of the Entry Summary:

Foreign Seller:

Foreign Seller's Address:

Foreign Seller's Invoice #:

Applicable Line Item # on the Foreign Seller's Invoice:

Producer:

Producer's Address:

(H) I understand that {NAME OF IMPORTING COMPANY} is required to maintain a copy of this certification and sufficient documentation supporting this certification (*i.e.,* documents maintained in the normal course of business, or documents obtained by the certifying party, for example, product specification sheets, production records, invoices, *etc.*) until the later of: (1) the date that is five years after the latest entry date of the entries covered by the certification; or (2) the date that is three years after the conclusion of any litigation in United States courts regarding such entries.

(I) I understand that {NAME OF IMPORTING COMPANY} is required to maintain a copy of the exporter's certification (attesting to information regarding the production and/or exportation of the imported merchandise identified above), and any supporting documentation provided to the importer by the exporter, until the later of: (1) the date that is five years after the latest entry date of the entries covered by the certification; or (2) the date that is three years after the conclusion of any litigation in United States courts regarding such entries.

(J) I understand that {NAME OF IMPORTING COMPANY} is required to provide U.S. Customs and Border Protection (CBP) and/or the U.S. Department of Commerce (Commerce) with the importer certification, and any supporting documentation, and a copy of the exporter's certification, and any supporting documentation provided to the importer by the exporter, upon the request of either agency.

(K) I understand that the claims made herein, and the substantiating documentation, are subject to verification by CBP and/or Commerce.

(L) I understand that failure to maintain the required certifications and supporting documentation, or failure to substantiate the claims made herein, or not allowing CBP and/or Commerce to verify the claims made herein, may result in a *de facto* determination that all entries to which this certification applies are not ''Applicable Entries.'' I understand that such a finding may result in:

(i) suspension of liquidation of all unliquidated entries (and entries for which liquidation has not become final) for which these requirements were not met;

(ii) the importer being required to post the antidumping duty and countervailing duty cash deposits determined by Commerce; and

(iii) the importer no longer being allowed to participate in the certification process.

(M) I understand that agents of the importer, such as brokers, are not permitted to make this certification.

(N) This certification was completed and signed on, or prior to, the date of the entry summary if the entry date is more than 14 days after the date of publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**. If the entry date is on or before the 14th day after the date of publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**, this certification was completed and signed by no later than 45 days after publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**.

(O) I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make materially false statements to the U.S. government.

Signature

{NAME OF COMPANY OFFICIAL}

{TITLE OF COMPANY OFFICIAL}

Date

**Exporter Certification**

The party that made the sale to the United States should fill out the exporter certification.

I hereby certify that:

(A) My name is {COMPANY OFFICIAL'S NAME} and I am an official of {NAME OF FOREIGN COMPANY THAT MADE THE SALE TO THE UNITED STATES}, located at {ADDRESS OF FOREIGN COMPANY THAT MADE THE SALE TO THE UNITED STATES};

(B) I have direct personal knowledge of the facts regarding the production and exportation of the solar cells and solar modules for which sales are identified below. ''Direct personal knowledge'' refers to facts the certifying party is expected to have in its own records. For example, an exporter should have direct personal knowledge of the producer's identity and location.

(C) The solar cells and/or solar modules covered by this certification were shipped to {NAME OF PARTY IN THE UNITED STATES TO WHOM MERCHANDISE WAS FIRST SHIPPED}, located at {U.S. ADDRESS TO WHICH MERCHANDISE WAS SHIPPED}.

(D) The solar cells and/or solar modules covered by this certification:

1. Were produced in {SELECT ONE OF THE FOLLOWING COUNTRIES: KINGDOM OF CAMBODIA, MALAYSIA, THE KINGDOM OF THAILAND, OR THE SOCIALIST REPUBLIC OF VIETNAM} using parts and components manufactured in the People's Republic of China;

2. Were exported to the United States from {SELECT ONE OF THE FOLLOWING COUNTRIES: KINGDOM OF CAMBODIA, MALAYSIA, THE KINGDOM OF THAILAND, OR THE SOCIALIST REPUBLIC OF VIETNAM} without further assembly in another country;

3. Absent the affirmative determination of circumvention, are not covered by the antidumping duty or countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China; and

4. Are not covered by the antidumping duty order on certain crystalline silicon photovoltaic products from Taiwan.

(E) This certification applies to the following sales to {NAME OF U.S. CUSTOMER}, located at {ADDRESS OF U.S. CUSTOMER} (repeat this block as many times as necessary):

# of the Foreign Seller's Invoice to the U.S. Customer:

Applicable Line Item # of the Foreign Seller's Invoice to the U.S. Customer:

Producer Name:

Producer's Address:

Invoice # of the Producer's Invoice to the Foreign Seller (if the foreign seller and the producer are the same party, report ''NA'' here):

(F) I understand that {NAME OF FOREIGN COMPANY THAT MADE THE SALE TO THE UNITED STATES} is required to maintain a copy of this certification and sufficient documentation supporting this certification (*i.e.,* documents maintained in

the normal course of business, or documents obtained by the certifying party, for example, product specification sheets, customer specification sheets, production records, invoices, *etc.*) until the later of: (1) the date that is five years after the latest entry date of the entries covered by the certification; or (2) the date that is three years after the conclusion of any litigation in United States courts regarding such entries.

(G) I understand that {NAME OF FOREIGN COMPANY THAT MADE THE SALE TO THE UNITED STATES} is required to provide the U.S. importer with a copy of this certification and is required to provide U.S. Customs and Border Protection (CBP) and/or the U.S. Department of Commerce (Commerce) with a copy of this certification, and any supporting documents, upon the request of either agency.

(H) I understand that the claims made herein, and the substantiating documentation, are subject to verification by CBP and/or Commerce.

(I) I understand that failure to maintain the required certification and supporting documentation, or failure to substantiate the claims made herein, or not allowing CBP and/or Commerce to verify the claims made herein, may result in a *de facto* determination that all sales to which this certification applies are sales of merchandise that was not entered into the United States in "Applicable Entries." I understand that such a finding may result in:

(i) suspension of liquidation of all unliquidated entries (and entries for which liquidation has not become final) for which these requirements were not met;

(ii) the importer being required to post the antidumping and countervailing duty cash deposits determined by Commerce; and

(iii) the seller/exporter no longer being allowed to participate in the certification process.

(J) I understand that agents of the seller/exporter, such as freight forwarding companies or brokers, are not permitted to make this certification.

(K) This certification was completed and signed, and a copy of the certification was provided to the importer, on, or prior to, the date of shipment if the shipment date is more than 14 days after the date of publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**. If the shipment date is on or before the 14th day after the date of publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**, this certification was completed and signed, and a copy of the certification was provided to the importer, by no later than 45 days after publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**.

(L) I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make materially false statements to the U.S. government.

Signature
{NAME OF COMPANY OFFICIAL}
{TITLE OF COMPANY OFFICIAL}
Date

## Appendix V

**Certification for Entries of Inquiry Merchandise From Companies Found Not To Be Circumventing**

*Company Name:* Boviet Solar Technology Co., Ltd.

**Importer Certification**

I hereby certify that:

(A) My name is {IMPORTING COMPANY OFFICIAL'S NAME} and I am an official of {NAME OF IMPORTING COMPANY}, located at {ADDRESS OF IMPORTING COMPANY}.

(B) I have direct personal knowledge of the facts regarding importation of the solar cells and solar modules produced in Vietnam that were entered into the Customs territory of the United States under the entry summary number(s) identified below which are covered by this certification. "Direct personal knowledge" refers to the facts the certifying party is expected to have in its own records. For example, the importer should have direct personal knowledge of the exporter and/or seller's identity and location.

(C) If the importer is acting on behalf of the first U.S. customer, include the following sentence as paragraph C of this certification:

The solar cells and/or solar modules covered by this certification were imported by {NAME OF IMPORTING COMPANY} on behalf of {NAME OF U.S. CUSTOMER}, located at {ADDRESS OF U.S. CUSTOMER}.

If the importer is not acting on behalf of the first U.S. customer, include the following sentence as paragraph C of this certification:

{NAME OF IMPORTING COMPANY} is not acting on behalf of the first U.S. customer.

(D) The solar cells and/or solar modules covered by this certification were shipped to {NAME OF PARTY IN THE UNITED STATES TO WHOM THE MERCHANDISE WAS FIRST SHIPPED}, located at {U.S. ADDRESS TO WHICH MERCHANDISE WAS SHIPPED}.

(E) I have personal knowledge of the facts regarding the production and exportation of the solar cells and modules identified below. "Personal knowledge" includes facts obtained from another party, (*e.g.,* correspondence received by the importer (or exporter) from the producer of the imported products regarding production).

(F) The solar cells and/or solar modules covered by this certification were:

1. Sold to the United States by Boviet Solar Technology Co., Ltd.

2. Exported to the United States by Boviet Solar Technology Co., Ltd.

3. Produced in Vietnam by Boviet Solar Technology Co., Ltd., using wafers manufactured in the People's Republic of China that were exported to Vietnam by Ningbo Kyanite International Trade Co., Ltd.

(G) The U.S. Department of Commerce (Commerce) found that solar cells and/or solar modules produced by Boviet Solar Technology Co., Ltd., using wafers manufactured in China that were exported by the wafer supplier listed in item F above, and exported by Boviet Solar Technology Co., Ltd. are not circumventing the antidumping duty and countervailing duty orders on

crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China.

(H) This certification applies to the following entries (repeat this block as many times as necessary):

Entry Summary #:
Applicable Line Item # of the Entry Summary:
Foreign Seller's Invoice #:
Applicable Line Item # on the Foreign Seller's Invoice:

(I) I understand that {NAME OF IMPORTING COMPANY} is required to maintain a copy of this certification and sufficient documentation supporting this certification (*i.e.,* documents maintained in the normal course of business, or documents obtained by the certifying party, for example, product specification sheets, production records, invoices, *etc.*) until the later of: (1) the date that is five years after the latest entry date of the entries covered by the certification; or (2) the date that is three years after the conclusion of any litigation in United States courts regarding such entries.

(J) I understand that {NAME OF IMPORTING COMPANY} is required to maintain a copy of the exporter's certification (attesting to information regarding the production and/or exportation of the imported merchandise identified above), and any supporting documentation provided to the importer by the exporter, until the later of: (1) the date that is five years after the latest entry date of the entries covered by the certification; or (2) the date that is three years after the conclusion of any litigation in United States courts regarding such entries.

(K) I understand that {NAME OF IMPORTING COMPANY} is required to provide U.S. Customs and Border Protection (CBP) and/or Commerce with the importer certification, and any supporting documentation, and a copy of the exporter's certification, and any supporting documentation provided to the importer by the exporter, upon the request of either agency.

(L) I understand that the claims made herein, and the substantiating documentation, are subject to verification by CBP and/or Commerce.

(M) I understand that failure to maintain the required certifications and supporting documentation, or failure to substantiate the claims made herein, or not allowing CBP and/or Commerce to verify the claims made herein, may result in a *de facto* determination that all entries to which this certification applies are entries of merchandise that is covered by the scope of the antidumping and countervailing duty orders on solar cells and solar modules from China. I understand that such a finding will result in:

(i) suspension of liquidation of all unliquidated entries (and entries for which liquidation has not become final) for which these requirements were not met;

(ii) the importer being required to post the antidumping duty and countervailing duty cash deposits determined by Commerce; and

(iii) the importer no longer being allowed to participate in the certification process.

(N) I understand that agents of the importer, such as brokers, are not permitted to make this certification.

(O) This certification was completed and signed on, or prior to, the date of the entry summary if the entry date is more than 14 days after the date of publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**. If the entry date is on or before the 14th day after the date of publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**, this certification was completed and signed by no later than 45 days after publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**.

(P) I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make materially false statements to the U.S. government.

Signature

NAME OF COMPANY OFFICIAL
TITLE OF COMPANY OFFICIAL
Date

**Exporter Certification**

**Certification for Entries of Inquiry Merchandise From Companies Found Not To Be Circumventing**

*Company Name:* Boviet Solar Technology Co., Ltd.

The party that made the sale to the United States should fill out the exporter certification.

I hereby certify that:

(A) My name is {COMPANY OFFICIAL'S NAME} and I am an official of Boviet Solar Technology Co., Ltd., located at B5, B6, Song Khe Industrial Zone, Noi Hoang District Bac Giang Province, Vietnam;

(B) I have direct personal knowledge of the facts regarding the production and exportation of the solar cells and solar modules for which sales are identified below. "Direct personal knowledge" refers to facts the certifying party is expected to have in its own records. For example, an exporter should have direct personal knowledge of the producer's identity and location.

(C) The solar cells and/or solar modules covered by this certification were shipped to {NAME OF PARTY IN THE UNITED STATES TO WHOM MERCHANDISE WAS FIRST SHIPPED}, located at {U.S. ADDRESS TO WHICH MERCHANDISE WAS SHIPPED}.

(D) The solar cells and/or solar modules covered by this certification were:

1. Sold to the United States by Boviet Solar Technology Co., Ltd.

2. Exported to the United States by Boviet Solar Technology Co., Ltd.

3. Produced in Vietnam by Boviet Solar Technology Co., Ltd. using wafers manufactured in the People's Republic of China (China) that were exported to Vietnam by Ningbo Kyanite International Trade Co., Ltd.

(E) The U.S. Department of Commerce (Commerce) found that solar cells and/or solar modules produced by Boviet Solar Technology Co., Ltd., using wafers manufactured in China that were exported by

the wafer supplier listed in item D above, and exported by Boviet Solar Technology Co., Ltd. are not circumventing the antidumping duty and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China.

(F) This certification applies to the following sales to {NAME OF U.S. CUSTOMER}, located at {ADDRESS OF U.S. CUSTOMER} {repeat this block as many times as necessary}:

# of the Foreign Seller's Invoice to the U.S. Customer: Applicable Line Item # of the Foreign Seller's Invoice to the U.S. Customer:

(G) I understand that Boviet Solar Technology Co., Ltd. is required to maintain a copy of this certification and sufficient documentation supporting this certification (*i.e.,* documents maintained in the normal course of business, or documents obtained by the certifying party, for example, product specification sheets, customer specification sheets, production records, invoices, *etc.*) until the later of: (1) the date that is five years after the latest entry date of the entries covered by the certification; or (2) the date that is three years after the conclusion of any litigation in United States courts regarding such entries.

(H) I understand that Boviet Solar Technology Co., Ltd. is required to provide the U.S. importer with a copy of this certification and is required to provide U.S. Customs and Border Protection (CBP) and/or Commerce with a copy of this certification, and any supporting documents, upon the request of either agency.

(I) I understand that the claims made herein, and the substantiating documentation, are subject to verification by CBP and/or Commerce.

(J) I understand that failure to maintain the required certification and supporting documentation, or failure to substantiate the claims made herein, or not allowing CBP and/or Commerce to verify the claims made herein, may result in a *de facto* determination that all sales to which this certification applies are sales of merchandise that is covered by the scope of the antidumping and countervailing duty orders on solar cells and solar modules from China. I understand that such a finding will result in:

(i) suspension of liquidation of all unliquidated entries (and entries for which liquidation has not become final) for which these requirements were not met;

(ii) the importer being required to post the antidumping and countervailing duty cash deposits determined by Commerce; and

(iii) the seller/exporter no longer being allowed to participate in the certification process.

(K) I understand that agents of the exporter, such as freight forwarding companies or brokers, are not permitted to make this certification.

(L) This certification was completed and signed, and a copy of the certification was provided to the importer, on, or prior to, the date of shipment if the shipment date is more than 14 days after the date of publication of the notice of Commerce's preliminary determination of circumvention in the

**Federal Register**. If the shipment date is on or before the 14th day after the date of publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**, this certification was completed and signed, and a copy of the certification was provided to the importer, by no later than 45 days after publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**.

(M) I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make materially false statements to the U.S. government.

Signature

{NAME OF COMPANY OFFICIAL}
{TITLE OF COMPANY OFFICIAL}
Date

**Certification for Entries of Inquiry Merchandise From Companies Found Not To Be Circumventing**

*Company Name:* Hanwha Q CELLS Malaysia Sdn. Bhd.

**Importer Certification**

I hereby certify that:

(A) My name is {IMPORTING COMPANY OFFICIAL'S NAME} and I am an official of {NAME OF IMPORTING COMPANY}, located at {ADDRESS OF IMPORTING COMPANY}.

(B) I have direct personal knowledge of the facts regarding importation of the solar cells and solar modules produced in Malaysia that were entered into the Customs territory of the United States under the entry summary number(s) identified below which are covered by this certification. "Direct personal knowledge" refers to the facts the certifying party is expected to have in its own records. For example, the importer should have direct personal knowledge of the exporter and/or seller's identity and location.

(C) If the importer is acting on behalf of the first U.S. customer, include the following sentence as paragraph C of this certification:

The solar cells and/or solar modules covered by this certification were imported by {NAME OF IMPORTING COMPANY} on behalf of {NAME OF U.S. CUSTOMER}, located at {ADDRESS OF U.S. CUSTOMER}.

If the importer is not acting on behalf of the first U.S. customer, include the following sentence as paragraph C of this certification:

{NAME OF IMPORTING COMPANY} is not acting on behalf of the first U.S. customer.

(D) The solar cells and/or solar modules covered by this certification were shipped to {NAME OF PARTY IN THE UNITED STATES TO WHOM MERCHANDISE WAS FIRST SHIPPED}, located at {U.S. ADDRESS TO WHICH MERCHANDISE WAS SHIPPED}.

(E) I have personal knowledge of the facts regarding the production and exportation of the solar cells and modules identified below. "Personal knowledge" includes facts obtained from another party, (*e.g.,* correspondence received by the importer (or exporter) from the producer of the imported products regarding production).

(F) The solar cells and/or solar modules covered by this certification were:

1. Sold to the United States by Hanwha Q CELLS Malaysia Sdn. Bhd.

2. Exported to the United States by Hanwha Q CELLS Malaysia Sdn. Bhd.

3. Produced in Malaysia by Hanwha Q CELLS Malaysia Sdn. Bhd., using wafers manufactured in the People's Republic of China that were exported to Malaysia by: {CHECK THE RELEVANT WAFER EXPORTERS BELOW} {we have afforded business proprietary information (BPI) treatment to the names of the wafer exporters; for a table of the names of the wafer exporters, which must be included as part of this paragraph in the certificate submitted to CBP—please refer to the proprietary version of this certification on ACCESS).

(G) The U.S. Department of Commerce (Commerce) found that solar cells and/or solar modules produced by Hanwha Q CELLS Malaysia Sdn. Bhd., using wafers manufactured in China that were exported by the wafer supplier(s) listed in item F above, and exported by Hanwha Q CELLS Malaysia Sdn. Bhd. are not circumventing the antidumping duty and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China.

(H) This certification applies to the following entries (repeat this block as many times as necessary):

Entry Summary #:
Applicable Line Item # of the Entry Summary:
Foreign Seller's Invoice #:
Applicable Line Item # on the Foreign Seller's Invoice:

(I) I understand that {NAME OF IMPORTING COMPANY} is required to maintain a copy of this certification and sufficient documentation supporting this certification (*i.e.,* documents maintained in the normal course of business, or documents obtained by the certifying party, for example, product specification sheets, production records, invoices, *etc.*) until the later of: (1) the date that is five years after the latest entry date of the entries covered by the certification; or (2) the date that is three years after the conclusion of any litigation in United States courts regarding such entries.

(J) I understand that {NAME OF IMPORTING COMPANY} is required to maintain a copy of the exporter's certification (attesting to information regarding the production and/or exportation of the imported merchandise identified above), and any supporting documentation provided to the importer by the exporter, until the later of: (1) the date that is five years after the latest entry date of the entries covered by the certification; or (2) the date that is three years after the conclusion of any litigation in United States courts regarding such entries.

(K) I understand that {NAME OF IMPORTING COMPANY} is required to provide U.S. Customs and Border Protection (CBP) and/or Commerce with the importer certification, and any supporting documentation, and a copy of the exporter's certification, and any supporting documentation provided to the importer by the exporter, upon the request of either agency.

(L) I understand that the claims made herein, and the substantiating documentation, are subject to verification by CBP and/or Commerce.

(M) I understand that failure to maintain the required certifications and supporting documentation, or failure to substantiate the claims made herein, or not allowing CBP and/or Commerce to verify the claims made herein, may result in a *de facto* determination that all entries to which this certification applies are entries of merchandise that is covered by the scope of the antidumping and countervailing duty orders on solar cells and solar modules from China. I understand that such a finding will result in:

(i) suspension of liquidation of all unliquidated entries (and entries for which liquidation has not become final) for which these requirements were not met;

(ii) the importer being required to post the antidumping duty and countervailing duty cash deposits determined by Commerce; and

(iii) the importer no longer being allowed to participate in the certification process.

(N) I understand that agents of the importer, such as brokers, are not permitted to make this certification.

(O) This certification was completed and signed on, or prior to, the date of the entry summary if the entry date is more than 14 days after the date of publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**. If the entry date is on or before the 14th day after the date of publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**, this certification was completed and signed by no later than 45 days after publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**.

(P) I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make materially false statements to the U.S. government.

Signature _____

{NAME OF COMPANY OFFICIAL}
{TITLE OF COMPANY OFFICIAL}
Date _____

**Exporter Certification**

**Certification for Entries of Inquiry Merchandise From Companies Found Not To Be Circumventing**

*Company Name:* Hanwha Q CELLS Malaysia Sdn. Bhd.

The party that made the sale to the United States should fill out the exporter certification.

I hereby certify that:

(A) My name is {COMPANY OFFICIAL'S NAME} and I am an official of {NAME OF COMPANY}, located at {ADDRESS OF COMPANY}.

(B) I have direct personal knowledge of the facts regarding the production and exportation of the solar cells and solar modules for which sales are identified below. "Direct personal knowledge" refers to facts the certifying party is expected to have in its own records. For example, an exporter should have direct personal knowledge of the producer's identity and location.

(C) The solar cells and/or solar modules covered by this certification were shipped to {NAME OF PARTY IN THE UNITED STATES TO WHOM MERCHANDISE WAS FIRST SHIPPED}, located at {U.S. ADDRESS TO WHICH MERCHANDISE WAS SHIPPED}.

(D) The solar cells and/or solar modules covered by this certification were:

1. Sold to the United States by Hanwha Q CELLS Malaysia Sdn. Bhd.

2. Exported to the United States by Hanwha Q CELLS Malaysia Sdn. Bhd.

3. Produced in Malaysia by Hanwha Q CELLS Malaysia Sdn. Bhd. using wafers manufactured in the People's Republic of China (China) that were exported to Malaysia by: {CHECK THE RELEVANT WAFER EXPORTERS BELOW} {we have afforded business proprietary information (BPI) treatment to the names of the wafer exporters; for a table of the names of the wafer exporters, which must be included as part of this paragraph in the certificate submitted to CBP—please refer to the proprietary version of this certification on ACCESS).

(E) The U.S. Department of Commerce (Commerce) found that solar cells and/or solar modules produced by Hanwha Q CELLS Malaysia Sdn. Bhd., using wafers manufactured in China that were exported by the wafer supplier(s) listed in item D above, and exported by Hanwha Q CELLS Malaysia Sdn. Bhd. are not circumventing the antidumping duty and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China.

(F) This certification applies to the following sales to {NAME OF U.S. CUSTOMER}, located at {ADDRESS OF U.S. CUSTOMER} (repeat this block as many times as necessary):

# of the Foreign Seller's Invoice to the U.S. Customer:
Applicable Line Item # of the Foreign Seller's Invoice to the U.S. Customer:

(G) I understand that Hanwha Q CELLS Malaysia Sdn. Bhd. is required to maintain a copy of this certification and sufficient documentation supporting this certification (*i.e.,* documents maintained in the normal course of business, or documents obtained by the certifying party, for example, product specification sheets, customer specification sheets, production records, invoices, *etc.*) until the later of: (1) the date that is five years after the latest entry date of the entries covered by the certification; or (2) the date that is three years after the conclusion of any litigation in United States courts regarding such entries.

(H) I understand that Hanwha Q CELLS Malaysia Sdn. Bhd. is required to provide the U.S. importer with a copy of this certification and is required to provide U.S. Customs and Border Protection (CBP) and/or Commerce with a copy of this certification, and any supporting documents, upon the request of either agency.

(I) I understand that the claims made herein, and the substantiating

documentation, are subject to verification by CBP and/or Commerce.

(J) I understand that failure to maintain the required certification and supporting documentation, or failure to substantiate the claims made herein, or not allowing CBP and/or Commerce to verify the claims made herein, may result in a *de facto* determination that all sales to which this certification applies are sales of merchandise that is covered by the scope of the antidumping and countervailing duty orders on solar cells and solar modules from China. I understand that such a finding will result in:

(i) suspension of liquidation of all unliquidated entries (and entries for which liquidation has not become final) for which these requirements were not met;

(ii) the importer being required to post the antidumping and countervailing duty cash deposits determined by Commerce; and

(iii) the seller/exporter no longer being allowed to participate in the certification process.

(K) I understand that agents of the exporter, such as freight forwarding companies or brokers, are not permitted to make this certification.

(L) This certification was completed and signed, and a copy of the certification was provided to the importer, on, or prior to, the date of shipment if the shipment date is more than 14 days after the date of publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**. If the shipment date is on or before the 14th day after the date of publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**, this certification was completed and signed, and a copy of the certification was provided to the importer, by no later than 45 days after publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**.

(M) I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make materially false statements to the U.S. government.
Signature _____
{NAME OF COMPANY OFFICIAL}
{TITLE OF COMPANY OFFICIAL}
Date _____

## Certification for Entries of Inquiry Merchandise From Companies Found Not To Be Circumventing

*Company Name:* Jinko Solar Technology Sdn. Bhd.; and Jinko Solar (Malaysia) Sdn. Bhd.

### Importer Certification

I hereby certify that:

(A) My name is {IMPORTING COMPANY OFFICIAL'S NAME} and I am an official of {NAME OF IMPORTING COMPANY}, located at {ADDRESS OF IMPORTING COMPANY}.

(B) I have direct personal knowledge of the facts regarding importation of the solar cells and solar modules produced in Malaysia that were entered into the Customs territory of the United States under the entry summary

number(s) identified below which are covered by this certification. "Direct personal knowledge" refers to the facts the certifying party is expected to have in its own records. For example, the importer should have direct personal knowledge of the exporter and/or seller's identity and location.

(C) If the importer is acting on behalf of the first U.S. customer, include the following sentence as paragraph C of this certification:

The solar cells and/or solar modules covered by this certification were imported by {NAME OF IMPORTING COMPANY} on behalf of {NAME OF U.S. CUSTOMER}, located at {ADDRESS OF U.S. CUSTOMER}.

If the importer is not acting on behalf of the first U.S. customer, include the following sentence as paragraph C of this certification:

{NAME OF IMPORTING COMPANY} is not acting on behalf of the first U.S. customer.

(D) The solar cells and/or solar modules covered by this certification were shipped to {NAME OF PARTY IN THE UNITED STATES TO WHOM THE MERCHANDISE WAS FIRST SHIPPED}, located at {U.S. ADDRESS TO WHICH MERCHANDISE WAS SHIPPED}.

(E) I have personal knowledge of the facts regarding the production and exportation of the solar cells and modules identified below. "Personal knowledge" includes facts obtained from another party, (*e.g.,* correspondence received by the importer (or exporter) from the producer of the imported products regarding production).

(F) The solar cells and/or solar modules covered by this certification were:

1. Sold to the United States by Jinko Solar Technology Sdn. Bhd. or Jinko Solar (Malaysia) Sdn. Bhd.

2. Exported to the United States by Jinko Solar Technology Sdn. Bhd. or Jinko Solar (Malaysia) Sdn. Bhd.

3. Produced in Malaysia by Jinko Solar Technology Sdn. Bhd. or Jinko Solar (Malaysia) Sdn. Bhd.}, using wafers manufactured in the People's Republic of China that were exported to Malaysia by: {CHECK THE RELEVANT WAFER EXPORTERS BELOW}

| |
|---|
| Jinko Solar Co., Ltd. |
| Jinko Solar Import and Export Co., Ltd. |
| Jinko Solar (Chuzhou) Co., Ltd. |
| Jinko Solar (Shangrao) Co., Ltd. |
| Yuhuan Jinko Solar Co., Ltd. |
| JINKOSOLAR MIDDLE EAST DMCC. |

(G) The U.S. Department of Commerce (Commerce) found that solar cells and/or solar modules produced by Jinko Solar Technology Sdn. Bhd. or Jinko Solar (Malaysia) Sdn. Bhd., using wafers manufactured in China that were exported by the wafer supplier(s) identified in item F above, and exported by Jinko Solar Technology Sdn. Bhd. or Jinko Solar (Malaysia) Sdn. Bhd. are not circumventing the antidumping duty and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China.

(H) This certification applies to the following entries (repeat this block as many times as necessary):

Entry Summary #: _____
Applicable Line Item # of the Entry Summary: _____
Foreign Seller's Invoice #: _____
Applicable Line Item # on the Foreign Seller's Invoice: _____

(I) I understand that {NAME OF IMPORTING COMPANY} is required to maintain a copy of this certification and sufficient documentation supporting this certification (*i.e.,* documents maintained in the normal course of business, or documents obtained by the certifying party, for example, product specification sheets, production records, invoices, *etc.*) until the later of: (1) the date that is five years after the latest entry date of the entries covered by the certification; or (2) the date that is three years after the conclusion of any litigation in United States courts regarding such entries.

(J) I understand that {NAME OF IMPORTING COMPANY} is required to maintain a copy of the exporter's certification (attesting to information regarding the production and/or exportation of the imported merchandise identified above), and any supporting documentation provided to the importer by the exporter, until the later of: (1) the date that is five years after the latest entry date of the entries covered by the certification; or (2) the date that is three years after the conclusion of any litigation in United States courts regarding such entries.

(K) I understand that {NAME OF IMPORTING COMPANY} is required to provide U.S. Customs and Border Protection (CBP) and/or Commerce with the importer certification, and any supporting documentation, and a copy of the exporter's certification, and any supporting documentation provided to the importer by the exporter, upon the request of either agency.

(L) I understand that the claims made herein, and the substantiating documentation, are subject to verification by CBP and/or Commerce.

(M) I understand that failure to maintain the required certifications and supporting documentation, or failure to substantiate the claims made herein, or not allowing CBP and/or Commerce to verify the claims made herein, may result in a *de facto* determination that all entries to which this certification applies are entries of merchandise that is covered by the scope of the antidumping and countervailing duty orders on solar cells and solar modules from China. I understand that such a finding will result in:

(i) suspension of liquidation of all unliquidated entries (and entries for which liquidation has not become final) for which these requirements were not met;

(ii) the importer being required to post the antidumping duty and countervailing duty cash deposits determined by Commerce; and

(iii) the importer no longer being allowed to participate in the certification process.

(N) I understand that agents of the importer, such as brokers, are not permitted to make this certification.

(O) This certification was completed and signed on, or prior to, the date of the entry summary if the entry date is more than 14 days after the date of publication of the

notice of Commerce's preliminary determination of circumvention in the **Federal Register**. If the entry date is on or before the 14th day after the date of publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**, this certification was completed and signed by no later than 45 days after publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**.

(P) I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make materially false statements to the U.S. government.
Signature _____
{NAME OF COMPANY OFFICIAL}
{TITLE OF COMPANY OFFICIAL}
Date _____

**Exporter Certification**

**Certification for Entries of Inquiry Merchandise From Companies Found Not To Be Circumventing**

*Company Name:* Jinko Solar Technology Sdn. Bhd.; and Jinko Solar (Malaysia) Sdn. Bhd.

The party that made the sale to the United States should fill out the exporter certification.

I hereby certify that:

(A) My name is {COMPANY OFFICIAL'S NAME} and I am an official of {NAME OF COMPANY}, located at {ADDRESS OF COMPANY}.

(B) I have direct personal knowledge of the facts regarding the production and exportation of the solar cells and solar modules for which sales are identified below. "Direct personal knowledge" refers to the facts the certifying party is expected to have in its own records. For example, an exporter should have direct personal knowledge of the producer's identity and location.

(C) The solar cells and/or solar modules covered by this certification were shipped to {NAME OF PARTY IN THE UNITED STATES TO WHOM MERCHANDISE WAS FIRST SHIPPED}, located at {U.S. ADDRESS TO WHICH MERCHANDISE WAS SHIPPED}.

(D) The solar cells and/or solar modules covered by this certification were:

1. Sold to the United States by Jinko Solar Technology Sdn. Bhd. or Jinko Solar (Malaysia) Sdn. Bhd.

2. Exported to the United States by Jinko Solar Technology Sdn. Bhd. or Jinko Solar (Malaysia) Sdn. Bhd.

3. Produced in Malaysia by Jinko Solar Technology Sdn. Bhd. or Jinko Solar (Malaysia) Sdn. Bhd. using wafers manufactured in the People's Republic of China (China) that were exported to Malaysia by: {CHECK THE RELEVANT WAFER EXPORTERS BELOW}

---
Jinko Solar Co., Ltd.
Jinko Solar Import and Export Co., Ltd.
Jinko Solar (Chuzhou) Co., Ltd.
Jinko Solar (Shangrao) Co., Ltd.
Yuhuan Jinko Solar Co., Ltd.
JINKOSOLAR MIDDLE EAST DMCC.

---

(E) The U.S. Department of Commerce (Commerce) found that solar cells and/or solar modules produced by Jinko Solar Technology Sdn. Bhd. or Jinko Solar (Malaysia) Sdn. Bhd., using wafers manufactured in China that were exported by the wafer supplier(s) identified in item D above, and exported by Jinko Solar Technology Sdn. Bhd. or Jinko Solar (Malaysia) Sdn. Bhd. are not circumventing the antidumping duty and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China.

(F) This certification applies to the following sales to {NAME OF U.S. CUSTOMER}, located at {ADDRESS OF U.S. CUSTOMER} (repeat this block as many times as necessary):

\# of the Foreign Seller's Invoice to the U.S. Customer:
Applicable Line Item \# of the Foreign Seller's Invoice to the U.S. Customer:

(G) I understand that Jinko Solar Technology Sdn. Bhd. or Jinko Solar (Malaysia) Sdn. Bhd. are required to maintain a copy of this certification and sufficient documentation supporting this certification (*i.e.,* documents maintained in the normal course of business, or documents obtained by the certifying party, for example, product specification sheets, customer specification sheets, production records, invoices, *etc.*) until the later of: (1) the date that is five years after the latest entry date of the entries covered by the certification; or (2) the date that is three years after the conclusion of any litigation in United States courts regarding such entries.

(H) I understand that Jinko Solar Technology Sdn. Bhd. or Jinko Solar (Malaysia) Sdn. Bhd. are required to provide the U.S. importer with a copy of this certification and is required to provide U.S. Customs and Border Protection (CBP) and/or Commerce with a copy of this certification, and any supporting documents, upon the request of either agency.

(I) I understand that the claims made herein, and the substantiating documentation, are subject to verification by CBP and/or Commerce.

(J) I understand that failure to maintain the required certification and supporting documentation, or failure to substantiate the claims made herein, or not allowing CBP and/or Commerce to verify the claims made herein, may result in a *de facto* determination that all sales to which this certification applies are sales of merchandise that is covered by the scope of the antidumping and countervailing duty orders on solar cells and solar modules from China. I understand that such a finding will result in:

(i) suspension of liquidation of all unliquidated entries (and entries for which liquidation has not become final) for which these requirements were not met;

(ii) the importer being required to post the antidumping and countervailing duty cash deposits determined by Commerce; and

(iii) the seller/exporter no longer being allowed to participate in the certification process.

(K) I understand that agents of the exporter, such as freight forwarding companies or brokers, are not permitted to make this certification.

(L) This certification was completed and signed, and a copy of the certification was provided to the importer, on, or prior to, the date of shipment if the shipment date is more than 14 days after the date of publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**. If the shipment date is on or before the 14th day after the date of publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register** this certification was completed and signed, and a copy of the certification was provided to the importer, by no later than 45 days after publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**.

(M) I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make materially false statements to the U.S. government.
Signature _____
{NAME OF COMPANY OFFICIAL}
{TITLE OF COMPANY OFFICIAL}
Date _____

**Appendix VI**

**Certification Regarding Chinese Components**

**Importer Certification**

I hereby certify that:

(A) My name is {IMPORTING COMPANY OFFICIAL'S NAME} and I am an official of {NAME OF IMPORTING COMPANY}, located at {ADDRESS OF IMPORTING COMPANY}.

(B) I have direct personal knowledge of the facts regarding importation of the solar cells and solar modules produced in {COUNTRY} that were entered into the Customs territory of the United States under the entry summary number(s) identified below which are covered by this certification. "Direct personal knowledge" refers to the facts the certifying party is expected to have in its own records. For example, the importer should have direct personal knowledge of the exporter and/or seller's identity and location.

(C) If the importer is acting on behalf of the first U.S. customer, include the following sentence as paragraph C of this certification:

The solar cells and/or solar modules covered by this certification were imported by {NAME OF IMPORTING COMPANY} on behalf of {NAME OF U.S. CUSTOMER}, located at {ADDRESS OF U.S. CUSTOMER}.

If the importer is not acting on behalf of the first U.S. customer, include the following sentence as paragraph C of this certification:

{NAME OF IMPORTING COMPANY} is not acting on behalf of the first U.S. customer.

(D) The solar cells and/or solar modules covered by this certification were shipped to {NAME OF PARTY IN THE UNITED STATES TO WHOM THE MERCHANDISE WAS FIRST SHIPPED}, located at {U.S. ADDRESS TO WHICH MERCHANDISE WAS SHIPPED}.

(E) I have personal knowledge of the facts regarding the production and exportation of the solar cells and modules identified below.

''Personal knowledge'' includes facts obtained from another party, (e.g., correspondence received by the importer (or exporter) from the producer of the imported products regarding production).

(F) If the imported products covered by this certification are solar cells that are not in solar modules or products that contain solar cells that are not in a solar module, then the importer certifies that the solar cells produced in {COUNTRY} that are covered by this certification were not manufactured using wafers produced in China, regardless of whether sourced directly from a Chinese producer or from a downstream supplier.

(G) If the imported products covered by this certification are solar modules or products that contain solar modules, then the importer certifies that the solar modules produced in {COUNTRY} that are covered by this certification were not manufactured using wafers produced in China, regardless of whether sourced directly from a Chinese producer or from a downstream supplier, *or* the solar modules produced in {COUNTRY} that are covered by this certification were manufactured using wafers produced in China but *no more than two* of the following inputs that were used to manufacture the solar modules were produced in China, regardless of whether sourced directly from a Chinese producer or from a Chinese downstream supplier:

a. Silver Paste
b. Aluminum Frames
c. Glass
d. Backsheets
e. Ethylene-Vinyl Acetate
f. Junction Boxes

(H) The solar cells and/or solar modules covered by this certification: (a) absent the affirmative determination of circumvention, are not covered by the antidumping duty or countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China; and (b) are not covered by the antidumping duty order on certain crystalline silicon photovoltaic products from Taiwan.

(I) This certification applies to the following entries (repeat this block as many times as necessary):

Entry Summary #:
Applicable Line Item # of the Entry Summary:
Foreign Seller:
Foreign Seller's Address:
Foreign Seller's Invoice #:
Applicable Line Item # on the Foreign Seller's Invoice:
Producer:
Producer's Address:

(J) I understand that {NAME OF IMPORTING COMPANY} is required to maintain a copy of this certification and sufficient documentation supporting this certification (i.e., documents maintained in the normal course of business, or documents obtained by the certifying party, for example, product specification sheets, production records, invoices, etc.) until the later of: (1) the date that is five years after the latest entry date of the entries covered by the certification; or (2) the date that is three years

after the conclusion of any litigation in United States courts regarding such entries.

(K) I understand that {NAME OF IMPORTING COMPANY} is required to maintain a copy of the exporter's certification (attesting to information regarding the production and/or exportation of the imported merchandise identified above), and any supporting documentation provided to the importer by the exporter, until the later of: (1) the date that is five years after the latest entry date of the entries covered by the certification; or (2) the date that is three years after the conclusion of any litigation in United States courts regarding such entries.

(L) I understand that {NAME OF IMPORTING COMPANY} is required to provide U.S. Customs and Border Protection (CBP) and/or the U.S. Department of Commerce (Commerce) with the importer certification, and any supporting documentation, and a copy of the exporter's certification, and any supporting documentation provided to the importer by the exporter, upon the request of either agency.

(M) I understand that the claims made herein, and the substantiating documentation, are subject to verification by CBP and/or Commerce.

(N) I understand that failure to maintain the required certifications and supporting documentation, or failure to substantiate the claims made herein, or not allowing CBP and/or Commerce to verify the claims made herein, may result in a *de facto* determination that all entries to which this certification applies are entries of merchandise that is covered by the scope of the antidumping and countervailing duty orders on solar cells and solar modules from China. I understand that such a finding will result in:

(i) suspension of liquidation of all unliquidated entries (and entries for which liquidation has not become final) for which these requirements were not met;

(ii) the importer being required to post the antidumping duty and countervailing duty cash deposits determined by Commerce; and

(iii) the importer no longer being allowed to participate in the certification process.

(O) I understand that agents of the importer, such as brokers, are not permitted to make this certification.

(P) This certification was completed and signed on, or prior to, the date of the entry summary if the entry date is more than 14 days after the date of publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**. If the entry date is on or before the 14th day after the date of publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**, this certification was completed and signed by no later than 45 days after publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**.

(Q) I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make materially false statements to the U.S. government.
Signature _____

{NAME OF COMPANY OFFICIAL}
{TITLE OF COMPANY OFFICIAL}
Date _____

**Exporter Certification**

The party that made the sale to the United States should fill out the exporter certification.

I hereby certify that:

(A) My name is {COMPANY OFFICIAL'S NAME} and I am an official of {NAME OF FOREIGN COMPANY THAT MADE THE SALE TO THE UNITED STATES}, located at {ADDRESS OF FOREIGN COMPANY THAT MADE THE SALE TO THE UNITED STATES};

(B) I have direct personal knowledge of the facts regarding the production and exportation of the solar cells and solar modules for which sales are identified below. ''Direct personal knowledge'' refers to facts the certifying party is expected to have in its own records. For example, an exporter should have direct personal knowledge of the producer's identity and location.

(C) The solar cells and/or solar modules covered by this certification were shipped to {NAME OF PARTY IN THE UNITED STATES TO WHOM MERCHANDISE WAS FIRST SHIPPED}, located at {U.S. ADDRESS TO WHICH MERCHANDISE WAS SHIPPED}.

(D) If the exported products covered by this certification are solar cells that are not in solar modules or products that contains solar cells that are not in a solar module, then the seller certifies that the solar cells produced in {COUNTRY} that are covered by this certification were not manufactured using wafers produced in China, regardless of whether sourced directly from a Chinese producer or from a downstream supplier.

(E) If the exported products covered by this certification are solar modules or products that contain solar modules, then the seller certifies that the solar modules produced in {COUNTRY} that are covered by this certification were not manufactured using wafers produced in China, regardless of whether sourced directly from a Chinese producer or from a downstream supplier, or the solar modules produced in {COUNTRY} that are covered by this certification were manufactured using wafers produced in China but *no more than two* of the following inputs that were used to manufacture the solar modules were produced in China, regardless of whether sourced directly from a Chinese producer or from a Chinese downstream supplier:

a. Silver Paste
b. Aluminum Frames
c. Glass
d. Backsheets
e. Ethylene-Vinyl Acetate
f. Junction Boxes

(F) The solar cells and/or solar modules covered by this certification: (a) absent the affirmative determination of circumvention, are not covered by the antidumping duty or countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China; and (b) are not covered by the antidumping duty order on certain crystalline silicon photovoltaic products from Taiwan.

(G) This certification applies to the following sales to {NAME OF U.S. CUSTOMER}, located at {ADDRESS OF U.S. CUSTOMER} (repeat this block as many times as necessary):

# of the Foreign Seller's Invoice to the U.S. Customer:

Applicable Line Item # of the Foreign Seller's Invoice to the U.S. Customer:

Producer Name:

Producer's Address:

Invoice # of the Producer's Invoice to the Foreign Seller (if the foreign seller and the producer are the same party, report "NA" here):

(H) I understand that {NAME OF FOREIGN COMPANY THAT MADE THE SALE TO THE UNITED STATES} is required to maintain a copy of this certification and sufficient documentation supporting this certification (*i.e.*, documents maintained in the normal course of business, or documents obtained by the certifying party, for example, product specification sheets, customer specification sheets, production records, invoices, *etc.*) until the later of: (1) the date that is five years after the latest entry date of the entries covered by the certification; or (2) the date that is three years after the conclusion of any litigation in United States courts regarding such entries.

(I) I understand that {NAME OF FOREIGN COMPANY THAT MADE THE SALE TO THE UNITED STATES} is required to provide the U.S. importer with a copy of this certification and is required to provide U.S. Customs and Border Protection (CBP) and/or the U.S. Department of Commerce (Commerce) with a copy of this certification, and any supporting documents, upon the request of either agency.

(J) I understand that the claims made herein, and the substantiating documentation, are subject to verification by CBP and/or Commerce.

(K) I understand that failure to maintain the required certification and supporting documentation, or failure to substantiate the claims made herein, or not allowing CBP and/or Commerce to verify the claims made herein, may result in a *de facto* determination that all sales to which this certification applies are sales of merchandise that is covered by the scope of the antidumping and countervailing duty orders on solar cells and solar modules from China. I understand that such a finding will result in:

(i) suspension of liquidation of all unliquidated entries (and entries for which liquidation has not become final) for which these requirements were not met;

(ii) the importer being required to post the antidumping and countervailing duty cash deposits determined by Commerce; and

(iii) the seller/exporter no longer being allowed to participate in the certification process.

(L) I understand that agents of the seller/exporter, such as freight forwarding companies or brokers, are not permitted to make this certification.

(M) This certification was completed and signed, and a copy of the certification was provided to the importer, on, or prior to, the date of shipment if the shipment date is more than 14 days after the date of publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**. If the shipment date is on or before the 14th day after the date of publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**, this certification was completed and signed and a copy of the certification was provided to the importer, by no later than 45 days after publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**.

(N) I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make materially false statements to the U.S. government.

Signature
_____
{NAME OF COMPANY OFFICIAL}
{TITLE OF COMPANY OFFICIAL}
Date
_____

[FR Doc. 2023–18161 Filed 8–22–23; 8:45 am]

**BILLING CODE 3510–DS–P**

# DEPARTMENT OF COMMERCE

## International Trade Administration

**[A–893–002, A–487–001, A–546–001, A–533–919, A–475–845, A–803–001, A–201–859, A–565–804, A–455–807, A–856–002, A–469–826, A–583–873]**

## Mattresses From Bosnia and Herzegovina, Bulgaria, Burma, India, Italy, Kosovo, Mexico, the Philippines, Poland, Slovenia, Spain, and Taiwan: Initiation of Less-Than-Fair-Value Investigations

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**DATES:** Applicable August 17, 2023.

**FOR FURTHER INFORMATION CONTACT:** Amaris Wade (Bosnia and Herzegovina), TJ Worthington (Bulgaria), Paul Gill (Burma), Steven Seifert (India), Caroline Carroll (Italy), Sean Carey (Kosovo), Benjamin Blythe (Mexico), Emily Halle (the Philippines), Dakota Potts (Poland), Benjamin A. Luberda (Slovenia), Matthew Palmer (Spain), and Paul Gill (Taiwan), AD/CVD Operations, Offices II, III, IV, V, VII, and IX, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–6334, (202) 482–4567, (202) 482–5673, (202) 482–3350, (202) 482–4948, (202) 482–3964, (202) 482–3457, (202) 482–0176, (202) 482–0223, (202) 482–2185, (202) 482–1678, and (202) 482–5673, respectively.

**SUPPLEMENTARY INFORMATION:**

## The Petitions

On July 28, 2023, the U.S. Department of Commerce (Commerce) received antidumping duty (AD) petitions concerning imports of mattresses from Bosnia and Herzegovina, Bulgaria, Burma, India, Italy, Kosovo, Mexico, the Philippines, Poland, Slovenia, Spain, and Taiwan, filed in proper form on behalf of the petitioners,[1] U.S. producers of mattresses and certified unions that represent workers engaged in the domestic production of mattresses.[2] These AD petitions were accompanied by a countervailing duty (CVD) petition concerning imports of mattresses from Indonesia.[3]

On August 1, 8, and 9, 2023, Commerce requested supplemental information pertaining to certain aspects of the Petitions.[4] Additionally, on August 7, 9, and 10, 2023, the petitioners filed timely responses to these requests for additional information.[5]

---

[1] Brooklyn Bedding; Carpenter Co.; Corsicana Mattress Company; Future Foam Inc.; FXI, Inc.; Kolcraft Enterprises Inc.; Leggett & Platt, Incorporated; Serta Simmons Bedding Inc.; Southerland, Inc.; Tempur Sealy International; the International Brotherhood of Teamsters; and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (collectively, the petitioners).

[2] *See* Petitioners' Letter, "Mattresses from Bosnia and Herzegovina, Bulgaria, Burma, India, Indonesia, Italy, Kosovo, Mexico, Philippines, Poland, Slovenia, Spain and Taiwan: Antidumping and Countervailing Duty Petitions," dated July 28, 2023 (Petitions).

[3] *Id.*

[4] *See* Commerce's Letters, "Petitions for the Imposition of Antidumping Duties on Imports of Mattresses from Bosnia and Herzegovina, Bulgaria, Burma, India, Italy, Kosovo, Mexico, the Philippines, Slovenia, Spain and Taiwan and Countervailing Duties on Imports from Indonesia: Supplemental Questions," dated August 1, 2023 (General Issues Supplemental); Country-Specific Supplemental Questionnaires: Bosnia Supplemental; Bulgaria Supplemental; Burma Supplemental; Burma Supplemental; India Supplemental; Italy Supplemental; Kosovo Supplemental; Mexico Supplemental; the Philippines Supplemental; Slovenia Supplemental; Spain Supplemental; and Taiwan Supplemental, dated August 1, 2023; "Petitions for the Imposition of Antidumping Duties on Imports of Mattresses from Bosnia and Herzegovina, Bulgaria, Burma, India, Italy, Kosovo, Mexico, the Philippines, Slovenia, Spain, and Taiwan and Countervailing Duties on Imports from Indonesia: Supplemental Questions," dated August 8, 2023 (Second General Issues Supplemental); *see also* Memoranda, "Phone Call with Counsel to the Petitioners," dated August 9, 2023.

[5] *See* Petitioners' Letters, "Mattresses from Bosnia and Herzegovina, Bulgaria, Burma, India, Italy, Kosovo, Mexico, Philippines, Slovenia, Spain and Taiwan: Responses to Petition Supplemental Questionnaires," dated August 7, 2023, at Volume I (First General Issues Supplement) and Volume II (Country-Specific AD Supplement); "Mattresses from Bosnia and Herzegovina, Bulgaria, Burma, India, Italy, Kosovo, Mexico, Philippines, Slovenia,

Continued

# CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B). The brief contains 13,580 words, excluding parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

        /s/ Craig A. Lewis
Craig A. Lewis

Dated: October 15, 2025

I, Nicholas W. Laneville, have entered an appearance as counsel to BYD (H.K.) Co., Ltd. in this proceeding and certify that I have authority to file this document.

/s/ Nicholas W. Laneville
Nicholas W. Laneville
October 15, 2025

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 25-1937

**Short Case Caption:** BYD (H.K.) Co., Ltd., v. US

---

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).

- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

---

The foregoing document contains ___9___ number of unique words (including numbers) marked confidential.

☐ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☑ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 10/15/2025

Signature: /s/ Nicholas W. Laneville

Name: Nicholas W. Laneville