## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

BYD (H.K.) Co. Ltd.,

Plaintiff-Appellant,

FLORIDA POWER & LIGHT CO., a subsidiary of NextEra Energy, Inc.,

Plaintiff,

v.

UNITED STATES,

Defendant-Appellee,

AUXIN SOLAR INC.,

Defendant.

On Appeal from the United States Court of International Trade in case no. 23-00221,
Judge M. Miller Baker.

## DEFENDANT-APPELLEE'S PUBLIC BRIEF

BRETT A. SHUMATE
*Assistant Attorney General*

PATRICIA M. McCARTHY
*Director*

*Of Counsel:*

SAPNA SHARMA
*Office of the Chief Counsel for*
*Trade and Enforcement Compliance*
*U.S. Department of Commerce*

CLAUDIA BURKE
*Attorneys, Commercial Litigation Branch*
*Civil Division, U.S. Department of Justice*
*P.O. Box 480, Ben Franklin Station*
*Washington, DC 20044*
*(202) 353-9063*

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

STATEMENT OF JURISDICTION .......................................................................... 2

STATEMENT OF THE ISSUE .................................................................................. 2

STATEMENT OF THE CASE .................................................................................... 4

    I.    Statutory Background ................................................................................. 4

    II.    Factual Background ..................................................................................... 7

SUMMARY OF ARGUMENT ................................................................................. 14

ARGUMENT ................................................................................................................ 16

    I.    Standard of Review .................................................................................. 16

    II.    Commerce Carefully Weighed the Section 1677j(b)(2) Factors to Find that the Process of Assembly or Completion in Cambodia Was Minor or Insignificant ............................................................................. 16

        A. *Loper* Does Not Apply ........................................................................ 17

        B. Commerce's Emphasis on Research and Development Is Supported by Substantial Evidence ............................................................................. 20

            1. Commerce Supported the Particular Emphasis on R&D ............. 20

        C. Commerce's Calculation of the Value of Processing in Cambodia Was Lawful and Supported by Substantial Evidence ................................... 23

        D. Commerce's Analysis of the Investment Prong Was Lawful ............. 26

        E. Commerce's Exclusion of Tollers' Information Was Lawful .............. 28

    III.    Commerce's Use of Surrogate Values Is Entirely Consistent with the Tariff Scheme ........................................................................................... 32

CONCLUSION ...........................................................................................................34

# TABLE OF AUTHORITIES

**Cases**                                                    **Page(s)**

*Al Ghurair Iron & Steel LLC v. United States*,
536 F. Supp. 3d 1357 (Fed. Cir. 2023) ............................................................... *passim*

*Al Ghurair Iron & Steel LLC v. United States*,
65 F.4th 1351 (Fed. Cir. 2023) ......................................................................... *passim*

*Canadian Solar, Inc. v. United States*,
918 F.3d 909 (Fed. Cir. 2019) .................................................................................. 4

*Downhole Pipe & Equip., L.P. v. United States*, 776
F.3d 1369 (Fed. Cir. 2015) ..................................................................................... 22

*Droplets, Inc. v. E*TRADE Bank*,
887 F.3d 1309 (Fed. Cir. 2018) ............................................................................... 30

*Garg Tube Export LLP v. United States*, 740
F. Supp. 3d 1355 (Ct. Int'l Trade 2024) ................................................................. 19

*Government of Quebec v. United States*,
105 F.4th 1359 (Fed. Cir. 2024) ......................................................... 20…18, 32

*Guangdong Wireking Housewares & Hardware Co. v. United States*,
745 F.3d 1194 (Fed. Cir. 2014) ................................................................................. 4

*Hanon Systems Alabama Corp. v. United States*,
794 F. Supp. 3d 1348 (Ct. Int'l Trade 2025) ............................................. 18, 25, 32

*Lignite Energy Council v. United States EPA*,
198 F.3d 930 (D.C. Cir. 1999) ........................................................................... 17, 18

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024) ..................................................................................... 14, 15, 18

*Mosaic Co. v. United States*,
160 F.4th 1340 (Fed. Cir. 2025) ......................................................................... 16, 18

*Royal Thai Gov't v. United States*,
436 F.3d 1330 (Fed. Cir. 2006) ............................................................................... 20

*Syneren Technologies Corp. v. United States*,
166 F.4th 1040 (Fed. Cir. 2026) ............................................................................... 31

*Tyler Constr. Grp. v. United States*,
570 F.3d 1329 (Fed. Cir. 2009) .......................................................... 31

*U.K. Carbon and Graphite Co., Ltd. v. United States*,
931 F. Supp. 2d 1322 (Ct. Int'l Trade 2013) ...................................... 33

## Statutes

19 U.S.C. § 1516a(b) ............................................................................. 16

19 U.S.C. § 1671(a) ................................................................................. 4

19 U.S.C. § 1673(1) ................................................................................. 4

19 U.S.C. § 1677(18) ............................................................................. 33

19 U.S.C. § 1677(b) ...................................................................... 7, 8, 25

19 U.S.C. § 1677b(f) ............................................................................. 33

19 U.S.C. § 1677j(b) ...................................................................... *passim*

19 U.S.C. § 3512(d) ................................................................................. 6

28 U.S.C. § 1295(a) ................................................................................. 2

28 U.S.C. § 1581(c) ................................................................................. 2

42 U.S.C. § 7411(a) ............................................................................... 18

PL 100–418, Aug. 23, 1988, 102 Stat 1107 at § 1321 (1988 Statute) ......................................... 25

## Regulations

19 C.F.R. § 351.225(h) ............................................................................. 6

19 C.F.R. § 351.226(h) ............................................................................. 5

## Adiministrative Determinations

*Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells,
Whether or Not Assembled Into Modules, From the People's Republic of China*,
87 Fed. Reg. 75,221 (Dep't of Commerce Dec. 8, 2022) ........................................... 8

*Certain Corrosion-Resistant Steel Products from the People's Republic of China: Affirmative Preliminary Determination of Circumvention Involving Malaysia*,
85 Fed. Reg. 8,823 (Dep't of Commerce February 18, 2020).................................. 23

*Certain Welded Carbon Steel Standard Pipes and Tubes from India: Preliminary Negative Determinations of Circumvention of the Antidumping Order*,
87 Fed. Reg. 52,507 (Dep't of Commerce Aug. 26 2022)...................................... 21

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China*,
77 Fed. Reg. 73,017 (Dep't of Commerce Dec. 7, 2012) ...................................... 7

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*,
77 Fed. Reg. 73,018 (Dep't of Commerce Dec. 7, 2012) ...................................... 7

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*,
87 Fed. Reg. 19,071 (Dep't of Commerce Apr. 1, 2022) ....................................... 8

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China*,
88 Fed. Reg. 57419 (Dep't of Commerce Aug. 23, 2023)...................................... 22

*Light-walled Rectangular Pipe and Tube From the People's Republic of China*,
88 Fed. Reg. 21,985 (Dep't of Commerce Apr. 12, 2023) ...................................... 21

*Tissue Paper from China (Vietnam) Preliminary Determination*,
73 Fed. Reg. 21580 (Dep't of Commerce April 22, 2008)...................................... 23

**Other Authorities**

Omnibus Trade Act of 1987, Report of the Senate Finance Committee, S. Rep. No. 100-71 (1987) ............................................................................ 7

Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316 (1994), reprinted in 1994 U.S.C.C.A.N. 4040............................ *passim*

S. Rep. No. 103-412 (1994)........................................................................ 17

# STATEMENT OF RELATED CASES

No other appeal in or from the present civil action has previously been before this or any other appellate court. The government is aware of three related cases within the meaning of Federal Circuit Rule 47.5(b):

1.    *Auxin Solar Inc. v. American Clean Power Assoc.*, Fed. Cir. No. 25-2120;

2.    *Trina Solar Science & Technology (Thailand) Ltd. V. United States*, Fed. Cir. No. 2025-1940; consolidated with

3.    *Canadian Solar International Ltd. et al. v. United States*, Fed. Cir. No. 25-1941.

# INTRODUCTION

The Department of Commerce issues antidumping and countervailing duty orders to address imports that are sold for less than fair value or are unfairly subsidized from specific countries. Often, producers and exporters will try to circumvent those orders by performing further processing in a third country and claiming the third country as the origin of the import, rather than the country subject to the order. Commerce conducts circumvention proceedings to ferret out this type of evasion. A key part of the statutory inquiry is to determine whether the finishing in the third country is "minor or insignificant." Congress instructed Commerce to consider five factors when assessing whether third country finishing is minor or

insignificant, and it explicitly stated that the balancing would be case-specific and that no one factor should control.

Here, Commerce conducted a circumvention inquiry on solar cells from China for which exporters and producers claimed Cambodian origin. Commerce weighed the five factors and determined that four of the five weighed in favor of finding that further processing in Cambodia was minor or insignificant and thus supported an affirmative circumvention determination. This, combined with further statutory analysis, led Commerce to find the Chinese orders were being circumvented by solar cells further processed in Cambodia and subsequently exported to the United States. Appellant BYD (H.K.) Co. Ltd (BYD) is a Cambodian producer of solar cells and challenged the finding at the Court of International Trade (CIT), which sustained Commerce's finding.

## STATEMENT OF JURISDICTION

The CIT possessed jurisdiction pursuant to 28 U.S.C. § 1581(c). This Court has exclusive jurisdiction over appeals from final decisions of the CIT under 28 U.S.C. § 1295(a)(5).

## STATEMENT OF THE ISSUE

1.      Whether Commerce's finding that the overall production process in Cambodia is minor or insignificant is supported by substantial evidence and lawful when Congress explicitly gave Commerce the discretion to weigh the statutory considerations case by case, with no set formula, and when:

a. Commerce placed primary weight on research and development;

b. Commerce determined that the value of processing performed in Cambodia represented a small proportion of the final import value.

c. Commerce determined that the level of investment in Cambodia was minor or insignificant; and

d. Commerce considered Cambodian tollers' operations for some purposes and not for others, depending on the goals of the analysis.

2. Whether Commerce's use of surrogate values rather than BYD's costs to calculate the value of the Chinese proportion of the goods exported to the United States was contrary to law.

# STATEMENT OF THE CASE

## I. Statutory Background

"The Tariff Act of 1930, as amended, permits Commerce to impose two types of duties on imports that injure domestic industries . . ." *Guangdong Wireking Housewares & Hardware Co. v. United States*, 745 F.3d 1194, 1196 (Fed. Cir. 2014). First, Commerce may impose antidumping duties on goods sold in the United States at less than fair value. 19 U.S.C. § 1673(1). Second, Commerce may impose countervailing duties on goods that receive countervailable subsidies from foreign governments. *Id.* § 1671(a). In imposing these duties, Commerce must describe the product "within the scope of the order[]" by reference to its "technical characteristics" and "country of origin." *Canadian Solar, Inc. v. United States*, 918 F.3d 909, 913 (Fed. Cir. 2019).

Often, when these duties "are imposed, the marketplace reacts to the requirement for the payment of the additional" duties, and "[o]ne such reaction is the circumvention of the duty orders" by efforts "such as by transshipping the goods subject to the duties through another country." *Al Ghurair Iron & Steel LLC v. United States (Al Ghurair II)*, 65 F.4th 1351, 1355 (Fed. Cir. 2023). Congress created 19 U.S.C. § 1677j to allow Commerce to investigate and "make determinations that prevent companies from circumventing [antidumping] and [countervailing duty] orders." *Id.*

To prevent circumvention of antidumping and countervailing duty orders, Commerce may include goods produced in a foreign country within the scope of an order covering a different foreign country if:

> (A) [the] merchandise imported into the United States is of the same class or kind as any merchandise produced in a foreign country that is subject of [an order],
>
> (B) before importation into the United States, such imported merchandise is completed or assembled in another foreign country from merchandise which . . . is subject to the order . . . or . . . produced in a foreign country . . . to which such order applies,
>
> (C) the process of assembly or completion in a foreign country . . . is minor or insignificant,
>
> (D) the value of the merchandise produced in the foreign country . . . is a significant portion of the total value of the merchandise exported to the United States, and
>
> (E) action is appropriate . . . to prevent evasion of such order.

19 U.S.C. § 1677j(b)(1); *see also* 19 C.F.R. § 351.226(h) (explaining that Commerce "may include within the scope of an antidumping or countervailing duty order, at any time such order is in effect, imported merchandise completed or assembled in a foreign country other than the country to which the order applies"). Commerce finds circumvention after making an affirmative finding with respect to each of the factors. 19 U.S.C. § 1677j(b)(1)(A)-(E). Then, Commerce "may include [circumventing] merchandise within the scope of" the order. 19 U.S.C. § 1677j(b)(1). This appeal turns on section (C)—whether the processing in Cambodia was minor or insignificant

and on section (D)—whether Commerce lawfully used surrogate values to value the price of Chinese inputs.

In determining whether the process of assembly or completion in the third country is "minor or insignificant" under 19 U.S.C. § 1677j(b)(1)(C), the statute directs Commerce to "take into account"

(A) the level of investment in the foreign country,

(B) the level of research and development in the foreign country,

(C) the nature of the production process in the foreign country,

(D) the extent of the production facilities in the foreign country, and

(E) whether the value of the processing performed in the foreign country represents a small proportion of the value of the merchandise imported into the United States.

19 U.S.C. § 1677j(b)(2). No single factor controls. 19 C.F.R. § 351.225(h); Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316 (SAA), at 893 (1994), reprinted in 1994 U.S.C.C.A.N. 4040.[1]

The statute also identifies additional, non-exhaustive, discretionary factors to consider in weighing whether to find circumvention. Commerce thus will "take into account such factors as"

(A) the pattern of trade, including sourcing patterns,

(B) whether the manufacturer or exporter of the merchandise . . . described in [19 U.S.C. § 1677j(b)(1)(B)] is affiliated with the person who

---

[1] The SAA is the "authoritative expression" of the statute's meaning. 19 U.S.C. § 3512(d).

uses the merchandise described in [19 U.S.C. § 1677j(b)(1)(B)] to assemble or to complete in the foreign country the merchandise that is subsequently imported into the United States; and

(C) whether imports into the foreign country of the merchandise described in [19 U.S.C. § 1677(b)(1)(B)] have increased after the initiation of the investigation that resulted in the issuance of such order.

19 U.S.C. § 1677j(b)(3).

Congress "authorize[d] [Commerce] to apply . . . orders in such a way as to prevent circumvention and diversion of U.S. law." Omnibus Trade Act of 1987, Report of the Senate Finance Committee, S. Rep. No. 100-71 (S. Rep.), at 101 (1987). Commerce thus possesses "substantial discretion in interpreting these terms, and invoking these measures, so as to allow it flexibility to apply the provisions in an appropriate matter . . . [and to] use [its] authority to the fullest extent possible to combat diversion and circumvention of the antidumping and countervailing duty laws." *Id.* at 100.

## II.   Factual Background

1.     Commerce issued antidumping and countervailing duty orders on solar products from China in 2012. *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 77 Fed. Reg. 73,018 (Dep't of Commerce Dec. 7, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China*, 77 Fed. Reg. 73,017 (Dep't of Commerce Dec. 7, 2012) (collectively Solar Orders). A domestic producer of solar modules requested that Commerce initiate a circumvention inquiry to determine whether solar

cells and modules from four countries (Cambodia, Malaysia, Thailand, and Vietnam) that use parts and components from China are circumventing the Solar Orders. *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 87 Fed. Reg. 19,071 (Dep't of Commerce Apr. 1, 2022). Commerce initiated an inquiry and chose two mandatory respondents, including BYD, to investigate. *Id.*

Commerce preliminarily found that circumvention was occurring through Cambodia on a country-wide basis. *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 87 Fed. Reg. 75,221 (Dep't of Commerce Dec. 8, 2022); Appx143.

The appeal concerns Commerce's determination that the process of assembly or completion of solar cells by BYD in Cambodia was minor or insignificant. Appx150. Commerce evaluated the five factors identified in 19 U.S.C. § 1677(b)(2) with respect to production in Cambodia: (A) the level of investment; (B) the level of research and development (R&D); (C) the nature of the production process; (D) the extent of the production process; and (E) the value added as a proportion of the total value of BYD's U.S. exports of solar cells and modules. Of those five statutory considerations, Commerce found that all but one weighed in favor of finding that further processing in Cambodia is minor or insignificant, and thus supported an affirmative circumvention determination.

8

First, Commerce found that BYD did not invest in the production of solar cells, and therefore that its level of investment in Cambodia was minor or insignificant when compared to its affiliated Chinese producers. Appx142. For this factor, Commerce did not consider the activities of BYD's unaffiliated tollers in its analysis. Specifically, Commerce found that BYD did not directly engage in the production of solar cells in Cambodia but, rather, relied on processing arrangements with unaffiliated tollers,[2] for whom BYD obtained China-origin solar wafers from its Chinese affiliate and certain other raw materials from China. Appx139-40. BYD then acted as the exporter of the merchandise completed by the tollers. *Id.* But because BYD "stated that it does not engage in production operations or have manufacturing agreements" with the toll processors, Commerce compared BYD's investments (none) to its Chinese affiliate's investments and found that BYD's investments were minor or insignificant. Appx142; Appx117.

Second, Commerce found that BYD did not carry out any R&D in Cambodia, and therefore that BYD's level of R&D in Cambodia was minor or insignificant when compared to the R&D incurred by its affiliates in China. Appx143. Commerce found that, although BYD's Chinese affiliates conducted R&D, BYD did not report any R&D related to solar cells nor did BYD have information on the R&D conducted by

---

[2] Toll processing is an arrangement where "a customer provides the material for manufacturing and receives the finished goods from the manufacturer . . . . The same party owns both the input and the output of the manufacturing process." *BYD (H.K). Co. Ltd. v. United States*, Appx12 (citations omitted).

its tollers.  Appx143.  Again, Commerce found BYD's R&D to be minor or insignificant.

Third, Commerce found the nature of the production in Cambodia did not indicate circumvention.  Commerce first described the general production process for solar modules in four steps.  First, raw polysilicon is heated, melted, and cooled to form a polysilicon ingot. Appx143-44.  Second, the ingot is sliced, typically using a diamond wire saw, into polysilicon wafers.  Appx144.  Third, polysilicon wafers undergo several chemical treatments, including the formation of a positive-negative (p/n) junction, which converts the polysilicon wafers into solar cells.  *Id.*  Commerce explained that the formation of the p/n junction is the step of the production process at which the solar cell is capable of converting sunlight into electricity and thus defines a cell's country of origin.  Appx 145-146.  Fourth, solar cells are soldered into strings and placed onto a layer of solar glass and ethyl vinyl acetate (EVA) and covered by another layer of EVA and backsheet.  The solar cells are then cured and encased in aluminum frames, and a junction box is attached to create a finished solar module.  Appx144.

Because the third stage of production is when the product is "no longer just a wafer but a solar cell," and because this stage occurred in Cambodia, Commerce found the nature of production processes in Cambodia to not be minor or insignificant.

Fourth, Commerce found that BYD did not maintain production facilities in Cambodia, and thus the extent of BYD's production facilities was minor or insignificant when compared to its Chinese affiliates' production facilities.

Fifth, Commerce found that the value of processing carried out by BYD in Cambodia represented a small proportion of the total value of the company's exports of solar cells to the U.S. In calculating the value of the Chinese inputs as a proportion of the overall value of the completed solar modules, Commerce used a surrogate value methodology because the order country (China) is a nonmarket economy. Appx135-37. Commerce explained its presumption in nonmarket economy cases that nonmarket economy costs and prices "are inherently unreliable and requires Commerce to value Chinese-produced material inputs using surrogate values" from a market economy, in this case, Malaysia. Appx136.

In weighing the five factors, Commerce explained that it placed special emphasis on the level of R&D carried out in Cambodia because of the uniquely complex and research-intensive nature of solar cell and module production. Appx150; Appx354. Commerce also determined that the value of the Chinese inputs is a significant portion of the overall exported value consistent with 19 U.S.C. § 1677j(b)(1)(D). Appx147. In calculating the value of the Chinese inputs as a proportion of the overall value of the completed solar modules, Commerce used a surrogate value methodology because the order country (China) is a nonmarket economy. Appx135-37. Commerce explained its presumption in nonmarket

economy cases that nonmarket economy costs and prices "are inherently unreliable and requires Commerce to value Chinese-produced material inputs using surrogate values" from a market economy, in this case, Malaysia. Appx136.

As a result, taking into consideration the above findings as well as the three 19 U.S.C. § 1677j(b)(3) factors, Commerce preliminarily concluded that BYD circumvented the Solar Orders. Appx150.

In its final determination, Commerce did not make significant changes to its overall circumvention finding and continued to find that BYD circumvented the Solar Orders. Appx292.

2. The CIT sustained Commerce's finding of circumvention. *BYD (H.K.) Ltd. V. United States*, Appx5. The court held that the Commerce's obligation to consider and weigh all five (b)(2) factors precluded most of BYD's arguments that one or the other factor was misweighed. For example, BYD argued that Commerce's inquiry should have ended as soon as it realized the value added in Cambodia exceeded [      ], and as soon as it realized that the Cambodian processing was not minor or insignificant. "The problem for BYD," the court stated, is that the statute "requires the Department to consider and balance *all five factors*, not just the company's preferred ones." Appx19 (emphasis in original). "To contend that it erred as a matter of law because it refused to limit its analysis to a subset of mandatory considerations flies in the face of the statute." *Id.* Similarly, the court sustained Commerce's focus

on research and development, stating, "It should go without saying—but apparently it needs restating—that each case turns on its own facts." *Id.* at 21.

BYD also complained that the tollers' operations should have been included in Commerce's evaluation of the "level of investment" and "extent of production facilities" factors. The court agreed with plaintiff-appellant that Commerce should have focused on "what *goes on*" in Cambodia, not "*who* does it." *Id.* at 23 (emphasis in original). But the court found the error harmless because "[e]ven if the Department had considered the tollers' activities and flipped its findings about the investment and production facilities factors, the result would have been the same" because the research and development prong was "determinative." *Id.* at 26 (citations omitted).

The court also sustained Commerce's evaluation of the value of processing performed in Cambodia – slightly greater than [      ] – as a "small proportion of the value imported into the United States." *Id.* The court confirmed "there are no 'rigid numerical standards'" for determining the value of processing in the third country. *Id.* at 27 (citing SAA at 894, 1994 U.S.C.C.A.N. at 4217 and *Al Ghurair*, 65 F.4th at 1361 n.4). And in any event, the court noted that "[i]t suffices here that the Department observed that in prior cases it *found similar ratios to be minor*." *Id.* (emphasis in original). The court found unpersuasive BYD's contention that Commerce turned a qualitative analysis into a strictly quantitative one.

Finally, the court sustained Commerce's use of surrogate value to determine whether the value of Chinese components in solar cells from Cambodia was a

"significant portion" of the total value of the goods. *Id.* at 31. Rejecting BYD's contention that the meaning of "value" should be decided by the Court after *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 303 (2024), the court held that the statute delegates authority to Commerce to define "value" in 19 U.S.C. § 1677j(b)(1)(D). "The Tariff Act presumes that nonmarket-economy pricing is unreliable . . . ." *Id.* at 35. This, the court stated, "raises a fundamental point: Countervailing duties respond to a foreign government's subsidization of the manufacture, production or export of merchandise, so it is reasonable to assume that the price of such goods, or of the inputs used to make them, reflects the subsidy." So, when BYD "complains that the surrogate values were higher than the actual [Chinese] prices," that is exactly the point—the agency reasonably presumed that the actual prices of Chinese-made components *are* artificially low." *Id.* at 35.

This appeal followed.

## SUMMARY OF ARGUMENT

The CIT's judgment should be affirmed because Commerce's final determination is the result of a careful balancing of statutory factors for a particularly unique industry. Congress delegated to Commerce the job of weighing these factors and was explicit that there was no magic formulation or weighing. BYD simply wants to weigh the factors itself and place primary importance on a different one. That is contrary to Congress's intent.

First, the statute provides Commerce significant discretion to investigate circumvention, and to weigh the relevant factors, according to the particular production scenario. The discretion is not implied, nor does it require analysis under *Loper Bright*. Rather, it is built into the statute explicitly and then confirmed by the SAA, which is the authoritative statement of Congress's intent. Consistent with the congressional directive to evaluate the paragraph (b)(2) factors according to the particular circumvention scenario in the case, Commerce found that this scenario involved vertically integrated Chinese producers spinning off the final stage of production into Cambodia. Based on that scenario, Commerce reasonably found that the fungible nature of R&D warranted emphasis, and that the level of investment and extent of production facilities were minor or insignificant. The CIT correctly sustained Commerce's finding and although we disagree with the court's finding of error on one (b)(2) factor, we ultimately agree that if it was error, it was harmless.

Second, Commerce appropriately used surrogate values to determine whether, under (b)(1)(D), the value of the merchandise was a significant portion of the overall value exported to the United States. The circumvention exercise here involved assessing whether Chines manufacturers were circumventing the orders. As it always does in nonmarket economy cases, Commerce does not rely on Chinese values because they are inherently unreliable. Instead, it relies on surrogate values to more accurately assess what a market economy transaction would look like. That it did so

here should have been no surprise, nor is it unlawful. It is the only way Commerce can reliably estimate the value of inputs and merchandise.

Commerce lawfully weighed the relevant factors, considered the record evidence, and arrived at a reasoned explanation for the decision. This Court should affirm the CIT's judgment.

## ARGUMENT

## I. Standard of Review

This Court reviews decisions of the CIT de novo and applies the same standard as the CIT in its review of Commerce's final determinations. *Mosaic Co. v. United States*, 160 F.4th 1340, 1346 (Fed. Cir. 2025). Under that standard, this Court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise no in accordance with law." *Id.* (quotations omitted); 19 U.S.C. § 1516a(b)(1)(B).

## I. Commerce Carefully Weighed the Section 1677j(b)(2) Factors to Find that the Process of Assembly or Completion in Cambodia Was Minor or Insignificant

Commerce satisfied the statute's requirements by carefully weighing all five factors and finding circumvention where four of the five factors weighed in favor of finding the further processing in Cambodia is minor or insignificant. To find that merchandise assembled or completed in a third country circumvents an order, Commerce must find the third-country production process to be minor or insignificant. 19 U.S.C. § 1677j(b)(1)(C). The statute provides five factors that

Commerce "shall take into account" when determining whether the production process is minor or insignificant but does not otherwise instruct Commerce how to evaluate the factors. The authoritative legislative history directs Commerce to evaluate the factors "depending on the particular circumvention scenario" and that "[n]o single factor will be controlling." SAA at 893. Congress recognized the need for Commerce to have "flexibility in administering this standard[.]" S. Rep. No. 103-412 at 82 (1994).

BYD challenges Commerce's weighing of three of the five factors: the level of investment in Cambodia, the level of research and development in Cambodia, and the value of processing in Cambodia as a proportion of the value of the merchandise imported into the United States. BYD contends that Commerce either incorrectly evaluated the evidence or improperly weighed one factor over the others.

## A. *Loper* Does Not Apply

As a threshold matter, *Loper* does not apply to any part of Commerce's exercise. To find circumvention, Commerce must determine "the process of assembly or completion in the foreign country . . . is minor or insignificant." 19 U.S.C. § 1677j(b)(1)(C). Instead of defining "minor or insignificant," the statute expressly provides five factors that Commerce "shall take into account." *Id.* § 1677j(b)(2). When Congress has prescribed factors but not their relative weight, the agency is granted "a great degree of discretion in balancing them." *Lignite Energy Council v. United States EPA*, 198 F.3d 930, 933 (D.C. Cir. 1999) (holding that the

Environmental Protection Agency was granted discretion to balance factors in 42 U.S.C. § 7411(a)(1) because no one factor was controlling).  The Court of International Trade found that Commerce reasonably weighed these factors to find that plaintiff-appellants' Cambodian operations were minor or insignificant.  Appx21.

BYD contends that Commerce, as a matter of law, could not find as minor or insignificant, processing that represents [      ] of the total cost and involves the most complex steps in the processing of solar cells.  BYD Br. at 29.  BYD encourages the Court to prioritize the dictionary definitions of "minor" and "insignificant,' over the statute's own definition.  But the five factors are what Congress specifically directed Commerce to "take into account."  They provide the context for the analysis.  It was no error for Commerce to have carefully weighed them.

Although the meaning of a statutory term is a legal question, *see Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 391-92 (2024), Congress may "leave [] agencies with flexibility" by using open ended terms, *id.* at 395.  As this Court has recently held, Congress frequently provides Commerce "reasonable flexibility in assessing" statutory terms.  *See Mosaic Co. v. United States*, 160 F.4th 1340, 1347 (Fed. Cir. 2025).  This flexibility is confirmed by the statute here, which articulates the specific factors Commerce "shall take into account."  19 U.S.C. § 1677j(b)(2) ("Determination of whether process is minor or insignificant"); *see also Lignite Energy Counsel*, 198 F.3d at 933; *Hanon Systems Alabama Corp. v. United States*, 794 F. Supp. 3d 1348, 1357 (Ct. Int'l Trade 2025) (holding that the circumvention statute provides Commerce "fact-

intensive flexibility"); *see also Garg Tube Export LLP v. United States*, 740 F. Supp. 3d 1355, 1366-67 (Ct. Int'l Trade 2024) ("The word "significantly" is an open-ended qualifier, akin to "appropriate" or "reasonable." Congress' mandate to Commerce to assess not merely whether prices differ, but whether they differ "significantly" necessarily affords Commerce flexibility to assess the degree of difference depending on the particular context.")(internal citations omitted).

And as the Court of International Trade correctly noted here, "[t]he SAA confirms this understanding, explaining that the agency evaluates the factors 'depending on the particular circumvention scenario.'" Appx16 (quoting SAA at 893). But in BYD's view, the court below should have, and this Court should now evaluate for itself, independently from the five factors, whether the evidence supported circumvention as a gestalt matter. The Court should not independently interpret "minor or insignificant" outside the context of the five factors. It would be contrary to the plain language of the provision, and would replace the discretion specifically given to Commerce, with the Court's own analysis.

Commerce did exactly what the statute charges it to do—it considered the facts of a particular production scenario in light of the statutory factors, weighed them according to the record evidence, and rendered a finding based on the totality of the evidence. As this Court has recognized, when "[t]he governing statute and implementing regulations do not prescribe any mandatory methods that Commerce must employ[,] . . . it is a fact-intensive and case specific inquiry, where the factors

involved and the weight accorded to them vary from case to case." *Government of Quebec v. United States*, 105 F.4th 1359, 1374 (Fed. Cir. 2024) (quoting *Royal Thai Gov't v. United States*, 436 F.3d 1330, 1335-36 (Fed. Cir. 2006)).

## B. Commerce's Emphasis on Research and Development Is Supported by Substantial Evidence

The trial court correctly sustained Commerce's emphasis on research and development as consistent with the statute, which, again, envisions a flexible approach depending on the particular case.

### 1. Commerce Supported Particular Emphasis on R&D

The statute directs Commerce to consider the level of R&D in assessing whether the production process in a third country is minor or insignificant. 19 U.S.C. § 1677j(b)(2)(B). Commerce found that the level of R&D carried out in Cambodia by appellants was minor, evidencing circumvention of the solar orders. Appx345. This determination is supported by substantial evidence.

Commerce found that R&D is a particularly important factor in the solar industry, "given the uniquely complex nature of solar cell and module production." Appx150. Agreeing with the *Bloomberg Report*, Commerce also found that "R&D is of particular importance to solar makers, especially to ingot and wafter production that is exclusively done by the affiliate of BYD HK and not done in Cambodia." Appx345. R&D has also "been key for technological breakthroughs in the solar cell and module industry." *Id.* The CIT recognized this when it sustained Commerce's finding that

R&D "has preeminent importance" in the solar industry.  Appx15; Appx20; Appx21.

Here, BYD reported no R&D expenses while BYD's Chinese affiliates reported

significantly more.  Appx7044-46; Appx7509-10.  Given the nature of the industry,

and Chinese affiliates' s heavy investment in R&D, Commerce's decision that BYD's

R&D was minor or insignificant is supported by substantial evidence.

Whether R&D is or is not a critical consideration depends on the industry.  For

example, Commerce has found in other circumvention determinations that R&D *is not*

an important factor.  *See Light-walled Rectangular Pipe and Tube From the People's Republic of*

*China* 88 Fed. Reg. 21,985 (Dep't of Commerce Apr. 12, 2023) (prelim. circumvention

det.), and accompanying PDM at 21 (finding that that "a lack of significant [R&D]

expenses with respect to [subject merchandise] does not necessarily mean that the

processing in Vietnam is minor or insignificant."); *Certain Welded Carbon Steel Standard*

*Pipes and Tubes from India: Preliminary Negative Determinations of Circumvention of the*

*Antidumping Order*, 87 Fed. Reg. 52,507 (Dep't of Commerce Aug. 26 2022, and

accompanying IDM at 16.  Although BYD argues that Commerce acted inconsistent

with these decisions, *see* BYD Br. At 41-42, these decisions instead demonstrate that

Commerce adapts its reasoning to the facts of the production scenario under review

and the evidence before it.  For example, in *Certain Welded Carbon Steel Standard Pipes*

*and Tube from India*, Commerce found that unlike in the raw steel industry, R&D is not

a significant factor in the pipe in tube industry.  87 Fed. Reg. 52,507, IDM at 16.

Naturally, Commerce would find differently here, when it had found that R&D is

particularly important to solar cell production, as opposed to the importance of R&D to the production of certain pipe and tube products.

BYD claims that Commerce should not have prioritized R&D under (b)(2)(B), but really BYD wants Commerce to have prioritized the nature of production under (b)(2)(C), to the exclusion of the other four factors. Commerce agrees with BYD that the processing in Cambodia is an important part of production. However, BYD would have this factor outweigh the other four that Commerce found were minor or insignificant. This is simply not borne out by the record in the case, or by the nature of the product and would simply replace Commerce's reasoned analysis supported by substantial evidence with BYD's preferences. *See Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1379 (Fed. Cir. 2015) ("To the extent Downhole Pipe requests this court to reweigh Commerce's findings. . ., this court may not do so.").

These facts, taken in totality, present Commerce with a circumvention scenario in which "large solar conglomerates are incentivized to 'spin off' production of solar cells into third countries, and in which third country producers are left with little choice but to source solar wafers from China." Appx311. This scenario, in conjunction with the importance of R&D to the solar industry, warrants Commerce's particular emphasis on R&D here because the "nature of [R&D] is such that, once carried out, it is easily transmissible across national borders." Appx310-11.

## C. Commerce's Calculation of the Value of Processing in Cambodia Was Lawful and Supported by Substantial Evidence

Commerce calculated the value of processing in Cambodia by adding the per-unit costs incurred by each respondent in Cambodia for non-Chinese inputs, and dividing that number by the per-unit average value of the respondents' U.S. sales during the period of the inquiry. Appx147. Commerce found that the valued added in Cambodia was roughly [    ] of the total value of sale. Appx117. This meant that the value of expenses incurred by BYD in Cambodia was one third of the sale price of the solar module to the United States. Commerce determined that the value added was a small proportion and therefore weighed in favor of circumvention. *Id.*

Relying on dictionary definitions, BYD argues that [    ] categorically cannot be considered a small proportion. BYD Br. at 30. But Congress was clear that the statute "d[id] not establish rigid numerical standards for determining the significance of the assembly. SAA at 894. Certainly a number that is less than half can be small, depending on the circumstances. And the circumstances are critical: Commerce noted other proceedings in which it has found similar percentages small—all with starkly different industries. For example, in *Certain Corrosion-Resistant Steel Products from the People's Republic of China: Affirmative Preliminary Determination of Circumvention Involving Malaysia*, 85 Fed. Reg. 8,823 (February 18, 2020) Commerce found "the value-added by CORE producers . . . is approximately 10 percent to 31 percent."). Similarly, in *Tissue Paper from China (Vietnam) Preliminary Determination*, 73

Fed. Reg. 21,582, 21,585 (Dep't of Commerce, Oct. 3, 2008), Commerce calculated a value of 34%, and noted a range *of plus* or minus 10%. Appx349. There may be determinations where Commerce reaches different conclusions based on different industries, but all of these Commerce decisions together reflect only that the determination is inherently fact and industry-specific.

BYD also complains that Commerce imposed a strictly quantitative analysis, instead of a qualitative one. The plain language of section 1677j(b)(2)(E), which provides that Commerce shall consider "whether the *value* of the processing performed in the foreign country represents a *small proportion* of the *value* of the merchandise imported into the United States," (emphasis added) envisions some quantitative analysis. To that end, Commerce found that, in the context of value added in the third country, "the word 'value' denotes monetary value." Appx347.

Citing legislative history, BYD maintains that Congress intended a more qualitative focus on the nature of the production process. BYD Br. at 44. But Commerce is already required to consider the qualitative "nature of the production process" under 19 U.S.C. § 1677j(b)(2)(C). It would be duplicative for Commerce to evaluate the qualitative nature of the production process pursuant to section 1677j(b)(2)(C) and then simply reevaluate the qualitative nature of the production process under section 1677j(b)(2)(E) (the value of production). And there is no doubt that Commerce performed a qualitative analysis of appellants' production process in Cambodia under section 1677j(b)(2)(C), and did so in BYD's favor. *See* Appx315; *see*

*also Hanon Systems Alabama*, 794 F. Supp. 3d at 1362 ("Clearly, Commerce did consider

qualitative factors like the complexity of the production of such product.").

And the Court of International Trade has sustained Commerce's value-added

methodology:

> Because [19 U.S.C. § 1677(b)] does not mandate the use of a particular
> formula, Commerce has the ability to choose how to calculate the value-
> added percentages as long as its chosen methodology is reasonable and
> Commerce explains its choice. Commerce is required neither to use a
> party's proffered and preferred methodology, nor to provide an
> explanation for a decision not to use an alternative methodology offered
> by a party.

*Al Ghurair I*, 536 F. Supp. 3d at 1374. So even if BYD's approach were permissible,

absent a clear statutory directive, Commerce's choice is lawful.

BYD further misreads the legislative history to discourage any quantitative

analysis. BYD Br. at 44-45. Congress stated that the statute would "not establish

rigid numerical standards . . . for determining the significance of the value of the

imported parts or components." SAA at 894. That is not equivalent to Congress

stating that Commerce *cannot* consider quantitative value.

And in any event, the SAA language predates Congress's decision to include

the nature of the production process as its own factor for consideration. The

previous version of the statute contained no provisions related to the nature of the

production process, and instead directed Commerce to determine whether

circumvention occurred based on the difference in value between exports to the U.S.

and the cost of the inputs purchased from the order country. PL 100–418, Aug. 23,

1988, 102 Stat 1107 at § 1321 (1988 Statute).  Congress recognized that the

"mechanical, quantitative approach" of the 1988 Statute failed to address scenarios

when minor assembly is done in a third country, but the difference in value between

the value of inputs and the value of the eventual export is not small.  SAA at 893.

The enactment of 19 U.S.C. § 1677j(b)(2)(A)-(D) resolved the issue.  Accordingly, the

shift away from a "mechanical, quantitative approach," is not even directed to the

current 19 U.S.C. § 1677j(b)(2)(E).

### D. Commerce's Analysis of the Investment Prong Was Lawful

1. The statute directs Commerce to consider the level of investment in

the foreign country.  19 U.S.C. § 1677j(b)(2)(A).  Commerce evaluated the level of

investment in Cambodia for BYD pursuant to the statute by comparing the total

initial startup cost of BYD's affiliated Chinese producer to BYD's own investments

in Cambodia.  BYD Prelim. Appx116.  Commerce found that BYD had no

investment in Cambodia, and therefore that BYD's investment in Cambodia was

minor compared to its affiliated Chinese producer, which did have initial startup

costs.  *Id.*  Commerce's determination is supported by substantial evidence and

consistent with the statute.

BYD further asserts that Commerce erred by evaluating the level of investment

on an absolute, rather than a per-unit, basis because Commerce "failed to take into

account the vastly smaller market served by the Cambodian operations as compared to

{BYD}'s Chinese affiliates."  BYD Br. at 51.  BYD's distinction is irrelevant because,

even if Commerce were to account for the alleged "vastly smaller market" of BYD's

Cambodian operation, BYD's total investment in Cambodia would still be *zero*. BYD

fails to explain how, regardless of calculation methodology, the level of investment for

a producer with no investment could be considered anything but minor.

And even if BYD had had investment in Cambodia, Commerce correctly found

that a per-unit comparison was unwarranted. Commerce explained that comparison

on a per-unit basis does not account for the threshold investments necessary to

achieve production of solar ingots and wafers. Appx301. A per-unit basis also fails to

account for the economies of scale realized in the Chinese market as a result of

China's dominance of solar supply chains. *Id.* at 301-02. In other words, the fact that

Chinese solar producers dominate global supply chains–which means that those

producers are more likely to have high levels of initial investment in absolute terms–

should be reflected in Commerce's analysis, not disregarded.

The fact that absolute levels of investment in Cambodia are lower than those in

China is not distortive but is consistent with Commerce's determination to apply the

section 1677j(b)(2) factors in a manner that accounts for the upstream affiliates of

third-country producers. Appx308. And because the statute does not speak to how

Commerce should compare levels of investment, and because Commerce's

determination to compare investment on an absolute basis is well-explained and

supported by the record, BYD's argument is unpersuasive. *See Al Ghurair I*, 536 F.

Supp. 3d at 1370) (explaining that "{t}he statute does not provide for a specific

minimum or maximum level of investment to qualify as minor or insignificant, so

Commerce has the discretion to adapt to different factual circumstances to address

circumvention.").

### E. Commerce's Exclusion of Tollers' Information Was Lawful

BYD contends that Commerce should have considered its tollers' information

in evaluating the level of investment and extent of production facilities. Commerce

compared BYD's production facilities in Cambodia to those of its Chinese affiliate in

evaluating the investment, R&D, and production facilities factors (19 U.S.C. §

1677j(b)(2)(A), (B), and (D)). Appx142-43; Appx116-17. In doing so, Commerce

considered the level of investment and production facilities by BYD and did not

consider the activities of BYD's unaffiliated tollers. Appx333-335. And because

BYD did not incur any investment or maintain any production facilities in Cambodia,

Commerce found that each of those factors supported a finding that the production

process in Cambodia was minor or insignificant. *Id.* at 344-350

Commerce's determination reflects the nature of the circumventing behavior

originally alleged by the US domestic industry party (Auxin) and investigated by

Commerce. Commerce explained that the particular circumvention scenario alleged

by Auxin involved third country (Cambodian) companies relying on affiliated Chinese

input suppliers to evade the *Solar Orders*. Appx308-309. BYD has no production

operations, R&D, or manufacturing equipment of its own in Cambodia. *Id.* at 334;

115. BYD also procures inputs, including solar wafers, from its Chinese affiliate.

Appx140.  It then acquires tolling (and other) services for the purpose of manufacturing solar products for export by BYD.  Appx115.

BYD purchases solar inputs from its Chinese affiliate and oversees the production of solar cells and modules from its wafers before exporting finished merchandise to the United States.  BYD's behavior is therefore reflective of the sort of circumventing behavior alleged by Auxin, in which Chinese solar producers spin off solar cell and module production to third countries.

In considering that fact pattern, Commerce determined to evaluate the section 1677j(b)(2) factors using a "comparative approach that accounts for the production activities of the upstream affiliates of the third country producers."  Appx308.  BYD's tollers are *not affiliated* with BYD and its Chinese input supplier, so it would have been inconsistent with Commerce's methodological approach to consider the tollers' information in its analysis.  And because BYD's tollers are unaffiliated with BYD or BYD's Chinese affiliate, their level of investment, R&D expenses, and production facilities are ultimately unrepresentative of whether BYD, as one of the two largest exporters of solar cells from Cambodia, circumvented the *Solar Orders*.  Appx5119.

The CIT held, though, that Commerce erred by factoring the ownership of BYD's tollers into the determination whether the processing in Cambodia  was minor or insignificant, stating that Commerce cannot consider affiliations during the (b)(1)(C) five-factor stage.  Appx24-25.  The CIT found that this was an error, but a harmless one.  *See* Appx25-25.  BYD disagrees, contending that this was prejudicial

error because it undermines Commerce's factual findings and emphasis on R&D. *See* BYD at 21-22. However, Commerce committed no error in analyzing the affiliation relationships.[3]

The CIT determined that the statute created an "if/then" analysis, where "if" Commerce finds section 1677j(b)(1) satisfied (i.e. circumvention of the order), "then" Commerce considers the section 1677j(b)(3) factors to determine if the order need be expanded to encompass the circumventing merchandise. *See* Appx20. While we agree that section 1677j(b)(1) contains an "if/then" condition, we respectfully disagree with the CIT's holding that it was a legal error for Commerce to consider affiliation concurrently with the section 1677j(b)(2) factors.

Specifically, section 1677j(b)(1) states that, "[i]f" Commerce finds that each (A)-(E) factor is met, Commerce "may include such imported merchandise within the scope of such order or finding." 19 U.S.C. § 1677j(b)(1). Or, in other words, if Commerce finds that circumvention is occurring and taking action is appropriate, then Commerce may include the circumventing good within scope of the orders. *Id.* Separately, the statute provides that Commerce "shall take into account" the 1677j(b)(3) factors "[i]n determining whether to include merchandise . . . or finding

---

[3] Contrary to BYD's contention, BYD Br. at 22 n1. There was no need for the United States to appeal this error finding because judgment was entered for the United States, and this Court may affirm on any ground. *See Droplets, Inc. v. E*TRADE Bank*, 887 F.3d 1309, 1322 (Fed. Cir. 2018*)* ("we have said that a cross-appeal is only proper when acceptance of the argument advanced would result in a reversal or modification of the judgment rather than an affirmance.") (cleaned up).

under paragraph (1)." *Id.* And as part of the "finding under paragraph (1),"

Commerce considers whether processing was "minor or insignificant." *See id.*

§ 1677j(b)(1).

It is clear that Commerce must consider the section 1677j(b)(3) factors when

making a circumvention determination. *See id.* § 1677j(b)(3). However, nothing in the

statute plainly states that Commerce shall not consider these factors in conjunction

with other steps in the circumvention analysis—even this Court has previously

analyzed section 1677j(b)(2) and (b)(3) factors concurrently. *See Al Ghurair II*, 65

F.4th at 1358-62 (analyzing section 1677j(b)(2) and 1677j(b)(3) factors together to

determine whether the factors "evidence[] circumvention."). Given that Congress

intended for Commerce to consider the "particular circumvention scenario," SAA at

893, in evaluating the minor or insignificant factors, it would be bizarre for Congress

to have arbitrarily limited the information Commerce could consider in its

determination. Instead, this instruction suggests that the discretionary paragraph

1677j(b)(3) factors—which include trade patterns as well—can guide Commerce's

overall minor or insignificant determination. *See Syneren Technologies Corp. v. United

States*, 166 F.4th 1040, 1044 (Fed. Cir. 2026) ("Here, the proper inquiry is whether any

statute or regulation prohibits the unilateral use"); *Tyler Constr. Grp. v. United States*, 570

F.3d 1329, 1333 (Fed. Cir. 2009) ("[T]he proper inquiry is not whether the FAR

authorizes the use . . ., but whether there is any statutory or regulatory provision that

precludes such use."); *see also Government of Quebec*, 105 F.4th at 1374. Absent explicit

congressional guidance otherwise, Commerce's reasonable methodology should stand. *Al Ghurair Iron & Steel LLC v. United States (Al Ghurair I)*, 536 F. Supp. 3d. 1357, 1374 (Ct. Int'l Trade 2021).

Even assuming the Court of International Trade was correct, the error would be harmless, as it also held. *See* Appx21. Commerce provided many other reasons why negative section 1677j(b)(2) findings deserved less weight, including that all of the production machinery and high-tech inputs were produced in China. Appx334; *see Al Ghurarir II*, 65 F.4th at 1363 ("Commerce's finding . . . was supported by many findings other than its [erroneous] calculation of [the plaintiff's] value added."); *Hanon Systems Alabama*, 794 F. Supp. 3d at 1364 ("Rather, this court has repeatedly sustained circumvention analyses by Commerce where two or fewer of the five statutory factors supported a circumvention finding).

## III. Commerce's Use of Surrogate Values Is Entirely Consistent with the Tariff Scheme

To find circumvention, Commerce must determine that "the value of the merchandise produced in the foreign country to which the antidumping duty order applies is a significant portion of the total value of the merchandise exported to the United States." 19 U.S.C. § 1677j(b)(1)(D). Here, Commerce used Malaysian prices as surrogate values for Chinese inputs (with the exception of solar glass, for which Commerce used Romanian prices). Appx137.

This is consistent with its broader non-market economy (NME)

methodology. China is a nonmarket economy country. Under 19 U.S.C.

§ 1677(18), "nonmarket economy country" "means any foreign country that

{Commerce} determines does not operate on market principles of cost or pricing

structures." And, for the purposes of 19 U.S.C. § 1677j(b)(1)(D), Commerce

considers "value" to mean the cost of the input. As a result, Commerce turned to

the text of 19 U.S.C. § 1677b(f)(1), which permits Commerce to use surrogate

values to determine the cost of inputs in antidumping proceedings. Appx327-28.

Commerce, finding its NME practice in antidumping proceedings to be relevant for

the purposes of circumvention inquiries, used surrogate values to calculate the

value of Chinese inputs as a proportion of the overall price of BYD's exports. *Id.*

Using surrogate values to calculate the value of Chinese inputs makes perfect

sense. By definition, nonmarket economy "prices" are not market based. 19 U.S.C. §

1677(18). And BYD merely took its affiliates' nonmarket inputs, hired Cambodian

companies to conduct finishing operations, and then set market-based export prices

from Cambodia to the United States for the subject merchandise. To use Chinese

input prices based on *non-market principles* to determine what proportion of the United

States *market price* was derived from Chinese production would be irrational. Given

this elemental understanding, Commerce's determination is consistent with the statute

and this Court's teaching. *Al Ghurair I*, 536 F. Supp. 3d. at 1378; *U.K. Carbon and

Graphite Co., Ltd. v. United States*, 931 F. Supp. 2d 1322 (Ct. Int'l Trade 2013).

BYD nevertheless contends that Commerce should not have used surrogate values for the proportion of the value of finished merchandise produced in China. BYD Br. at 53. BYD's only support is the fact that Cambodia is a market-economy country. But the statute directs Commerce to calculate the value of merchandise produced in "the foreign country to which the antidumping duty order applies," 19 U.S.C. § 1677j(b)(1)(D), which is China, not Cambodia. China is a non-market economy country, therefore, Commerce properly used a surrogate value methodology that it normally applies with respect to non-market economy countries to carry out that calculation, particularly when the statute does not define the term "value" and does not direct Commerce how to carry out its calculation. *Al Ghurair I*, 536 F. Supp. 3d. at 1378. The Court should therefore follow its precedent and sustain Commerce's determination to calculate the value of production in China using surrogate values.

## CONCLUSION

For these reasons, the Court of International Trade's judgment should be affirmed.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

PATRICIA M. McCARTHY
  *Director*

*Of Counsel:*

SAPNA SHARMA
  *Office of the Chief Counsel for*
  *Trade and Enforcement Compliance*
  *U.S. Department of Commerce*

<u>/s/ *Claudia Burke*</u>
CLAUDIA BURKE
  *Deputy Director*
  *Assistant Director*
  *Commercial Litigation Branch*
  *Civil Division*
  *U.S. Department of Justice*
  *P.O. Box 480, Ben Franklin Station*
  *Washington, DC 20044*
  *(202) 353-9063*
  *Claudia.burke@usdoj.gov*

March 13, 2026

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 8440 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

/s/ Claudia Burke
[CLAUDIA BURKE]